Pal Lengyel-Leahu  CA SBN147153
360 East 1st Street #609
Tustin, CA  92780
Attorney for Defendant
Nader Elhuzayel
714-497-6813
plitigate@aol.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. : 15-00060-DOC(A) |
| Plaintiff, | DEFENDANT'S MOTION TO DISMISS INDICTMENT Counts 1 and 2<br>RULE 12 |
| vs. | |
| NADER SALEM ELHUZAYEL and MUHANAD ELFATIH M. A. BADAWI, | |
| Defendants. | |

      The above defendant, Nader Elhuzayel, by and through undersigned counsel, and in accordance with Rule 12 (b), and the teaching and invitation of Holder v. Humanitarian Law Project, 561 U.S. 1, 18 (2010), moves for an Order dismissing Counts 1 and 2. The terrorism statute violates these defendants' First Amendment protections. It is void for vagueness as applied.

      Our grounds are these:

1. This motion pertains to the terrorism charges: Count 1 alleges a conspiracy "to provide material support and resources, including personnel, as that term is defined in Title 18, United States Code, Sec. 2339A(b)(1), to a foreign terrorist organization, namely, Islamic State in Iraq and the Levant . . ." ; an alleged attempt to provide the same material support, lodged against Defendants and Count 2 involves the attempt to consummate the act of providing material support to a foreign terrorist organization.

2. The terrorism charges involve three related statutory provisions. The material support provision is found in 18 U.S.C. 2339A(b)(1). The defendant must know that ISIL is a designated foreign terrorist organization as defined in 18 U.S.C. 2339B(g)(6); there is a related scienter requirement that the defendants know that the organization had engaged in terrorist activity and terrorism. 18 U.S.C. 2339B(a)(1).

The statute also recognizes the concerns raised here. 18 U.S.C. 2339B(i) provides that "[n]othing in this section shall be construed or applied as to abridge the exercise of rights guaranteed under the First Amendment of the Constitution."

3. The Fifth Amendment provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." The Supreme Court's "cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standard-less that it invites arbitrary enforcement." Johnson v. United States, 135 S.Ct. 2551, 2556 (2015) (citing Kolender v. Lawson, 461 U.S. 352, 357-58 1983)). A defense vagueness challenge may be made both the elements of the crime and the statutes establishing the penalty. Id. at 2557 (citing United States v. Batchelder, 442 U.S. 114, 123 (1979)).

4. In Johnson, our High Court emphasized that if a criminal statute features an "indeterminacy" a defendant may not be not given a fair notice of the charge. Id. at 2557. "Indeterminacy" describes the word "shapeless." Id. at 2560. Words matter, and these two, if present, suggest the underlying statute may be applied arbitrarily, due process considerations implicated. Id. at 2557.

5. The First Amendment provides that "Congress shall make no law ...abridging the freedom of speech." The First Amendment "protects speech and the speaker, and the ideas that flow from each." Citizens United v. Federal Election Commission, 130 S.Ct. 876, 899 (2009). To that preferred end, the Amendment "stands against attempts to disfavor certain subjects or viewpoints." Id. "If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech." Id. at 904.

That's why blanket prohibitions on membership in organizations, even if nefarious, are unconstitutional under the First Amendment. Scales v. United States, 367 U.S. 203, 229 (1961); Elfrandt v. Russell, 384 U.S. 11, 16 (1966).

6. A defense void-for-vagueness as applied claim finds a more tangible resonance when the First Amendment is implicated. The Supreme Court has cautioned against the possibility of "brooding governmental power," a power that "cannot be reconciled with confidence and stability in civil discourse that the First Amendment must secure." Citizens United, 130 S.Ct. at 904. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." Id. at 904 (quoting Buckley v. Valeo, 424 U.S. 1, 48-49 (1976)).

Today's internet world has altered what once were ordinary avenues of expression. Most the cases were written without the internet in mind. Even so, "[r]apid changes in technology –

and the creative dynamic inherent in the concept of free expression – counsel against upholding a law that restricts political speech in certain media or by certain speakers." Id. at 913. In whatever medium, then, "[t]he First Amendment confirms the freedom to think for ourselves." Id. at 908. Humanitarian Law Project, 561 U.S. 1, 130 S.Ct. 2705, 2719 (2010)(quoting Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982)).

    9. Holder featured a constitutional challenge to 18 U.S.C. 2339B. The opinion upheld the statute on a facial challenge, but left open the filing of motions like this one. "Of course," the Supreme Court counseled, "the scope of the material-support statute may not be clear in every application." Id. at 2720. "We do not, however, address the resolution of more difficult cases that may arise under the statute in the future." Id. at 2712.

    For emphasis, the Court added this telling sentence: "All this is not to say that any future applications of the material-support statute to speech or advocacy will survive First Amendment scrutiny." Id. at 2730. This motion addresses "future applications," what the High Court anticipated.

    The Holder opinion provides a roadmap of why this motion has merit, in five parts.

    Because 1) "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals and objectives [are] not considered to be working under the foreign terrorist organization's direction and control." Id. At 2721 (quoting Sec. 2339B(h)).

    Because 2) under the material-support statute, defendants still "may say anything they wish on any topic." In Holder, the government agreed that "the statue does not prohibit independent advocacy or expression of any kind." Id. At 2723 (quoting Brief for Government 13).

Because 3) even a defendant's communication with a terrorist group, direct or otherwise, is not prohibited, unless what is conveyed involves a "specific skill" or "specialized knowledge." Id. at 2724. A knowledge and skill set not shared by those recently graduated from El Modeno High School. Terror classes are not in the curriculum.

Because 4) "the statute [does not] prohibit an individual from associating with a terrorist group, or promoting its political goals." Id. at 2730. The statute prohibits instead is "the act of giving material support." Id. (citation omitted).

And because 5) when a valid First Amendment claim is raised, it is this "court's own obligation to secure the protection that the Constitution grants to individuals," even in the terrorism context. Id. at 2728.

10. In cases decided before and after Holder and Citizens United, the Supreme Court has permitted a defendant to advocate with near impunity on almost any topic, including thoughts of violence. A recent First Amendment decision in the criminal arena is Elonis v. United States, decided June 1, 2015. One Mr. Elonis, described as "an active user of the social networking Web site Facebook," made a habit of writing entries which "included graphically violent language and imagery." 135 S.Ct. 2001, 2004 (2015). In one message, Mr. Elonis referenced the threat of blowing up a bridge, the hoped-for sound of "Boom, Boom, Boom." Id. at 2007.

In a sample photograph, Mr. Elonis is seen "holding a toy knife against his co-worker's neck," featuring the caption, "I wish." Id.

The Supreme Court described his posts as "crude, degrading," containing "violent material about his soon-to-be ex-wife." Id. at 2004. Local law enforcement authorities became alarmed. After an investigation, Mr. Elonis was charged with making threats to, among others, his wife.

At trial, Mr. Elonis "requested a jury instruction that 'the government must prove that he intended to communicate a true threat,'" which was denied. Id. At 2007 (emphasis added). "My writing is therapeutic," was his claim to the jury. Id. at 2006.

Elonis opines that a defendant's statements indicating the potential for violence, the yearning to kill, the use of means of manner and means to do so, the targeting of innocent individuals (re: his spouse) may be unreasonable but not necessarily criminal.

In one sense, Elonis is a jury instruction case. After a lengthy discussion as to quantum of proof required, the Supreme Court determined that Mr. Elonis's intent had to be far more than what "a reasonable person" would have understood his thought process to be. Id. at 2011. Under that standard, the defendant could be convicted without any "awareness of some wrongdoing." Id. (quoting Staples v. United States, 511 U.S. at 606, 607 (1994)). The government's suggested instruction – whether "a reasonable person would have recognized that the poses would be read as genuine threats," was cast aside, construed as a mere "negligence standard" inconsistent with the criminal intent required by a felony statute. Id. At 2011.

In another sense, Elonis is a freedom of speech case, suggesting that the First Amendment protections should be considered in evaluating the criminal intent required. Id. at 2005. Mr. Elonis could say the things he did if he didn't mean or intend any actual harm. And here again, the harm must be "actual" not hypothetical or conditional.

11. A similar result appears in Snyder v. Phelps, 562 U.S. 443, 131 S.Ct. 1207 (2011), where the question was whether an individual could picket military funerals. "Marine Lance Corporal Matthew Snyder was killed in Iraq in the line of duty." 131 S.Ct. at 1213. His funeral was to be at a Catholic Church in Westminster, Maryland, noticed in the local newspapers. Id. All the way from Topeka Kansas traveled Albert Phelps along with "two of his daughters and

four of his grandchildren." Arriving just in time to hold up the following signs: "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Thank God for Dead Solders," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," "You're Going to Hell," and "God Hates You." Id. These placards, opined the Court, "reflected the church's view that the United States is overly tolerant of sin and that God kills American soldiers as punishment." Id. at 1213.

Mr. Snyder's father sued Phelps, his family members and the demonstration's apparent sponsor, the Westboro Baptist Church, for defamation, intrusion upon seclusion, and intentional infliction of emotional distress, among other torts. A jury awarded 2.9 million in compensatory damages, eight million more in punitive.

The defendants claimed a First Amendment protected right to picket, no matter how offensive the signs were to the dead soldier's family. The Supreme Court agreed the messages were "particularly hurtful to many," Id. at 1218, and accentuated Mr. Phelps' fathers' "already incalculable grief," Id.   But since the speech occurred in a public place, it was entitled to "special protection," even if the signs were "outrageous." Id. at 1219. A subjective dislike for content can never be the test for a tort or punishment. The last paragraph in Phelps:

Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and – as it did here – inflict great pain.  On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course – to protect even hurtful speech on public issues to ensure that we do not stifle public debate. That choice requires that we shield Westboro from tort liability for its picketing in this case.  Id. at 1220.

12. The result in Snyder was predictable. Over thirty-years ago, in Smith v. Collin, 439 U.S. 916 (1978), the setting was Skokie, Illinois, a suburb of Chicago with 70,000 residents the

majority of whom were Jewish and one out of every six was a Holocaust survivor. There, the National Socialist Party of America was permitted to assemble and march "wearing uniforms with swastikas," the Nazi symbol prominently displayed as symbolic political speech intended to convey to the public the beliefs of those who display it.

The High Court discerned the march in Skokie to be "potentially explosive and dangerous, inflamed by unforgettable recollections of traumatic experiences in the Second World War conflict." Id. At 918. For the demonstration was "taunting and overwhelmingly offensive to the citizens [of Skokie]," yet permitted on First Amendment grounds. The High Court went so far as to recognize that, for some Judges, a "need to apologize for the result." Id (quoting 578 F.2d 1197, 1121 (7th Cir. 1978)).

13. The prosecution impacts the defendants' First Amendment rights by arbitrarily applying the term "personnel" under the statute. The Indictment "reaches too far," Citizens United, 130 S.Ct. at 932. In 2004, Congress amended Sec. 2339B, limiting the definition of "personnel" to an individual who "[work]s under that terrorist organization's direction or control or . . . Organize[s], manage[s], supervi[s], or other direct[s] the operation of that organization." 18 U.S.C. 2339B(h). The statute is written with a key caveat: it carves out the conduct of "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives." Id.

14. In Holder, the as-applied First Amendment challenge was rejected. The complaining parties in that case sought to "train" and provide "expert advice" to a designated terrorist organization; they possessed by their own admission a "specialized knowledge." Id. at 2721. Their questioned conduct fit the statute's requirement. Accord United States v. Farhane, 634 F.3d 127 (2nd Cir. 2011)(physician who swore oath of allegiance to Al Qaeda and who offered

to "serve as an on-call doctor for the organization, standing ready to treat wounded mujahideen in Saudi Arabia"); United States v. Shah, 474 F. Supp. 2d 492, 498-99 (S.D.N.Y. 2007)(defendant "volunteered as a medic for the al Qaeda military"); Lindh, 212 F. Supp. 2d at 549 (defendant received combat training and served an an al Qaeda combat unit); United States v. Goba, 220 F. Supp. 2d 182, 193-194 (W.D.N.Y. 2002)(same).

The key distinction made in Holder, as there should be here, was between "active" and "nominal" membership. Holder does not interpret the First Amendment as a kind of lazy muzzle for if a defendant's interest in ISIS is "independent" of that organization and not a joinder with it, the terrorism statute does not apply. Id. at 2721; 18 U.S.C. 2339(B)(h). Merely writing about an organization in e-mails texts, or voicing an interest on a clandestinely recorded tape, or narrating a selfie, does not suffice. Id. at 2722-23. Holder opines that if the defendants' knowledge of the terror organization is only "general or unspecialized" and the individual in turn conveys that knowledge in abstract terms or yearnings, there is no crime, either. Id. at 2724.

15. The First Amendment Establishment Clause prohibits the governmental diminution of religious practice and belief. Hernandez v. C.R.I., 490 U.S. 680, 699 (1989). There are "very broad protection[s]" in federal law for the exercise of "religious liberty." Holt v. Hobbs, 135 S.Ct. 853, 859 (2015)(quoting Burwell v. Hobby Lobby Stores, Inc., 134 S.Ct. 2751 (2014)).

The Defendants' motivations recognized the religious obligation to assist Muslims in need, a collective desire to associate and travel to the Mideast for reasons of faith.

Even if that belief does not "squarely fit" within the divergent doctrines of Islam, it nonetheless may be "sincerely held," reflecting a First Amendment protected expression. See United States v. Ali, 682 F.3d 705, 710 (8th Cir. 2012).

16. The word "personnel" has been defined to include "employees or employee-like operatives who serve the designated group and work at its command." Lindh, 212 F. Supp. 2d. at 572. No evidence exists of personal payments, the status quo of a knowing, clandestine operative.

The advent of the internet, 24/7 access, and the near constant communication has changed the landscape of our social fabric, if not how the law should work going forward. The ISIS YouTube tapes are everywhere, and can be seen without caution.

The ennui of the electronic youth does not provide "fair notice of what is prohibited." Holder, 561 U.S. at 27 (quoting United States v. Williams, 553 U.S. 285, 304 (2008)).

Indeed the "[r]apid changes in technology" inundate this case. Citizens United, 130 S.Ct. at 913. The former understanding that a friend is someone with whom a person shares a personal relationship of mutual respect and affection has been replaced by Facebook where you can have thousands of profiles that have clicked an icon declaring they "like" or "friend", including those who say they are linked with ISIS but may not be. And if some are, that isn't a crime. Holder, 130 S.Ct. at 2721. The word friend has itself become a verb that attaches none of the former emphasis of any actual relationship, affection or even agreement.

17. The central problem this prosecution is how to distinguish protected speech and religious association from criminal conduct. On our facts that fine line, to use Johnson's phrasing, has become a "shapeless indeterminacy" 135 S.Ct. at 2557, 2560 subject to arbitrary application.

18. Without the protections sought in this motion, all Constitutionally protected speech and associations are in jeopardy of becoming the basis of criminal prosecution should the government declare that the ideas themselves are abhorrent or the group despicable.

19. The entire prosecution is built upon the notion that someone can be indicted, tried and convicted for advocating his or her support for a foreign organization, whether or not that organization is listed as a foreign terrorist organization, and when their only overt act was to buy a ticket.

Counts 1 and 2 should be dismissed.

RESPECTFULLY SUBMITTED,

DATED : 13 March 2016

*/s/ Pal A. Lengyel-Leahu*
_____
PAL A. LENGYEL-LEAHU
ATTORNEY FOR DEFENDANT, NADER ELHUZAYEL