Pal Lengyel-Leahu  CA SBN147153
360 East 1st Street #609
Tustin, CA  92780
Attorney for Defendant
Nader Salem Elhuzayel
714-497-6813
plitigate@aol.com

PAL A. LENGYEL-LEAHU
360 East First Street #609
Tustin, CA 92780
Phone: 714-497-6813

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SANTA ANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>        vs.<br><br>NADER SALEM ELHUZAYEL AND<br><br>MUHUNAD BADAWI,<br><br>                              Defendants. | Case No.:  8:15-cr-00060-DOC<br><br>**DEFENDANT'S SENTENCING**<br><br>**MEMORANDUM**<br><br>Hearing Date: September 29, 2016<br><br>Time: 8:00 a.m.<br><br>Department: 9 |

        The Presentence Investigation Report provides a detailed history of the case before the court and the defendant Nader Elhuzayel. Probation calculated the defendant's sentencing guideline range as 40 with a category VI for criminal history with a recommendation of 360 months to life imprisonment and restitution of $3,376.14. This paper and accompanying letters of

1

support and exhibits offer grounds for the court's consideration of a further downward adjustment based upon the mitigation factors before the Court.

## THE DEFENDANT

**The History and Characteristics of the Defendant.**

In United States v. Booker, 543 U.S. 220, 245 (Jan. 12, 2005), the Supreme Court held that the sentencing guidelines are advisory only, not mandatory.  The other factors set forth in 18 U.S.C. § 3555 (a) must also be considered in fashioning the appropriate sentence. See United States v. Ameline, 400 F.3d 646, 655-656 (9th Cir. Feb. 9, 2005) (advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence").

These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for law and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant; to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, the need to avoid unwarranted sentencing disparities, and to provide restitution to the victims.

The district court may now consider even those mitigating factors that the advisory guidelines prohibit:  e.g., poverty, racial discrimination and humiliation, drug abuse and addiction, dysfunctional family background, lack of guidance as a youth, etc. Ameline; United States v. Ranum, 353 F.Supp.2d 984 (E.D. Wisc. Jan. 19, 2005) ("The guidelines' prohibition of considering these factors cannot be squared with the Section 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant'); U.S. v. Myers  353 F.Supp.2d 1026 (S.D.Iowa,2005) ("The guidelines prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the

PAL A. LENGYEL-LEAHU
360 East First Street #609
Tustin, CA 92780
Phone: 714-497-6813

PAL A. LENGYEL-LEAHU
360 East First Street #609
Tustin, CA 92780
Phone: 714-497-6813

1  defendant....Thus, in cases in which a defendant's history and character are positive, consideration

2  of all of the § 3553(a) factors might call for a sentence outside the guideline range")   See also 18

3  U.S.C. § 3661( "no limitation shall be placed on the information concerning the background,

4  character, and conduct of a person convicted of an offense which a court of the United States may

5  receive and consider for the purpose of imposing an appropriate sentence." Consider also that

6  Congress had directed that the district court "shall impose a sentence sufficient, but not greater

7  than necessary, to comply with [the purposes of sentencing]" (emphasis added). 18 U.S.C. §

8  3553(a).  This is the "primary directive" of the sentencing statute.

9

10      Remember also that The Supreme Court said in Koon v. U.S., 518 U.S. 81, 113 (1996),

11  that "[i]t  has been uniform and constant in the federal judicial tradition for the sentencing judge to

12  consider every convicted person as an individual and every case as a unique study in the human

13  failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

14  Even before Booker, the Sentencing Guidelines "place[d] essentially no limit on the number of

15  potential factors that may warrant a departure."  Koon 518 U.S. at 106; U.S.  v. Coleman, 188

16  F.3d 354, 358 (6th Cir.1999) (en banc) (there are a "potentially infinite number of factors which

17  may warrant a departure"); 18 U.S.C. §3661 ("no limitation shall be placed on the information" a

18  court can receive and consider for purposes of imposing an appropriate sentence).  A departure is

19  warranted if the case is "unusual enough for it to fall outside the heartland of cases in the

20  guidelines."  Even when the guidelines were mandatory, they did not "displace the traditional role

21  of the district court in bringing compassion and common sense to the sentencing process….In

22  areas where the Sentencing Commission has not spoken . . . district courts should not hesitate to

23  use their discretion in devising sentences that provide individualized justice."  U.S.  v. Williams,

24  65 F.3d 301, 309-310 (2d Cir. 1995);  "It is important, too, to realize that departures are an

25  important part of the sentencing process because they offer the opportunity to ameliorate, at least

26  in some aspects, the rigidity of the Guidelines themselves. District judges, therefore, need not

27

28

3

DEFENDANT'S SENTENCING MEMORANDUM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PAL A. LENGYEL-LEAHU
360 East First Street #609
Tustin, CA 92780
Phone: 714-497-6813

shrink from utilizing departures when the opportunity presents itself and when circumstances require such action to bring about a fair and reasonable sentence." U.S. v. Gaskill, 991 F.2d 82, 86 (3rd Cir. 1993). "The Guidelines are not a straightjacket for district judges." U.S. v. Cook, 938 F.2d 149, 152 (9th Cir. 1991); The Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom." U.S. v. Dominguez, 296 F.3d 192, 196 n. 7 (3rd Cir. 2002) (quoting U.S. v. Johnson, 964 F.2d 124, 125 (2d Cir.1992)); ." U.S. v. Blarek II, 7 F.Supp. 2d 192, 211 (EDNY 1998) ("To impose the harsh sentence suggested by Probation and the government under the Guidelines without appropriate downward departures would amount to an act of needless cruelty given the nature of the crimes committed and the personal circumstances of these defendants"). Finally, remember that "[i]f the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm." U.S. v. Myers, 353 F.Supp.2d 1026, 1027 (S.D.Iowa Jan. 26, 2005)

Nader Elhuzayel appears to the court as a man of deep confusion, longing to find an identity for himself. In search of a great purpose to life, he found religion, which provided only an illusion of purpose.

Mr. Elhuzayel was born in Anaheim, California to two parents who are of Palestinian origin. His family was not religious. The family briefly lived in Rahat, Israel, where they have a residence. Although Mr. Elhuzayel had parents whose native language was Arabic, he was never taught it. While in the third grade in Israel, he was subjected to mockery for his lack of understanding both Arabic and Hebrew. Soon his family moved back to Anaheim, California. Here too, he felt out of place and insolated himself as a defense mechanism from mockery.

His parents were adamant that he needed do well in school; however, there were many bullies that bullied Mr. Elhuzayel, causing him to hate going to school. His brother, Ausama, who is the only one in family who is a devote Muslim, convinced his parents to send Mr. Elhuzayel to Muslim California Science Academy, so that he could be with other Muslims. At first Mr.

4

Elhuzayel was very excited to finally "fit in," but he never was able to. Many students did not to appear to be religious as Mr. Elhuzayel. Feeling out of place, he asked his parents to enroll him public school, but it never happened. As a result, he ran away from school for a day or two. He graduated from the academy and enrolled in the American Career College ("ACC").

At ACC he studied medical billing and coding. He earned his certificate, but did not pursue employment in that field. He then enrolled in a local community college to study general education.

On August 1, 2013, like thousands of other Americans, his family home was foreclosed. Mr. Elhuzayel was very upset and did not want to leave; however, the family was eventually forcibly evicted and arrested. Because his family finances were not good, they lived in a motel. During this time, Mr. Elhzuayel worked as a gardener.

While in community college, he met Muhunad Badawi.  Mr. Badawi was the only person whom Mr. Elhuzayel was close to. Mr. Badawi helped to educate Mr. Elhuzayel in the basic tenets of Islam and encouraged him when he felt like leaving the faith. During this time, Mr. Badawi taught Mr. Elhuzayel about jihad and the importance of a Caliphate to be formed. Mr. Elhuzayel began to believe these beliefs and started to closely follow the Islamic State of Syria and Iraq ("ISIS"). He also began to advocate for the beliefs of ISIS.

Mr. Elhuzayel began to follow ISIS on social media—namely on Twitter. He made numerous accounts, which he daily re-tweeted other tweets from fellow supporters. He also had numerous conversations with Mr. Badawi about the rise of the Islamic State as declared by Abu Bakr al-Badgdadi. His devotion to his religion and the establishment of the Islamic State gave him a sense of identity and purpose.

Around May 2014, Mr. Elhuzayel met Ennis Taub  online. Both of them shared the same beliefs about the Islamic State and Islam. They conversed about getting married and starting a family. Mr. Elhuzayel told her that his family owned property in Beersheba, Israel and he would

PAL A. LENGYEL-LEAHU
360 East First Street #609
Tustin, CA 92780
Phone: 714-497-6813

like to meet her in Tel Aviv, Israel to get married. This was the first time Mr. Elhuzayel had ever been close with a woman.

Between April to May 21, 2015, Mr. Elhzuyel and Mr. Badawi talked about going to the Middle East. Both of them talked about joining the struggle to establish an Islamic State, which the establishment and fight for the Caliphate is a historical belief in their religion. They both devised a plan that Mr. Elhuzayel would travel to Tel Aviv, Israel to get married to Ennis Taub.

On May 21, 2015, Mr. Elhuzayel was arrested and interrogated at Los Angeles Airport ("LAX") before he boarded his flight to Tel Aviv, Israel. Mr. Elhuzayel told the federal agents that he wanted to go to Tel Aviv, Israel to get married. However, it was not until the federal agents threatened to arrest Mr. Elhuzayel's family and fiancée that he changed his story to joining ISIS from Turkey. It was this story that the federal agents capitalized on. Mr. Elhuzayel's possessions at the airport included: Israeli passport, Israeli identification card, America passport, two suits, multiple shoes including dress shoes, honey, and casual clothes. His luggage was also checked to Tel Aviv, Israel.

It is also worth noting that the Islamic State was not designated as a foreign terrorist organization until September 29, 2015. That was four months after Mr. Elhuzayel was arrested. Lastly, Mr. Elhuzayel never threatened to harm anyone—the only exception was self-defense—, commit terrorist acts in the United States or elsewhere, or rape women and children. His motivation to help establish an Islamic State was solely based on his belief that the establishment of the Islamic State was fulfillments of Islamic prophesy in the Koran.

In summary, Mr. Elhuzayel is a man without a personal identity, who was drawn to his religion and drank of it until he was completely intoxicated.

**MITIGATING FACTORS**

The court should give some consideration to reduction based upon mitigating role as outlined in §3B1.2 for a defendant's minimal role in criminal activity and recommend a decrease

6

PAL A. LENGYEL-LEAHU
360 East First Street #609
Tustin, CA 92780
Phone: 714-497-6813

1  by 4 levels. Mr. Elhuzayel was minimal participant based on both direct and circumstantial

2  evidence. Direct evidence showed that his luggage contained Israeli passport and identification

3  card, two suits, numerous pairs of shoes, ticket to Tel Aviv, Israel, and conversations with Ennis

4  Taub about marriage. Circumstantial evidence showed that it was impossible for Mr. Elhuzayel to

5  join the Islamic State because all his belongings were going to Tel Aviv, Israel and contained

6  within his belongings—namely an Israeli and America passports—would cause him to be killed

7  even if he was able to make it to the Islamic State. Lastly, there was not a shred of evidence

8  provided by the government that Mr. Elhuzayel had any contacts in the Islamic State. It is

9  factually impossible to join an organization, fight for it, if the prospective member does not have

10  any contacts within the organization to give him direction and supplies.

11

12     Under *Holder v. Humanitarian Law Project,* 561 U.S. 1, 39 (2010), "the statute [18 USC

13  § 2339B] does not prohibit being a member of one of the designated groups or vigorously

14  promoting and supporting the political goals of the group…What § 2339B prohibits is the act of

15  giving material support…."

16

17                          **Disparity In Sentencing.**

18     U.S. v. Tzoc-Sierra, 387 F.3d 978  (9th Cir. 2004) (a drug case affirmed district court's

19  downward departure from range of 46-47 months to 36 months on basis of disparity of sentence

20  received by codefendants); U.S. v. Caperna, 251 F.3d 827 (9th Cir. 2001) (where a defendant was

21  a small player in large drug conspiracy, district court's downward departure to 36 months because

22  of disparity in sentence of co-defendant vacated, but on remand the district court has discretion to

23  depart downward because of disparity in sentence with other co-defendant as long as codefendant

24  convicted of same crime); U.S. v. Daas, 198 F.3d 1167 (9th Cir. 1999) (defendant argued for

25  departure based on disparity between his sentence and that of co-defendants, who turned into

26  informants, but judge said it was not an legal ground. Reversed. "Downward departure to equalize

27  sentencing disparity is a proper ground for departure under the appropriate circumstances . . .

28

7

PAL A. LENGYEL-LEAHU
360 East First Street #609
Tustin, CA 92780
Phone: 714-497-6813

Indeed, a central goal of the Sentencing Guidelines is to eliminate sentencing disparity . . . Here, the record indicates that the district court believed incorrectly that it lacked the authority to depart downward based on sentencing disparity.  Because the district court actually had this authority but mistakenly failed to exercise it to determine whether the facts here warranted departure, this court remands for findings as to whether a downward departure is appropriate."); U.S.  v. Meza, 127 F.3d 545 (7th Cir. 1997) (an unjustified disparity, one that does not result from the proper application of the guidelines, "is potentially a sentencing factor to consider" because the goal of the guidelines is of course "to reduce unjustified departures."); U.S.  v. Boshell, 952 F.2d 1101, 1106-09 (9th Cir. 1991) (downward departure from 27 to 12 years upheld on ground that guideline sentence was disproportionately long compared to the 5 to 6-year sentences impose on codefendant who had been sentenced after the Ninth Circuit held the guidelines unconstitutional but before they were upheld by the Supreme Court); U.S. v. Ray, 920 F.2d 562 (9th Cir. 1990), amended, 930 F.2d 1368, 1372-73 (9th Cir. 1991) ("disparity was said to be one of the most important evils the guidelines were intended to cure").

United States v. Galvez-Barrios, 355 F.Supp.2d 958(E.D. Wis. Feb. 2, 2005) (Adelman, J.) (post Booker, in illegal reentry case where Guideline range was 41-51 months, court imposes 24 months in part because of unwarranted disparity in sentences among § 1326 defendants in border areas); United States v. Huerta-Rodriguez, 355 F. Supp. 2d 1019(D. Neb. Feb. 1, 2005) (Bataillon, J.) (post Booker, in illegal reentry case, where guideline range was 70-87 months (57-70months after government concession), imposing sentence of 36 months in part because criminal history overrepresented and because "in other districts a similar defendant would not be prosecuted for illegal reentry, but would simply be deported");  U.S.  v. Clark, 79 F.Supp.2d 1066 (N.D.Iowa 1999) (unlike all districts, U.S.  attorney here does not give cooperating witnesses protection for incriminating statement under U.S.S.G. §1B1.8, so departure granted from 36 to 28 where eight levels were due to drugs he admitted to in his debriefing).

PAL A. LENGYEL-LEAHU
360 East First Street #609
Tustin, CA 92780
Phone: 714-497-6813

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Probation recommended 15 years of Federal prison for each charge of material support to a foreign terrorist organization for Mr. Elhuzayel. However, the recommendation is outrageous as compared to those who have been sentenced for far worse actions of material support to foreign terrorist organizations. Mr. Elhuzayel's actions are in stark contrast to the actions of the following defendants.

First, Salim Ahmed Hamdan was Osama bin Laden's personal driver was sentenced to 5.5 years in Federal prison. *See* Exhibits A and B.

Second, Ibrahim Ahmed Mahmoud al-Qosi was a head cook, provided security, and did other logistical services for an al-Qaeda compound in Afghanistan. He was sentenced to 14 years in Federal prison. *Id.*

Third, Omar Khadr pleaded guilty to murder and attempted murder in violation of the laws of war, conspiracy to commit terrorism, providing material support for terrorism, and spying. He was sentenced to 8 years in Federal prison. *Id.*

These are just a few examples from Exhibits A and B. Lastly, according to The Center of National Security at Fordham Law, the average sentence for those convicted of material support of a foreign terrorist organization is 9.2 years. *See* Exhibit F.

In regards to the bank fraud convictions, probation recommend a total of 30 years for all charges served consecutively; however, this recommendation is completely disproportionate to the evidence introduced at trial.. The following examples are from Exhibits C and D.

First, Matthew D. Spillman pleaded guilty to bank fraud and money laundering. He was sentenced to 2.5 years in prison and ordered to pay $413,904 in restitution. *See* Exhibit C and D.

Second, James Olivos pleaded guilty to bank fraud and money laundering. He was sentenced to 5 years in prison and ordered to pay $2,866,121 money judgment. *Id.*

DEFENDANT'S SENTENCING MEMORANDUM

Third, Michael R. Ussery was convicted at trial of 12 counts of bank fraud. He was sentenced to 2 years in prison and ordered to $1.2 million in restitution to the victim bank. *Id.* These are just a few examples from Exhibits C and D.

For all the foregoing reasons, Mr. Elhuzayel requests the court to consider a downward departure based upon mitigating circumstances for his sentence.


Date: September 20, 2016                              /s/_____
                                                     Pal A. Lengyel-Leahu
                                                     Attorney for Defendant


Exhibits:

A- Sentencing Chart US v. Elhuzayel

B- Sentencing Cases from 2005-2016

C- Bank Fraud Sentences Chart

D- IRS bank fraud cases reports

E- Letters of Support

F- Fordam Law report

DEFENDANT'S SENTENCING MEMORANDUM