1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4              - - - - - - -

5    UNITED STATES OF AMERICA,        )
                                       )        <u>**CERTIFIED**</u>
6              Plaintiff,              )
                                       )
7         vs.                          ) No. 8:15-CR-0060-DOC
                                       )    Item No. 2
8    1) NADER SALEM ELHUZAYEL;         )
     2) MUHANAD ELFATIH M.A. BADAWI,   )
9                                      )
               Defendants.             )
10   _____  )

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Hearing on Motions

17                Santa Ana, California

18               Thursday, May 5, 2016

19

20

21

22   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-8141

25

**DEBBIE GALE, U.S. COURT REPORTER**

1    **APPEARANCES OF COUNSEL:**

2

     FOR THE UNITED STATES OF AMERICA:

3

4        DEPARTMENT OF JUSTICE
         OFFICE OF THE UNITED STATES ATTORNEY
         Criminal Division
5        BY:  Judith A. Heinz
              Assistant United States Attorney
6        312 North Spring Street
         15th Floor
7        Los Angeles, California 90012
         213-894-7280
8        USACAC.Criminal@usdoj.gov

9        DEPARTMENT OF JUSTICE
         OFFICE OF THE UNITED STATES ATTORNEY
10       Criminal Division
         BY:  Deirdre Z. Eliot
11            Assistant United States Attorney
         411 West 4th Street
12       Suite 8000
         Santa Ana, California 92701
13       714-338-3500
         USACAC.SACriminal@usdoj.gov

14

         DEPARTMENT OF JUSTICE
15       OFFICE OF THE UNITED STATES ATTORNEY
         General Crimes Section
16       BY:  Julius J. Nam
              Assistant United States Attorney
17       312 North Spring Street
         Suite 1200
18       Los Angeles, California 90012
         213-894-4491
19       julius.nam@usdoj.gov

20

21   FOR DEFENDANT NADER SALEM ELHUZAYEL:

22       Pal A. Lengyel-Leahu *(retained)*
         LAW OFFICES OF PAL A. LENGYEL-LEAHU
23       360 East First Street
         Suite 609
24       Tustin, California 92780
         714-497-6813
25       plitigate@aol.com

1    **APPEARANCES (Continued:)**

2    FOR DEFENDANT MUHANAD ELFATIH M.A. BADAWI:

3

4            Katherine T. Corrigan *(CJA appointment)*
             CORRIGAN WELBOURN AND STOKKE APLC
             4100 Newport Place
5            Suite 550
             Newport Beach, California 92660
6            949-251-0330
             kate@cwsdefense.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2       **PROCEEDINGS**                                    **PAGE**

3       Appearances                                          5

4       Discussion re health and weight of Defendant Badawi  5

5       Discussion re Defendant Elhuzayel incident          19

6       Further discussion re defendant badawi              21

7       Defendant Badawi's FISA motion                      27

8       Argument by Mr. Lengyel-leahu                       32

9       Argument by Ms. Heinz                               34

10      Response by Ms. Corrigan                            38

11      Rebuttal by Mr. Lengyel-Leahu                       44

12      Rebuttal by Ms. Heinz                               47

13      Defendant Elhuzayel's Motions to Dismiss            57

14      Response by Ms. Heinz                               64

15      Response by Mr. Lengyel-Leahu                       67

16      Defendant Elhuzayel's Second Motion to Dismiss      78

17      Response by Ms. Heinz                               78

18

19

20

21

22

23

24

25

**DEBBIE GALE, U.S. COURT REPORTER**

|  | 1 | **SANTA ANA, CALIFORNIA, THURSDAY, MAY 5, 2016** |
|--|---|---|
|  | 2 | **Item No. 2** |
|  | 3 | (8:54 a.m.) |
| 08:54 | 4 | THE COURT:  First, I'll call the matter of |
|  | 5 | Elhuzayel and Counsel Lengyel-Leahu; and Ms. Corrigan and |
|  | 6 | Mr. Badawi. |
| 08:55 | 7 | **APPEARANCES** |
| 08:55 | 8 | MS. CORRIGAN:  Good morning, Your Honor. |
| 08:55 | 9 | THE COURT:  And the government is represented -- |
|  | 10 | although I know you, the record doesn't, so, please. |
| 08:55 | 11 | MS. HEINZ:  Good morning, Your Honor.  Judith |
|  | 12 | Heinz on behalf of the United States. |
| 08:55 | 13 | MS. ELIOT:  Good morning, Your Honor.  Deirdre |
|  | 14 | Eliot. |
| 08:55 | 15 | THE COURT:  Okay.  Thank you. |
| 08:55 | 16 | MR. NAM:  Good morning, Your Honor -- |
| 08:55 | 17 | THE COURT:  Oh, I'm sorry.  My apologies. |
| 08:55 | 18 | MR. NAM:  That's fine, Your Honor.  Julius Nam for |
|  | 19 | the United States, as well. |
| 08:55 | 20 | THE COURT:  Thank you very much.  It's a pleasure. |
| 08:55 | 21 | I want to note that the family's present.  I see |
|  | 22 | the mother, the brothers -- I don't know you personally, but |
|  | 23 | I want to thank you for your presence today. |
| 08:55 | 24 | **DISCUSSION RE HEALTH AND WEIGHT OF DEFENDANT BADAWI** |
| 08:55 | 25 | THE COURT:  Yesterday, the marshal came to me and |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | said that the records show that Mr. Badawi has decreased his |
|       | 2  | weight from 134 to 123.  I note that that was informal       |
|       | 3  | discussion.  I asked to be notified if there was a           |
|       | 4  | significant weight drop.  There's been a significant weight  |
|       | 5  | drop.                                                        |
| 08:56 | 6  | Now I'll make a note for the record that                     |
|       | 7  | Mr. Badawi looks substantially different to the Court today  |
|       | 8  | than he did on the last occasion; although, I'm not making a |
|       | 9  | record of incompetency.                                      |
| 08:56 | 10 | So let me speak to the family for a moment because           |
|       | 11 | this Court's deeply appreciative of your efforts on his      |
|       | 12 | behalf.  The prior order that I had set forth on             |
|       | 13 | December 14th ordered involuntary force-feeding.  I'm going  |
|       | 14 | to read that for a moment, and take the time so we're all on |
|       | 15 | the same page, although I know you have the order.           |
|       | 16 | *(Reading:)*                                                 |
| 08:57 | 17 | *"The Court has received reports that*                       |
|       | 18 | *Defendant Muhanad Elfatih Badawi has*                       |
|       | 19 | *recently experienced significant weight*                    |
|       | 20 | *loss while in custody.  Since being held*                   |
|       | 21 | *in custody, Mr. Badawi, at times,*                          |
|       | 22 | *refused to eat anything and at other*                       |
|       | 23 | *times ate only minimally.  He has also*                     |
|       | 24 | *only had a minimal amount of liquids*                       |
|       | 25 | *during this time.*                                          |

08:57    1      *"On December 10th and 14th, 2015, the*

        2      *Court considered testimony and evidence*

        3      *regarding Mr. Badawi's current medical*

        4      *condition while in custody at the Santa*

        5      *Ana Jail facility and at the*

        6      *Metropolitan Detention Center in*

        7      *Los Angeles.  On December 14th, 2015,*

        8      *Eliezer Ben-Shmuel, the supervising*

        9      *attorney with the Department of Justice,*

     10      *Federal Bureau of Prisons, submitted a*

     11      *proposed order requesting approval for*

     12      *Badawi to be involuntarily fed, which*

     13      *was the BOP Proposed Order, Docket 61.*

08:58   14      *"The Court bases the following order on*

     15      *both the filings from evidentiary*

     16      *hearings and representations made in the*

     17      *BOP Proposed Order.*

08:58   18      *"At these December 10 and 14th, 2015,*

     19      *hearings, MDC personnel, including the*

     20      *prison's warden, chief medical officer,*

     21      *chief psychologist, as well as the*

     22      *Federal Bureau of Prisons Medical*

     23      *Director for the Western Region, James*

     24      *Pelton, made the following*

     25      *representations to the Court:*

08:58    1              *"Upon his arrest, Mr. Badawi was*

         2              *initially held at the Santa Ana City*

         3              *Jail.  He was transferred to the*

         4              *Med- --MDC on November 23rd, 2015."*

08:58    5              *"Mr. Badawi's height is 6 feet, 4*

         6              *inches.  It was initially represented to*

         7              *the Court that Badawi was 140 or more*

         8              *pounds upon his intake at Santa Ana City*

         9              *Jail.  On November 23rd, 2015,*

        10              *Mr. Badawi weighed 118.  On*

        11              *December 10th, 2015, Badawi weighed*

        12              *110.8 pounds.  As of December 12th,*

        13              *2015, Badawi's weight had dropped to*

        14              *190.6 pounds."  (Verbatim as read.)*

08:59   15          Now that's an incomplete record because, at one

        16   time it was represented to me, in the numerous phone calls

        17   between the warden and myself, literally, over the Christmas

        18   period, through the New Years, et cetera, he dropped to

        19   105 pounds.  But that's the official record.  I'll stay with

        20   109.8, but I'll inform you:  He got as low as 105.

08:59   21              *"Since the hearing on December 10, 2015,*

        22              *Badawi has refused to drink and*

        23              *therefore became dehydrated while at*

        24              *MDC.  Badawi has also only eaten*

        25              *minimally since that hearing.  On*

1    *December 12th, 2015, Badawi was*

2    *transported to White Memorial Medical*

3    *Center for treatment for his*

4    *dehydration.  At White Memorial Medical*

5    *Center, medical professionals attempted*

6    *to give Badawi fluids through an IV, but*

7    *he ripped the IV out of his arm.*

09:00    8    *"On December 14, 2015, Dr. James Pelton*

9    *testified that the Bureau of Prisons*

10    *uses an evidentiary-based practice*

11    *guideline to determine when inmates need*

12    *to be involuntarily fed.  Specifically,*

13    *Dr. Pelton stated that involuntary*

14    *feeding is considered for individuals*

15    *with Body Mass Index of under 17.*

16    *Additionally, Dr. Pelton stated that*

17    *standard BOP protocol is to weigh three*

18    *factors in deciding whether involuntary*

19    *feeding is necessary:  The safety of the*

20    *inmate, the inmate's rights to protest,*

21    *up to the point of medical necessity,*

22    *and the safety of the institution."*

09:00    23    *"At the December 14th, 2015, (sic)*

24    *Dr. Pelton stated that Badawi's BMI is*

25    *currently under 14.  Dr. Pelton also, in*

1          *his medical opinion, recommended*

2          *involuntary feeding should occur in this*

3          *case.  Dr. Pelton based this*

4          *determination on evaluation of Badawi's*

5          *medical condition and the BOP protocol*

6          *to determine whether involuntary feeding*

7          *should occur.*

09:01   8          *"MDC officials have conveyed to the*

9          *Court that this BMI marks the defendant*

10         *as being significantly underweight and*

11         *places him in an increased risk of organ*

12         *damage, muscle loss, and damaged joints.*

13         *Further, the defendant's repeated*

14         *episodes of dehydration place him in*

15         *danger of cerebral edema, seizures,*

16         *hypovolemic shock, kidney failure, coma,*

17         *and death.*

09:01   18         *"Based on the forgoing, the Court*

19         *ordered, at the December 14th hearing,*

20         *that Badawi is to be involuntarily fed.*

09:01   21         *"It is further ordered that:*

09:01   22         *"First, if the Medical Director of the*

23         *Metropolitan Detention Center*

24         *determines, to a reasonable degree of*

25         *medical certainty, that Badawi is at*

**DEBBIE GALE, U.S. COURT REPORTER**

1          *risk of near-term death or great bodily*

2          *injury in the absence of intervention or*

3          *has become incompetent to give consent*

4          *or make medical decisions, involuntary*

5          *feeding or other life-saving measures*

6          *may continue without need of further*

7          *Court order.*

09:02   8          *"Second, all such feeding will be*

9          *undertaken in conformance with Title 28*

10         *of the Code of Federal Regulations,*

11         *sections 549.60, et seq., Federal Bureau*

12         *of Prisons Program Statement 5562.05,*

13         *Hunger Strikes and the Federal Bureau of*

14         *Prisons' Clinical Practice Guidelines*

15         *for the Medical Management of Inmates on*

16         *Hunger Strike."*

09:02   17         *"Third, per the applicable regulations*

18         *and guidelines, Mr. Badawi should be*

19         *given the opportunity to consume food*

20         *and liquids orally prior to being*

21         *involuntarily fed.*

09:03   22         *"Fourth, this order is not meant to*

23         *limit or override the exercise of sound*

24         *medical judgment by the physicians*

25         *responsible for medical care.*

09:03   1               *"Fifth, the Court will reconvene for a*

        2               *hearing on this matter on Wednesday,*

        3               *December 16th, 12:00 p.m., in the*

        4               *Courtroom 890 in the Royal Federal*

        5               *Building and the U.S. Courthouse in*

        6               *Los Angeles."  (Verbatim as read.)*

09:03   7          Now that order's still in effect.  And what you

        8    should know is much of the morning's been consumed, with you

        9    patiently waiting, while I've been talking to the captain at

       10    MDC.

09:03  11          Warden Shinn is no longer there.  He had a rich

       12    history concerning this and I think, Ms. Corrigan, that we

       13    spoke about your clients *(sic)* between Warden Shinn and

       14    myself literally every day starting in December.  I don't

       15    know if it included New Years, but it was literally on

       16    Christmas day also.  It's a delicate balance, and I'm going

       17    to seek your input and wisdom in just a moment.

09:04  18          First, you heard a lot of testimony from the

       19    psychologist that this was manipulative, in her opinion;

       20    that he was force-fed on one occasion in December; and after

       21    that force-feeding, there was no other involuntary

       22    force-feeding.

09:04  23          *(To audience:)* But also, I have to believe and

       24    speculate that you, as the family, have been a tremendous

       25    help in talking to your brother, and your son.  And,

1    therefore, in balancing this, I've made the decision that

2    this case will be tried in Orange County and that the

3    resources will be here from this point forward for this

4    Division in terms of any medical needs that Mr. Badawi

5    needs.

09:04    6        Because, starting a trial under these

7    circumstances, on June 7th, with over 5,000 jury summons

8    going out, over 200 jurors that are going to be necessary

9    for at least a five- or six-week trial -- if you're accurate

10   in your assessment -- is going to put the Court in the

11   position of recessing and sending the gentleman down the

12   road to MDC, back after a forced-feeding -- if there are

13   two-a-day, like I've had to implement in Superior Court

14   before -- and as a presiding judge over there, although the

15   federal system finds this unique, this is not unique to the

16   Superior Courts.  It's not an everyday occurrence.  But over

17   there, because of the volume and violence that we're not

18   used to here in federal court -- I typically, as a presiding

19   judge, dealt with at least one suicide attempt:  Usually

20   across the vein, which was playing.  When they went up the

21   vein, it was serious.

09:05    22       And Mr. Badawi's situation is not unique to me.

23   It's unique to the federal court system, though.

09:05    24       I can't afford losing the resources of the family,

25   and the inconvenience of them going to Los Angeles to have

|       |    |                                                                 |
|-------|----|-----------------------------------------------------------------|
|       | 1  | contact with their son and brother.  He has to stay here.       |
| 09:05 | 2  | Number two, this Division should have the medical               |
|       | 3  | resources, whether it's by private contract or through the      |
|       | 4  | jail contract to undertake force-feeding locally.  And I and     |
|       | 5  | the other judges are gonna demand that for this Division         |
|       | 6  | from now on.                                                    |
| 09:06 | 7  | Number three, Mr. Badawi, you placed me in a very               |
|       | 8  | unfortunate situation.  You're not incompetent.  You're         |
|       | 9  | getting a little languid at the present time.  But I don't       |
|       | 10 | see the same stress factors or concern that I had when you       |
|       | 11 | dropped to 105 or 109 pounds.  And, as I said before, I         |
|       | 12 | wouldn't put you in front of the jury.                          |
| 09:06 | 13 | Today, I would.  But I can't afford any further                 |
|       | 14 | dissipation.  You've already proven to me once that you're      |
|       | 15 | willing to apparently starve yourself to death.  And I can't     |
|       | 16 | let that proceed down the road in an emergency condition on     |
|       | 17 | each occasion, subject to your whim.                            |
| 09:06 | 18 | DEFENDANT BADAWI:  Thank you.                                    |
| 09:06 | 19 | THE COURT:  So, therefore, you're going to stay                 |
|       | 20 | here because I think that's humane in terms of the family       |
|       | 21 | having access.                                                  |
| 09:06 | 22 | DEFENDANT BADAWI:  It is, Your Honor.                           |
| 09:06 | 23 | THE COURT:  I want your counsel to have access.                 |
| 09:06 | 24 | You're not going to Los Angeles, except the                     |
|       | 25 | following:  I'm prepared, subject to Ms. Corrigan's input,       |

1    to send him back to MDC.  I don't want a helter-skelter

2    process in Orange County while we set that up.  I want

3    Marcelino to proceed in a thoughtful manner.  Because, if

4    this occurs during the trial, he'll be force-fed at

5    7:00 o'clock.  He'll be back by 9:00 o'clock.  He'll be

6    involuntarily force-fed at 4:30 or 5:00.  And each time I'll

7    get a report.

09:07   8         I don't think it's appropriate that the Court, by

9    the way, Ms. Corrigan, inflicts an order of involuntary

10   force-feeding and leaves it to the side.  I think I need to

11   constantly check in.  And if he shows compliance and gains

12   weight back -- but he's not dropping below 123.

09:07   13        So that was why the excessive time was spent this

14   morning, to the detriment of some other counsel and to you

15   waiting patiently in my court.  We're prepared to send him

16   to Los Angeles.  But I'm prepared to send him there for an

17   indefinite period of time, which will cause some disruption.

18   But if I either have, once again, the assurance or the proof

19   that he's back up to, minimally, 134 -- that's my arbitrary

20   number now 'cause he was 140-something when he came in --

21   um, he's going to stay there up until the time trial.

09:08   22        I'm prepared to bring him back next week.  I'm

23   prepared to bring him back the following week.  That's up to

24   him.  He will be involuntarily force-fed, though.

09:08   25        *(To the defendant:)* And I want you to hear that

**DEBBIE GALE, U.S. COURT REPORTER**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | clearly.  And, once that order starts, don't expect my       |
|       | 2  | intersession because, with good medical input, if the MDC    |
|       | 3  | decides to do that, you'll be force-fed twice a day.         |
| 09:08 | 4  | Do you understand me?                                         |
| 09:08 | 5  | DEFENDANT BADAWI:  Yeah.                                      |
| 09:08 | 6  | THE COURT:  Yes or no?                                        |
| 09:08 | 7  | DEFENDANT BADAWI:  Yes.                                       |
| 09:08 | 8  | THE COURT:  All right.                                        |
| 09:08 | 9  | DEFENDANT BADAWI:  Thank you.                                 |
| 09:08 | 10 | THE COURT:  This is going to cease immediately               |
|       | 11 | or...                                                         |
| 09:08 | 12 | All right.  Now, I'm not taking a chance on this.            |
|       | 13 | So I'm sending you back to MDC no matter what today.  I       |
|       | 14 | don't care what you represent to me.  I don't care if        |
|       | 15 | there's a change'a heart.                                     |
| 09:08 | 16 | And, in all likelihood, they're going to             |
|       | 17 | force-feed you today.  I want you understood -- I want you    |
|       | 18 | to understand that fully and completely.  And I'm not going   |
|       | 19 | to intercede if they make that decision.  But I'm going to    |
|       | 20 | rely upon the professionals.  So if they decide -- or you     |
|       | 21 | decide to voluntarily start *(sic)* eating over a prolonged   |
|       | 22 | period of time -- I hope that that doesn't take place.  But   |
|       | 23 | I will make that order so that MDC isn't criticized.  That's  |
|       | 24 | my responsibility.  And you're not going to diminish any      |
|       | 25 | further.  But I hope I'm communicating with you.              |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 09:09 | 1 | Counsel, I'm speaking. |
| 09:09 | 2 | MR. LENGYEL-LEAHU:  I'm sorry. |
| 09:09 | 3 | THE COURT:  Now, Ms. Corrigan, this is uniquely a |
| | 4 | problem for you, not the co-defendant for a moment. |
| 09:09 | 5 | Your input?  You've heard where I'm at |
| | 6 | tentatively, but always -- |
| 09:09 | 7 | No, no.  Have a seat. |
| 09:09 | 8 | -- I'm always listening to your wisdom. |
| 09:09 | 9 | MS. CORRIGAN:  Well, Your Honor, this is something |
| | 10 | that Marcelino has brought to my attention earlier this |
| | 11 | week.  I actually met with my client, discussed this with |
| | 12 | him at the jail.  I've also met with Officer Manriquez.  And |
| | 13 | then, this morning -- so the record's clear -- |
| | 14 | Mr. Hazelwood, who's present in the courtroom, was good |
| | 15 | enough to show an e-mail that had been circulated, which |
| | 16 | delineates out the weight issues. |
| 09:09 | 17 | THE COURT:  By the way, I thought that that would |
| | 18 | turn around.  I thought when he got to 128, it might be a |
| | 19 | little dehydration.  I didn't know if he had diarrhea.  I |
| | 20 | didn't -- so I let that go into the low 120's.  We could've |
| | 21 | acted earlier.  I didn't want to be precipitous. so you know |
| | 22 | now we're at 123 and dissipating quickly. |
| 09:10 | 23 | MS. CORRIGAN:  Understood. |
| 09:10 | 24 | And what I can tell the Court is that -- |
| | 25 | obviously, I think the Court can imagine what my advice is |

1    to my client.  He's indicated to me that he will comply.

2    Obviously, his actions will speak louder than his words.

3    And obvious -- I have the concerns over his health issues.

4    We can't get to where we were back in November and December.

5    Particularly in front of a jury.

09:10   6            But I will defer to the Court, but I do believe

7    that he -- particularly, with the Court now reminding him

8    today of what has been already talked to him about -- his

9    attention hopefully has been snapped.  And his family, who

10   is present in the courtroom, I think will continue to

11   encourage him to engage in healthy habits.

09:11   12           THE COURT:  So we can all agree, if we can get him

13   back to Orange County, if we can give you, as the family,

14   greater access, I'd like to do that.  Just for humane

15   reasons.  The young man's presumed to be not guilty.  The

16   burden's on the government to prove him guilty.

09:11   17           But, by the same token, I want your involvement.

18   I think it's very humane.  I think its helpful for you to

19   see your son, and your brother.  I think it's helpful for

20   him in terms of support.

09:11   21           But, under these circumstances, he's going back to

22   MDC today.  And how long he's there depends upon his

23   actions.  But he has to minimally be 134.  That's my

24   bottom-line criteria.

09:11   25           *(To the defendant:)* You're gaining 11 pounds

**DEBBIE GALE, U.S. COURT REPORTER**

|      |    |                                                                          |
|------|----|--------------------------------------------------------------------------|
|      | 1  | before I ever consider bringing you back.  If that's                     |
|      | 2  | involuntary force-feeding twice a day, that's what will take             |
|      | 3  | place.                                                                   |
| 09:11| 4  | If this occurs during trial, I will be prepared to                       |
|      | 5  | have you sent over to a local facility, force-fed, and it                |
|      | 6  | will not disrupt the trial.  And it'll be done twice a day.              |
| 09:12| 7  | Now, I need to check, Ms. Corrigan, every day,                           |
|      | 8  | though.  I need to make a record, and I'll start calling up,             |
|      | 9  | you know, to MDC, as I did before, probably at the end of                |
|      | 10 | the day.  But I'm not going to bring him up and down the                 |
|      | 11 | highway now.  I think that that's cruel.  He needs to remain             |
|      | 12 | at the MDC with the staff.                                               |
| 09:12| 13 | MS. CORRIGAN:  Understood, Your Honor.                                    |
| 09:12| 14 | THE COURT:  Okay?                                                         |
| 09:12| 15 | Okay.  Mr. Badawi, I don't need any                                       |
|      | 16 | representations from you.  I'm not negotiating with you.                 |
|      | 17 | You've heard it.  You haven't heard it from your counsel.                |
|      | 18 | You heard it from me.  That's the way it is.  Your choice.               |
|      | 19 | But you are going to trial on June 7th.                                   |
| 09:12| 20 | **DISCUSSION RE DEFENDANT ELHUZAYEL INCIDENT**                            |
| 09:12| 21 | THE COURT:  Now, let me turn to the co-defendant.                         |
| 09:12| 22 | First of all, we had an incident, Mr. Elhuzayel,                          |
|      | 23 | on the last occasion where you had a little problem with my              |
|      | 24 | deputies, in terms of pinching, and there was some                       |
|      | 25 | allegations concerning spitting, and I had to bring you in,              |

|       |    |                                                                       |
|-------|----|-----------------------------------------------------------------------|
|       | 1  | in a spit-hood and a chair.  And then I put you in your               |
|       | 2  | present situation.                                                    |
| 09:13 | 3  |      I choose not to treat you in the same manner, as |
|       | 4  | long as you're well-behaved.  Understood?                             |
| 09:13 | 5  |      DEFENDANT ELHUZAYEL:  Yeah, yeah.       |
| 09:13 | 6  |      THE COURT:  Okay.  No.  You don't have to talk to |
|       | 7  | me.  Just -- you can grin, but I want you to hear it from             |
|       | 8  | me, not your counsel.                                                 |
| 09:13 | 9  |      But if there's any altercation with my deputies, |
|       | 10 | if there's any alleged spitting, you'll be brought in a               |
|       | 11 | spit-hood.  You'll be brought down in a "tied-in" chair.             |
| 09:13 | 12 |      And, right now, I'm going to make a record that |
|       | 13 | I'm going to remain -- have you remain manacled.  But I'm            |
|       | 14 | going to now order the marshals to put him into the chair            |
|       | 15 | with the belly chain, and I'm going to free your hands.              |
| 09:13 | 16 |      So if we need to remove Mr. Badawi, Marcelino, for |
|       | 17 | security purposes, but -- this is what we did during the             |
|       | 18 | Aryan Brotherhood trial for nine months.                             |
| 09:13 | 19 |      So, you're going to have a belly chain that's not |
|       | 20 | viewable to the jury.  But I want your hands freed, and               |
|       | 21 | we're going to see how you react.                                     |
| 09:14 | 22 |      Now, in the past, Counsel -- I want to inform you, |
|       | 23 | Mr. Lengyel-Leahu, I've actually had to protect some of my           |
|       | 24 | counsel from the Aryan Brotherhood and Mexican Mafia.  Now,          |
|       | 25 | you don't know that.  But one of my most difficult problems          |

|  | 1 | was protecting defense counsel from their own clients. |
| 09:14 | 2 | I don't expect any conflict between you, and I |
|  | 3 | assume that you are in a good and safe condition with your |
|  | 4 | client. |
| 09:14 | 5 | MR. LENGYEL-LEAHU:  Absolutely, Your Honor. |
| 09:14 | 6 | THE COURT:  Okay.  I just wanna check in because I |
|  | 7 | care about my counsel.  And, it's funny:  It's not the |
|  | 8 | prosecutors or judge, usually, it's the defense counsel that |
|  | 9 | for some reason meets with the disapproval of some'a their |
|  | 10 | clients.  I'm very sensitive to that. |
| 09:14 | 11 | I choose not to have him in a restrained |
|  | 12 | condition.  And we'll see how he does.  But any spitting... |
| 09:14 | 13 | **FURTHER DISCUSSION RE DEFENDANT BADAWI** |
| 09:14 | 14 | THE COURT:  Now, next thing is, let me talk to |
|  | 15 | both of you.  I've gotta anticipate the worst and hope for |
|  | 16 | the best. |
| 09:15 | 17 | Just like with Mr. Badawi, I'm setting up a |
|  | 18 | process in Orange County so that I can get him force-fed, if |
|  | 19 | we go to trial and this occurs again.  I can get 'em back to |
|  | 20 | court.  I can do it during the evening.  But he's gonna |
|  | 21 | remain local.  I think that's more humane in balancing this |
|  | 22 | for the family and for counsel. |
| 09:15 | 23 | I'm going to assume that you're as well-behaved as |
|  | 24 | you are today, unlike the last occasion. |
| 09:15 | 25 | DEFENDANT ELHUZAYEL:  Yeah, I mean -- |

09:15   1           THE COURT:  No, no.  I don't want to talk to you.

        2   I don't want you to say anything.

09:15   3           But if I have an incident like the last occasion,

        4   I'll remove you from the court, and I've made provisions to

        5   have a television monitor set up in the backroom so that you

        6   can view the proceedings.  And so you know that the Court's

        7   anticipating, but hoping that the following doesn't occur:

        8   You'll be able to view the proceedings, but I won't let any

        9   witness conclude their testimony until the next recess.

09:15  10           And, although you've been able to view the

       11   evidence on a monitor -- that your counsel can take back the

       12   evidence and discuss it with you.  And, therefore, if you

       13   have any input, further -- cross-examination can take place.

       14   But no witness will leave, Counsel, if this occurs -- if the

       15   worst occurs -- until you've had adequate time to speak to

       16   your client.

09:16  17           I'm assuming that this isn't going to occur.  But

       18   if I have an indication, like the last incident -- hear me

       19   out -- yelling, spitting, going after one of my deputies --

       20   you're in the back with a nice monitor, and I'll make sure

       21   that you have access.  So I wanna forewarn you about that.

09:16  22           This trial's going forward on June 7th.

09:16  23           All right.  So far, you're well-behaved.  Thank

       24   you.  Hands are in an unmanacled condition.

09:16  25           And we need some civilian clothes for both of

**DEBBIE GALE, U.S. COURT REPORTER**

1    these gentlemen, don't we?

09:16    2         MR. LENGYEL-LEAHU:  Yes.

09:16    3         MS. CORRIGAN:  I have arrangements already for my

4    counsel, Your Honor.  That's been taken care of.

09:16    5         THE COURT:  Counsel?

09:16    6         MR. LENGYEL-LEAHU:  We are arranging for that,

7    Your Honor, yeah.

09:16    8         THE COURT:  Okay.  In the next appearance, I want

9    'em in civilian clothes, even though the jury hasn't been

10    summoned.  In other words, we're back for motions at some

11    point, as well today.

09:17    12        And I believe you have a severance motion also

13    pending, and that's in May.

09:17    14        MS. CORRIGAN:  Yes, Your Honor.

09:17    15        THE COURT:  You have other motions pending today

16    that I'd like to hear at this time; take them under

17    submission in all likelihood.

09:17    18        I think that's enough of a discussion if -- it's

19    enough of a warning.  And, therefore, Counsel, I wanted to

20    speak to each of your clients without a response.  I want

21    them to hear that from the Court so they don't think it's

22    coming from you.  It's coming from me.

09:17    23        Okay.  Counsel, anything further before we hear

24    Ms. Corrigan's motions?

09:17    25        MR. LENGYEL-LEAHU:  Just briefly, Your Honor.

**DEBBIE GALE, U.S. COURT REPORTER**

09:17   1             The behavior issues that we experienced with my

        2   client at the last, uh, court appearance, um, he had

        3   indicated to me that there was --

09:17   4             (Cellphone rings in courtroom.)

09:17   5             MR. LENGYEL-LEAHU:  I'm sorry.

09:17   6             THE COURT:  Oh, that's fine.  Don't worry about

        7   that.  I'm not having a seizure over a phone.  That's fine.

09:17   8             MR. LENGYEL-LEAHU:  Um, he indicated to me that he

        9   wasn't quite feeling himself.

09:17  10             THE COURT:  Well, we know that.

09:18  11             So do the marshals.

09:18  12             MR. LENGYEL-LEAHU:  And --

09:18  13             THE COURT:  You're lucky, by the way.

09:18  14             You go after one of the marshals and you might

       15   meet -- get greeted with a surprise in terms of

       16   self-defense.  So let's -- let's put that off to the side.

       17   Whatever that reason is, we're starting new.

09:18  18             MR. LENGYEL-LEAHU:  Well, I think the reason's a

       19   little important, uh, because I got a call from the jail

       20   about a week or so later.  And they indicated that my client

       21   was not being compliant.

09:18  22             And I asked 'em -- I said, "What exactly do you

       23   mean?"

09:18  24             And they said, "Well, he's not seeing his doctor

       25   and he's not taking his medicines."

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 09:18 | 1 | And I said, "What medicines is he under?" |
| 09:18 | 2 | And we went and obtained the medical records.  And |
| | 3 | he had been prescribed some psychotropic drugs, which was -- |
| | 4 | I was unaware of; he was unaware of -- and they were having |
| | 5 | an effect on his behavior. |
| 09:18 | 6 | THE COURT:  Was he taking those at the time?  In |
| | 7 | other words, had they come down from MDC? |
| 09:18 | 8 | 'Cause your client has been held in Orange County. |
| 09:18 | 9 | MR. LENGYEL-LEAHU:  Correct. |
| 09:18 | 10 | THE COURT:  Normally, this facility isn't set up. |
| | 11 | I mean, they can prescribe medication.  But usually it takes |
| | 12 | something from MDC. |
| 09:19 | 13 | So I'm curious how that's occurring.  I wasn't |
| | 14 | informed of that by Warden Shinn. |
| 09:19 | 15 | MR. LENGYEL-LEAHU:  And I hadn't been, uh, |
| | 16 | warned -- warned of it until -- |
| 09:19 | 17 | THE COURT:  What's the present status?  Does he |
| | 18 | have psychotropic medication? |
| 09:19 | 19 | MR. LENGYEL-LEAHU:  None whatsoever. |
| 09:19 | 20 | And we have an expert who's going to evaluate him |
| | 21 | a little bit today, and look at those medical records a |
| | 22 | little closer, and give me, uh -- render an opinion about |
| | 23 | what was going on, who was authorizing it.  And I think that |
| | 24 | would've been the only issue. |
| 09:19 | 25 | Because I have never had any contact with him |

**DEBBIE GALE, U.S. COURT REPORTER**

1  where there was any of those issues until that one brief

2  period of time.  And it may've been a reaction to the drugs

3  that he -- he was being -- he was being fed -- that he

4  didn't realize what they were or what they were for, and the

5  effects that would have on him.

09:19  6        THE COURT:  I'm not concerned.  We're starting

7  over again.  Okay?

09:19  8        But there is a history now; and, as such, you

9  know, I'm going to be aware of that and the marshals are not

10  going to be put in a position of anything other than safety,

11  getting him to court.

09:20  12        But, as you can see, minimally, I'm going to set a

13  record before trial.  In all likelihood, your client will

14  remain in a belly-chain, but his hands will be free.  The

15  jury can't see him in this condition.  I'll take

16  photographs, just -- I did -- like I did with the Mexican

17  Mafia and Aryan Brotherhood so the Circuit can see what's

18  occurring.

09:20  19        With Mr. Badawi, I don't think that that's

20  necessary.  I don't think I wanna set that record at the

21  present time, Ms. Corrigan.  It seems to be involuntarily

22  *(verbatim)* -- you know, starvation or eating.  He doesn't

23  seem to've acted out against the marshals.

09:20  24        MS. CORRIGAN:  That's correct.

09:20  25        THE COURT:  Okay.

| | | |
|---|---|---|
| 09:20 | 1 | Now, also, before you came over today, the |
| | 2 | marshals were telling me that they were both well-behaved. |
| | 3 | So that's why you're not coming in, in a chair, strapped |
| | 4 | down at the present time, with that kind of drama.  I don't |
| | 5 | wanna set that tone unless it's necessary. |
| 09:20 | 6 | So, Ms. Corrigan, your motions. |
| 09:20 | 7 | MS. CORRIGAN:  Thank you, Your Honor.  Which |
| | 8 | motion would you like to start with?  The FISA? |
| 09:21 | 9 | THE COURT:  FISA. |
| 09:21 | 10 | **DEFENDANT BADAWI'S FISA MOTION** |
| 09:21 | 11 | MS. CORRIGAN:  So, Your Honor, without -- I guess, |
| | 12 | the papers that I filed relative to suppressing what we |
| | 13 | believe is a FISA motion because, obviously, in this |
| | 14 | situation, we're without that information -- I'm going -- |
| | 15 | what I think is probably appropriate here is, as in other |
| | 16 | motions, is that everything is covered in the written |
| | 17 | materials.  However, with that said -- |
| 09:21 | 18 | THE COURT:  But set a good record.  Make sure |
| | 19 | you're confident that he's heard your argument -- |
| 09:21 | 20 | MS. CORRIGAN:  Understood. |
| 09:21 | 21 | THE COURT:  -- and that you have the time needed. |
| 09:21 | 22 | MS. CORRIGAN:  So I think that one'a the things |
| | 23 | that we all have to be concerned about here is the |
| | 24 | unraveling and the tattering of the Constitution as a result |
| | 25 | of what I view as the scare tactics and the horror that this |

```
 1    country has seen time and time again over the acts of ISIL.

 2    ISIS, and other entities.  And there is no question that

 3    those -- in my mind, that those entities, foreign terrorism

 4    organizations, have placed an enormous amount of fear, not

 5    only in our citizenry, but in the world's citizenry.

 6            We have a number of incidents.  We have the Paris

 7    incident.  We have just the recent murder of SEAL -- or Navy

 8    SEAL Keating, the young 31-year-old man.  That's an

 9    atrocity.  We have atrocity after atrocity.  We have

10    San Bernardino.  We have the downing of planes.  We have

11    bombings in Baghdad.  We have bombings pretty much anywhere.

12            And my concern is that what has ended up happening

13    is that the FISA courts, that apparently meet in secret, are

14    rubber-stamping every single application that comes forward

15    to it.  Now, I don't have any way to document that because

16    that information is not available to me 'cause it's not

17    public.

18            But I think that this Court should be very leery

19    of full-blown -- I'll call it the redaction of the

20    Constitution here -- where the Fourth Amendment has

21    essentially been taken out of the Constitution as it relates

22    to my client's rights.

23            And despite the fact that he is charged,

24    obviously, with financial aid fraud, but also the other

25    issue of material support to a foreign terrorist
```

09:22  6
09:22  12
09:23  18
09:23  23

1    organization by way of supplying personnel, being the

2    co-defendant, um, I think that we have to be very careful in

3    not letting our individual rights in this country be

4    destroyed systematically by pure fear that ISIS, ISIL, and

5    other groups have instilled in all of us and, unfortunately,

6    have forced upon us, and have ended up -- and it -- we -- I

7    think that, by not granting the motion, what the "message

8    out" to everyone, unfortunately, is that they win.  And that

9    they win in destroying our ability to exercise our rights in

10   this country.  And that is exactly what ISIL and ISIS is all

11   about.

09:24   12          And I think that probably some people in the

13   audience may be wondering why am I making these positions

14   *(sic)* when I have someone that's charged with providing

15   material support.  'Cause, the end of the day, the defense

16   is not about whether they're justified in what they're

17   doing, but, I think that when we get to the motion aspect,

18   when we're talking about our essential rights that we --

19   that are near and dear to all of us, and that we -- our

20   forefathers have fought valiantly to make sure that we have

21   and that our courts have enforced, our nation, our -- our

22   people enforce -- or want enforced.

09:24   23          Um, the disintegration of what this fear has

24   caused, um, I don't think is something that we should give

25   in -- because, ultimately, I think, if the motion is not

|  | 1 | granted, it's a signal that all we're doing is giving in to |
|---|---|---|

granted, it's a signal that all we're doing is giving in to

exactly what ISIL and ISIS want us to do; and that is, to

give up our rights and to -- and to go along with what

they -- what their beliefs are.

09:25    I'm not indicating that the Court would -- would

be -- you know, its thoughts are consistent with theirs.

But I do think that we -- there has to be a careful

examination here because I don't think these -- this'll be

the first or last case that deals -- deals with this issue.

We've had a number of these cases across the county.

09:25    Unfortunately, I think that too many courts don't

take the careful time that this Court does in evaluating

what it means to give up our rights wholeheartedly or

wholesale.  And I think that, in this situation, the FISA

process is a complete destruction of my client's Fourth

Amendment rights and that the Court should, um -- should

grant the motion that I've filed and suppress the evidence

that has been apparently -- and I have to say "apparently"

'cause the government doesn't really confirm or deny that

there is a warrant.

09:26    Obviously, if here's no warrant, then it has to be

suppressed 'cause there's no way they can support the

seizures -- um, the searches and the seizures.  But assuming

that there is a warrant, I'm assuming that it would be outta

the FISA court.  Perhaps there's another secret court I'm

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | not aware of.  But I think that the Court should, uh,              |
|       | 2  | consider that and not give in to what I view as the ultimate       |
|       | 3  | goal of ISIS and ISIL, which is to destrour -- destroy our         |
|       | 4  | rights and the rights that my client enjoys in this country.       |
| 09:26 | 5  | And I'd submit it on that basis.                                    |
| 09:26 | 6  | THE COURT:  Let me ask, Mr. Lengyel-Leahu, are you                  |
|       | 7  | joining in this motion along with Ms. Corrigan?  So I have a        |
|       | 8  | record.                                                             |
| 09:26 | 9  | MR. LENGYEL-LEAHU:  We both filed separate                          |
|       | 10 | motions.                                                            |
| 09:26 | 11 | THE COURT:  I know you did.                                         |
| 09:26 | 12 | MR. LENGYEL-LEAHU:  Yes.                                            |
| 09:26 | 13 | THE COURT:  But you're joining in her motion?                       |
| 09:27 | 14 | And I assume you're joining in co-counsel's                         |
|       | 15 | motion.                                                             |
| 09:27 | 16 | MS. CORRIGAN:  I will, Your Honor.                                  |
| 09:27 | 17 | THE COURT:  Let's presume that for every motion                     |
|       | 18 | brought by either one of you -- so the default position is          |
|       | 19 | always joinder of your respective motions, unless you make          |
|       | 20 | known to the Court that you're not joining in a particular          |
|       | 21 | motion, and that will perfect your record throughout the            |
|       | 22 | process.                                                            |
| 09:27 | 23 | Do you have comments that you'd like to add, sir?                   |
| 09:27 | 24 | MR. LENGYEL-LEAHU:  Yes, Your Honor.                                |
|       | 25 |                                                                    |

**DEBBIE GALE, U.S. COURT REPORTER**

09:27  1                    **ARGUMENT BY MR. LENGYEL-LEAHU**

09:27  2              MR. LENGYEL-LEAHU:  It's the constitution that

3    makes us exceptional.  Um, it is the very foundation of this

4    country, and it makes us different.  It's -- it's not so

5    much the geography that we've been placed with, but the fact

6    that we have a system of government that is acutely aware of

7    individual rights.  And the Fourth Amendment is the very

8    foundation of our freedom from government intrusion.

09:27  9              And I clearly recognize that there have been

10   occasions under time of war where the President has

11   suspended the Constitution.  Famously, Lincoln suspended the

12   Writ of Habeas Corpus.  And since then, the Japanese

13   internment during World War II.

09:28  14             Uh, events have taken place in time of war.  We

15   have entered into a period of our history where the

16   government refuses to declare war, yet nonetheless takes on

17   these war powers.  And in the -- in the instance of the

18   Patriot Act, um, under the immediate threat of terrorism on

19   our soil, there was this need and representations by the

20   government that they would nonetheless protect us.  And

21   we're asked now to trust them.

09:28  22             *"Trust us that we will do the right thing."*

09:28  23             And what they did, immediately after the Patriot

24   Act is completely disavow that trust.  As it says in our

25   papers, the violations that the government did under the

8:15-CR-0060-DOC - 5/5/2016 - Item No. 2

33

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | Patriot Act were outrageous and required federal judges to               |
|       | 2  | step in and say, *"No more. You're gonna have to start*                  |
|       | 3  | *giving notice to the defense so at least they're aware of*              |
|       | 4  | *what's going on."*                                                      |
| 09:29 | 5  | And by suspending the probable cause element in                          |
|       | 6  | order to do searches of American citizens, uh, it --                     |
|       | 7  | there -- there is no foundation for it. And that's why they              |
|       | 8  | require a showing of a foreign agency. Yet the discovery                 |
|       | 9  | they turn over doesn't indicate any foreign agency                       |
|       | 10 | whatsoever of our clients.                                               |
| 09:29 | 11 | So we're troubled. And -- and we're gonna have to                        |
|       | 12 | rely on your *in camera* review. But that's patently unfair              |
|       | 13 | that a member of the court -- as an officer of the court,                |
|       | 14 | that I can't be trusted. I can't be trusted with reviewing               |
|       | 15 | the foundational requirements of what the government is                  |
|       | 16 | attempting to bring into court when they know they're                    |
|       | 17 | violating my clients' Fourth Amendment right. They know                  |
|       | 18 | that upfront because they do -- not required to show                     |
|       | 19 | probable cause.                                                          |
| 09:29 | 20 | And I -- I think it's a -- it's a horrible                               |
|       | 21 | situation that, if we're going to be engaged in a war on                 |
|       | 22 | drugs or a war on terror or a war on any other amorphous                 |
|       | 23 | entity or threat, that this will go on forever; that we have             |
|       | 24 | modified the Constitution by Executive Order.                            |
| 09:30 | 25 | And, truly, you are the last bastion of upholding                        |

Case 8:15-cr-00060-DOC   Document 286   Filed 03/31/17   Page 34 of 85   Page ID #:3759
8:15-CR-0060-DOC - 5/5/2016 - Item No. 2

34

1    what we all thought we held dear.  And -- and I know you

2    take your job seriously, as we all do.  Um, and -- and it's

3    absolutely imperative that somewhere, someplace, sometime

4    someone says "No."

09:30    5         And I urge you to look at the evidence that

6    they're attempting to present on the basis they're

7    attempting to present it, and -- and I believe my client's

8    due process rights are directly violated by my inability to

9    point the Court to the direction that we think you should be

10   looking at with respect to the admissibility of this

11   evidence.

09:30   12         And, on that, we would submit on the FISA.

09:31   13         THE COURT:  Thank you.  We'll come back for

14   further argument and comments.

09:31   15         Let me turn to the government.

09:31   16         Counsel, which one of you will be arguing on

17   behalf of the United States?

09:31   18         MS. HEINZ:  Your Honor, Judith Heinz on behalf of

19   the United States.

09:31   20                    **ARGUMENT BY MS. HEINZ**

09:31   21         The FISA statute does not violate the

22   Constitution, does not trample on the Constitution, does not

23   trample on Fourth Amendment rights, nor is it driven by a

24   particular fear of terrorism or terrorist organizations.

09:31   25         The FISA statute was enacted by Congress

1    specifically to set up a way to gather intelligence

2    information and to deal with it, and for there to be a legal

3    framework that would work for the gathering of intelligence

4    information, and for that information to be used, if

5    appropriate, in a criminal proceeding.

09:32    6         So let's start here:  It was Congress that enacted

7    the FISA statute.  It was Congress that set up FISA.

8    Congress, duly-elected representatives of people of the

9    United States, enacted this law.  It has not been

10   overturned.

09:32   11         FISA -- the FISA statute sets up a court.  It's

12   called the FISC.  The FISC are Article III judges who are

13   appointed to sit on the FISC.  This is a panel of judges,

14   Article III judges, and they look very closely at all FISA

15   applications that are introduced.

09:33   16         The FISA applications that are introduced to the

17   FISC are extremely detailed, as the Court can see from the

18   applications in this case.  They are extremely detailed, and

19   they are presented to the FISC.  The FISC is not a rubber

20   stamp for the government.  The FISC looks very carefully at

21   the applications, and then can either grant the application

22   or not.

09:33   23         It is not true that defendants are totally in the

24   dark here, or that they have no notice about the fact that

25   FISA collection occurred in this case.  In fact, the

1       defendant received a notice, a written notice from the

2       government shortly after they were arrested in this case and

3       brought to court.  They received a notice that said, *"We*

4       *hereby notify you that information, evidence, evidence*

5       *collected through FISA will be used against you in this*

6       *case."*

09:34   7            So they have known for nearly a year about this.

8       And they received notice as required under the law:  The law

9       that was passed by Congress.

09:34   10            This is not law that was modified by some

11      Executive Order.  This is law that was passed by Congress.

12      There is a procedure that is done by judges.  There are

13      lawful orders issued here which allowed for the collection

14      of the information.

09:35   15            Many, many courts have looked at FISA information

16      and have carefully considered the arguments that the

17      defendants make here:  The arguments that FISA effectively

18      takes the Fourth Amendment out of the Constitution,

19      arguments that FISA violates due process, all of these

20      arguments have been considered by many, many courts, as the

21      government has briefed in its extensive opposition to the

22      motions, and those courts have found that the collection of

23      information under FISA and the procedures for litigating

24      FISA suppression motions do not violate the Fourth Amendment

25      and do not violate due process.

09:36   1            The government absolutely agrees that the

        2   United States Constitution makes our country exceptional.  A

        3   FISA is absolutely consistent with the Constitution of the

        4   United States.

09:36   5            The defense makes the argument the FISA does not

        6   require probable cause.  That, of course, is directly

        7   contrary to the law, as the government has briefed in its

        8   opposition.  The FISC must, of course, find, based on the

        9   application, that there is probable cause for the

       10   collection.  It is the same standard that is used for a

       11   federal search warrant.  Probable cause is probable cause.

09:36  12            The Article III judges that sit on the FISC are

       13   highly qualified to make this determination.  And they are

       14   not rubber stamps.  They make this determination the same

       15   way that Article III judges here in this courthouse make

       16   that determination.

09:37  17            Obviously, this country should not allow its fears

       18   to trample the Constitution, but that is not what is

       19   happening here.  We have a very well-qualified District

       20   Court Judge, Your Honor, who is highly qualified to look at

       21   the FISA application and the other materials that have been

       22   presented to this Court.  They are complete.  They are

       23   everything that the FISC saw.  And this Court is highly

       24   qualified and highly capable of looking at those materials

       25   and making a determination, a legal determination, based on

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | the law, based on the legal standards that apply here.     |
| 09:38 | 2  | It is absolutely inappropriate for the defense to          |
|       | 3  | suggest that this Court should grant their motion to       |
|       | 4  | suppress simply to send a message, simply to send some     |
|       | 5  | message that we should not allow our fears to trample the  |
|       | 6  | Constitution.  Rather, the Court, the government expects,  |
|       | 7  | will make its decision based on the law because it is the  |
|       | 8  | rule of law in this country which secures our rights and our |
|       | 9  | freedoms, and ultimately protects us all.                  |
| 09:38 | 10 | Now, Your Honor, I would like to confer briefly            |
|       | 11 | with co-counsel.                                           |
| 09:39 | 12 | THE COURT:  Please.                                        |
| 09:39 | 13 | MS. HEINZ:  Nothing further from the government.           |
| 09:39 | 14 | THE COURT:  Thank you.                                     |
| 09:39 | 15 | Counsel, your response.                                    |
| 09:39 | 16 | MS. CORRIGAN:  Thank you, Your Honor.                      |
| 09:39 | 17 | **RESPONSE BY MS. CORRIGAN**                               |
| 09:39 | 18 | MS. CORRIGAN:  Briefly, I would concur with                |
|       | 19 | Ms. Heinz that -- or with the government -- that there was a |
|       | 20 | notice on the FISAL -- or FISA Act Information.  Uh, there |
|       | 21 | was a notice that was provided to us.  It was a two-page   |
|       | 22 | document that's found at Docket Entry 38.  And it is       |
|       | 23 | literally a -- looks like a three-sentence notice.  And it |
|       | 24 | says,                                                      |
| 09:39 | 25 | *"Plaintiff, United States of America, by*                 |

1             *and through its counsel of record,*

2             *hereby provides notice of -- to*

3             *defendants, uh, and to the Court that*

4             *pursuant to"* --

09:39    5        And then the code sections are cited.

09:39    6        *"-- that the United States intends to*

7             *offer into evidence or otherwise use or*

8             *disclose in any proceedings in the*

9             *above-captioned matter information*

10            *obtained or derived from electronic*

11            *surveillance and physical searches*

12            *conducted pursuant to the Foreign*

13            *Intelligence Surveillance Act of 1979."*

09:40   14        And then the code section is specifically

15    indicated.

09:40   16        We did receive that notice.  But that notice is --

17    gives no -- no information whatsoever.  That is strictly

18    saying, *"Hey, guys, um, just so you know, we -- we're gonna*

19    *be giving you something."*

09:40   20        It doesn't tell you what.  It doesn't tell you how

21    you -- we got it.  We also got a subsequent notice -- and

22    it's not been the subject of this, uh, or a prior notice --

23    on June 19th, 2015, at ECF number -- or Docket Entry 29, um,

24    with the -- a notice of government's intent to invoke the

25    Classified Information Procedures Act.  And that's a similar

| | | |
|---|---|---|
| | 1 | notice that's quite short. |
| 09:40 | 2 | So, yes, is there technically notice?  There was. |
| | 3 | But it's meaning -- it's meaningless.  I coulda figured that |
| | 4 | out just by looking at the evidence because it's clear that |
| | 5 | we -- that they didn't have what I'll call regular search |
| | 6 | warrants:  The ones that we see that come through these |
| | 7 | courts and, um -- you know, another Article III judge. |
| 09:41 | 8 | But, in the situation here, the FISA or FISC court |
| | 9 | is in a situation where, yes, we're told that there're |
| | 10 | Article III judges that look over this, uh -- these matters. |
| | 11 | But it is my understanding -- and it's -- again, I don't |
| | 12 | have data because there -- I don't think there is data |
| | 13 | available to us.  But, at least from what I read in |
| | 14 | *The Register* and other newspapers out there -- the *New York* |
| | 15 | *Times* -- there's a recent op-ed in *The Register* this week |
| | 16 | about the FISA court being a rubber stamp for the |
| | 17 | government, and that it operates in that way. |
| 09:41 | 18 | So did we get notice?  We did.  But at the end of |
| | 19 | the day, that notice is -- is -- might as well not've been |
| | 20 | given because it was clear that something was going on that |
| | 21 | was not supported by a finding of probable cause by a court |
| | 22 | that would -- by a court, um, such as this one, in other |
| | 23 | words, that we would be able to access those records in some |
| | 24 | way, in -- in our normal procedures. |
| 09:42 | 25 | In this setting, we are not given that benefit. |

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | We are not -- our -- the -- our defendants -- our clients                |
|       | 2  | are not given the benefit of being on notice, being assured              |
|       | 3  | that their Fourth Amendment rights have been secured and                 |
|       | 4  | enforced.  We have no way of knowing, in terms of filing                 |
|       | 5  | these motions -- it's kind of the scatter-shot way of                    |
|       | 6  | filling a motion here.                                                    |
| 09:42 | 7  | For the first time in my life, here I am filing a                        |
|       | 8  | motion to suppress based on the Fourth Amendment vio- -- or               |
|       | 9  | what I believe is a Fourth Amendment violation, and having               |
|       | 10 | absolutely no idea where to start.  Right?  Because I don't               |
|       | 11 | have any kind of an affidavit.  I don't have any kind of a                |
|       | 12 | probable cause statement.  I have nothing to base it on.  So              |
|       | 13 | what we do, instead, is we have this scatter-shot motion                  |
|       | 14 | that sets out every possible way of attacking the Fourth                  |
|       | 15 | Amendment -- or Fourth -- Fourth Amendment violation.                     |
| 09:43 | 16 | It's kind of akin to the old suppression motions                         |
|       | 17 | that I think this Court was -- was familiar with back in the             |
|       | 18 | Court's C-5 days, where I think the Court might recall --                 |
|       | 19 | and I try to find one 'cause I thought it'd be fun to -- not              |
|       | 20 | "fun," but interesting to attach as an exhibit to my motion.              |
|       | 21 | But I couldn't find it -- find one.                                       |
| 09:43 | 22 | But I think the court'll recall where the Public                         |
|       | 23 | Defender's Office used to just file a motion and check off                |
|       | 24 | boxes, and that would be it.  Right?  But that's the way I                |
|       | 25 | felt like in this -- in filing this motion -- is that                     |

|       |    |                                                                                     |
|-------|----|-------------------------------------------------------------------------------------|
|       | 1  | literally I did not know.  All I knew is we've -- we had                             |
|       | 2  | recordings inside of vehicles.  We have a variety of                                 |
|       | 3  | different ways -- um, surveillance, intelligence-gathering                           |
|       | 4  | is -- has gone on in this case, or at least appears to be --                         |
|       | 5  | have gone on, without the benefit of knowing how they got                           |
|       | 6  | it.  A wiretap, Title 3 --                                                           |
| 09:43 | 7  | (Court reporter requests clarification for the                                       |
|       | 8  | record.)                                                                             |
| 09:43 | 9  | MS. CORRIGAN:  A Title 3 wiretap.                                                    |
| 09:43 | 10 | We know we don't have that.  Which, normally we                                      |
|       | 11 | get a copy of -- the Court is well familiar with 'em.  I've                          |
|       | 12 | attacked those wiretaps before.  We get tons of paper to                             |
|       | 13 | show what the basis is.                                                              |
| 09:44 | 14 | Here we've got nothing.  And I think that the                                        |
|       | 15 | Court -- and I -- I understand that other courts have                                |
|       | 16 | blessed this procedure.  But, you know, I think that what we                         |
|       | 17 | end up with is, that, *"Oh, well, this is what everybody else*                       |
|       | 18 | *does."*  This is the common practice.  This is what is going                        |
|       | 19 | on in this country.                                                                  |
| 09:44 | 20 | Well, I think that this Court -- and I know this                                     |
|       | 21 | Court will -- it, obviously, takes this very seriously --                            |
|       | 22 | but I'm suggesting that the Court be very mindful that we                            |
|       | 23 | are consistently, through these processes, trampling the                            |
|       | 24 | rights of every citizen in this country.                                             |
| 09:44 | 25 | But, in particular, my concern is today and -- and                                   |

1    Mr. Badawi's rights, and his rights being trampled here.

2    Because there really is no way that I can confirm one way or

3    the other whether there was, in fact, probable cause to do

4    what they did.  There's -- whether -- and what the court

5    actually looked at.  I mean, as the Court knows, I haven't

6    been -- I, to this day, still have not been provided with

7    adequate -- with information or the documents that support

8    the request -- the information that was given to those

9    Title III judges in the FISC court, the FISA court --

10   whatever we're gonna call it.

09:45   11        We don't know.  And so we are shooting in the dark

12   here.  Um, I don't think that this is something that our --

13   that should be tolerated under our Constitution.  I think

14   our Fourth Amendment is -- is there for a reason.  It's

15   tattered.  I -- I think, just under general law these days,

16   it's tattered.  But what this FISA Court suggests, it should

17   be -- should be obliterated, and that the information --

18   that we should just trust what's gone on.

09:45   19        And I'm just gonna go back to what I said earlier:

20   I think as a matter of policy, to give in to ISIS and ISIL

21   on this issue -- on this very issue -- gives in to them.

22   But more -- but, at the end of the day, we cannot give in as

23   a nation or in -- in the courts to the obliteration of our

24   rights.  Because it's not just the rights of my client; it's

25   the rights of everyone in this courtroom.  It's the rights

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | of everyone who's going to Crave and all the other           |
|       | 2  | restaurants in this -- in Santa Ana today, throughout        |
|       | 3  | Orange County, and across our nation.                        |
| 09:46 | 4  | Um, we give in to that, I think that we -- it's a            |
|       | 5  | sorry day that we give in to that.  And I think that the --  |
|       | 6  | by not granting the motion, this Court gives in to it.       |
| 09:46 | 7  | And I would submit.                                           |
| 09:46 | 8  | THE COURT:  Counsel, thank you.                               |
| 09:46 | 9  | Mr. Lengyel-Leahu.                                            |
| 09:46 | 10 | MR. LENGYEL-LEAHU:  Thank you, Your Honor.                   |
| 09:46 | 11 | **REBUTTAL BY MR. LENGYEL-LEAHU**                            |
| 09:46 | 12 | MR. LENGYEL-LEAHU:  I also got notice of their              |
|       | 13 | intent to introduce the FISA-acquired information.           |
| 09:46 | 14 | And let's not forget that the only reason I got             |
|       | 15 | that notice is because they were found in violation of       |
|       | 16 | Patriot Act.  And when I say "they," the Justice             |
|       | 17 | Department -- they repeatedly violated the Patriot Act to    |
|       | 18 | the point that the federal court had'a get involved and say, |
|       | 19 | *"You must give notice."*                                    |
| 09:47 | 20 | And, as co-counsel said, it's the bare-minimal of           |
|       | 21 | notice.  *"Oh, by the by, we're using information acquired*  |
|       | 22 | *through the Patriot Act."*  And that's all we get, which is |
|       | 23 | an absolute violation of the notion that we have an          |
|       | 24 | adversarial system.  And the whole point of an adversarial   |
|       | 25 | system is basically to find the truth of issues.             |

09:47   1          Yet, I'm being denied -- my client is being denied

2    the opportunity to adversarial-ly litigate the issue as to

3    whether or not the information was obtained in accordance

4    with our Constitution.

09:47   5          And, yes, we all know Congress passed a law.  But

6    that has never been the standard under the Constitution.

7    They passed the Alien and Sedition Acts, too.  Congress can

8    do things that are unconstitutional.  And it is incumbent

9    upon you and the federal justice system to step in and say

10   *No more.*

09:48   11         We have to do something to protect our rights.

12   And, clearly, the government is embarrassed by this because

13   their arguments make no sense whatsoever.  They tell us that

14   the judges look very closely and offer no evidence of that.

15   In fact, what we know is there have been specific violations

16   where they've been caught.

09:48   17         They say they're not a rubber stamp, but don't

18   provide us with any statistics to that effect.  How many

19   applications have been denied?  We have no idea.  Yet we

20   hear reports and rumors.  But we'll never get into the weeds

21   of the thing because they won't provide the information.

09:48   22         An open government?  Hardly on this issue.

09:48   23         Others say it's okay?  Let's take a poll of

24   everyone who believes that the Constitution should be

25   suspended for these issues.  And that's what we're going to

|        |    |
|--------|----|
|        | 1  | base the Constitution on from here on in?  Absolutely not. |
| 09:48  | 2  | You took an oath.  We all took an oath.  We're |
|        | 3  | gonna uphold the Constitution.  And we either -- we either |
|        | 4  | respect those oaths that we personally took, or we ignore |
|        | 5  | them because a lot of people agree with it.  That can't be |
|        | 6  | the standard.  We have to have the gold standard.  We are |
|        | 7  | the gold standard. |
| 09:49  | 8  | Absolutely consistent with the Constitution? |
|        | 9  | Clearly that's what the government position is.  And they're |
|        | 10 | advocating it.  But it's not clearly anything.  When you say |
|        | 11 | the word "clearly" or "absolutely," that's the absence of |
|        | 12 | argument.  That's a conclusion. |
| 09:49  | 13 | And if the Court, alone, is allowed to look at it, |
|        | 14 | as I mentioned before, it is not an adversarial process at |
|        | 15 | all.  And if we're gonna suspend the adversarial process, |
|        | 16 | then we're gonna suspend the search for truth and we're just |
|        | 17 | going to rely on the whims and prejudices of the |
|        | 18 | individuals. |
| 09:49  | 19 | We're not a country of men.  We're a country of |
|        | 20 | laws.  It's what makes us unique.  And when we're going to |
|        | 21 | step away from that and allow individuals to determine what |
|        | 22 | is Constitutional and what isn't, then we have failed. |
| 09:50  | 23 | And I hope we don't fail in this case. |
| 09:50  | 24 | I submit. |
| 09:50  | 25 | THE COURT:  All right.  Thank you, Counsel. |

| | | |
|---|---|---|
| 09:50 | 1 | Counsel on behalf of the government. |
| 09:50 | 2 | MS. HEINZ:  Just briefly, Your Honor. |
| 09:50 | 3 | **REBUTTAL BY MS. HEINZ** |
| 09:50 | 4 | MS. HEINZ:  The reason that counsel received the |
| | 5 | notice of the FISA -- the FISA notice in this case was |
| | 6 | because it's required by law, not because they violated the |
| | 7 | Patriot Act or some other reason.  It is because it is |
| | 8 | required by law, and because government -- the government |
| | 9 | complies with the law and provided the notice in compliance |
| | 10 | with the law. |
| 09:50 | 11 | Counsel makes a lot of different arguments |
| | 12 | complaining about the statute.  The statute is the law.  If |
| | 13 | they want the law changed, then they need to get Congress to |
| | 14 | change the law.  That's the way it is.  Many, many courts |
| | 15 | have upheld this law and have found that FISA is |
| | 16 | constitutional. |
| 09:51 | 17 | Your Honor, may I check with co-counsel for a |
| | 18 | moment? |
| 09:51 | 19 | THE COURT:  Absolutely. |
| 09:51 | 20 | MS. HEINZ:  Nothing further from the government, |
| | 21 | Your Honor. |
| 09:51 | 22 | THE COURT:  All right. |
| 09:51 | 23 | Now, let me ask, are there other motions that you |
| | 24 | wish to argue today? |
| 09:51 | 25 | You have a pending severance motion, for instance, |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | that's set later in May.                                     |
| 09:51 | 2  | MS. CORRIGAN:  Correct.                                       |
| 09:51 | 3  | THE COURT:  Let me talk to all of you about that.            |
| 09:51 | 4  | You haven't received a ruling yet from this Court,           |
|       | 5  | but you can probably expect a ruling by sometime next week.  |
|       | 6  | I tend to get back to matters immediately and I'll work      |
|       | 7  | through the weekend.                                         |
| 09:52 | 8  | MS. HEINZ:  Your Honor, the government would like            |
|       | 9  | the opportunity under the schedule to file oppositions.      |
| 09:52 | 10 | THE COURT:  Oh, why was -- was it set, then, for             |
|       | 11 | hearing today?                                               |
| 09:52 | 12 | MS. HEINZ:  No.  The severance motion is set                 |
|       | 13 | for --                                                       |
| 09:52 | 14 | THE COURT:  Oh, no.  Let me talk to you about                |
|       | 15 | that.  Just a moment.  Just a minute.  I understand that.  I |
|       | 16 | thought we were back on the original motion.  No.  The FISA  |
|       | 17 | suppression.                                                 |
| 09:52 | 18 | More than welcome to, obviously.  What I'm                   |
|       | 19 | suggesting is this:  If your motion was successful, and it   |
|       | 20 | was severed, the government needs to have notice because     |
|       | 21 | there would be two consecutive trials.  They would be back   |
|       | 22 | to back.  In other words, it's not going over.  But I need   |
|       | 23 | to rely upon the availability of witnesses.  That's a        |
|       | 24 | hardship for you, in a sense.                                |
| 09:52 | 25 | If we're proceeding in a non-severed trial, I               |

| | | |
|---|---|---|
| | 1 | think the defense needs to know that.  So presently the |
| | 2 | motion is scheduled for what day?  I think it's May 31st. |
| | 3 | Could you check? |
| 09:53 | 4 | MS. CORRIGAN:  Yes. |
| 09:53 | 5 | MS. HEINZ:  Yes, Your Honor. |
| 09:53 | 6 | THE COURT:  May 31st? |
| 09:53 | 7 | Let me see if we can take that a little bit |
| | 8 | earlier.  But, obviously, you're gonna file opposition. |
| | 9 | There could be a reply. |
| 09:53 | 10 | I'm just wondering if we can tweak that schedule a |
| | 11 | little bit.  Maybe it's just better to leave it for |
| | 12 | May 31st. |
| 09:53 | 13 | MS. HEINZ:  Your Honor, I believe -- yes, the |
| | 14 | government's oppositions, under the current schedule, are |
| | 15 | due next Monday, Your Honor. |
| 09:53 | 16 | THE COURT:  Next Monday.  I'd forgotten that.  I |
| | 17 | couldn't remember the date offhand. |
| 09:53 | 18 | MS. HEINZ:  And I believe the date for replies is |
| | 19 | the following Monday. |
| 09:53 | 20 | THE COURT:  And I wanna apologize.  All my papers |
| | 21 | are nextdoor -- when we had an issue this morning. |
| 09:53 | 22 | MS. HEINZ:  Yes. |
| 09:53 | 23 | THE COURT:  I spent most the morning on the phone |
| | 24 | with MDC.  We moved nextdoor, so I just don't have those |
| | 25 | dates. |

**DEBBIE GALE, U.S. COURT REPORTER**

09:53   1          Well, let's keep the schedule for now.  But I want

        2   to ask the government:  It proceeds forward in a non-severed

        3   trial, is your estimate still about 15 days?

09:54   4          That was the original -- I'm not holding you to

        5   that.  I'm just trying to get an idea.  Because you know

        6   we're going to be in recess over that 4th of July.  Maybe

        7   the jury is able to proceed, but I don't wanna take the

        8   chance on losing jurors.  'Cause we're sending out over

        9   5,000 jury summons.

09:54  10          In the Aryan Brotherhood we had to send out 18,000

       11   jury summons for trial.

09:54  12          Ms. Corrigan, were you involved in that case?  You

       13   were involved in the second trial.

09:54  14          MS. CORRIGAN:  Yes.

09:54  15          THE COURT:  You were involved in the nine-month

       16   trial.

09:54  17          The six-month trial, we had to send out 18,000

       18   jury summons for a jury pool of, I think, 200 in both your

       19   five- or six-month trial and the first trial.

09:54  20          Here, we're sending out a lot less.  But I intend

       21   to have a jury pool of 200.  And the reason for that is I

       22   think the questionnaire -- once those questions are asked --

       23   are going to cause a reaction from some members of the

       24   public.

09:54  25          Second, I want to address the timing of this.

**DEBBIE GALE, U.S. COURT REPORTER**

|        |    |                                                            |
|--------|----|------------------------------------------------------------|
|        | 1  | This case was set for trial -- what? -- nine, ten months   |
|        | 2  | ago.                                                       |
| 09:55  | 3  | MS. CORRIGAN:  That's correct.                             |
| 09:55  | 4  | THE COURT:  Okay.  Now, believe it or not,                 |
|        | 5  | sometimes judges are rational.  You won't believe this, but|
|        | 6  | I didn't know who would be the potential nominees from the |
|        | 7  | respective parties.  But I do know that the war on terror, |
|        | 8  | immigration -- you know, all these things are hot-button   |
|        | 9  | issues.  And one of the reasons that the Court picked June |
|        | 10 | is it tends to be what I call a "lull."                    |
| 09:55  | 11 | Normally, the parties have people in places, their         |
|        | 12 | nominees, unlike --                                        |
| 09:55  | 13 | MS. HEINZ:  Unlike now.                                    |
| 09:55  | 14 | THE COURT:  -- yeah, unlike now.  It's been                |
|        | 15 | interesting for both parties.                              |
| 09:55  | 16 | So you have to know that that was one of the               |
|        | 17 | considerations.  Because I couldn't anticipate, you know,  |
|        | 18 | the next act or non-act.  Could never have anticipated     |
|        | 19 | San Bernardino when this was set.  Could've never          |
|        | 20 | anticipated Paris or Belgium.  Couldn't anticipate the Navy|
|        | 21 | SEAL, who you brought into the record.                     |
| 09:56  | 22 | So my evaluation at the time was there might be a          |
|        | 23 | terrorist act, and I didn't certainly want the drama of that|
|        | 24 | carryover to your client, but I'd recognized -- very       |
|        | 25 | possible.  That's why you're getting a questionnaire.      |

**DEBBIE GALE, U.S. COURT REPORTER**

09:56  1          I caution you, though, when I've used these

2    extensive questionnaires, both in state court for death

3    penalty cases, and here for, uh -- well, the death penalty

4    cases involving the A.B. and the Mexican Mafia -- you go at

5    your own -- well, let me say -- just say, you tread a narrow

6    road.  I won't cut you off.  I'll give you a period of time

7    for voir dire.  But if you ask the wrong question and it

8    opens up Pandora's box, I'm not going to step in and protect

9    you.  So that's why the questionnaire's there.  That

10   questionnaire's an in-depth look, where we can get down to

11   bias, cause, et cetera, and have a discussion.

09:56  12         Now, we can do an old *Hovey* voir dire process.  We

13   can -- in most death penalty cases on the State Court level,

14   unlike some of my colleagues, who moved rapidly, tried to

15   get a jury in one day, I've always gone through a *Hovey* voir

16   dire.  I don't intend to do that here; in other words, where

17   each juror was called in.  I used to be able to do ten in

18   the morning.  It got up to 15 or so.  So we went through

19   about 30 jurors a day.

09:57  20         That individual questioning in a death penalty

21   case about whether you would always or substantially, uh --

22   have a substantial likelihood of finding death, if you

23   reached first-degree murder and special circumstances on the

24   state level or the federal level, or if you would never, or

25   have a substantial likelihood of never finding for death --

1   you know, got rid of what I call the *Witt/Witherspoon*

2   dichotomy of people who never or would always rush to that

3   kinda judgment.

09:57   4           I contemplated that here, but I chose not to.  I

5   think that the questionnaire is enough to sort out the

6   obvious bias.  You can make motions for cause.  And on this

7   occasion, I anticipate more time in the hallway than we

8   would normally spend.  But be careful of your questions.

09:58   9           I'm not limiting you.  But once you ask the wrong

10   question, you may get the answer that one'a colleagues got

11   who decided that he would take a shortcut --

09:58   12          And you love stories, don't you?

09:58   13          MS. HEINZ:  Yes, Your Honor.

09:58   14          THE COURT:  1984 -- won't name the judge 'cause

15   most of you weren't alive then -- decided that he was going

16   to get a death penalty jury in one day.  And I've told this

17   story many times.

09:58   18          Instead of following *Witt/Witherspoon* and slowing

19   down for fairness, he decided to prove how economical he

20   was.  And so he asked a hundred jurors in the hallway:

09:58   21          *"Would any of you have a substantial*

22              *likelihood, or automatically, or always*

23              *find for death, if you reach*

24              *first-degree murder and special*

25              *circumstances; or is there a substantial*

1           *likelihood that you would never find for*

2           *death, or that you would never find for*

3           *death?"  (Verbatim.)*

09:58   4           One gentleman seated amongst the twelve

5    perspective jurors got up and said the following:

09:58   6           *"My sister was raped and murdered, and*

7           *I'd kill every sonofabitch I could."*

09:59   8           Now, pardon the expression, pardon the vernacular,

9    but that's an absolute accurate quote.  Now that judge went

10   on to pretend that the jury wasn't influenced by that, made

11   a nice record, and apparently -- but you know the impact of

12   that.  So I tell you that little dramatic story about

13   just -- you've got a questionnaire.  I've tried to make that

14   as thorough as possible and take into account...

09:59   15          The second thing, is I've got more questionnaires

16   over more years than you can possibly imagine.  I've got 32

17   pages, which are the Circuit's delight.  They're not

18   workable.  In a trial situation, you can't go through 32

19   pages.  That's why it's been trimmed down to about 9 pages

20   or so.  It's a very workable document.

09:59   21          If you have suggestions in the meantime, or if you

22   come to me with a stipulation, I'll modify that

23   questionnaire.  But eventually we're gonna start sending out

24   an initial 5,000 jury summons.  We think we can get 180 to

25   200 people from that.

Case 8:15-cr-00060-DOC   Document 286   Filed 03/31/17   Page 55 of 85   Page ID #:3780
8:15-CR-0060-DOC - 5/5/2016 - Item No. 2

55

09:59    1        But I wanna ask your permission about something:

2    Let's just say we got lucky -- which we won't -- and we had

3    380 to 400 that came back, and said, *"Oh, yeah,*

4    *Judge Carter, I can serve for six weeks"* -- which, by the

5    way, is not a long trial for this Court.

10:00    6        Do I stop at 200?  Or do you want me to continue

7    to collect those questionnaires?  Because, remember, when I

8    collect those question -- and we bring these people in,

9    we're gonna have a courthouse with 400 people.  Now, in the

10    past, we've stopped with the first 200, for instance, but by

11    consent of counsel.  'Cause you don't know what you're going

12    to get when you send out 5,000 jury summons.

10:00    13        So, two things in summary:  First, I think this is

14    the most applicable time in fairness the case could be tried

15    because there's no "rhetoric" taking place in June.  There

16    will be a lot of pronouncements in the political arena by

17    both eventual candidates, whoever they are, starting

18    after -- or during the conventions and after the

19    conventions.  It's a very dangerous time for you to try the

20    case.  Hopefully we'll be done with it by that time.

10:01    21        Number two, you can't control another attack.

22    There's just no way to have a timing.  *(Verbatim.)*  So

23    hopefully, you know, the world is peaceful up until at least

24    the time of the trial.

10:01    25        I'll hold to May 31st, then, in terms of motion to

Case 8:15-cr-00060-DOC   Document 286   Filed 03/31/17   Page 56 of 85   Page ID #:3781
8:15-CR-0060-DOC - 5/5/2016 - Item No. 2

56

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | sever.  Fair enough?                                         |
| 10:01 | 2  | MS. HEINZ:  It's fine with the government.                   |
| 10:01 | 3  | THE COURT:  Not gonna spoil your opposition or the           |
|       | 4  | reply.  Okay?  We'll hear it on May 31st.  So don't be       |
|       | 5  | concern.                                                     |
| 10:01 | 6  | Now, is there any other business that you'd like             |
|       | 7  | to bring to my attention today?  And, if not, Mr. Badawi,    |
|       | 8  | you're going to be ordered by the Court to be forthwith      |
|       | 9  | transported to MDC.                                          |
| 10:01 | 10 | With my apologies to the family.  I'll get 'em               |
|       | 11 | back to you as fast as possible.  Just as quick as I can.    |
|       | 12 | But he's gotta voluntarily eat.                              |
| 10:01 | 13 | Meanwhile, Marcelino is going to set up a process            |
|       | 14 | here locally.  I didn't want 'em to do it today, because I   |
|       | 15 | think they're well-suited, with the prior history,          |
|       | 16 | Ms. Corrigan, in Los Angeles to treat this.                  |
| 10:01 | 17 | But during the trial, I can't take the time to run          |
|       | 18 | him down to MDC, run him back, run 'em down, run 'em back -- |
|       | 19 | it's almost cruel to do that.  So there'll be a "local"      |
|       | 20 | procedure.  I don't think it's going to have to be used, but |
|       | 21 | I've got to be prepared to have it used, 'cause we're not    |
|       | 22 | recessing.                                                   |
| 10:02 | 23 | So, Mr. Badawi, I didn't want this news to come to          |
|       | 24 | you from your counsel.  I don't wanna speak to you right     |
|       | 25 | now.  There's no negotiation with me.  This is what's        |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | happening.  You've a choice in the next couple hours and a          |
|       | 2  | decision to make whether you're gonna voluntarily eat.             |
| 10:02 | 3  | But you're minimally -- "minimally" -- 134 pounds.                 |
|       | 4  | If it was my preference, you'd be well-under *(sic)* 140.          |
|       | 5  | Your choice.  Otherwise, the tube's going in you today.  I         |
|       | 6  | don't have to describe that to you.  You went through it           |
|       | 7  | once.  It's not pleasant.  And I'll make the order, and I've       |
|       | 8  | already done so.                                                   |
| 10:02 | 9  | All right.  Now, anything further on behalf of the                 |
|       | 10 | government?                                                        |
| 10:02 | 11 | MS. HEINZ:  Your Honor, you did have on calendar                   |
|       | 12 | for today the two motions to suppress that were filed by          |
|       | 13 | counsel for Mr. Elhuzayel.  I'm sorry.  I misspoke.  Motions       |
|       | 14 | to dismiss.                                                        |
| 10:03 | 15 | THE COURT:  Motions to dismiss.                                    |
| 10:03 | 16 | We've been through the motions to suppress and --                 |
| 10:03 | 17 | MS. HEINZ:  Yes.                                                   |
| 10:03 | 18 | THE COURT:  -- they're under submission now.                      |
| 10:03 | 19 | Counsel, motions to dismiss?                                      |
| 10:03 | 20 | MR. LENGYEL-LEAHU:  Those would be my motions,                    |
|       | 21 | Your Honor.                                                       |
| 10:03 | 22 | THE COURT:  Please.                                               |
| 10:03 | 23 | **DEFENDANT ELHUZAYEL'S MOTIONS TO DISMISS**                      |
| 10:03 | 24 | MR. LENGYEL-LEAHU:  The government, in their                      |
|       | 25 | response to our motion, obviously identifies the importance       |

1    of the motion.

10:03    2        *(Court reporter requests clarification for the*

3        *record.)*

10:03    4        MR. LENGYEL-LEAHU:  We have brought a motion

5    indicating that my client is being accused of attempting to

6    provide material support to a foreign terrorist

7    organization, as those items are specifically defined by

8    statute.  And, in this case, a foreign terrorist

9    organization must be so designated in collaboration between

10    the Secretary of State, the Department of Treasury, and the

11    Attorney General's Office.

10:04    12        I went on the website just yesterday, and the

13    State Department has a list of foreign terrorist

14    organizations that they publish and, um, make American

15    citizens aware of what organizations they can or cannot --

10:04    16        THE COURT:  Certifications.

10:04    17        Certifications?

10:04    18        MR. LENGYEL-LEAHU:  Um, and I notice, as of

19    yesterday, "The Islamic State" is not listed anywhere on the

20    list, and has never been listed on their website.

10:04    21        THE COURT:  Now, let me ask you:  Assuming that

22    they're not listed or will not be listed by the time of

23    trial, it leaves you two in a precarious position, a

24    tactical decision:  One, I can anticipate the government

25    saying, *"You know, Judge Carter, we need to show this*

1    *organization, its structure, and its acts,"* which is the

2    very thing I would assume that you don't want a detailed

3    expert or evidence on.

10:05   4            There's not a certification, is there, at the

5    present time that the government's aware of?

10:05   6            MS. HEINZ:  Your Honor, the -- of course, ISIL --

7    the organization, ISIL, which also has many, many aka's,

8    is --

10:05   9            THE COURT:  DAESH?  ISIS?

10:05   10           MS. HEINZ:  -- is a designated foreign terrorist

11   organization, and has been so designated for all the

12   relevant time period in this case.

10:05   13           And, in addition, Your Honor, the State Department

14   has also designated the, quote/unquote, "Islamic State" as

15   an alias, an aka for ISIL, although that was done after

16   these defendants were arrested.

10:05   17           THE COURT:  I see.

10:05   18           Okay.  Counsel?

10:06   19           MR. LENGYEL-LEAHU:  I don't believe that the

20   activities of a terrorist organization are even relevant to

21   the proceedings because it does not matter what the

22   organization does.  If they're listed on and certified by

23   the State Department, the Department of Treasury, and the

24   Attorney General's Office -- if they're certified, we're not

25   allowed to litigate whether or not they should be listed.

10:06  1          It could be *The Little Sisters of Mercy.*  If

       2    they're on the list, they're on the list.

10:06  3          And what our objection is "The Islamic State"

       4    clearly has been added as of September 2015 -- not added to

       5    the website to give notice to the population, but added into

       6    the Federal Register.  And what's curious is the

       7    government's position on that, because it's clearly an *ex*

       8    *post facto* law.

10:06  9          What they are attempting to do, by passing a

      10    certification in September, is to bootstrap-in everybody who

      11    was attempting to go over to join the new Caliphate, which

      12    is a completely different structure.  It's a completely

      13    different identity.  In fact, they specifically declare an

      14    end to ISIS and ISIL, and have never used it since.

      15    *(Verbatim.)*

10:07 16          They have a very extensive market in public

      17    relations.  They -- they have a very extensive media

      18    presence.  And they were very clear that ISIS and ISIL is no

      19    more as of June of 2014.  And Baghdadi declared himself as

      20    the new Khalif of the new universal Caliphate.  And we have

      21    his speech, Your Honor.  And we have the, uh, translations

      22    of the announcements to the world.

10:07 23          The entire world recognizes The Islamic State as

      24    something new and different than an insurgency that grew up

      25    out of Iraq and an insurgency that grew up inside of Syria.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | This is a different animal.  It's a different entity.        |
| 10:08 | 2  | And it's completely disingenuous to say that the            |
|       | 3  | government can add this alias a year and four months after   |
|       | 4  | the creation of the new organization and say, *Oh, but it*   |
|       | 5  | *includes everyone in history that's ever been arrested.*"   |
|       | 6  | It's not right.  That is an *ex post facto* law.  And that's |
|       | 7  | why we specially reject it.                                  |
| 10:08 | 8  | Notice that an activity is a crime -- is a                   |
|       | 9  | necessary prerequisite in our jurisprudence.  We have to     |
|       | 10 | know that an act -- a specific act is illegal.  And, again,  |
|       | 11 | to point to an historical reference, we're talking of the    |
|       | 12 | Star Chamber or, in fiction, Kafka's *The Trial.*            |
| 10:08 | 13 | How can anyone know that The Islamic State is, in            |
|       | 14 | fact, an organization that is not allowed to be materially   |
|       | 15 | supported, unless we're given notice of it?  And that notice |
|       | 16 | doesn't come out -- it comes out in the Federal Register,    |
|       | 17 | which isn't dramatically published.  And what's incredibly   |
|       | 18 | curious is the State Department did not put out a press      |
|       | 19 | release -- that I could find -- that -- that -- that         |
|       | 20 | indicated that The Islamic state is now also added to this   |
|       | 21 | list.                                                        |
| 10:09 | 22 | They put out press releases for everybody else              |
|       | 23 | they do.  But I can't find one on The Islamic State.  It's   |
|       | 24 | almost as if they snuck it in and kept really quiet about    |
|       | 25 | it.  You will never hear the Secretary of State, the        |

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | President or the Attorney General refer to "The Islamic                       |
|       | 2  | State."  It's always "ISIL" or "DAESH" or "ISIS," never "The                  |
|       | 3  | Islamic State."  And I think there's an important                            |
|       | 4  | distinction.  Because they're completely different entities.                 |
| 10:09 | 5  | What's also interesting:  On the Department of                               |
|       | 6  | State website, where it lists all of the FTO's --                            |
| 10:10 | 7  | *(Court reporter requests clarification for the*                             |
|       | 8  | *record.)*                                                                    |
| 10:10 | 9  | MR. LENGYEL-LEAHU:  FTO's, Foreign Terrorist                                 |
|       | 10 | Organizations.                                                               |
| 10:10 | 11 | When I filed my motion, I obviously was looking at                           |
|       | 12 | the website.  And I noticed some really interesting                          |
|       | 13 | language, um -- and it was at the bottom of the website.                     |
| 10:10 | 14 | Now, I was able to find it again on the press                                |
|       | 15 | release of May of 2014.  And it says -- it says in the press                 |
|       | 16 | release, uh, in short:                                                        |
| 10:10 | 17 | *"Tension piqued in early 2014, when*                                         |
|       | 18 | *al-Qa'ida leader"* --                                                        |
| 10:10 | 19 | *(Court reporter requests clarification for the*                             |
|       | 20 | *record.)*                                                                    |
| 10:10 | 21 | THE COURT:  Give it with the spellings.                                       |
| 10:10 | 22 | MR. LENGYEL-LEAHU:  I'll spell the names for you.                            |
| 10:10 | 23 | *"-- Ayman al-Zawahiri"* --                                                   |
| 10:10 | 24 | A-Y-M-A-N, A-L, hyphen, Z-A-W-A-H-I-R-I.                                      |
| 10:11 | 25 | *"-- released a statement dismissing ISIL*                                    |

1              *from AQ"* -- Al Qa'ida.  *"Therefore, we*
2              *have amended the AQI designation to*
3              *better reflect the change in status of*
4              *both ISIL and ANF."*
10:11  5       Here's the important part:
10:11  6       *"We review our designations regularly*
7              *and, as needed, make adjustments to*
8              *ensure we remain current with*
9              *nomenclature and other changes."*
10:11  10      Since my motion, that language has been removed
11      from the State Department's website.  And I wonder why.  But
12      I don't really have to wonder.  We know why.  Because we
13      made a motion that's absolutely dispositive in this case.
10:11  14      The government's hiding from the fact that The
15      Islamic State exists.  They don't wanna talk about it.  They
16      don't wanna refer to it, and they don't.  But it does.  And
17      because it does, it needs to be on the list.
10:12  18      Now, they mighta snuck it in on the Federal
19      Register and not told anybody about it.  Granted.  But we
20      still have a Constitution that says you cannot have an
21      *ex post facto* law.  And if that's the case, Your Honor,
22      that's exactly what they're trying to do here.  And that's
23      why Counts One and Two should be dismissed.  Because,
24      clearly, my clients said over and over in his interview with
25      the FBI he was going to join The Islamic State.  He was

**DEBBIE GALE, U.S. COURT REPORTER**

|       |    |                                                         |
|-------|----|---------------------------------------------------------|
|       | 1  | migrating there and he was never coming back.           |
| 10:12 | 2  | Thank you, Your Honor.                                   |
| 10:12 | 3  | We'll submit.                                            |
| 10:12 | 4  | THE COURT:  Counsel, I want to make sure.  Are you       |
|       | 5  | joining in this motion, Ms. Corrigan?                    |
| 10:12 | 6  | MS. CORRIGAN:  Can I approach?  I'm not gonna            |
|       | 7  | answer that with a yes or no, Your Honor.                |
| 10:12 | 8  | THE COURT:  Okay.                                        |
| 10:12 | 9  | MS. CORRIGAN:  I may just answer it this way:            |
|       | 10 | This folds right into what's not --                      |
| 10:12 | 11 | THE COURT:  The motion to sever?                         |
| 10:12 | 12 | MS. CORRIGAN:  The motion to sever because --            |
| 10:12 | 13 | THE COURT:  Let's delay that.                            |
| 10:12 | 14 | MS. CORRIGAN:  I have very grave concerns over           |
|       | 15 | these arguments and how they're gonna present my client. |
| 10:13 | 16 | THE COURT:  I read your opening motion.                  |
|       | 17 | Obviously, I haven't read governor's -- uh, the government's |
|       | 18 | yet.  But I saw your opening motion, so we'll just delay |
|       | 19 | that.  Okay.                                             |
| 10:13 | 20 | MS. CORRIGAN:  Thank you.                                |
| 10:13 | 21 | THE COURT:  Okay.                                        |
| 10:13 | 22 | Counsel on behalf of the government?                     |
| 10:13 | 23 | MS. HEINZ:  Briefly, Your Honor.                         |
| 10:13 | 24 | **RESPONSE BY MS. HEINZ**                                |
| 10:13 | 25 | MS. HEINZ:  Defense -- um, Counsel for                   |

1    Mr. Elhuzayel claims that The Islamic State is a

2    completely -- completely different organization from ISIL.

3    The government, of course, disagrees.  It is the same

4    organization.  It is the same structure.  It is the same

5    leadership.  And the government will present evidence at

6    trial as to that fact.

10:13   7         It is -- Counsel for Mr. Elhuzayel also argues

8    that the entire world recognizes that The Islamic State is a

9    different organization from ISIL.  Again, that is just

10   patently wrong.  It's just wrong.

10:14   11        The fact that members of the United States

12   Government, such as the President and the Secretary of

13   State, rarely use the term "The Islamic State" is actually

14   evidence of the fact that they do not recognize that as a

15   government, as a legitimate government, or a legitimate

16   organization who should be recognized as being legitimately

17   in control of the territory that they hold.

10:14   18        The Indictment here charges the defendants with

19   providing material support to ISIL, also known as a variety

20   of other names, also known as "The Islamic State."

21   Therefore, the Indictment gives the defendants fair notice

22   that they are charged with providing material support to a

23   designated foreign terrorist organization, ISIL, that is

24   also now known as The Islamic State.  So they -- the

25   defendants have exact knowledge about what the government is

DEBBIE GALE, U.S. COURT REPORTER

1    alleging here.

10:15    2         There is no -- there is no argument, I think, by

3    the defense that ISIL is not designated.  I think the

4    defense agrees that ISIL is designated.  So the only

5    argument here is whether or not a defendant, who claims that

6    they are going to join The Islamic State, somehow is free to

7    do so even though that is the same organization that is

8    designated as ISIL.

10:15    9         The government would also introduce at trial

10    evidence that the defendants here both knew that the,

11    quote/unquote, "Islamic State" was the same as ISIL because

12    they used those terms interchangeably in the evidence.

10:16    13         The government -- just briefly on the evidence

14    that the government would introduce at trial:  The

15    government has the burden of proving that the defendants in

16    this case knew that ISIL, aka The Islamic State, engaged in

17    terrorism and terrorism activities.  Therefore, it is

18    necessary for the government to introduce that kind of

19    evidence.

10:16    20         And, to the extent that defendants are using the

21    term "Islamic State" rather than ISIL in some of the

22    evidence, then the government also needs to introduce some

23    evidence that ISIL and The Islamic State are the same

24    organization.  So while the government is very, very

25    cognizant of issues of inflaming the jury or unfair

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | prejudice, quite frankly, the evidence at trial, um, it is         |
|       | 2  | necessary to present evidence that these defendants did know       |
|       | 3  | that ISIL, aka The Islamic State, was engaged in terrorism.        |
|       | 4  | And the evidence that the government will be showing is            |
|       | 5  | evidence that the defendants themselves disseminated.              |
| 10:17 | 6  | So it is not -- we are not planning on showing a          |
|       | 7  | lot of ISIL propaganda off the Internet that these                 |
|       | 8  | defendants did not have, or not themselves disseminating,          |
|       | 9  | and that kind of evidence.  The evidence that the government       |
|       | 10 | will show is highly relevant and necessary to prove the           |
|       | 11 | defendants' intent in this -- and knowledge in this case.         |
| 10:18 | 12 | THE COURT:  All right.                                     |
| 10:18 | 13 | MS. HEINZ:  I'm sorry, Your Honor.  May I consult          |
|       | 14 | with co-counsel briefly?                                            |
| 10:18 | 15 | THE COURT:  Certainly.                                     |
| 10:18 | 16 | MS. HEINZ:  Nothing further, Your Honor.                   |
| 10:18 | 17 | THE COURT:  Submitted?  Or would you like another         |
|       | 18 | round of argument?                                                  |
| 10:18 | 19 | MR. LENGYEL-LEAHU:  Just briefly, Your Honor.              |
| 10:18 | 20 | **RESPONSE BY MR. LENGYEL-LEAHU**                          |
| 10:18 | 21 | MR. LENGYEL-LEAHU:  From the same press release I          |
|       | 22 | quoted from earlier -- uh, from the same quotation from the        |
|       | 23 | State Department website that's now been removed, the             |
|       | 24 | State Department indicated, about the amendments, when            |
|       | 25 | changing the designations of aliases or whatnot, they say,        |

|  | 1 | *"differences over management and tactics."* So if there's a |
|---|---|---|
|  | 2 | change in management or a change in tactics of an |
|  | 3 | organization, then they feel that it's obviously something |
|  | 4 | different. |
| 10:18 | 5 | And I -- I draw on for historical perspective -- |
|  | 6 | is our own -- our own government.  Originally, the Articles |
|  | 7 | of Confederation were the original 13 colonies' form of |
|  | 8 | government.  When they went into constitutional convention |
|  | 9 | *(verbatim)* and created the Constitution, it was exactly the |
|  | 10 | same people.  It was the exact same management, but it was a |
|  | 11 | completely different government. |
| 10:19 | 12 | Even the State Department recognizes that there |
|  | 13 | was an announcement of a Caliphate.  Even the State |
|  | 14 | Department recognizes that there were no longer -- in fact, |
|  | 15 | Baghdadi says it very clearly:  They are no longer just |
|  | 16 | going to be an insurgency in Iraq and Syria.  It is now a |
|  | 17 | global call for a worldwide Muslim, uh, form of |
|  | 18 | government -- or form of, uh, the -- the Caliphate. |
| 10:19 | 19 | Consequently, that is a complete difference in |
|  | 20 | both tactics and management, and that would require that the |
|  | 21 | government add them as a foreign terrorist organization. |
|  | 22 | And they haven't. |
| 10:20 | 23 | It's not that the President or the Secretary'a |
|  | 24 | State rarely used "Islamic State."  They never use it. |
|  | 25 | Never.  Those words -- and I've checked -- have never come |

Case 8:15-cr-00060-DOC   Document 286   Filed 03/31/17   Page 69 of 85   Page ID #:3794
8:15-CR-0060-DOC - 5/5/2016 - Item No. 2

69

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | across their lips.  They refer to them as the old            |
|       | 2  | designation "ISIS" and "ISIL," which no longer exists.  And  |
|       | 3  | *(inaudible)*.                                               |
| 10:20 | 4  | *(Court reporter requests clarification for the*            |
|       | 5  | *record.)*                                                   |
| 10:20 | 6  | MR. LENGYEL-LEAHU:  And consequently we would                |
|       | 7  | submit.                                                       |
| 10:20 | 8  | THE COURT:  Okay.                                             |
| 10:20 | 9  | All right.  Counsel, any response?                           |
| 10:20 | 10 | MS. HEINZ:  Nothing further from the government.             |
| 10:20 | 11 | THE COURT:  All right.                                        |
| 10:20 | 12 | For the government, I'm not holding you to an                 |
|       | 13 | exact time.  You understand that?  You'll have time, as will |
|       | 14 | the defense, to put on your case.                            |
| 10:20 | 15 | Is your estimate still about 15 days?  Has it                |
|       | 16 | increased or decreased?                                       |
| 10:20 | 17 | MS. HEINZ:  Your Honor, I think it's going to                |
|       | 18 | decrease.  Earlier today, before the hearing, we met --       |
|       | 19 | defense counsel and the government counsel met.  And I think  |
|       | 20 | we are hopeful --                                             |
| 10:21 | 21 | THE COURT:  Three days?  I'm just kidding you,               |
|       | 22 | Counsel.                                                      |
| 10:21 | 23 | MS. HEINZ:  Yeah.                                             |
| 10:21 | 24 | We are hopeful we are going to be able to enter              |
|       | 25 | into some stipulations which may reduce --                    |

| | | |
|---|---|---|
| 10:21 | 1 | THE COURT: Let's leave it at 15 -- |
| 10:21 | 2 | MS. HEINZ: It may reduce -- |
| 10:21 | 3 | THE COURT: -- but it could be a little shorter. |
| 10:21 | 4 | MS. HEINZ: It could be shorter, of course. But |
| | 5 | it also depends on the defendants, so... |
| 10:21 | 6 | THE COURT: Well, the reason I'm asking you both |
| | 7 | this is, if we get into a trial that week is a guesstimate |
| | 8 | on my part -- it's just a guess that we're going to |
| | 9 | significantly decrease our jury pool unless we take that |
| | 10 | week off. And I don't wanna fight that, getting 200 people |
| | 11 | in here, and having 15 hands go up and say, *"Oh, there's* |
| | 12 | *been a problem,"* because that whole pool will walk out on |
| | 13 | you. |
| 10:21 | 14 | So I think we made the wide decision -- wise |
| | 15 | decision. It's conclusive. What I worry about is splitting |
| | 16 | the defense, splitting an argument. And the one thing I |
| | 17 | pledge to you is the arguments will come in close proximity |
| | 18 | to each other. The jury instructions will come at the same |
| | 19 | time. |
| 10:22 | 20 | What you won't have is the Court instructing on |
| | 21 | jury instructions on a Friday and your argument on a Monday. |
| | 22 | We'll make that work. |
| 10:22 | 23 | The second thing is, you know about the horrendous |
| | 24 | hours. But it's not because I choose that. It's just |
| | 25 | because complex cases demand an awful lotta time. So here's |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | what I'm anticipating; and that is, at the last moment,              |
|       | 2  | oftentimes I get complete disagreement.  If the rule -- if I         |
|       | 3  | rule favorable to the defense, it resolves it.  If I don't,          |
|       | 4  | though, now we're into the quandary of what is the                   |
|       | 5  | government presenting.                                               |
| 10:22 | 6  | And the government's represented fairness and                        |
|       | 7  | moderation.  But, from your perspective, that may not be the         |
|       | 8  | moderation you're seeking.  So I'm gonna be blunt.                   |
| 10:23 | 9  | You're producing an expert; is that correct?                         |
| 10:23 | 10 | MS. HEINZ:  Yes, Your Honor.                                         |
| 10:23 | 11 | THE COURT:  Are you going to show beheadings?  No,                   |
|       | 12 | no.  That's an easy:  Yes or no.                                     |
| 10:23 | 13 | MS. HEINZ:  Um.                                                      |
| 10:23 | 14 | THE COURT:  Why don't you consult with your                         |
|       | 15 | different -- in other words, am I going to see that, and am          |
|       | 16 | I gonna get -- hold on -- am I going to get a last-moment            |
|       | 17 | pushback when you start seeing what the expert's presenting?         |
|       | 18 | Because then I wanna be in session earlier.  I wanna start           |
|       | 19 | resolving what those *in limine* motions are that you believe        |
|       | 20 | are so simply decided.                                               |
| 10:23 | 21 | Or am I going to eventually evidence where the                       |
|       | 22 | defense allegedly have this material in their possession,            |
|       | 23 | whether they're beheadings or not, and disseminating 'em?            |
|       | 24 | Or am I just going to see words?                                     |
| 10:23 | 25 | And I want you to meet for a moment and just                         |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | decide.  Because, otherwise, I'm not going to get caught     |
|       | 2  | with 200 jurors coming in because I'll --                    |
| 10:23 | 3  | Ms. Corrigan, how late were you here with the               |
|       | 4  | Court?                                                        |
| 10:23 | 5  | MS. CORRIGAN:  1:35 in the morning.                          |
| 10:24 | 6  | THE COURT:  1:35 a.m.  Now, we were on the record.          |
|       | 7  | And there's no problem.  I really don't care.  But you hold  |
|       | 8  | the key to the courthouse.                                   |
| 10:24 | 9  | So that last moment is going to leave you                    |
|       | 10 | absolutely exhausted.  I don't need sleep.  I don't care     |
|       | 11 | anymore.  I'm joking with you.  But I'm telling you that     |
|       | 12 | that jury is not going to be disturbed.                      |
| 10:24 | 13 | So I need to wrestle with that last moment 'cause           |
|       | 14 | it always comes as a flurry.  It's in good faith.  I know    |
|       | 15 | that you're very fair, from the government's perspective.    |
|       | 16 | But what you think is fair is anathema to the defense.       |
| 10:24 | 17 | So take a moment, and I'm -- my question's simple:          |
|       | 18 | Am I going to see, through your expert, films of beheadings? |
| 10:24 | 19 | And I'm not against that.  I just wanna make sure           |
|       | 20 | that we're wrestling with that on the record.  We're having  |
|       | 21 | *in limine* motions, if you're pushing back.  Talk.          |
| 10:24 | 22 | MS. CORRIGAN:  And, just for the record,                    |
|       | 23 | Your Honor, I have filed a motion as to that expert.         |
| 10:24 | 24 | THE COURT:  I know.  But they haven't responded.           |
|       | 25 | I know.                                                       |

| | | |
|---|---|---|
| 10:24 | 1 | So we're raising it right now. |
| 10:24 | 2 | Am I going to see beheadings, potentially? |
| 10:24 | 3 | MS. HEINZ:  Your Honor, there will be no videos of |
| | 4 | beheadings.  The defendants in this case disseminated still |
| | 5 | photos of beheadings, so that evidence will come in -- |
| 10:25 | 6 | THE COURT:  From the defense? |
| 10:25 | 7 | MS. HEINZ:  -- from -- no, well, from the |
| | 8 | government. |
| 10:25 | 9 | THE COURT:  I'm sorry.  Let me summarize that very |
| | 10 | quickly.  The evidence, then, is evidence already in the |
| | 11 | defendants' possession that they're disseminating. |
| 10:25 | 12 | Far different, from your perspective, than you |
| | 13 | getting an expert on the stand and proving the actions of |
| | 14 | ISIS, ISIL, DAESH, Islamic State through this expert |
| | 15 | bringing in -- |
| 10:25 | 16 | MS. HEINZ:  The expert is not going to himself |
| | 17 | bring in any evidence.  He is -- he is going to have viewed |
| | 18 | the evidence that the defendants themselves disseminated and |
| | 19 | talk about it. |
| 10:25 | 20 | THE COURT:  Okay.  Now, the reason I'm asking you |
| | 21 | this is I don't want you caught the day before trial on June |
| | 22 | 6th -- we're going to have enough issues concerning jury |
| | 23 | questionnaires, et cetera.  Since we're disseminating |
| | 24 | *(verbatim)* them on Wednesday -- and I don't have my calendar |
| | 25 | in this court right now 'cause we moved so hastily this |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | morning -- um, the jury questionnaire goes out on Wednesday. |
| 10:26    | 2  | We'll do all the xeroxing like we've done before.            |
|          | 3  | You'll get them back on Thursday.  You've got Friday,        |
|          | 4  | Saturday, Sunday.  If we need to be in session, we'll be in  |
|          | 5  | session on Saturdays.  I think we had six consecutive        |
|          | 6  | sessions with the Aryan Brotherhood:  Saturday and Sundays.  |
| 10:26    | 7  | I'm not planning on taking your weekend from you.            |
|          | 8  | But you will be available to me, so cancel any plans in case |
|          | 9  | I need you.  You'll be in session on Monday.                 |
| 10:26    | 10 | My question is, do we need to wrestle with some of           |
|          | 11 | these last moment issues?  And I think we do.  I think we    |
|          | 12 | need to set aside some time and plan for the worst, and hope |
|          | 13 | for the best.                                                |
| 10:26    | 14 | So I'm going to send out notice to you, when I               |
|          | 15 | look at my calendar -- 'cause I don't want counsel sitting   |
|          | 16 | around, as they are today -- and let me clear off that week  |
|          | 17 | before, so we start wrestling with some of these issues.     |
|          | 18 | And, therefore, you know the presentation and you know what  |
|          | 19 | you have to defend.                                          |
| 10:27    | 20 | The third or fourth or fifth question is, can I              |
|          | 21 | stop at 200?  I'm happy to bring 400 people into the         |
|          | 22 | courthouse.  I've done it before.  But I think we all agree  |
|          | 23 | that we really need a pool of 200 potential jurors who can   |
|          | 24 | serve, you know, five or six weeks.  And, after that, I just |
|          | 25 | don't think, even on the death penalty cases that we've had, |

|  |  |  |
|--|--|--|
|  | 1 | that we went beyond a pool of 200, even with the AB, you |
|  | 2 | know, and their notoriety.  I haven't needed that in State |
|  | 3 | Court on death cases either. |
| 10:27 | 4 | So I'm just suggesting if you can reach by |
|  | 5 | stipulation that we cut it at 200 -- we can keep the others |
|  | 6 | on call -- but I just think, if 200 can serve with that |
|  | 7 | letter that goes out, that we ought'a cut it. |
| 10:27 | 8 | MS. CORRIGAN:  Your Honor, from my perspective, if |
|  | 9 | we were to leave them the -- I think the terrorism issues |
|  | 10 | are far different than even with the AB, as notorious as |
|  | 11 | they are. |
| 10:28 | 12 | THE COURT:  I mentioned John Gotti in |
|  | 13 | Count No. 104.  That got the public's attention. |
| 10:28 | 14 | MS. CORRIGAN:  Right.  That did. |
| 10:28 | 15 | But, in any event, I think that if -- we could |
|  | 16 | potentially set a number, but if we had the agreement that |
|  | 17 | if we had to go over the 200, that the other -- any other |
|  | 18 | people that are time-qualified should be at least available |
|  | 19 | to us so that we don't end up -- |
| 10:28 | 20 | THE COURT:  Let's do this:  Why don't I tell |
|  | 21 | Kathy, with both of your permission, to cut it at 200, but |
|  | 22 | not "relieve."  In other words, let's see what that initial |
|  | 23 | group comes back -- not the quality, but the number of |
|  | 24 | people willing to serve for six weeks. |
| 10:28 | 25 | And then I'll keep the jury commissioner alerted |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | that in case we need 50 more --                                      |
| 10:28 | 2  | Sir, would you be kind enough to sit down.                           |
| 10:28 | 3  | *(Member in audience complies.)*                                     |
| 10:29 | 4  | THE COURT:  If we need more, we'll get them in.                      |
| 10:29 | 5  | In other words, we -- we'll have time, starting                      |
|       | 6  | May 31st and earlier to see what that group looks like.              |
|       | 7  | Kathy will probably tell me the week before.                         |
| 10:29 | 8  | So, tentatively, 200.  That means we're not                          |
|       | 9  | picking and choosing.  A hundred of them could be absolutely         |
|       | 10 | biased one way or the other.  We could excuse them.  But I'm         |
|       | 11 | not measuring that.  I'm measuring the initial group of 200.         |
| 10:29 | 12 | And we still need the following, don't we?                           |
| 10:29 | 13 | We need twelve in the box.                                           |
| 10:29 | 14 | Six alternates.  I think eight -- don't think we                     |
|       | 15 | need eight.  Six alternates.                                         |
| 10:29 | 16 | That's 18.  So help me count.                                        |
| 10:29 | 17 | Um, ten and six, still?  It's not a death case.                      |
|       | 18 | It's not 20 and 20.  So ten and six.                                 |
| 10:29 | 19 | MS. CORRIGAN:  On that issue, Your Honor.  I may                     |
|       | 20 | make a motion to expand, depending on how things go.                 |
|       | 21 | Because I think that -- and, particularly as to the motion           |
|       | 22 | to sever, I may have a different angle on issues.                     |
| 10:30 | 23 | THE COURT:  Right.                                                   |
| 10:30 | 24 | But, right now, by code, it's ten and six --                         |
| 10:30 | 25 | MS. CORRIGAN:  Understood.                                           |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 10:30 | 1 | THE COURT:  -- but that awaits your motion. |
| 10:30 | 2 | So that means that we've got 18.  22.  We are at |
| | 3 | 40 jurors right there, aren't we? |
| 10:30 | 4 | Now, we're going to take -- besides that, we've |
| | 5 | never decided the number of peremptories.  And forget the |
| | 6 | code.  Make that fair to each of you.  You can have one |
| | 7 | peremptory, if you choose, between -- for each of the six, |
| | 8 | which would give you six more, and six more.  So I would add |
| | 9 | twelve. |
| 10:30 | 10 | Or we can go with a lesser number.  So let's plan |
| | 11 | for the worse.  52.  We absolutely need a bare minimum of |
| | 12 | 52.  And we know what we're going to get back on some of |
| | 13 | these questionnaires in the real world.  It'll be motions |
| | 14 | for cause.  Maybe some of those can be stipulated to.  Maybe |
| | 15 | you need questioning.  But that's where it gets interesting. |
| 10:31 | 16 | 200 is about right, I think, but it's a guess.  I |
| | 17 | don't -- I just don't wanna get 400.  It's almost unwieldy. |
| | 18 | We can bring them in later on when we talk to Kathy. |
| 10:31 | 19 | So let's take a look at that week for a moment. |
| | 20 | And, once again -- |
| 10:31 | 21 | *(To the clerk:)* Nancy, we're going to square this |
| | 22 | courtroom away.  I need a calendar.  Can I borrow yours? |
| 10:31 | 23 | THE CLERK:  I'll go grab one. |
| 10:31 | 24 | THE COURT:  Okay.  I want to get through the |
| | 25 | Monday calendar, but I think I wanna be in session the rest |

| | | |
|---|---|---|
| | 1 | of that week.  In other words, I think I'm going to draw you |
| | 2 | in on Tuesday.  And I want to get the date. |
| 10:31 | 3 | MS. HEINZ:  And, Your Honor, just with respect to |
| | 4 | today, Counsel for Mr. Elhuzayel had one other motion to |
| | 5 | dismiss.  Had a second one. |
| 10:31 | 6 | THE COURT:  Okay. |
| 10:31 | 7 | All right.  Well, Counsel, while we're waiting for |
| | 8 | a calendar, your argument. |
| 10:32 | 9 | MR. LENGYEL-LEAHU:  Thank you, Your Honor. |
| 10:32 | 10 | **DEFENDANT ELHUZAYEL'S SECOND MOTION TO DISMISS** |
| 10:32 | 11 | MR. LENGYEL-LEAHU:  I believe she's talking about |
| | 12 | the "vagueness" issue. |
| 10:32 | 13 | There's also a corollary to our other motion that |
| | 14 | we have an enemy combatant situation.  I think we can submit |
| | 15 | on the paperwork that was submitted to the Court. |
| 10:32 | 16 | THE COURT:  Okay. |
| 10:32 | 17 | Counsel. |
| 10:32 | 18 | **RESPONSE BY MS. HEINZ** |
| 10:32 | 19 | MS. HEINZ:  The "Enemy Combatant Immunity" claim |
| | 20 | was made in the motion to dismiss Counts One and Two, that |
| | 21 | was in connection with the previous FTO argument. |
| 10:32 | 22 | The second Motion to Dismiss Counts One and Two |
| | 23 | was based on alleged violations of the First and Fifth |
| | 24 | Amendment, Your Honor. |
| 10:32 | 25 | THE COURT:  Counsel? |

| | | |
|---|---|---|
| 10:32 | 1 | MR. LENGYEL-LEAHU:  Yes.  We'll submit on the |
| | 2 | paperwork. |
| 10:32 | 3 | THE COURT:  Satisfied, Counsel? |
| 10:32 | 4 | MS. HEINZ:  Yes, Your Honor.  Thank you. |
| 10:33 | 5 | THE COURT:  All right.  You'll probably hear from |
| | 6 | me next week.  It'll give me the weekend to work through |
| | 7 | without other cases on my calendar. |
| 10:33 | 8 | Then, is there anything further today?  Let me |
| | 9 | turn to the government first. |
| 10:33 | 10 | MS. HEINZ:  Nothing further from the government |
| | 11 | today, Your Honor. |
| 10:33 | 12 | THE COURT:  Okay.  I want to thank you very much. |
| 10:33 | 13 | Counsel, anything further on behalf of your |
| | 14 | client? |
| 10:33 | 15 | MR. LENGYEL-LEAHU:  Um, I mentioned to co-counsel, |
| | 16 | but I haven't -- I haven't got my hands around the idea. |
| 10:33 | 17 | My client needs financial assistance, although I |
| | 18 | am retained counsel.  He has not been providing any, uh, |
| | 19 | financial help for his own defense, but he's gonna need at |
| | 20 | least one expert to come visit him, um, and perhaps some |
| | 21 | ancillary services. |
| 10:33 | 22 | THE COURT:  Make that known to me by court |
| | 23 | order -- an under-seal order. |
| 10:33 | 24 | MR. LENGYEL-LEAHU:  An under-seal order? |
| 10:33 | 25 | THE COURT:  Under seal. |

**DEBBIE GALE, U.S. COURT REPORTER**

10:33   1          MR. LENGYEL-LEAHU:  Ex parte to the Court?

10:33   2          THE COURT:  I think so, Counsel, at least

        3    initially.  But, eventually, it's going to be disclosed to

        4    the government.

10:34   5          MR. LENGYEL-LEAHU:  Okay.

10:34   6          THE COURT:  I just don't think that you have to

        7    give away a defense this early; but, eventually, that

        8    witness will be made known to the government.  I just don't

        9    know if it has to be made at this time, unless the

       10    government's objecting.  And if so, tell me the section,

       11    then.

10:34  12          MS. HEINZ:  No, Your Honor.

10:34  13          THE COURT:  In other words, in death penalty

       14    cases, the government actually has three days before the

       15    death penalty -- which is ludicrous -- or the start of the

       16    trial to disclose witnesses.

10:34  17          I'd like to afford the defense the same

       18    opportunity, at least, to, you know, set forth a defense

       19    without being bound to it.

10:34  20          MS. HEINZ:  Your Honor, my understanding is this

       21    would simply be a motion for funds in order to engage an

       22    expert.  And the government would agree that that is

       23    properly *ex parte*.

10:34  24          THE COURT:  And the actual motion that justifies

       25    that, the affidavit?

Case 8:15-cr-00060-DOC Document 286 Filed 03/31/17 Page 81 of 85 Page ID #:3806
8:15-CR-0060-DOC - 5/5/2016 - Item No. 2

81

10:34  1         MS. HEINZ:  Yes, Your Honor.  The government would

2  agree that's properly *ex parte*.

10:34  3         THE COURT:  Obviously, if there's testimony,

4  you'll be notified of that.

10:34  5         All right.  Then anything further, sir?

10:34  6         MR. LENGYEL-LEAHU:  Can't think of a thing.

10:34  7         THE COURT:  Ms. Corrigan, anything further?

10:34  8         MS. CORRIGAN:  Just as a logistics matter,

9  Your Honor.  I think that, in light of the fact my clients'

10  gonna be, at least for some period'a time, up at MDC -- for

11  purposes of the May 31st hearing, if he's still at MDC, what

12  I'd like to propose -- and I can get together with

13  Mr. Hazelwood on the clothing issue -- that, perhaps, I just

14  have the clothing brought to the courtroom that day, rather

15  than trying to rely on MDC dressing him out.

10:35  16         My suspicion is he'll be back-it-up *(sic)* uh -- up

17  in 8 North again.  And that's -- I'm not so sure we'll be

18  guaranteed that he'd be in civil -- civilian clothing.  I

19  don't wanna end up with the hassles of trying to retrieve

20  the clothing from L.A. on the 31st.  It'll delay the

21  proceedings.  So if I could have an outfit brought --

22  I'll -- I'll make the arrangement.  I'll get together with

23  the marshals so that -- on that date, if we could have at

24  least a Plan B for clothing, if need be.

10:35  25         THE COURT:  Marcelino?

10:35   1           U.S. MARSHAL:  No issues.

10:35   2           MR. LENGYEL-LEAHU:  Okay.

10:35   3           Excuse me, Your Honor.  I was thinking that we

     4   were gonna bring the clothes here anyway.

10:35   5           MS. CORRIGAN:  No.  You don't.

10:35   6           THE COURT:  No.  Let me help you with the process

     7   and procedure.  And it makes sense from a security

     8   standpoint, but in this kinda litigation, it doesn't.

10:36   9           The Marshal's rules are they're basically dressed

    10   out at the facility that they're being held, and then

    11   brought to court.  The problem is it doesn't make any sense.

    12   You need a backup set of clothing.  Yes, they can be dressed

    13   out.  But we need a set of clothing in court.

10:36  14           And I -- you weren't here when I told the infamous

    15   story of the Mexican Mafia, where, in the fifth month of

    16   trial, twelve defendants -- they reeked one morning.

    17   Smelled like a sewer.  And they're sitting there very

    18   calmly.  And I asked what the smell was.  And they informed

    19   me that the sewage pipe had broken over their dry cleaning

    20   clothes over at the MDC, and that they'd been dressed out

    21   anyway.  I'm joking, but I'm not.  We had to run 'em back

    22   through the tunnel.  Get clean clothes, and bring 'em back.

10:36  23           Marcelino, the marshals here, have been through

    24   more complex litigation than any group of marshals in the

    25   country.  So we'll somewhat violate that security rule.

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | We'll have a backup set of clothing, Mr. Corrigan and                 |
|        | 2  | Counsel, that you submit to the court.                                |
| 10:37  | 3  | *(To the marshal:)* Marcelino, you'll check that.                    |
| 10:37  | 4  | *(To counsel:)* Okay?                                                 |
| 10:37  | 5  | MR. LENGYEL-LEAHU:  Okay.                                             |
| 10:37  | 6  | THE COURT:  Anything else?                                            |
| 10:37  | 7  | MS. HEINZ:  No, Your Honor.                                           |
| 10:37  | 8  | THE COURT:  Okay.  I apologize for the lateness.                     |
| 10:37  | 9  | All this started occurring earlier in the week.                      |
|        | 10 | And there was no reason to bring you in, you know, yesterday          |
|        | 11 | or today.  But it's --                                               |
| 10:37  | 12 | Okay.  Mr. Badawi, you're ordered to be                              |
|        | 13 | transported forthwith to MDC.                                        |
| 10:37  | 14 | Thank you very much.                                                 |
| 10:37  | 15 | Oh, by the way, one more thing:  From now on,                       |
|        | 16 | Counsel, when we go into session from this point forward,            |
|        | 17 | you're ordered not to stand.                                         |
| 10:37  | 18 | MR. LENGYEL-LEAHU:  Thank you.                                        |
| 10:37  | 19 | MS. HEINZ:  Yes, Your Honor.                                          |
| 10:37  | 20 | THE COURT:  The reason for that is -- and, the                      |
|        | 21 | audience, thank you very much -- but you're ordered, as               |
|        | 22 | Counsel, not to stand; and the reason for that is, if you            |
|        | 23 | stand in my presence, it becomes obvious that the two                |
|        | 24 | gentlemen aren't standing; therefore, there's something              |
|        | 25 | different.  So I'll train you to do that.  It's a little             |

|          |    |                                                           |
|----------|----|-----------------------------------------------------------|
|          | 1  | hard.  And thank you for the respect.                     |
| 10:38    | 2  |          But in complex litigation where one of the       |
|          | 3  | gentlemen is going to be restrained --                    |
| 10:38    | 4  |          MS. CORRIGAN:  Your Honor, can we confirm what    |
|          | 5  | time we're here on the 31st?                              |
| 10:38    | 6  |          THE COURT:  I'm sorry?                            |
| 10:38    | 7  |          MS. CORRIGAN:  What time --                       |
| 10:38    | 8  |          THE COURT:  I'm sorry?                            |
| 10:38    | 9  |          MS. CORRIGAN:  -- you want us here?               |
| 10:38    | 10 |          THE COURT:  7:30.                                 |
| 10:38    | 11 |          MS. CORRIGAN:  Okay.  7:30.  Great.               |
| 10:38    | 12 |          *(Proceedings adjourned at 10:38 p.m.)*          |
| 10:38    | 13 |                         -oOo-                             |
| 10:38    | 14 |                                                           |
|          | 15 |                                                           |
|          | 16 |                                                           |
|          | 17 |                                                           |
|          | 18 |                                                           |
|          | 19 |                                                           |
|          | 20 |                                                           |
|          | 21 |                                                           |
|          | 22 |                                                           |
|          | 23 |                                                           |
|          | 24 |                                                           |
|          | 25 |                                                           |

```
10:38    1                          -oOo-

10:38    2

10:38    3                       CERTIFICATE

10:38    4

10:38    5          I hereby certify that pursuant to Section 753,

         6    Title 28, United States Code, the foregoing is a true and

         7    correct transcript of the stenographically reported

         8    proceedings held in the above-entitled matter and that the

         9    transcript page format is in conformance with the

        10    regulations of the Judicial Conference of the United States.

10:38   11

10:38   12    Date:  March 31, 2017

10:38   13

10:38   14
10:38                               /s/ Debbie Gale
10:38   15
10:38                           _____
10:38   16                      DEBBIE GALE, U.S. COURT REPORTER
10:38                           CSR NO. 9472, RPR, CCRR

10:38   17

        18

        19

        20

        21

        22

        23

        24

        25
```