1              **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3          **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  - - - - - - -

5    UNITED STATES OF AMERICA,        )
                                      )        **CERTIFIED**
6              Plaintiff,             )
                                      )
7         vs.                         ) No. 8:15-CR-0060-DOC
                                      )    Day 2, Volume II
8    1) NADER SALEM ELHUZAYEL;        )
     2) MUHANAD ELFATIH M.A. BADAWI,  )
9                                     )
               Defendants.            )
10   _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    Jury Trial

17               Santa Ana, California

18             Wednesday, June 8, 2016

19

20

21

22   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-8141

25

1    **APPEARANCES OF COUNSEL:**

2

     FOR THE UNITED STATES OF AMERICA:
3

          DEPARTMENT OF JUSTICE
4         OFFICE OF THE UNITED STATES ATTORNEY
          Criminal Division
5         BY:  Judith A. Heinz
               Assistant United States Attorney
6         312 North Spring Street
          15th Floor
7         Los Angeles, California 90012
          213-894-7280
8         USACAC.Criminal@usdoj.gov

9         DEPARTMENT OF JUSTICE
          OFFICE OF THE UNITED STATES ATTORNEY
10        Criminal Division
          BY:  Deirdre Z. Eliot
11             Assistant United States Attorney
          411 West 4th Street
12        Suite 8000
          Santa Ana, California 92701
13        714-338-3500
          USACAC.SACriminal@usdoj.gov
14
          DEPARTMENT OF JUSTICE
15        OFFICE OF THE UNITED STATES ATTORNEY
          General Crimes Section
16        BY:  Julius J. Nam
               Assistant United States Attorney
17        312 North Spring Street
          Suite 1200
18        Los Angeles, California 90012
          213-894-4491
19        julius.nam@usdoj.gov

20

     FOR DEFENDANT NADER SALEM ELHUZAYEL:
21

          Pal A. Lengyel-Leahu *(retained)*
22        LAW OFFICES OF PAL A. LENGYEL-LEAHU
          360 East First Street
23        Suite 609
          Tustin, California 92780
24        714-497-6813
          plitigate@aol.com

25

1    **APPEARANCES (Continued):**

2

     FOR DEFENDANT MUHANAD ELFATIH M.A. BADAWI:
3

4         Katherine T. Corrigan *(CJA appointment)*
          CORRIGAN WELBOURN AND STOKKE APLC
5         4100 Newport Place
          Suite 550
6         Newport Beach, California 92660
          949-251-0330
7         kate@cwsdefense.com

8

9    ALSO PRESENT:

10        Cambria Lisonbee (assisting Ms. Corrigan)
          Joshua Hopps (assisting Mr. Lengyel-Leahu)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               **I N D E X**

2            Jury Trial - Day 2, Volume II

3    **PROCEEDINGS**                              **PAGE**

4    VICENCIA, Nicholas                              8

5    Video recording played, Exhibit No. 1003       11

6    Video recording played, Exhibit 1005           19

7    Video recording played, Exhibit No. 1007       21

8    HILL, Scott                                     27

9    HOM, Terry                                      32

10   AHMED, Abdalla                                  42

11   PALMER, Ron                                     49

12   GROTE, Lena                                     57

13   WALES, Scott Christopher                        68

14

15                      **WITNESSES**

16   **WITNESSES**              **DIRECT  CROSS  REDIRECT  RECROSS**

17   VICENCIA, Nicholas
     By Ms. Heinz                 8
18   By Mr. Lengyel-Leahu                25

19
     HILL, Scott
20   By Ms. Eliot                27

21
     HOM, Terry
22   By Ms. Heinz                32

23   AHMED, Abdalla
     By Ms. Heinz                43
24

25

**DEBBIE GALE, U.S. COURT REPORTER**

**WITNESSES (Continued)**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PALMER, Ron | | | | |
| By Ms. Eliot | 49 | | | |
| GROTE, Lena | | | | |
| By Ms. Eliot | 58 | | | |
| WALES, Scott | | | | |
| By Ms. Eliot | 69 | | | |

**EXHIBITS**

| EXHIBIT NO./DESCRIPTION | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 601    Black iPhone | | 31 |
| 606    Black duffle bag belonging to Defendant Elhuzayel | | 13 |
| 607    Large grey suitcase with rollers belonging to Defendant Elhuzayel | | 13 |
| 608    Small black laptop computer case belonging to Defendant Elhuzayel | | 13 |
| 617    Thumb drive from duffle bag (Exhibit 606) | | 23 |
| 618    Travel power adapter from duffle bag (Exhibit 606) | | 24 |
| 619    Receipt from Staples retrieved from duffle bag (Exhibit 606) | | 24 |
| 1001   Depiction of Turkish Airlines check-in counter at LAX | | 15 |

**EXHIBITS**

| EXHIBIT NO./DESCRIPTION | IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 1002     Depiction of Turkish Airlines check-in counter at LAX | | 15 |
| 1003     Video recording | | 11 |
| 1004     Security surveillance video of Defendant Elhuzayel at LAX | | 18 |
| 1005     Security surveillance video of Defendant Elhuzayel at LAX during luggage search | | 19 |
| 1007     Security surveillance video of agents leaving LAX with luggage | | 21 |
| 1021     Document with English translations of Arabic words, phrases, etc. | | 47 |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | SANTA ANA, CALIFORNIA, WEDNESDAY, JUNE 8, 2016               |
|       | 2  | Day 2, Volume II                                             |
|       | 3  | (10:27 a.m.)                                                 |
| 10:27 | 4  | *(Outside the presence of the jury.)*                        |
| 10:27 | 5  | THE COURT:  Okay.  Counsel, we're on the record              |
|       | 6  | outside the presence of the jury.                            |
| 10:27 | 7  | We had screens set up for any overflow.  I didn't            |
|       | 8  | want it packed, and I had no idea what to expect.  I'm ready |
|       | 9  | to take down that screen.  My guess is after opening         |
|       | 10 | statement, there's going to be a significant decrease in     |
|       | 11 | attendees in the audience.                                   |
| 10:27 | 12 | MS. CORRIGAN:  I would agree.                                 |
| 10:27 | 13 | THE COURT:  So we can disassemble that.                       |
| 10:27 | 14 | TECHNICIAN:  Okay.  Take it out now?                          |
| 10:28 | 15 | THE COURT:  I'd take it out now.  Maybe we'll set            |
|       | 16 | it up for closing arguments.                                 |
| 10:32 | 17 | Counsel, I'm going to summon the jury at this time.         |
| 10:33 | 18 | *(In the presence of the jury.)*                             |
| 10:33 | 19 | THE COURT:  All right.  The jury's present.  The             |
|       | 20 | alternates are present.  All counsel, all parties are        |
|       | 21 | present.                                                      |
| 10:33 | 22 | Counsel on behalf of the government, would you like         |
|       | 23 | to call your first witness, please.                          |
| 10:33 | 24 | MS. HEINZ:  Yes, Your Honor.  The United States             |
|       | 25 | calls Special Agent Nicholas Vicencia.                       |

| | | |
|---|---|---|
| 10:34 | 1 | THE COURT:  Thank you.  Would you step forward, |
| | 2 | sir, and stop at that location and raise your right hand, |
| | 3 | please. |
| 10:34 | 4 | **NICHOLAS VICENCIA, CALLED BY THE GOVERNMENT, SWORN** |
| 10:34 | 5 | THE WITNESS:  Yes, I do. |
| 10:34 | 6 | THE COURT:  Thank you, sir.  If you would please |
| | 7 | be seated in the witness box.  It's just to my left.  The |
| | 8 | entrance to the witness box is closest to the wall. |
| 10:34 | 9 | And after you're seated, sir, could you face the |
| | 10 | jury, state your full name and spell your last name, please. |
| 10:34 | 11 | THE WITNESS:  Special Agent Nicholas Vicencia, |
| | 12 | V-I-C-E-N-C-I-A. |
| 10:34 | 13 | THE COURT:  Thank you. |
| 10:34 | 14 | This is direct examination by the government. |
| 10:34 | 15 | **DIRECT EXAMINATION** |
| 10:34 | 16 | BY MS. HEINZ: |
| 10:34 | 17 | Q.   Good morning, Special Agent Vicencia. |
| 10:34 | 18 | A.   Good morning. |
| 10:34 | 19 | Q.   What is your current job? |
| 10:34 | 20 | A.   I'm a Special Agent with the Federal Bureau of |
| | 21 | Investigation, the FBI. |
| 10:34 | 22 | Q.   And how long have you been a Special Agent with the |
| | 23 | Federal Bureau of Investigation? |
| 10:35 | 24 | A.   Since July 2006. |
| 10:35 | 25 | Q.   What is your current assignment? |

| | | |
|---|---|---|
| 10:35 | 1 | A.    I'm assigned to the Joint Terrorism Task Force in |
| | 2 | Orange County, California. |
| 10:35 | 3 | Q.    On the afternoon of May 21st, 2015, where were you? |
| 10:35 | 4 | A.    I was at the Los Angeles International Airport, also |
| | 5 | known as LAX. |
| 10:35 | 6 | Q.    And specifically where in LAX were you? |
| 10:35 | 7 | A.    I was at the Tom Bradley International Terminal. |
| 10:35 | 8 | Q.    When you were at the Tom Bradley International airport |
| | 9 | at LAX on May 21st 2015, did you see either of the |
| | 10 | defendants in this case? |
| 10:35 | 11 | A.    Yes, I did. |
| 10:35 | 12 | Q.    Do you see that person sitting here? |
| 10:35 | 13 | A.    Yes. |
| 10:35 | 14 | Q.    Please describe where the person is sitting. |
| 10:35 | 15 | A.    He's sitting at the second defense counsel table, |
| | 16 | wearing a gray suit. |
| 10:35 | 17 |        THE COURT:  All right.  The record will indicate |
| | 18 | he's identified Mr. Elhuzayel. |
| 10:36 | 19 | BY MS. HEINZ: |
| 10:36 | 20 | Q.    When you first saw Defendant Elhuzayel at LAX on |
| | 21 | May 21st, 2015, where was he? |
| 10:36 | 22 | A.    I first observed him getting out of a car curbside in |
| | 23 | front of the Tom Bradley International Terminal. |
| 10:36 | 24 | Q.    And was he carrying anything? |
| 10:36 | 25 | A.    Yes. |

**DEBBIE GALE, U.S. COURT REPORTER**

8:15-CR-0060-DOC - 6/8/2016 - Day 2, Volume II

10

| | | |
|--|--|--|
| 10:36 | 1 | Q.   What was he carrying? |
| 10:36 | 2 | A.   He had three pieces of luggage. |
| 10:36 | 3 | Q.   And once he got out of the car, was he alone? |
| 10:36 | 4 | A.   Yes.  He was dropped off. |
| 10:36 | 5 | Q.   Okay.  I'd like you to look at what's been marked as |
| | 6 | Government's Exhibit 1003. |
| 10:36 | 7 |      Special Agent Vicencia, what is Government's |
| | 8 | Exhibit 1003? |
| 10:36 | 9 | A.   It's a copy of LAX surveillance security footage. |
| 10:36 | 10 | Q.   Okay.  And is that security footage -- is that a video? |
| 10:37 | 11 | A.   Yes. |
| 10:37 | 12 | Q.   And what does that show? |
| 10:37 | 13 | A.   It shows the Defendant Elhuzayel entering the Tom |
| | 14 | Bradley International Terminal from the curb with his |
| | 15 | luggage. |
| 10:37 | 16 | Q.   And does what's been marked as Government's |
| | 17 | Exhibit 1003 accurately depict what you saw |
| | 18 | Defendant Elhuzayel doing at LAX on May 21st, 2015? |
| 10:37 | 19 | A.   Yes. |
| 10:37 | 20 |           MS. HEINZ:  Your Honor, move to admit Government's |
| | 21 | Exhibit 1003. |
| 10:37 | 22 |           THE COURT:  Any objection? |
| 10:37 | 23 |           MS. CORRIGAN:  No, Your Honor. |
| 10:37 | 24 |           MR. LENGYEL-LEAHU:  No, Your Honor. |
| 10:37 | 25 |           THE COURT:  Received. |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 10:37 | 1 | *(Exhibit No. 1003 received in evidence.)* |
| 10:37 | 2 | THE COURT:  You may play 1003. |
| 10:37 | 3 | *(Video recording played.)* |
| 10:38 | 4 | MS. HEINZ:  All right.  Could you freeze the frame |
| | 5 | for a moment, Mr. Lee. |
| 10:38 | 6 | *(Technician complies.)* |
| 10:38 | 7 | MS. HEINZ:  All right.  Is it possible to back |
| | 8 | that up a little bit? |
| 10:38 | 9 | *(Technician complies.)* |
| 10:38 | 10 | MS. HEINZ:  Thank you.  That's fine.  Freeze it |
| | 11 | there. |
| 10:38 | 12 | All right.  Is it possible to enlarge the image? |
| 10:39 | 13 | *(Technician complies.)* |
| 10:39 | 14 | BY MS. HEINZ: |
| 10:39 | 15 | Q.   Special Agent Vicencia, could you please look at the |
| | 16 | image on the video.  Do you recognize who that is? |
| 10:39 | 17 | A.   Yes. |
| 10:39 | 18 | Q.   Who is it? |
| 10:39 | 19 | A.   It's Defendant Nader Elhuzayel. |
| 10:39 | 20 | Q.   Special Agent Vicencia, would you please look at what |
| | 21 | has been marked as Government's 606. |
| 10:39 | 22 | What is Government's Exhibit 606? |
| 10:39 | 23 | A.   It's one of Defendant Elhuzayel's pieces of luggage. |
| 10:39 | 24 | Q.   When you look at the video, at the picture that's up on |
| | 25 | the screen, do you see Government's Exhibit 606? |

Case 8:15-cr-00060-DOC  Document 291  Filed 03/31/17  Page 12 of 83  Page ID #:4214
8:15-CR-0060-DOC - 6/8/2016 - Day 2, Volume II

12

| 10:40 | 1 | A.   I'm not sure which piece it is.  It just says, "luggage |
| | 2 | bag." |
| 10:40 | 3 | Q.   Well, could you look at the actual exhibit? |
| 10:40 | 4 | A.   Yeah, may I get up? |
| 10:40 | 5 | *(Witness approaches physical exhibits:)*  It's -- it is |
| | 6 | the bag that's in his left hand, a black duffel bag, |
| | 7 | carry-on bag. |
| 10:40 | 8 | Q.   So it's a black carry-on bag? |
| 10:40 | 9 | A.   Yes. |
| 10:40 | 10 | Q.   All right.  Actually, I'm gonna ask you to identify a |
| | 11 | couple of exhibits here.  Okay? |
| 10:40 | 12 | So since you're going over to the side, could you please |
| | 13 | look at what's been marked as Government's Exhibit 607 and |
| | 14 | Government's Exhibit 608. |
| 10:40 | 15 | And perhaps you could bring those nearer to you so you |
| | 16 | can talk about them. |
| 10:41 | 17 | A.   607 and 608 are a laptop bag and a roller bag. |
| 10:41 | 18 | Q.   All right.  So to be clear, take a look at what's been |
| | 19 | marked as Government's Exhibit 607.  Okay? |
| 10:41 | 20 | And could you just generally describe what is |
| | 21 | Government's Exhibit 607? |
| 10:41 | 22 | A.   Yes.  It's a large gray suitcase with rollers. |
| 10:41 | 23 | Q.   And could you also describe briefly what has been |
| | 24 | marked as Government's Exhibit 608? |
| 10:42 | 25 | A.   It's a small, black, laptop computer bag. |

8:15-CR-0060-DOC - 6/8/2016 - Day 2, Volume II

13

| | | |
|---|---|---|
| 10:42 | 1 | Q.   Okay.  And when you look at the screen, what is the |
| | 2 | stop-freeze frame of the video that is Government's |
| | 3 | Exhibit 1003? |
| 10:42 | 4 | Do you see these three bags that we've been talking |
| | 5 | about, which would be Government's Exhibits 606, 607 and |
| | 6 | 608? |
| 10:42 | 7 | A.   Yes, I do. |
| 10:42 | 8 | Q.   Could you point out to us where each one is? |
| 10:42 | 9 | A.   On the screen? |
| 10:42 | 10 | Q.   Yes. |
| 10:42 | 11 | A.   Government's Exhibit 607 is in his right hand.  He's |
| | 12 | rolling it behind him. |
| 10:42 | 13 | Government 606 is in his left hand, the black bag that |
| | 14 | he's carrying. |
| 10:42 | 15 | And Government 608 is the laptop bag that's over his |
| | 16 | left shoulder. |
| 10:42 | 17 | MS. HEINZ:  Your Honor, I'd move into evidence |
| | 18 | Government's Exhibits 606, 607 and 608. |
| 10:42 | 19 | THE COURT:  Any objection? |
| 10:42 | 20 | MS. CORRIGAN:  No, Your Honor. |
| 10:42 | 21 | MR. LENGYEL-LEAHU:  No, Your Honor. |
| 10:42 | 22 | THE COURT:  Each are received:  606, 607 and 608. |
| 10:43 | 23 | *(Exhibit Nos. 606, 607, and 608 received in* |
| | 24 | *evidence.)* |
| 10:43 | 25 | MS. HEINZ:  Your Honor, may we take a brief moment |

**DEBBIE GALE, U.S. COURT REPORTER**

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | to show these bags to the jury?                                      |
| 10:43 | 2  | THE COURT:  You can hold them up for just a                          |
|       | 3  | moment, Counsel.                                                     |
| 10:43 | 4  | THE WITNESS:  Yes, Your Honor.                                       |
| 10:43 | 5  | This is 608, the laptop bag.  *(Indicating.)*                        |
| 10:43 | 6  | THE COURT:  Thank you.                                               |
| 10:43 | 7  | THE WITNESS:  Carry-on bag.  *(Indicating.)*                         |
| 10:43 | 8  | THE COURT:  What was the last one?  Was that 607?                    |
| 10:43 | 9  | THE WITNESS:  606.                                                   |
| 10:43 | 10 | THE COURT:  606.  Thank you.                                         |
| 10:43 | 11 | THE WITNESS:  This one's -- this is 607.                             |
|       | 12 | *(Indicating.)*                                                      |
| 10:43 | 13 | THE COURT:  All right.  Thank you.                                   |
| 10:43 | 14 | Now let's continue, Counsel.                                         |
| 10:43 | 15 | BY MS. HEINZ:                                                        |
| 10:43 | 16 | Q.  Special Agent Vicencia, after you saw                           |
|       | 17 | Defendant Elhuzayel enter the Tom Bradley International              |
|       | 18 | Airport *(sic)* at LAX on May 21st, 2015, where did he go           |
|       | 19 | next?                                                                |
| 10:43 | 20 | A.  I saw him go to the Turkish Airlines check-in counter.          |
| 10:43 | 21 | Q.  Okay.  Would you please look at what's been marked as           |
|       | 22 | Government's Exhibit 1001 and 1002.                                 |
| 10:44 | 23 | Do Government's Exhibit 1001 and 1002 accurately depict             |
|       | 24 | the Turkish Airlines counter at the Tom Bradley Terminal at         |
|       | 25 | LAX as they appeared on May 21st, 2015?                             |

| | | |
|---|---|---|
| 10:44 | 1 | A.   Yes, they do. |
| 10:44 | 2 | MS. HEINZ:  Your Honor, move to admit into |
| | 3 | evidence Government's Exhibit 1001 and 1002. |
| 10:44 | 4 | THE COURT:  Each are received, unless there's an |
| | 5 | objection by counsel. |
| 10:44 | 6 | MS. CORRIGAN:  No objection. |
| 10:44 | 7 | MR. LENGYEL-LEAHU:  No objection, Your Honor. |
| 10:44 | 8 | *(Exhibit Nos. 1001 and 1002 received in* |
| | 9 | *evidence.)* |
| 10:44 | 10 | BY MS. HEINZ: |
| 10:44 | 11 | Q.   Please describe what, if anything, you saw |
| | 12 | Defendant Elhuzayel do at the Turkish Airlines ticket |
| | 13 | counter at LAX on May 21, 2015. |
| 10:44 | 14 | A.   I observed him interacting with a ticket agent for a |
| | 15 | few minutes. |
| 10:45 | 16 | When they were working on his paperwork, I also observed |
| | 17 | him speaking with another passenger in line. |
| 10:45 | 18 | Q.   And what, if anything, did you see happen with the |
| | 19 | bags, the three bags that he was carrying? |
| 10:45 | 20 | A.   After they provided him a ticket and a boarding pass, |
| | 21 | he checked in his large gray roller bag and also his small |
| | 22 | black carry-on bag.  And he had his laptop bag still over |
| | 23 | his shoulder. |
| 10:45 | 24 | Q.   And did he receive any documents there at the ticket |
| | 25 | counter? |

| | | |
|---|---|---|
| 10:45 | 1 | A.   I observed the ticket agent give him what appeared to |
| | 2 | be a passport and what appeared to be tickets or boarding |
| | 3 | passes. |
| 10:45 | 4 | Q.   And did you see Defendant Elhuzayel leave the ticket |
| | 5 | counter? |
| 10:45 | 6 | A.   Yes. |
| 10:45 | 7 | Q.   Where did he go? |
| 10:45 | 8 | A.   I observed him walking on the west side of the |
| | 9 | terminal, through the terminal in the construction area, to |
| | 10 | the bottom of the escalator at the TSA checkpoint. |
| 10:46 | 11 | Q.   And then what happened? |
| 10:46 | 12 | A.   I observed him interact with the, uh, agent who was |
| | 13 | checking his boarding pass and his passport.  I observed him |
| | 14 | take the -- his passport and tickets back, and I observed |
| | 15 | him running almost in a sprintlike fashion back towards the |
| | 16 | terminal, towards the ticket counter. |
| 10:46 | 17 | Q.   And did you continue to observe him as he went to the |
| | 18 | Turkish Airlines ticket counter? |
| 10:46 | 19 | A.   Yes. |
| 10:46 | 20 | Q.   So what happened there at the Turkish Airlines ticket |
| | 21 | counter? |
| 10:46 | 22 | A.   I observed him interacting with, again, a Turkish |
| | 23 | Airlines employee for few minutes.  And then another Turkish |
| | 24 | Airlines employee approached me. |
| 10:46 | 25 | Q.   And then at some point in time, did you go back behind |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | the ticket counter?                                          |
| 10:46 | 2  | A.   Yes, I did.                                             |
| 10:46 | 3  | Q.   And what happened there?                               |
| 10:46 | 4  | A.   The Turkish Airline employee told me that the defendant |
|       | 5  | wanted to get his carry-on bag from being checked, and he   |
|       | 6  | wanted to take it on the plane with him.                    |
| 10:47 | 7  | Q.   Did you direct the Turkish Airlines employee to do     |
|       | 8  | anything?                                                    |
| 10:47 | 9  | A.   He asked -- the Turkish Airline employee asked me if it |
|       | 10 | was okay to give him back his bag, and I said it was.       |
| 10:47 | 11 | Q.   And then at that time, did you come out from behind the |
|       | 12 | ticket counter and stand in a position where you could      |
|       | 13 | observe Defendant Elhuzayel?                                |
| 10:47 | 14 | A.   Yes.                                                   |
| 10:47 | 15 | Q.   So what happened then?  Where did he go then?         |
| 10:47 | 16 | A.   I observed the employee give him back his second      |
|       | 17 | carry-on bag, and I observed him going back to the TSA     |
|       | 18 | checkpoint.                                                 |
| 10:47 | 19 | Q.   And just to be clear, we're talking about what is     |
|       | 20 | Government's Exhibit 606 when we're talking about the      |
|       | 21 | carry-on luggage bag; is that correct?                     |
| 10:47 | 22 | A.   Correct.                                               |
| 10:47 | 23 | Q.   Please look at what's been marked as Government's     |
|       | 24 | Exhibit 1004.                                               |
| 10:48 | 25 |      What is Government's Exhibit 1004?                    |

| | | |
|---|---|---|
| 10:48 | 1 | A.   It's a security surveillance video of |
| | 2 | Defendant Elhuzayel at the top of the escalator, entering |
| | 3 | the line for the TSA security checkpoint. |
| 10:48 | 4 | Q.   Does Government's Exhibit 1004 accurately depict what |
| | 5 | you observed Defendant Elhuzayel doing on May 21st, 2015? |
| 10:48 | 6 | A.   Yes, it does. |
| 10:48 | 7 | MS. HEINZ:  Your Honor, move to admit Government's |
| | 8 | Exhibit 1004. |
| 10:48 | 9 | THE COURT:  Any objection? |
| 10:48 | 10 | MS. CORRIGAN:  No, Your Honor. |
| 10:48 | 11 | MR. LENGYEL-LEAHU:  No objection. |
| 10:48 | 12 | THE COURT:  1004 is received. |
| 10:48 | 13 | You may play 1004 received. |
| 10:48 | 14 | *(Exhibit No. 1004 received in evidence.)* |
| 10:48 | 15 | *(Video recording played.)* |
| 10:48 | 16 | MS. HEINZ:  Okay.  Could you please freeze that. |
| 10:48 | 17 | BY MS. HEINZ: |
| 10:49 | 18 | Q.   Special Agent Vicencia, do you see the defendant on the |
| | 19 | screen in front of you? |
| 10:49 | 20 | A.   Yes. |
| 10:49 | 21 | Q.   Okay.  And again, that is Government's Exhibit 1004; is |
| | 22 | that correct? |
| 10:49 | 23 | A.   Yes. |
| 10:49 | 24 | Q.   Okay.  Please look at what's been marked as |
| | 25 | Government's Exhibit 1005. |

| | | |
|---|---|---|
| 10:49 | 1 | What is Government's Exhibit 1005? |
| 10:49 | 2 | A.   It's, again, LAX surveillance security video of |
| | 3 | Defendant Elhuzayel having his luggage searched by TSA |
| | 4 | personnel. |
| 10:49 | 5 | Q.   And does Government's Exhibit 1005 accurately depict |
| | 6 | what you observed Defendant Elhuzayel doing at LAX on |
| | 7 | May 21st, 2015? |
| 10:49 | 8 | A.   Yes. |
| 10:49 | 9 | MS. HEINZ:  Your Honor, move to admit into |
| | 10 | evidence Government's Exhibit 1005. |
| 10:49 | 11 | THE COURT:  Any objection? |
| 10:49 | 12 | MS. CORRIGAN:  No, Your Honor. |
| 10:49 | 13 | MR. LENGYEL-LEAHU:  *(No response.)* |
| 10:49 | 14 | THE COURT:  Received. |
| 10:50 | 15 | *(Exhibit No. 1005 received in evidence.)* |
| 10:50 | 16 | THE COURT:  You may play 1005. |
| 10:50 | 17 | *(Video recording played.)* |
| 10:50 | 18 | BY MS. HEINZ: |
| 10:50 | 19 | Q.   Special Agent Vicencia, as we watch Government's |
| | 20 | Exhibit 1005, could you look -- is Defendant Elhuzayel |
| | 21 | carrying the black carry-on bag that is Government's |
| | 22 | Exhibit 606? |
| 10:50 | 23 | A.   Yes, he is. |
| 10:50 | 24 | Q.   Did you take Government's Exhibit 606 from |
| | 25 | Defendant Elhuzayel on May 21st, 2015? |

| | | |
|---|---|---|
| 10:50 | 1 | A.    Yes, I did. |
| 10:50 | 2 | Q.    Please describe that. |
| 10:50 | 3 | A.    He was being escorted into an interview room, and |
| | 4 | before he walked into the room, I removed his laptop bag and |
| | 5 | the carry-on duffel bag. |
| 10:51 | 6 | Q.    And the carry-on bag is Government's Exhibit 606? |
| 10:51 | 7 | A.    Correct. |
| 10:51 | 8 | Q.    And when you took it from him, where did you put it? |
| 10:51 | 9 | A.    I placed it on a table outside of the interview room. |
| 10:51 | 10 | Q.    Did you see any FBI agents there by the table? |
| 10:51 | 11 | A.    Yes. |
| 10:51 | 12 | Q.    How many? |
| 10:51 | 13 | A.    There's approximately three or four FBI agents.  There |
| | 14 | was also customs agents and TSA agents, LAX police. |
| 10:51 | 15 | Q.    And did the FBI agents know that that black carry-on |
| | 16 | bag -- did they know that that black carry-on bag that is |
| | 17 | Government's Exhibit 606 -- did they know that that belonged |
| | 18 | to Defendant Elhuzayel? |
| 10:51 | 19 |         MR. LENGYEL-LEAHU:  Objection, Your Honor.  Calls |
| | 20 | for speculation. |
| 10:51 | 21 |         THE COURT:  Sustained. |
| 10:51 | 22 | BY MS. HEINZ: |
| 10:51 | 23 | Q.    Please look at what's been marked as Government's |
| | 24 | Exhibit 1007. |
| 10:52 | 25 |     What is Government's Exhibit 1007? |

| | | |
|---|---|---|
| 10:52 | 1 | A.   It's again surveillance footage at LAX showing two |
| | 2 | agents leaving the terminal with the defendant's luggage |
| | 3 | that he arrived with. |
| 10:52 | 4 | Q.   Okay.  And does Government's Exhibit 1007 accurately |
| | 5 | depict the two federal agents leaving the Tom Bradley |
| | 6 | terminal at LAX on May 21st, 2015? |
| 10:53 | 7 | A.   Yes, it does. |
| 10:53 | 8 | MS. HEINZ:  Your Honor, move to admit into |
| | 9 | evidence Government's Exhibit 1007. |
| 10:53 | 10 | THE COURT:  Any objection, Counsel? |
| 10:53 | 11 | MS. CORRIGAN:  No, Your Honor. |
| 10:53 | 12 | MR. LENGYEL-LEAHU:  No objection. |
| 10:53 | 13 | THE COURT:  1007 is received into evidence. |
| 10:53 | 14 | *(Exhibit No. 1007 received in evidence.)* |
| 10:53 | 15 | THE COURT:  You may play 1007. |
| 10:53 | 16 | *(Video recording played.)* |
| 10:53 | 17 | MS. HEINZ:  Okay.  Could you freeze that for a |
| | 18 | minute. |
| 10:53 | 19 | BY MS. HEINZ: |
| 10:53 | 20 | Q.   Special Agent Vicencia, when you look at what is |
| | 21 | Government's Exhibit 1007, do you recognize the individuals |
| | 22 | that appear to be carrying luggage there? |
| 10:53 | 23 | A.   Yes, I do. |
| 10:53 | 24 | Q.   Okay.  And who are they? |
| 10:53 | 25 | A.   One carrying the roller bag, which is 1007, is an FBI |

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | Special Agent.  And then the gentleman in the white T-shirt      |
|       | 2  | carrying the laptop bag and the carry-on bag is a task force     |
|       | 3  | officer with the Joint Terrorism Task Force, who's assigned      |
|       | 4  | to the Drug Enforcement Administration.                          |
| 10:54 | 5  | Q.   Sometime in May 2016, did you see Exhibit 606?  Again,      |
|       | 6  | that is the black carry-on bag.                                  |
| 10:54 | 7  | A.   Yes, I did.                                                 |
| 10:54 | 8  | Q.   Where did you see it?                                       |
| 10:54 | 9  | A.   We saw it at the FBI office in Orange, California.          |
| 10:54 | 10 | Q.   And specifically was it in an FBI evidence room?           |
| 10:54 | 11 | A.   It was initially in an FBI storage room, and it was        |
|       | 12 | moved to a conference room.                                      |
| 10:54 | 13 | Q.   Okay.  And did you watch that happen?                       |
| 10:54 | 14 | A.   Yes.                                                        |
| 10:54 | 15 | Q.   And was there another special agent there?                 |
| 10:54 | 16 | A.   Yes.  There was two other agents there.                    |
| 10:54 | 17 | Q.   Okay.  And what, if anything, did you watch the special    |
|       | 18 | agent do there?                                                 |
| 10:54 | 19 | A.   I watched the agent remove the Government 606 out of       |
|       | 20 | the evidence box, and I also observed the agent remove a USB    |
|       | 21 | drive from the bag.                                              |
| 10:55 | 22 | Q.   Okay.  Would you please look at what's been marked as      |
|       | 23 | Government's Exhibit 617.                                        |
| 10:55 | 24 |      What is Government's Exhibit 617?                          |
| 10:55 | 25 | A.   It's the thumb drive the agent removed from the bag.       |

| | | |
|---|---|---|
| 10:55 | 1 | MS. HEINZ:  Your Honor, move to admit into |
| | 2 | evidence Government's Exhibit 617. |
| 10:55 | 3 | THE COURT:  Any objection? |
| 10:55 | 4 | MS. CORRIGAN:  No, Your Honor. |
| 10:55 | 5 | MR. LENGYEL-LEAHU:  No, Your Honor. |
| 10:55 | 6 | THE COURT:  Received. |
| 10:55 | 7 | *(Exhibit No. 617 received in evidence.)* |
| 10:55 | 8 | BY MS. HEINZ: |
| 10:55 | 9 | Q.   Please look at what has been marked as Government's |
| | 10 | Exhibit 618. |
| 10:55 | 11 | What is Government's Exhibit 618? |
| 10:56 | 12 | A.   It's a travel power adapter that was also removed from |
| | 13 | the bag that day. |
| 10:56 | 14 | Q.   From -- this is during May of 2016? |
| 10:56 | 15 | A.   May 11th, 2016, yes. |
| 10:56 | 16 | Q.   Okay.  And was it in the same place in the luggage as |
| | 17 | the USB drive? |
| 10:56 | 18 | A.   Yes. |
| 10:56 | 19 | MS. HEINZ:  Your Honor, move to admit into |
| | 20 | evidence Government's Exhibit 618. |
| 10:56 | 21 | THE COURT:  Any objection? |
| 10:56 | 22 | MS. CORRIGAN:  No, Your Honor. |
| 10:56 | 23 | MR. LENGYEL-LEAHU:  *(No response.)* |
| 10:56 | 24 | THE COURT:  Counsel, any objection? |
| 10:56 | 25 | MR. LENGYEL-LEAHU:  The portable phone charger? |

| | | |
|---|---|---|
| 10:56 | 1 | THE COURT:  It's travel power adapter. |
| 10:56 | 2 | MR. LENGYEL-LEAHU:  No objection. |
| 10:56 | 3 | THE COURT:  Received. |
| 10:56 | 4 | *(Exhibit No. 618 received in evidence.)* |
| 10:56 | 5 | BY MS. HEINZ: |
| 10:56 | 6 | Q.   Please look at what's been marked as Government's |
| | 7 | Exhibit 619. |
| 10:56 | 8 | What is Government Exhibit 619? |
| 10:56 | 9 | A.   It's a receipt from Staples that was in the same area |
| | 10 | as the USB drive and also the travel adapter that was |
| | 11 | located in the bag. |
| 10:57 | 12 | MS. HEINZ:  Your Honor, move to admit into |
| | 13 | evidence Government's Exhibit 619. |
| 10:57 | 14 | THE COURT:  Any objection? |
| 10:57 | 15 | MS. CORRIGAN:  No, Your Honor. |
| 10:57 | 16 | MR. LENGYEL-LEAHU:  No, Your Honor. |
| 10:57 | 17 | THE COURT:  Received. |
| 10:57 | 18 | *(Exhibit No. 619 received in evidence.)* |
| 10:57 | 19 | MS. HEINZ:  Can you please publish Government's |
| | 20 | Exhibit 619? |
| 10:57 | 21 | THE COURT:  Counsel, he can simply describe the |
| | 22 | data on it. |
| 10:57 | 23 | MS. HEINZ:  Thank you, Your Honor. |
| 10:57 | 24 | BY MS. HEINZ: |
| 10:57 | 25 | Q.   Special Agent Vicencia, looking at Government's |

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | Exhibit 619, do you see -- what is it, first of all?          |
| 10:57 | 2  | A.   It's a receipt from Staples office store.                |
| 10:57 | 3  | Q.   Okay.  And what is the date on it?                        |
| 10:58 | 4  | A.   It's dated May 21st, 2015.                                |
| 10:58 | 5  | Q.   And is there a time on the receipt?                       |
| 10:58 | 6  | A.   Yes.                                                      |
| 10:58 | 7  | Q.   What is that time?                                        |
| 10:58 | 8  | A.   2:47 a.m. *(Verbatim.)*                                   |
| 10:58 | 9  | Q.   Okay.  And on Government's Exhibit 619, which you've      |
|       | 10 | described as the receipt from Staples, do you see any          |
|       | 11 | information on there that is related to Government's           |
|       | 12 | Exhibit 617 and 618?                                           |
| 10:58 | 13 | A.   Yes.                                                      |
| 10:58 | 14 | Q.   What is that information?                                 |
| 10:58 | 15 | A.   It shows the prices and that they were purchased on the   |
|       | 16 | receipt.                                                       |
| 10:58 | 17 |         MS. HEINZ:  Thank you, Your Honor.  Nothing            |
|       | 18 | further.                                                       |
| 10:58 | 19 |         THE COURT:  Cross-examination, Mr. Lengyel-Leahu.      |
| 10:58 | 20 |                      **CROSS-EXAMINATION**                     |
| 10:58 | 21 | BY MR. LENGYEL-LEAHU:                                          |
| 10:58 | 22 | Q.   Did you inventory the entire property from the carry-on   |
|       | 23 | bags?                                                          |
| 10:59 | 24 | A.   Did I personally?                                         |
| 10:59 | 25 | Q.   Yes.                                                      |

| | | |
|---|---|---|
| 10:59 | 1 | A.    No. |
| 10:59 | 2 | Q.    Did this occur in your presence on -- when was it -- |
| | 3 | May 11th? |
| 10:59 | 4 | A.    On May 11, 2016? |
| 10:59 | 5 | Q.    Yes. |
| 10:59 | 6 | A.    I did not, no.  The entire bag was looked through by |
| | 7 | another agent. |
| 10:59 | 8 | Q.    So the only items that you saw removed from the bags |
| | 9 | would be the thumb drive you previously described and the |
| | 10 | portable phone charger and the Staples receipt? |
| 10:59 | 11 | A.    I saw some clothes that were in there, and I saw some |
| | 12 | sort of workout device for -- it was like an elastic piece |
| | 13 | of workout -- I can't -- really know the name of it, but it |
| | 14 | was like a workout piece. |
| 11:00 | 15 |           MR. LENGYEL-LEAHU:  One second, please, |
| | 16 | Your Honor. |
| 11:00 | 17 |           Nothing further, Your Honor. |
| 11:00 | 18 |           THE COURT:  Cross-examination, Ms. Corrigan. |
| 11:00 | 19 |           MS. CORRIGAN:  No, Your Honor.  This doesn't |
| | 20 | pertain to my client.  Thank you. |
| 11:00 | 21 |           THE COURT:  Redirect? |
| 11:00 | 22 |           MS. HEINZ:  No redirect, Your Honor. |
| 11:00 | 23 |           THE COURT:  All right.  Sir, we're going to ask |
| | 24 | you to remain on call. |
| 11:00 | 25 |           Counsel, unless you indicate differently, I'll ask |

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | each witness to remain on call so that witnesses don't need                  |
|       | 2  | to be subpoenaed.  If there's a default position or if you                   |
|       | 3  | want a witness excused, I'll take that up at the end of the                   |
|       | 4  | day.                                                                          |
| 11:00 | 5  | Sir, you're on call.  You may please step down.                              |
| 11:00 | 6  | THE WITNESS:  Yes, Your Honor.                                                |
| 11:00 | 7  | *(Witness steps down.)*                                                       |
| 11:00 | 8  | THE COURT:  Your next witness, please.                                       |
| 11:00 | 9  | MS. ELIOT:  Your Honor, the government calls                                  |
|       | 10 | Special Agent Scott Hill.                                                     |
| 11:01 | 11 | THE COURT:  Thank you, sir.  Would you raise your                            |
|       | 12 | right hand, please.                                                          |
| 11:01 | 13 | **SCOTT HILL, CALLED BY THE GOVERNMENT, SWORN**                              |
| 11:01 | 14 | THE WITNESS:  I do.                                                          |
| 11:01 | 15 | THE COURT:  Thank you.  If you would walk to this                           |
|       | 16 | side of the courtroom, please, along the railing where the                   |
|       | 17 | jury is located.  After you're seated, if you would face the                 |
|       | 18 | jury.  State your full name and spell your last name, sir.                   |
| 11:01 | 19 | THE WITNESS:  Scott Hill, H-I-L-L.                                           |
| 11:01 | 20 | THE COURT:  Direct examination by the government.                            |
| 11:01 | 21 | **DIRECT EXAMINATION**                                                       |
| 11:01 | 22 | BY MS. ELIOT:                                                                |
| 11:01 | 23 | Q.   Good morning.  What do you do for a living?                             |
| 11:01 | 24 | A.   Good morning.  I'm a special agent with the Federal                     |
|       | 25 | Bureau of Investigation.                                                     |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 11:01 | 1 | Q.   How long have you been a special agent with the FBI? |
| 11:01 | 2 | A.   14 years. |
| 11:01 | 3 | Q.   In general, what are your duties and responsibilities |
| | 4 | as a special agent? |
| 11:01 | 5 | A.   Currently, I'm a team leader on our special weapons and |
| | 6 | tactics team. |
| 11:01 | 7 | Q.   And what is that -- is that known as SWAT? |
| 11:01 | 8 | A.   Yes, it is. |
| 11:01 | 9 | Q.   And are you assigned to CT7 as well? |
| 11:02 | 10 | A.   That's correct. |
| 11:02 | 11 | Q.   And what is CT7? |
| 11:02 | 12 | A.   CT7's our crisis response squad, so that squad |
| | 13 | encompasses all our squads for special missions, SWATs, |
| | 14 | evidence response, et cetera. |
| 11:02 | 15 | Q.   And how long have you been assigned to CT7? |
| 11:02 | 16 | A.   Approximately eight months. |
| 11:02 | 17 | Q.   Where were you assigned prior to joining CT7? |
| 11:02 | 18 | A.   I was full-time with the firearms training unit. |
| 11:02 | 19 | Q.   Did you receive training when you first joined the FBI? |
| 11:02 | 20 | A.   I did. |
| 11:02 | 21 | Q.   Where does that training take place? |
| 11:02 | 22 | A.   In Quantico, Virginia. |
| 11:02 | 23 | Q.   As a member of the FBI SWAT team, have you conducted |
| | 24 | arrests? |
| 11:02 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:02 | 1 | Q.   Where were you on May 21st, 2015? |
| 11:02 | 2 | A.   I was in the County of Orange, and specifically, in the |
| | 3 | City of Anaheim, California. |
| 11:02 | 4 | Q.   Were you at a gas station that day? |
| 11:02 | 5 | A.   Yes, I was. |
| 11:02 | 6 | Q.   What did you do at the gas station? |
| 11:02 | 7 | A.   We effected the arrest of two individuals in a vehicle, |
| | 8 | the ARCO gas station. |
| 11:02 | 9 | Q.   Is either of the individuals that you arrested present |
| | 10 | in the courtroom today? |
| 11:03 | 11 | A.   Yes. |
| 11:03 | 12 | Q.   Can you please point out the person you arrested and |
| | 13 | describe where he's seated? |
| 11:03 | 14 | A.   Individual to the right, dark blue suit, gray shirt, |
| | 15 | black hair, writing on a yellow notepad. |
| 11:03 | 16 |         THE COURT:   Record will indicate that the agent's |
| | 17 | identified Mr. Badawi. |
| 11:03 | 18 | BY MS. ELIOT: |
| 11:03 | 19 | Q.   Did Defendant Badawi have any possessions with him at |
| | 20 | the time of his arrest on May 21st, 2015? |
| 11:03 | 21 | A.   Yes, he did. |
| 11:03 | 22 | Q.   We'd like to show you what has been marked as |
| | 23 | Government's Exhibit 601. |
| 11:03 | 24 |         *(Exhibits provided to the witness.)* |
| | 25 | |

| | | |
|---|---|---|
| 11:03 | 1 | BY MS. ELIOT: |
| 11:03 | 2 | Q.   Do you recognize that exhibit? |
| 11:03 | 3 | A.   Yes, I do. |
| 11:03 | 4 | Q.   What is it? |
| 11:03 | 5 | A.   It is a black iPhone. |
| 11:03 | 6 | Q.   And when did you see this before? *(Verbatim.)* |
| 11:03 | 7 | A.   This was on or about the person of Badawi in his |
| | 8 | vehicle on the driver's side. |
| 11:04 | 9 | Q.   Did you give the iPhone to anyone after you took it |
| | 10 | during the arrest of Defendant Badawi? |
| 11:04 | 11 | A.   Yes, I did.  I passed it on to an agent that came after |
| | 12 | we effected the arrest. |
| 11:04 | 13 | Q.   What is the purpose of passing that on to that agent? |
| 11:04 | 14 | A.   To maintain chain of custody. |
| 11:04 | 15 | Q.   Do you recognize the bag that the iPhone is in now, |
| | 16 | generally? |
| 11:04 | 17 | A.   Generally, yes. |
| 11:04 | 18 | Q.   What is it? |
| 11:04 | 19 | A.   It is a brown bag. |
| 11:04 | 20 | Q.   And what is that used for by the FBI?  I'm sorry.  The |
| | 21 | clear plastic bag? |
| 11:04 | 22 | A.   The clear plastic bag, this would be an evidentiary bag |
| | 23 | that all of our evidence is maintained in, varying -- |
| | 24 | different sizes, but of this clear plastic nature. |
| 11:04 | 25 | Q.   And is the exhibit in the same or substantially the |

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | same condition as when you took possession of it at the time                 |
|       | 2  | of Badawi's arrest?                                                           |
| 11:04 | 3  | A.   Yes it is.                                                               |
| 11:04 | 4  |          MS. ELIOT:  Your Honor, the government moves to                      |
|       | 5  | admit Exhibit 601.                                                           |
| 11:04 | 6  |          THE COURT:  Any objection?                                           |
| 11:04 | 7  |          MS. CORRIGAN:  No, Your Honor.                                       |
| 11:04 | 8  |          MR. LENGYEL-LEAHU:  No, sir.                                         |
| 11:04 | 9  |          THE COURT:  Received.                                                |
| 11:04 | 10 |      *(Exhibit No. 601 received in evidence.)*                                |
| 11:04 | 11 | BY MS. ELIOT:                                                                 |
| 11:04 | 12 | Q.   Did you take anything else from Defendant Badawi at the                  |
|       | 13 | time of his arrest?                                                           |
| 11:04 | 14 | A.   I believe there was a wallet there as well.                             |
| 11:04 | 15 | Q.   What, if anything, did you do with the wallet that you                   |
|       | 16 | took custody of?                                                              |
| 11:05 | 17 | A.   All the items we placed on the roof of the vehicle.                      |
| 11:05 | 18 | Q.   And after it was placed on the roof, did you do                          |
|       | 19 | anything with it?                                                             |
| 11:05 | 20 | A.   When the agents came that we gave the phone to, we gave                  |
|       | 21 | all the other items to that person as well.                                  |
| 11:05 | 22 |          MS. ELIOT:  No further questions.                                    |
| 11:05 | 23 |          THE COURT:  Cross-examination, Mr. Lengyel-Leahu.                    |
| 11:05 | 24 |          MR. LENGYEL-LEAHU:  No.  Thank you, Your Honor.                      |
| 11:05 | 25 |          THE COURT:  Cross-examination, Ms. Corrigan.                         |

| | | |
|---|---|---|
| 11:05 | 1 | MS. CORRIGAN:  No, Your Honor. |
| 11:05 | 2 | THE COURT:  Agent, we're going to place you on |
| | 3 | call.  Thank you very much.  You may step down, sir. |
| 11:05 | 4 | THE WITNESS:  Yes, sir. |
| 11:05 | 5 | *(Witness steps down.)* |
| 11:05 | 6 | THE COURT:  Counsel, your next witness, please. |
| 11:05 | 7 | MS. HEINZ:  Government calls Terry Hom. |
| 11:05 | 8 | THE COURT:  Thank you, sir.  Would you raise your |
| | 9 | right hand, sir. |
| 11:05 | 10 | **TERRY HOM, CALLED BY THE GOVERNMENT, SWORN** |
| 11:05 | 11 | THE WITNESS:  I do. |
| 11:05 | 12 | THE COURT:  Thank you, sir.  If you will walk |
| | 13 | along the side of the jury railing, the entrance to the jury |
| | 14 | box is closest to the wall. |
| 11:06 | 15 | Be seated, please.  Face the jury, state your full |
| | 16 | name, and spell your last name, please. |
| 11:06 | 17 | THE WITNESS:  Terry J. Hom, H-O-M. |
| 11:06 | 18 | THE COURT:  Thank you.  Direct examination by the |
| | 19 | government. |
| 11:06 | 20 | **DIRECT EXAMINATION** |
| 11:06 | 21 | BY MS. HEINZ: |
| 11:06 | 22 | Q.   Good morning, Mr. Hom. |
| 11:06 | 23 | A.   Good morning. |
| 11:06 | 24 | Q.   Where are you employed? |
| 11:06 | 25 | A.   I'm employed with the Federal Bureau of Investigation. |

| | | |
|---|---|---|
| 11:06 | 1 | Q.    And specifically do you work at a certain facility? |
| 11:06 | 2 | A.    I work at the Orange County regional computer forensic |
| | 3 | lab. |
| 11:06 | 4 | Q.    And what is your position? |
| 11:06 | 5 | A.    I am a, um, information technology specialist forensic |
| | 6 | examiner. |
| 11:06 | 7 | Q.    And for purposes of today, I'm gonna shorten that a |
| | 8 | little bit to forensic examiner. |
| 11:07 | 9 | A.    Thank you. |
| 11:07 | 10 | Q.    What does a forensic examiner do? |
| 11:07 | 11 | A.    A forensic examiner examines digital information such |
| | 12 | as -- such as information on flash drives, hard drives, and |
| | 13 | it -- |
| 11:07 | 14 | Q.    Does that include phones? |
| 11:07 | 15 | A.    That includes cell phones, yes. |
| 11:07 | 16 | Q.    And what is your educational background? |
| 11:07 | 17 | A.    I have a bachelor of science in public administration, |
| | 18 | and I have a *(sic)* associate's degree in electronic |
| | 19 | technology. |
| 11:07 | 20 | Q.    And please describe any work in the private sector |
| | 21 | outside of FBI that you have done that's -- relates to the |
| | 22 | technology of digital devices. |
| 11:07 | 23 | A.    Before the bureau, I was employed as a field engineer |
| | 24 | installing and repairing computer systems. |
| 11:07 | 25 | Q.    And since you joined the FBI, what training have you |

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | received in the forensic examination of digital devices?               |
| 11:08 | 2  | A.   I received -- I started my training in 2005 and                    |
|       | 3  | certified in 2006.  The training involved hardware, hardware            |
|       | 4  | and then software, and it included training of the forensic            |
|       | 5  | software.                                                              |
| 11:08 | 6  | Q.   And what training have you received in the examination            |
|       | 7  | of cell phones?                                                        |
| 11:08 | 8  | A.   I received training from BlackBag Technologies with a             |
|       | 9  | tool called "BlackLight."                                             |
| 11:08 | 10 | Q.   What's certi- -- do you hold any certifications in                |
|       | 11 | forensic examination?                                                  |
| 11:08 | 12 | A.   No, I don't.                                                       |
| 11:08 | 13 | Q.   In your work at the FBI, approximately how many                    |
|       | 14 | forensic examinations do you typically do during a week?               |
| 11:08 | 15 | A.   Average is maybe two to three.                                     |
| 11:08 | 16 | Q.   And approximately how many times have you testified               |
|       | 17 | previously in court as a forensic examiner?                            |
| 11:09 | 18 | A.   Four times.                                                        |
| 11:09 | 19 | Q.   Like you to look at what's been marked as Government's            |
|       | 20 | Exhibit 69.                                                             |
| 11:09 | 21 | THE COURT:  Six-nine?                                                   |
| 11:09 | 22 | MS. HEINZ:  69.                                                        |
| 11:09 | 23 | THE COURT:  Thank you.                                                  |
| 11:09 | 24 | BY MS. HEINZ:                                                           |
| 11:09 | 25 | Q.   And, Mr. Hom, after you've had a chance to look at                 |

**DEBBIE GALE, U.S. COURT REPORTER**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | government's -- what's been marked as Government's            |
|       | 2  | Exhibit 69, would you tell us what it is?                     |
| 11:09 | 3  | A.   Yes.  This is the results from an iPhone examination     |
|       | 4  | that I did.                                                   |
| 11:09 | 5  | Q.   Okay.                                                    |
| 11:09 | 6  | MR. LENGYEL-LEAHU:  Objection.  Excuse me,                    |
|       | 7  | Your Honor, could I approach?  My exhibit folder must be out  |
|       | 8  | of order.                                                     |
| 11:09 | 9  | THE COURT:  You may.                                          |
| 11:10 | 10 | MR. LENGYEL-LEAHU:  I just wanna check the exhibit            |
|       | 11 | 'cause the folder that I was handed by the government...      |
| 11:10 | 12 | THE COURT:  Why don't you check with the                     |
|       | 13 | government.                                                   |
| 11:10 | 14 | MS. CORRIGAN:  For the record, I have Exhibit 69,             |
|       | 15 | Your Honor.                                                   |
| 11:10 | 16 | *(Mr. Lengyel-Leahu approaches the witness.)*                 |
| 11:10 | 17 | MR. LENGYEL-LEAHU:  It's a disc.                              |
| 11:10 | 18 | THE COURT:  It's a disc.                                      |
| 11:10 | 19 | Okay.  Counsel, your next question, please.                  |
| 11:10 | 20 | BY MS. HEINZ:                                                 |
| 11:10 | 21 | Q.   Mr. Hom, when you look at what's been marked as          |
|       | 22 | Government's Exhibit 69, how do you know what it is?  Does    |
|       | 23 | it have any identifying characteristics?                      |
| 11:10 | 24 | A.   Yes.  I recognize the logo from our laboratory.  I       |
|       | 25 | recognize my name's on it, and I recognize my initials.       |

Case 8:15-cr-00060-DOC   Document 291   Filed 03/31/17   Page 36 of 83   Page ID #:4238
8:15-CR-0060-DOC - 6/8/2016 - Day 2, Volume II

36

| | | |
|---|---|---|
| 11:10 | 1 | Q.   And does Government's Exhibit 69 contain true copies of |
| | 2 | files that were copied from an iPhone? |
| 11:10 | 3 | MR. LENGYEL-LEAHU:  Objection.  Lack of |
| | 4 | foundation, Your Honor. |
| 11:11 | 5 | THE COURT:  And what's missing concerning |
| | 6 | foundation, Counsel? |
| 11:11 | 7 | MR. LENGYEL-LEAHU:  Whether he's reviewed the |
| | 8 | exhibit prior to coming to court, had an opportunity to |
| | 9 | correlate it with the investigation. |
| 11:11 | 10 | THE COURT:  Sustained. |
| 11:11 | 11 | MR. LENGYEL-LEAHU:  Thank you. |
| 11:11 | 12 | BY MS. HEINZ: |
| 11:11 | 13 | Q.   Mr. Hom, have you reviewed what's been marked as |
| | 14 | Government's Exhibit 69 previously? |
| 11:11 | 15 | A.   Not since it was -- not since it left my hands and was |
| | 16 | submitted to evidence. |
| 11:11 | 17 | Q.   But once you -- once it left your hands, you had looked |
| | 18 | at it then; is that correct? |
| 11:11 | 19 | A.   Yes. |
| 11:11 | 20 | Q.   Okay.  And do you know that because your initials are |
| | 21 | on it? |
| 11:11 | 22 | A.   That's correct. |
| 11:11 | 23 | Q.   Okay.  And so, therefore, do you know that it contains |
| | 24 | true copies of files that were copied from an iPhone? |
| 11:11 | 25 | MR. LENGYEL-LEAHU:  Objection.  Calls for |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | speculation, Your Honor.                                     |
| 11:11 | 2  | THE COURT:  Overruled.  You can answer that                  |
|       | 3  | question, sir.                                               |
| 11:11 | 4  | THE WITNESS:  Could you repeat, please?                      |
| 11:11 | 5  | MS. HEINZ:  Yes.                                             |
| 11:12 | 6  | BY MS. HEINZ:                                                |
| 11:12 | 7  | Q.   Based on your review of Government's Exhibit 69, do you |
|       | 8  | know that it contains true copies of files that were copied  |
|       | 9  | from an iPhone?                                               |
| 11:12 | 10 | MR. LENGYEL-LEAHU:  Same objection, Your Honor.             |
| 11:12 | 11 | THE COURT:  Overruled.                                        |
| 11:12 | 12 | THE WITNESS:  Yes.                                           |
| 11:12 | 13 | BY MS. HEINZ:                                                |
| 11:12 | 14 | Q.   Please look at Government's Exhibit 601.                |
| 11:12 | 15 | What is Government's Exhibit 601?                            |
| 11:12 | 16 | A.   This is an iPhone 5.                                     |
| 11:12 | 17 | Q.   Okay.  Did you perform a forensic examination of       |
|       | 18 | Government's Exhibit 601?                                     |
| 11:12 | 19 | A.   Yes, I did.                                              |
| 11:12 | 20 | Q.   Okay.  And how do you know that?                        |
| 11:12 | 21 | A.   I recognize it by the bar code from our laboratory.  I  |
|       | 22 | recognize it from the date and my initials.                  |
| 11:13 | 23 | Q.   Did you use a search warrant to guide your examination |
|       | 24 | of Government's Exhibit 601?                                  |
| 11:13 | 25 | A.   Yes, I did.                                              |

11:13    1    Q.   Okay.  And how did you do that?  How did it guide you?

11:13    2    A.   It gave me the authority to do the examination on the

          3    phone.

11:13    4    Q.   All right.  Could you please describe the process you

          5    performed to conduct a forensic examination of Government's

          6    Exhibit 601, the iPhone?

11:13    7    A.   Yes.  The iPhone was attached to a computer which had

          8    the software BlackLight.  Connected the phone to that

          9    computer, then I connected a clean hard drive to receive the

        10    extracted files from the iPhone.

11:13   11      I started the program, and when it completed, I

        12    disconnected the phone and I secured the phone and that hard

        13    drive that contained the extracted files in my locker.

11:13   14    Q.   And what is BlackLight?  What is it?

11:14   15    A.   BlackLight is a program made by BlackBag Technologies.

        16    And it's a very good program for devices such as iPhones.

11:14   17    Q.   And is BlackLight software widely used by forensic

        18    examiners?

11:14   19    A.   Yes.  It's known worldwide.  It's used by many other

        20    agencies.

11:14   21    Q.   And did BlackLight copy the files that were on the

        22    iPhone on the -- what's been marked as Government's

        23    Exhibit 601?  Did it copy those files?

11:14   24    A.   It copied the files, processed the files, and from

        25    that, a review of the copied files was made.

11:14   1   Q.   And can BlackLight copy deleted files from an iPhone?

11:14   2   A.   Yes, it can.

11:14   3   Q.   I'm going back to Government's Exhibit 69.  Okay?

11:14   4        Now, I believe you testified that you created

        5   Government's Exhibit 69; is that correct?

11:15   6   A.   Yes, I did.

11:15   7   Q.   Okay.  So does Government's Exhibit 69 contain true

        8   copies of files that were copied from Government's

        9   Exhibit 601 using BlackLight?

11:15  10   A.   Yes, it does.

11:15  11   Q.   What happened to Government's Exhibit 601 after you

       12   performed the forensic examination using BlackLight?

11:15  13   A.   They were sealed and returned to evidence.

11:15  14   Q.   And what happened to Government's Exhibit 69 after you

       15   initialed it?

11:15  16   A.   Same thing.  It was signed, sealed, and submitted into

       17   evidence.

11:15  18   Q.   Like you to look at what's been marked as Government's

       19   Exhibit 617.

11:15  20        What is Government's Exhibit 617?

11:15  21   A.   This is a thumb drive.

11:15  22   Q.   And did you make a copy of any files on Government's

       23   Exhibit 617?

11:16  24   A.   Yes, I did.

11:16  25   Q.   How do you know?

**DEBBIE GALE, U.S. COURT REPORTER**

| 11:16 | 1 | A.    I recognize this by -- same thing:  By the bar code, by |
| | 2 | initials and the data on the back. |
| 11:16 | 3 | Q.    Did you use the search warrant to guide your processing |
| | 4 | of Government's Exhibit 617? |
| 11:16 | 5 | A.    Yes, I did. |
| 11:16 | 6 | Q.    How'd you do that? |
| 11:16 | 7 | A.    I read the warrant which specified this thumb drive and |
| | 8 | allowed me to do the copying and search of the thumb drive. |
| 11:16 | 9 | Q.    Please describe the process you performed to make a |
| | 10 | copy of Government's 617. |
| 11:16 | 11 | A.    Yes.  I took the thumb drive.  I plugged it into a |
| | 12 | physical write blocker, which protects the thumb drive from |
| | 13 | accidental writing to it.  Then I initiated a program called |
| | 14 | Nero, which copies the files from the thumb drive to a clean |
| | 15 | CD, compact disc. |
| 11:17 | 16 | Q.    And when you used that software, what -- I'm sorry. |
| | 17 | Did you call it -- what did you call it again? |
| 11:17 | 18 | A.    Nero, N-E-R-O. |
| 11:17 | 19 | Q.    When you used that software, Nero, did it show you |
| | 20 | whether or not the CD contained a true and accurate copy of |
| | 21 | all the files on Government's Exhibit 617? |
| 11:17 | 22 | A.    Yes.  At the end of the process, it showed 100 percent |
| | 23 | data burned or copied and it also stated that the |
| | 24 | verification was completed. |
| 11:17 | 25 | Q.    Could you please look at what's been marked as |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | Government's Exhibit 148.  What is Government's Exhibit 148?          |
| 11:17 | 2  | A.   Yes.  This is a copy of the thumb drive that I made.            |
| 11:18 | 3  | Q.   All right.  And I'm going to call it a disc.  Would             |
|       | 4  | that be appropriate?                                                  |
| 11:18 | 5  | A.   Compact disc, that's correct.                                   |
| 11:18 | 6  | Q.   Okay.  Does the disc that is -- been marked as                  |
|       | 7  | Government's Exhibit 148, does it contain the copied files           |
|       | 8  | from Government's Exhibit 617?                                        |
| 11:18 | 9  | A.   Yes, it does.                                                   |
| 11:18 | 10 | Q.   And how do you know that?                                       |
| 11:18 | 11 | A.   I recognize the CD, the file number, the date, my name         |
|       | 12 | and my initials.                                                     |
| 11:18 | 13 | Q.   Okay.  What did you do with Government's Exhibit 148            |
|       | 14 | after you initialed it?                                               |
| 11:18 | 15 | A.   After initialing, I sealed it, signed it, checked it           |
|       | 16 | into evidence.                                                        |
| 11:18 | 17 | Q.   Okay.  And at any time did you provide Government's             |
|       | 18 | Exhibit 148 to Special Agent Scott Wales?                            |
| 11:18 | 19 | A.   Once it was checked into evidence, it was -- it was            |
|       | 20 | released to Scott Wales.                                              |
| 11:18 | 21 | Q.   And what happened to Government's Exhibit 617 after you         |
|       | 22 | made a copy of it on Government's Exhibit 148?                       |
| 11:19 | 23 | A.   Same thing; it was resealed, signed, and checked back          |
|       | 24 | into evidence.                                                        |
| 11:19 | 25 |         MS. HEINZ:  No further questions, Your Honor.                |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 11:19 | 1 | THE COURT:  Cross-examination, Mr. Lengyel-Leahu. |
| 11:19 | 2 | MR. LENGYEL-LEAHU:  No.  Thank you, Your Honor. |
| 11:19 | 3 | THE COURT:  Cross-examination, Ms. Corrigan. |
| 11:19 | 4 | MS. CORRIGAN:  No, Your Honor. |
| 11:19 | 5 | THE COURT:  Sir, we're going to place you on call. |
| | 6 | Thank you very much.  You may step down. |
| 11:19 | 7 | *(Witness steps down.)* |
| 11:19 | 8 | THE COURT:  Counsel, your next witness, please. |
| 11:19 | 9 | MS. HEINZ:  Government calls Abdalla Ahmed. |
| 11:19 | 10 | THE COURT:  Thank you, sir.  If you would step |
| | 11 | forward between the double doors, please.  Stop at that |
| | 12 | location and please raise your right hand. |
| 11:19 | 13 | **ABDALLA AHMED, CALLED BY THE GOVERNMENT, SWORN** |
| 11:19 | 14 | THE COURT:  I couldn't hear you, sir. |
| 11:20 | 15 | THE WITNESS:  Yes. |
| 11:20 | 16 | THE COURT:  All right.  Thank you. |
| 11:20 | 17 | If you would please be seated in the jury box. |
| | 18 | It's to my left.  Walk along the side of the jury railing. |
| | 19 | The entrance is closest to the wall.  Be seated, please. |
| 11:20 | 20 | THE WITNESS:  Thank you. |
| 11:20 | 21 | THE COURT:  Pull the microphone close to you so we |
| | 22 | can hear you.  State your full name for the jury, sir. |
| 11:20 | 23 | THE WITNESS:  Abdalla Ahmed. |
| 11:20 | 24 | THE COURT:  Spell your last name, please. |
| 11:20 | 25 | THE WITNESS:  A-H-M-E-D. |

| | | |
|---|---|---|
| 11:20 | 1 | THE COURT:  Direct examination by the government. |
| 11:20 | 2 | **DIRECT EXAMINATION** |
| 11:20 | 3 | BY MS. HEINZ: |
| 11:20 | 4 | Q.   Good morning, Mr. Ahmed. |
| 11:20 | 5 | A.   Good morning. |
| 11:20 | 6 | Q.   Did the government hire you to prepare translations in |
| | 7 | this case? |
| 11:20 | 8 | A.   Yes. |
| 11:20 | 9 | Q.   And did that work require you to translate Arabic |
| | 10 | language words and phrases into the English language? |
| 11:20 | 11 | A.   Yes. |
| 11:20 | 12 | Q.   And have you done that work? |
| 11:20 | 13 | A.   Yes. |
| 11:20 | 14 | Q.   All right.  I'm going to talk to you a little bit about |
| | 15 | your qualifications. |
| 11:21 | 16 | Mr. Ahmed, what is your native language? |
| 11:21 | 17 | A.   Arabic Sudanese. |
| 11:21 | 18 | Q.   And you do speak Sudanese Arabic? |
| 11:21 | 19 | A.   Yes, I do. |
| 11:21 | 20 | Q.   And have you spoken Sudanese Arabic your entire life? |
| 11:21 | 21 | A.   Yes. |
| 11:21 | 22 | Q.   The Arabic language materials that you reviewed in this |
| | 23 | case, did these include audio and video recordings? |
| 11:21 | 24 | A.   Yes. |
| 11:21 | 25 | Q.   And on these audio recordings and video recordings, did |

**DEBBIE GALE, U.S. COURT REPORTER**

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | some of the speakers speak in the Arabic language?           |
| 11:21 | 2  | A.   Yes.                                                    |
| 11:21 | 3  | Q.   And did one of the speakers speak in Sudanese Arabic?   |
| 11:21 | 4  | A.   Yes.                                                    |
| 11:21 | 5  | Q.   Do you also understand the Arabic language as it is     |
|       | 6  | spoken in Syria and Palestine?                               |
| 11:21 | 7  | A.   Yes, I do.                                              |
| 11:21 | 8  | Q.   And does spoken Sudanese Arabic -- does that differ a   |
|       | 9  | little bit from the Arabic language that is spoken in Middle |
|       | 10 | Eastern language?                                            |
| 11:22 | 11 | A.   Yes, it is different.                                   |
| 11:22 | 12 | Q.   Do you also read Arabic?                                |
| 11:22 | 13 | A.   Yes, I do.                                              |
| 11:22 | 14 | Q.   And can you also write in Arabic?                       |
| 11:22 | 15 | A.   Yes.                                                    |
| 11:22 | 16 | Q.   Have you been reading and writing in Arabic since you   |
|       | 17 | were a child?                                                |
| 11:22 | 18 | A.   Yes, since first grade.                                 |
| 11:22 | 19 | Q.   When did you begin learning English?                   |
| 11:22 | 20 | A.   Uh, I start learning English in the nine grade.         |
|       | 21 | *(Verbatim.)*                                                |
| 11:22 | 22 | Q.   In the ninth grade?                                     |
| 11:22 | 23 | A.   Yes.                                                    |
| 11:22 | 24 | Q.   Did you attend and receive a degree from the University |
|       | 25 | of Khartoum in Khartoum, Sudan?                              |

| | | |
|---|---|---|
| 11:22 | 1 | A.    Yes. |
| 11:22 | 2 | Q.    What was that degree? |
| 11:22 | 3 | A.    It's a bachelor in economy and political science. |
| 11:22 | 4 | Q.    At some point did you move to the United States? |
| 11:22 | 5 | A.    Yes. |
| 11:22 | 6 | Q.    What year? |
| 11:22 | 7 | A.    2003. |
| 11:22 | 8 | Q.    Did you attend college in the United States? |
| 11:22 | 9 | A.    Yes.  I went to Georgetown University, and I have a |
| | 10 | master degree from Institute for the -- |
| 11:23 | 11 | *(Court reporter requests clarification for the* |
| | 12 | *record.)* |
| 11:23 | 13 |        THE WITNESS:  -- International Training. |
| 11:23 | 14 | BY MS. HEINZ: |
| 11:23 | 15 | Q.    At Georgetown University, what did you study? |
| 11:23 | 16 | A.    I studied "linguist." *(Verbatim.)* |
| 11:23 | 17 | Q.    And did you attend there on a scholarship? |
| 11:23 | 18 | A.    Yes.  I got, um -- full scholarship from the National |
| | 19 | Security Education Program. |
| 11:23 | 20 | Q.    Have you been certified in the translation of Arabic |
| | 21 | into English? |
| 11:23 | 22 | A.    Yes, I have.  I have an IL -- ILR certificate from |
| | 23 | Georgetown University. |
| 11:23 | 24 | Q.    And could you tell us a little bit about what the level |
| | 25 | of certification is that you have? |

11:23   1   A.   Actually, it is Interagency Language Roundtable.

11:23   2   Q.   That's the name of the agency that provided the

        3   certification?

11:23   4   A.   Yes.

11:23   5   Q.   And what degree of certification do you have; in other

        6   words, just tell us a little -- describe the level of

        7   certification.

11:24   8   A.   It's level three.

11:24   9   Q.   What does level three mean?

11:24  10   A.   For Arabic, it means a native speaker.  Actually, I

       11   have proficient, proficient level.  For English, it is a

       12   proficient level.

11:24  13   Q.   Did you also previously work as a translator for the

       14   United States military?

11:24  15   A.   Yes.

11:24  16   Q.   And what was the time period of that approximately?

11:24  17   A.   Like six years.

11:24  18   Q.   Okay.  And could you describe your duties?

11:24  19   A.   I used to translate from Arabic to English, and I did

       20   actually translation, too, from spoken Arabic into English.

11:24  21   Q.   So just to rephrase a little bit, is it correct to say

       22   that you translated spoken Arabic into written English?

11:25  23   A.   Yes.

11:25  24   Q.   And did you also translate documents for the

       25   United States military, taking an Arabic language document

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | and translating it into English?                           |
| 11:25 | 2  | A.   Yes.                                                   |
| 11:25 | 3  | Q.   Would you please look at what's been marked as        |
|       | 4  | Government's Exhibit 1021.                                  |
| 11:25 | 5  |      Mr. Ahmed, have you reviewed all of the translations   |
|       | 6  | listed in Government's Exhibit 1021?                        |
| 11:25 | 7  | A.   Yes, I have.                                           |
| 11:25 | 8  | Q.   Are the translations listed in Government's           |
|       | 9  | Exhibit 1021 English language translations of Arabic       |
|       | 10 | language words, phrases, and sentences?                    |
| 11:25 | 11 | A.   Yes.                                                   |
| 11:25 | 12 | Q.   Based on your review, are all of the translations     |
|       | 13 | listed in Government's Exhibit 1021 correct and accurate?  |
| 11:26 | 14 | A.   Yes.                                                   |
| 11:26 | 15 |           MS. HEINZ:  Move Government's Exhibit 1021 into   |
|       | 16 | evidence.                                                   |
| 11:26 | 17 |           THE COURT:  Any objection?                        |
| 11:26 | 18 |           MS. CORRIGAN:  No, Your Honor.                    |
| 11:26 | 19 |           MR. LENGYEL-LEAHU:  No, Your Honor.               |
| 11:26 | 20 |           THE COURT:  Received.                             |
| 11:26 | 21 |      *(Exhibit No. 1021 received in evidence.)*             |
| 11:26 | 22 | BY MS. HEINZ:                                               |
| 11:26 | 23 | Q.   Mr. Ahmed, looking at Government's Exhibit 1021.  Okay.|
|       | 24 | Since you're looking at it, I'm going to direct your       |
|       | 25 | attention to the right-hand column.                        |

| | | |
|---|---|---|
| 11:26 | 1 | A.   Okay. |
| 11:26 | 2 | Q.   Okay.  On the top of that column, it says exhibit |
| | 3 | number; is that correct? |
| 11:26 | 4 | A.   Yes. |
| 11:26 | 5 | Q.   Okay.  In the exhibit number column, there are numbers |
| | 6 | with a capital A after it.  Do you see that? |
| 11:26 | 7 | A.   Yes. |
| 11:26 | 8 | Q.   Exhibits with the capital A after the number, are these |
| | 9 | the exhibits that contain the English language translations |
| | 10 | of Arabic words, phrases, and sentences that you reviewed in |
| | 11 | this case? |
| 11:26 | 12 | A.   Yes. |
| 11:26 | 13 | MS. HEINZ:  Your Honor, I'd move the translations |
| | 14 | listed in Government's Exhibit 1021 into evidence subject to |
| | 15 | a showing of relevance later on. |
| 11:26 | 16 | THE COURT:  Counsel? |
| 11:26 | 17 | MS. CORRIGAN:  No objection. |
| 11:27 | 18 | MR. LENGYEL-LEAHU:  No objection. |
| 11:27 | 19 | THE COURT:  Granted. |
| 11:27 | 20 | *(Exhibit No. 1021 previously received in* |
| | 21 | *evidence.)* |
| 11:27 | 22 | MS. HEINZ:  Nothing further, Your Honor. |
| 11:27 | 23 | THE COURT:  Cross-examination, Mr. Lengyel-Leahu. |
| 11:27 | 24 | MR. LENGYEL-LEAHU:  No.  Thank you, Your Honor. |
| 11:27 | 25 | THE COURT:  Cross-examination, Ms. Corrigan? |

| | | |
|---|---|---|
| 11:27 | 1 | MS. CORRIGAN:  No, Your Honor. |
| 11:27 | 2 | THE COURT:  Mr. Ahmad, you may step down.  Thank |
| | 3 | you, sir. |
| 11:27 | 4 | *(Witness steps down.)* |
| 11:27 | 5 | THE COURT:  Your next witness, please, counsel. |
| 11:27 | 6 | MS. ELIOT:  Your Honor, the government calls |
| | 7 | Special Agent Ron Palmer. |
| 11:27 | 8 | THE COURT:  Thank you. |
| 11:27 | 9 | Thank you, sir.  Would you step forward between the |
| | 10 | double doors, please, and raise your right hand, sir. |
| 11:27 | 11 | **RON PALMER, CALLED BY THE GOVERNMENT, SWORN** |
| 11:27 | 12 | THE WITNESS:  I do. |
| 11:27 | 13 | THE COURT:  Thank you, sir.  If you would be |
| | 14 | seated in the witness box.  It's just to my left along the |
| | 15 | wall.  After you've been seated, sir, would you state your |
| | 16 | full name, spell your last for the jurors, please. |
| 11:28 | 17 | THE WITNESS:  Ron Palmer, P-A-L-M-E-R. |
| 11:28 | 18 | THE COURT:  Thank you.  Direct examination by the |
| | 19 | government. |
| 11:28 | 20 | **DIRECT EXAMINATION** |
| 11:28 | 21 | BY MS. ELIOT: |
| 11:28 | 22 | Q.   Good morning, Special Agent Palmer. |
| 11:28 | 23 | A.   I'm a supervisory special agent with the Data Intercept |
| | 24 | Technology Unit. |
| 11:28 | 25 | Q.   And how long have you been with the FBI? |

| 11:28 | 1 | A. | Nineteen and a half years. |

11:28   1   A.   Nineteen and a half years.

11:28   2   Q.   And is the Data Intercept Technology Unit with the FBI

        3   known as DITU for D-I-T-U?

11:28   4   A.   Yes, it is.

11:28   5   Q.   Is DITU within the Operational Technology Division?

11:28   6   A.   Yes, it is.

11:28   7   Q.   Where is DITU located?

11:28   8   A.   DITU is located in Quantico, Virginia, on FBI academy

        9   grounds.

11:28  10   Q.   How long have you been a supervisor at DITU?

11:28  11   A.   Eight years.

11:28  12   Q.   Can you describe generally what DITU does?

11:28  13   A.   DITU collects, processes, and transfers electronic

       14   surveillance information in support of the FBI's mission

       15   under an authorized court order.

11:29  16   Q.   And when you're talking about collection, does the data

       17   refer to things like e-mails and Internet traffic?

11:29  18   A.   Yes, ma'am.

11:29  19   Q.   And in general, what are your responsibilities as a

       20   supervisor with the Data Intercept Technology Unit?

11:29  21   A.   When a court order is signed, it is delivered directly

       22   to the provider that's going to be delivering us the

       23   information.  A copy of that court order is also sent

       24   directly to our unit.  I'm a supervisor over the operational

       25   management unit that inputs those orders.

| | | |
|---|---|---|
| 11:29 | 1 | What they do is they take the significant information in |
| | 2 | that order, such as the start and stop date of the order, |
| | 3 | the "sign" date, and the target that we are going to be |
| | 4 | collecting on and put it into our system. |
| 11:30 | 5 | Once the provider gets a copy of the court order, they |
| | 6 | will begin streaming us data. |
| 11:30 | 7 | Q.   Okay.  If I could stop you for a minute. |
| 11:30 | 8 | A.   Okay. |
| 11:30 | 9 | Q.   Thank you.  We'll just go back to your background for a |
| | 10 | moment. |
| 11:30 | 11 | A.   Okay. |
| 11:30 | 12 | Q.   Where were you assigned before DITU? |
| 11:30 | 13 | A.   I was assigned to Mobile, Alabama, field office. |
| 11:30 | 14 | Q.   Do you have a bachelor's degree? |
| 11:30 | 15 | A.   Yes, I do.  Mechanical engineering. |
| 11:30 | 16 | Q.   After college, did you serve in the military? |
| 11:30 | 17 | A.   I served seven years in the Air Force. |
| 11:30 | 18 | Q.   And how many years do you have in data intercept |
| | 19 | technology? |
| 11:30 | 20 | A.   Eight years. |
| 11:30 | 21 | Q.   Are you familiar generally with the various types of |
| | 22 | internet-based accounts a user can have? |
| 11:30 | 23 | A.   Yes. |
| 11:30 | 24 | Q.   Are you familiar with the collection of data from the |
| | 25 | Facebook in particular? |

| | | |
|---|---|---|
| 11:30 | 1 | A.    Yes, ma'am. |
| 11:30 | 2 | Q.    At DITU, you mentioned, does the Internet service |
| | 3 | provider -- are they the entity that actually collects the |
| | 4 | data you're seeking pursuant to the lawful court process? |
| 11:31 | 5 | A.    Yes, ma'am. |
| 11:31 | 6 | Q.    In this case, did DITU obtain data from Facebook? |
| 11:31 | 7 | A.    Yes, we did. |
| 11:31 | 8 | Q.    And how does -- physically, how does Facebook transmit |
| | 9 | the data to DITU? |
| 11:31 | 10 | A.    It's an automatic process.  Facebook sends it to us |
| | 11 | electronically. |
| 11:31 | 12 | Q.    And what does DITU do with the data upon receipt from |
| | 13 | the provider? |
| 11:31 | 14 | A.    Again, once we receive the date from a provider, the |
| | 15 | order that we inputted, a validity check is done to make |
| | 16 | sure that the information that we are receiving from the |
| | 17 | provider, that we have an authorized court order in the |
| | 18 | system for that date.  Once -- |
| 11:31 | 19 | MR. LENGYEL-LEAHU:  Objection.  Your Honor, |
| | 20 | nonresponsive. |
| 11:31 | 21 | THE COURT:  I'm sorry.  I couldn't hear, Counsel. |
| 11:31 | 22 | MR. LENGYEL-LEAHU:  Not responsive. |
| 11:31 | 23 | THE COURT:  Restate the question.  I thought it |
| | 24 | was, but I may be wrong.  Restate the question. |
| 11:32 | 25 | MS. ELIOT:  I was asking precisely what does DITU |

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | do with the data once it's received.  And the witness has |
|       | 2  | established that there's a quality control.            |
| 11:32 | 3  | THE COURT:  Just ask the question.                     |
| 11:32 | 4  | MS. ELIOT:  We can move on.                             |
| 11:32 | 5  | BY MS. HEINZ:                                           |
| 11:32 | 6  | Q.   After a quality control check is conducted, what does |
|       | 7  | DITU do with the data?                                  |
| 11:32 | 8  | A.   At that point an MD5 hash is placed on the product. |
|       | 9  | That MD5 hash remains with that product for the duration. |
|       | 10 | That MD5 hash is a unique fingerprint on that product.  The |
|       | 11 | product is then processed and transmitted to whatever field |
|       | 12 | office has the order.                                   |
| 11:32 | 13 | Q.   And in that process, is a product ID number assigned to |
|       | 14 | the material?                                           |
| 11:32 | 15 | A.   Yes, it is.                                        |
| 11:32 | 16 | Q.   Were you asked to review certain Facebook materials |
|       | 17 | that were assigned product ID numbers in this case?    |
| 11:32 | 18 | A.   Yes, we were.                                      |
| 11:32 | 19 | Q.   And did you conduct that review with the assistance of |
|       | 20 | charts setting forth the product ID number and a       |
|       | 21 | corresponding Government's Exhibit ID number?          |
| 11:33 | 22 | A.   Yes, we did.                                       |
| 11:33 | 23 | MS. ELIOT:  We'd ask if we could place before the      |
|       | 24 | witness what has been marked as Government's Exhibit 430 |
|       | 25 | through 432.                                            |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 11:33 | 1 | THE COURT:  430, 431, 432. |
| 11:33 | 2 | MS. ELIOT:  Yes, Your Honor. |
| 11:33 | 3 | THE COURT:  All right.  Thank you. |
| 11:33 | 4 | *(Exhibits provided to the witness.)* |
| 11:33 | 5 | THE COURT:  Counsel, please continue. |
| 11:33 | 6 | BY MS. ELIOT: |
| 11:33 | 7 | Q.   Do you recognize these exhibits? |
| 11:33 | 8 | A.   Yes, I do. |
| 11:33 | 9 | Q.   What are they? |
| 11:33 | 10 | A.   These are the "product" that we went ahead and |
| | 11 | reprocessed, establishing the hash on those products, to |
| | 12 | make sure that the stored hash was the same as the computed |
| | 13 | hash on products that you asked us to reprocess. |
| 11:33 | 14 | Q.   Okay.  And does each chart there contain a column with |
| | 15 | a product ID number? |
| 11:34 | 16 | A.   Yes, it does. |
| 11:34 | 17 | Q.   Exhibit number and a date of applicable -- |
| 11:34 | 18 | A.   Yes, it does. |
| 11:34 | 19 | Q.   And can you tell us what was the result of your review? |
| 11:34 | 20 | A.   Yes.  Each one of the products that were reprocessed, |
| | 21 | the hash marks were compared and the hash values matched on |
| | 22 | each product. |
| 11:34 | 23 | Q.   Is the fact that the hash values matched reflected on |
| | 24 | the chart marked as Exhibits 430, 431 and 432? |
| 11:34 | 25 | A.   Yes, they are. |

| 11:34 | 1 | Q.    In addition to Facebook data, was your unit also |
| | 2 | involved in the collection of data from a device in certain |
| | 3 | cars in the course of this investigation? |
| 11:34 | 4 | A.    Yes. |
| 11:34 | 5 | Q.    Was that data collected pursuant to lawful court |
| | 6 | process? |
| 11:34 | 7 | A.    Yes. |
| 11:34 | 8 | Q.    And do you understand that for purposes of your |
| | 9 | testimony today, we have numbered a device and call it |
| | 10 | Device No. 3? |
| 11:35 | 11 | A.    Yes. |
| 11:35 | 12 | Q.    Does DITU process data collected from a device in the |
| | 13 | car in the same or different way it processes data from |
| | 14 | Facebook? |
| 11:35 | 15 | A.    Same way. |
| 11:35 | 16 | Q.    And so in this case, did DITU assign a unique signature |
| | 17 | or MD hash value to the data collected from Device 3? |
| 11:35 | 18 | A.    Yes, we did. |
| 11:35 | 19 | Q.    Did this data also get assigned a product ID number? |
| 11:35 | 20 | A.    Yes, it did. |
| 11:35 | 21 | Q.    Were you asked to review the data collected from |
| | 22 | Device 3 in this case? |
| 11:35 | 23 | A.    Yes, I was. |
| 11:35 | 24 | Q.    And did you conduct that review with the assistance of |
| | 25 | charts setting forth the product ID number and a |

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | corresponding government's exhibit number as well?                       |
| 11:35 | 2  | A.   Yes, I did.                                                         |
| 11:35 | 3  |        MS. ELIOT:  If we could place before the witness                   |
|       | 4  | what has been marked as Government's Exhibit 843 and 844.                 |
| 11:36 | 5  |      *(Exhibits provided to the witness.)*                                |
| 11:36 | 6  | BY MS. ELIOT:                                                            |
| 11:36 | 7  | Q.   Do you recognize these exhibits?                                    |
| 11:36 | 8  | A.   Yes, I do.                                                          |
| 11:36 | 9  | Q.   What are they generally?                                           |
| 11:36 | 10 | A.   These again are the products that you asked us to go                |
|       | 11 | ahead and reprocess.                                                    |
| 11:36 | 12 | Q.   And does each chart there contain a column with exhibit            |
|       | 13 | number, product ID number, along with a date and a time?                |
| 11:36 | 14 | A.   Yes, it does.                                                       |
| 11:36 | 15 | Q.   And when you conducted your review, can you tell us                |
|       | 16 | what was the result?                                                    |
| 11:36 | 17 | A.   Yes.  We reprocessed -- the hash value was attached to             |
|       | 18 | it, and the hash values matched.                                        |
| 11:36 | 19 | Q.   And the fact that the hash values matched, is that                 |
|       | 20 | indicated on your chart as well?                                        |
| 11:36 | 21 | A.   Yes, it is.                                                         |
| 11:36 | 22 | Q.   And when a hash value does match, what does that mean              |
|       | 23 | in terms of the integrity of the data?                                  |
| 11:37 | 24 | A.   It means that nothing within that packet was ever                  |
|       | 25 | changed.                                                                 |

| | | |
|---|---|---|
| 11:37 | 1 | For instance, if you are looking at an e-mail, if a |
| | 2 | period within that e-mail had been changed, the hash value |
| | 3 | would be completely different. |
| 11:37 | 4 | MS. ELIOT:  I have nothing further, Your Honor. |
| 11:37 | 5 | THE COURT:  Cross-examination, Mr. Lengyel-Leahu. |
| 11:37 | 6 | MR. LENGYEL-LEAHU:  No.  Thank you, Your Honor. |
| 11:37 | 7 | THE COURT:  Cross-examination, Ms. Corrigan. |
| 11:37 | 8 | MS. CORRIGAN:  No, Your Honor. |
| 11:37 | 9 | THE COURT:  Thank you, sir.  You may step down. |
| | 10 | We're going to place you on call. |
| 11:37 | 11 | *(Witness steps down.)* |
| 11:37 | 12 | THE COURT:  Your next witness please, counsel. |
| 11:37 | 13 | MS. ELIOT:  Your Honor, the government calls |
| | 14 | Ms. Lena Grote. |
| 11:37 | 15 | THE COURT:  Step forward, please, between the |
| | 16 | double doors.  Stop at that location and raise your right |
| | 17 | hand, please. |
| 11:37 | 18 | **LENA GROTE, CALLED BY THE GOVERNMENT, SWORN** |
| 11:38 | 19 | THE WITNESS:  I do. |
| 11:38 | 20 | THE COURT:  Thank you.  If you'll please be seated |
| | 21 | to my left.  The entrance to the jury box is closest to the |
| | 22 | wall. |
| 11:38 | 23 | Would you state your full name to the jury, please, |
| | 24 | and spell your last. |
| 11:38 | 25 | THE WITNESS:  Lena Grote, G-R-O-T-E. |

| | | |
|---|---|---|
| 11:38 | 1 | THE COURT:  Thank you. |
| 11:38 | 2 | Direct examination by the government. |
| 11:38 | 3 | **DIRECT EXAMINATION** |
| 11:38 | 4 | BY MS. ELIOT: |
| 11:38 | 5 | Q.   Good morning.  What do you do for a living? |
| 11:38 | 6 | A.   I'm an intelligence analyst. |
| 11:38 | 7 | Q.   Who are you employed by? |
| 11:38 | 8 | A.   CSRA. |
| 11:38 | 9 | Q.   Is that a Homeland Security group? |
| 11:38 | 10 | A.   Yes. |
| 11:38 | 11 | Q.   How long have you been an intelligence analyst with |
| | 12 | CSRA? |
| 11:38 | 13 | A.   A little over three years. |
| 11:38 | 14 | Q.   Where are you currently assigned? |
| 11:38 | 15 | A.   I'm assigned at the OCIAC. |
| 11:38 | 16 | THE COURT:  I'm sorry.  Where? |
| 11:38 | 17 | THE WITNESS:  The OCIAC. |
| 11:38 | 18 | BY MS. ELIOT: |
| 11:38 | 19 | Q.   Is that O-C-I-A-C? |
| 11:39 | 20 | A.   Yes. |
| 11:39 | 21 | Q.   Can you tell the jury what that stands for? |
| 11:39 | 22 | A.   Orange County Intelligence Assessment Center. |
| 11:39 | 23 | Q.   What is your title at the Orange County Intelligence |
| | 24 | Assessment Center? |
| 11:39 | 25 | A.   I'm the lead tactical intelligence analyst. |

8:15-CR-0060-DOC - 6/8/2016 - Day 2, Volume II

59

| | | |
|---|---|---|
| 11:39 | 1 | Q.   In general, what are your duties and responsibilities |
| | 2 | as the lead technical intelligence analyst? |
| 11:39 | 3 | A.   Um, conduct open source information and all source |
| | 4 | collection of information supporting federal, state, and |
| | 5 | local law enforcement. |
| 11:39 | 6 | Q.   And when you say "open source," do you mean it's |
| | 7 | information that is available to the public? |
| 11:39 | 8 | A.   Yes. |
| 11:39 | 9 | Q.   Where did you work prior to joining the Orange County |
| | 10 | intelligence assessment center? |
| 11:39 | 11 | A.   The Department of Homeland Security. |
| 11:39 | 12 | Q.   And were there particular programs that you supported |
| | 13 | at that time? |
| 11:39 | 14 | A.   Yes.  I supported the DHS tripwire program. |
| 11:39 | 15 | Q.   Is that a bombing prevention program? |
| 11:39 | 16 | A.   Yes. |
| 11:39 | 17 | Q.   Did you support a -- another program at the Department |
| | 18 | of Homeland Security? |
| 11:40 | 19 | A.   Can you clarify exactly? |
| 11:40 | 20 | Q.   Yes.  Have you done any work supporting cyber strategy? |
| 11:40 | 21 | A.   Yes.  I supported the office of cyber and strategy for |
| | 22 | DHS tripwire program. |
| 11:40 | 23 | Q.   Turning to your education, what university did you |
| | 24 | attend? |
| 11:40 | 25 | A.   Indiana University Bloomington. |

| 11:40 | 1 | Q. | Did you earn a degree there? |

11:40    1    Q.    Did you earn a degree there?

11:40    2    A.    Yes.

11:40    3    Q.    What's that in?

11:40    4    A.    Bachelor of arts in international studies in Arabic.

11:40    5    Q.    Are you familiar with social media?

11:40    6    A.    Yes.

11:40    7    Q.    As an analyst, what types of social media do you

         8    typically review?

11:40    9    A.    Open publicly available, um, social media platforms

        10    such as Google, Facebook, Instagram...

11:40   11            THE COURT:  You're dropping your voice.  I'm going

        12    to ask you to pull that microphone a little closer.  And

        13    would you repeat your answer.

11:41   14            THE WITNESS:  Um, types of social media, uh,

        15    publicly available information such as Google, Facebook,

        16    Instagram, Twitter.

11:41   17    BY MS. ELIOT:

11:41   18    Q.    Have you had any training in Internet investigations or

        19    investigations involving social media evidence?

11:41   20    A.    Yes.

11:41   21    Q.    What kinds of courses or training have you had?

11:41   22    A.    I'm a certified social media security professional.

11:41   23    Q.    And have you attended any trainings or courses prior to

        24    getting certified?

11:41   25    A.    Yes, I have.  I have been in the DHS open source

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | investigations course in addition to the social media         |
|       | 2  | security professional certification as well as other          |
|       | 3  | additional, uh, online investigative courses.                 |
| 11:42 | 4  | Q.   What does a certification as a social media security     |
|       | 5  | professional mean in terms of knowledge?                      |
| 11:42 | 6  | A.   Uh, it provides you with familiarity in, um,            |
|       | 7  | understanding and knowledge of the platforms themselves, um,  |
|       | 8  | the different types of information out there, um, and the     |
|       | 9  | vulnerabilities within them.                                  |
| 11:42 | 10 | Q.   Did you have to take a test to become certified?        |
| 11:42 | 11 | A.   Yes.                                                     |
| 11:42 | 12 | Q.   Did you serve as an instructor or provide training on   |
|       | 13 | analyzing social media evidence in the course of             |
|       | 14 | investigations?                                               |
| 11:42 | 15 | A.   I have, yes.                                             |
| 11:42 | 16 | Q.   What particular courses have you taught or will you be  |
|       | 17 | teaching to antiterrorism investigators?                      |
| 11:42 | 18 | A.   I have provided open source investigative courses to    |
|       | 19 | federal, state, and local law enforcement professionals.      |
| 11:42 | 20 | Q.   And that's training in Internet investigations          |
|       | 21 | generally?                                                     |
| 11:42 | 22 | A.   Yes.                                                     |
| 11:42 | 23 | Q.   Are you familiar with methods of preserving social      |
|       | 24 | media evidence that appears online?                           |
| 11:43 | 25 | A.   Yes, I am.                                               |

**DEBBIE GALE, U.S. COURT REPORTER**

11:43   1   Q.   In the course of your duties, do you use any particular

2   techniques to preserve evidence you see online?

11:43   3   A.   Yes.  I utilize various free applications that are out

4   there to, uh, just save information that's on pages.

11:43   5   Q.   And have you used the application called "Snagit"

6   before?

11:43   7               THE COURT:  I'm sorry.  Counsel, what was that?

11:43   8               MS. ELIOT:  I'm sorry.

11:43   9        Has she used the application called "Snagit,"

10   S-N-A-G-I-T.

11:43   11              THE WITNESS:  Yes.

11:43   12  BY MS. ELIOT:

11:43   13  Q.   Are you also familiar with FireShot screen capture?

11:43   14  A.   Yes, I have used and am familiar with both.

11:43   15  Q.   And is there a third program that you're familiar with

16   called "MHT"?

11:43   17  A.   Yes.

11:43   18  Q.   Starting with Snagit, can you explain what that program

19   captures or preserves?

11:43   20  A.   Snagit is essentially just a preservation tool that you

21   can use to preserve information on a screen in various

22   formats.  You can use it to preserve a photo or video or

23   anything that you have available on the screen in front of

24   you.

11:44   25  Q.   What does FireShot screen capture preserve?

8:15-CR-0060-DOC - 6/8/2016 - Day 2, Volume II

63

| | | |
|---|---|---|
| 11:44 | 1 | A.   Fireshot allows you to save the page in a PDF format, |
| | 2 | so it puts it into a document where you can look at it |
| | 3 | outside of the software itself.  So it saves it sort of like |
| | 4 | a page document where you don't have to see the browser or |
| | 5 | software around it.  Um, you just see it within the actual |
| | 6 | sort of document itself. |
| 11:44 | 7 | Q.   And what does MHT preserve? |
| 11:44 | 8 | A.   MHT preserves -- it essentially archives a page, so it |
| | 9 | will save it in a format where it will save all the videos |
| | 10 | that were on a page, all the links that are on the page, all |
| | 11 | the images on the page in a workable format, so if you |
| | 12 | needed to play videos again, you know, it's not a static |
| | 13 | image like a PDF capture or a picture saving. |
| 11:45 | 14 | Q.   So that's -- essentially, a live Internet page is |
| | 15 | captured? |
| 11:45 | 16 | A.   Yes. |
| 11:45 | 17 | Q.   Did you provide analytical assistance in this case? |
| 11:45 | 18 | A.   I saved various pages off of the Internet, yes. |
| 11:45 | 19 | Q.   What type of social media accounts did you -- or what |
| | 20 | type of, um, social media did you save in this case? |
| 11:45 | 21 | A.   Um, there were Twitter -- Twitter pages. |
| 11:45 | 22 | Q.   And did you save Facebook as well? |
| 11:45 | 23 | A.   I do not recall. |
| 11:45 | 24 | Q.   We would now place before you what's been marked as |
| | 25 | Government's Exhibits 203, 2010, and 2011, please. |

| | | |
|---|---|---|
| 11:45 | 1 | *(Exhibits provided to the witness.)* |
| 11:46 | 2 | BY MS. ELIOT: |
| 11:46 | 3 | Q.   Do you recognize these exhibits? |
| 11:46 | 4 | A.   I only have two of the three.  One second. |
| 11:46 | 5 | Yes, I do. |
| 11:46 | 6 | Q.   And what are they? |
| 11:46 | 7 | A.   These are Snagit screen captures of a Twitter page. |
| 11:46 | 8 | Q.   And can you explain how you go about -- how someone |
| | 9 | would go about preserving evidence with Snagit starting with |
| | 10 | accessing a Twitter account? |
| 11:47 | 11 | A.   Um, yes.  You just go to the website and whatever is on |
| | 12 | the page at the time, you load the page, and you, um -- |
| | 13 | utilizing the application that's an add-on onto your |
| | 14 | browser, you just click "Snagit," and it essentially saves |
| | 15 | what's on the page in front of you at the time. |
| 11:47 | 16 | Q.   And where does it save the information to? |
| 11:47 | 17 | A.   It saves it onto your computer. |
| 11:47 | 18 | Q.   And at the Orange County Intelligence Assessment |
| | 19 | Center, are the computers in a secure location? |
| 11:47 | 20 | A.   Yes. |
| 11:47 | 21 | Q.   Are the computer hard drives password-protected? |
| 11:47 | 22 | A.   Yes. |
| 11:47 | 23 | Q.   And did you have an opportunity to review these |
| | 24 | exhibits and compare them to the original files that were |
| | 25 | preserved? |

11:47   1    A.   Yes.

11:47   2    Q.   Are the exhibits before you the same as the content on

        3    the Twitter page that was preserved using Snagit?

11:48   4    A.   Yes.

11:48   5    Q.   And do these exhibits fairly and accurately depict what

        6    the Twitter page looked like at the time the Twitter account

        7    was accessed?

11:48   8    A.   Yes, they do.

11:48   9            MS. ELIOT:  If we could place before the witness

       10    what has been marked as Government's Exhibits 204 and 212.

11:48  11        (Exhibits provided to the witness.)

11:48  12    BY MS. ELIOT:

11:48  13    Q.   Now, were these exhibits captured using one of the

       14    other programs that you mentioned earlier?

11:48  15    A.   Yes.  These were captured using FireShot screen capture

       16    so the PDF version of a website-saving application.

11:48  17    Q.   And in this case with the FireShot screen shot, is a

       18    file again saved to your hard drive?

11:49  19    A.   Yes, it is.

11:49  20    Q.   And have you had the opportunity to review these

       21    exhibits and compare them to the original files you

       22    preserved?

11:49  23    A.   Yes, I have.

11:49  24    Q.   Are these exhibits before you the same as the data you

       25    preserved using FireShot?

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 11:49 | 1 | A.    Yes. |
| 11:49 | 2 | Q.    And do the exhibits fairly and accurately depict what |
| | 3 | the computer screen looked like at the time you preserved or |
| | 4 | accessed the Twitter accounts? |
| 11:49 | 5 | A.    Yes. |
| 11:49 | 6 | MS. ELIOT:  If we can now place before the witness |
| | 7 | what has been marked as Government's Exhibit 201. |
| 11:49 | 8 | *(Exhibit provided to the witness.)* |
| 11:49 | 9 | BY MS. ELIOT: |
| 11:49 | 10 | Q.    And you do recognize this exhibit as well? |
| 11:49 | 11 | A.    Yes, I do. |
| 11:49 | 12 | Q.    And what is it? |
| 11:49 | 13 | A.    This is a screen shot from a phone of an open Twitter |
| | 14 | page. |
| 11:50 | 15 | Q.    Does the exhibit fairly and accurately depict what the |
| | 16 | Twitter account looked like at the time you accessed it by |
| | 17 | phone? |
| 11:50 | 18 | A.    Yes. |
| 11:50 | 19 | MS. ELIOT:  We're now placing before the witness, |
| | 20 | please, what has been marked as Government's Exhibits 205 |
| | 21 | through 208, and 213, please. |
| 11:50 | 22 | MR. LENGYEL-LEAHU:  You said 205 through 208? |
| 11:50 | 23 | MS. ELIOT:  Yes. |
| 11:50 | 24 | *(Exhibits provided to the witness.)* |
| 11:50 | 25 | THE COURT:  Counsel. |

| | | |
|---|---|---|
| 11:51 | 1 | BY MS. ELIOT: |
| 11:51 | 2 | Q.   Do you recognize what method of capture was used to |
| | 3 | preserve the documents that are marked as exhibits before |
| | 4 | you? |
| 11:51 | 5 | A.   Yes.  These are a depiction of an MHT capture. |
| 11:51 | 6 | Q.   And when you use MHT software to capture evidence, is |
| | 7 | the file again saved to your hard drive? |
| 11:51 | 8 | A.   Yes. |
| 11:51 | 9 | Q.   Have you had an opportunity to review these exhibits |
| | 10 | and compare them to the original files you preserved? |
| 11:51 | 11 | A.   Yes. |
| 11:51 | 12 | Q.   Are the exhibits before you the same as the data you |
| | 13 | preserved using MHT software? |
| 11:51 | 14 | A.   Yes. |
| 11:51 | 15 | Q.   Do these exhibits fairly and accurately depict what the |
| | 16 | Internet pages looked like at the time you accessed |
| | 17 | particular Twitter accounts? |
| 11:51 | 18 | A.   Yes, they do. |
| 11:51 | 19 |         MS. ELIOT:  No further questions, Your Honor. |
| 11:51 | 20 |         THE COURT:  Cross-examination, Mr. Lengyel-Leahu. |
| 11:51 | 21 |         MR. LENGYEL-LEAHU:  Could I approach, Your Honor? |
| 11:51 | 22 |         THE COURT:  You may. |
| 11:52 | 23 |       *(Counsel approaches the witness with documents.)* |
| 11:52 | 24 |         MR. LENGYEL-LEAHU:  Let me take that back, |
| | 25 | Your Honor.  The government hasn't moved these exhibits into |

|        |    |                                                      |
|--------|----|------------------------------------------------------|
|        | 1  | evidence.                                            |
| 11:52  | 2  | THE COURT:  Not yet.                                 |
| 11:52  | 3  | MS. ELIOT:  No.                                      |
| 11:52  | 4  | MR. LENGYEL-LEAHU:  I think we can do it during      |
|        | 5  | the lunch break.                                     |
| 11:52  | 6  | No questions.                                        |
| 11:52  | 7  | THE COURT:  And, Counsel?                            |
| 11:52  | 8  | MS. CORRIGAN:  No, Your Honor.  Thank you.           |
| 11:52  | 9  | THE COURT:  If you would step down, please.  I'm     |
|        | 10 | going to ask you to remain over the lunch hour, though, out |
|        | 11 | in the hallway.  Thank you very much.                |
| 11:52  | 12 | Counsel, your next witness, please.                  |
| 11:52  | 13 | *(Witness steps down.)*                              |
| 11:52  | 14 | MS. ELIOT:  Your Honor, the government calls         |
|        | 15 | Special Agent Scott Wales.                           |
| 11:53  | 16 | THE COURT:  Thank you, sir.  If you'll stop at       |
|        | 17 | that location and raise your right hand, please.     |
| 11:53  | 18 | **SCOTT CHRISTOPHER WALES, CALLED BY THE GOVERNMENT, SWORN** |
| 11:53  | 19 | THE WITNESS:  I do.                                  |
| 11:53  | 20 | THE COURT:  Sir, would you face the jury after       |
|        | 21 | you're seated.  Would you state your full name and spell |
|        | 22 | your last name, please.                              |
| 11:53  | 23 | THE WITNESS:  My full name is Scott Christopher      |
|        | 24 | Wales, and my last name is spelled W-A-L-E-S.        |
| 11:53  | 25 | THE COURT:  Thank you.                               |

8:15-CR-0060-DOC - 6/8/2016 - Day 2, Volume II

69

| | | |
|---|---|---|
| 11:53 | 1 | Direct examination by the government, please. |
| 11:53 | 2 | **DIRECT EXAMINATION** |
| 11:53 | 3 | BY MS. ELIOT: |
| 11:53 | 4 | Q.   Good morning.  What do you do for a living? |
| 11:53 | 5 | A.   I'm a special agent with the Federal Bureau of |
| | 6 | Investigation. |
| 11:53 | 7 | Q.   How long have you been a special agent with the FBI? |
| 11:53 | 8 | A.   I've been an agent for coming up on five years. |
| 11:53 | 9 | Q.   In general, what are your duties and responsibilities |
| | 10 | as a special agent? |
| 11:54 | 11 | A.   So I'm assigned to a counterterrorism squad, |
| | 12 | specifically the Joint Terrorism Task Force here in |
| | 13 | Orange County, where we investigate mainly Sunni extremism |
| | 14 | matters. |
| 11:54 | 15 | Q.   Is the Joint Terrorism Task Force sometimes known as |
| | 16 | JTTF? |
| 11:54 | 17 | A.   Yes. |
| 11:54 | 18 | Q.   And how long have you been assigned to the task force? |
| 11:54 | 19 | A.   Same, four and a half years. |
| 11:54 | 20 | Q.   Did you receive training when you first joined the FBI |
| | 21 | in 2011? |
| 11:54 | 22 | A.   I did. |
| 11:54 | 23 | Q.   And where did that basic agent training take place? |
| 11:54 | 24 | A.   In Quantico, Virginia. |
| 11:54 | 25 | Q.   Can you briefly describe the general subject areas you |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | covered at basic agent training?                             |
| 11:54 | 2  | A.   Yes.  So during the five to six months of training,     |
|       | 3  | they cover many different areas for the special agent        |
|       | 4  | position that include physical training, defensive tactics,  |
|       | 5  | and then tactics for entering and making arrests in a home.  |
|       | 6  | There's legal training, various other classroom trainings    |
|       | 7  | that really cover the whole gamut of the violations that the |
|       | 8  | FBI investigates, from criminal matters to national security |
|       | 9  | matters, and there's firearms training as well.              |
| 11:55 | 10 | Q.   Have you had any training in counterterrorism?          |
| 11:55 | 11 | A.   I have.                                                  |
| 11:55 | 12 | Q.   And what training programs have you attended, or what   |
|       | 13 | training have you received?                                  |
| 11:55 | 14 | A.   I received basic training while at Quantico, Virginia,  |
|       | 15 | in counterterrorism, and then once I came to the             |
|       | 16 | Orange County office of the FBI, I was assigned to a         |
|       | 17 | counterterrorism squad, where I received further training,   |
|       | 18 | um, specific to just that violation.  And that included      |
|       | 19 | training on designated foreign terrorist organizations,      |
|       | 20 | their idealogy, you know, their -- the geography of          |
|       | 21 | terrorism, and the various threats that are related to those |
|       | 22 | organizations.                                               |
| 11:56 | 23 | Q.   And have you received any training regarding            |
|       | 24 | terrorists' use of the Internet?                             |
| 11:56 | 25 | A.   I have.                                                 |

8:15-CR-0060-DOC - 6/8/2016 - Day 2, Volume II

71

| | | |
|---|---|---|
| 11:56 | 1 | Q.   And does that include mobile messaging apps training on |
| | 2 | how those are used as well? |
| 11:56 | 3 | A.   That's correct. |
| 11:56 | 4 | Q.   Are you familiar with social media? |
| 11:56 | 5 | A.   I am. |
| 11:56 | 6 | Q.   And what do you understand the term "social media" to |
| | 7 | mean? |
| 11:56 | 8 | A.   Social media is a -- a -- uh, platforms available |
| | 9 | online for people to connect to one another to share |
| | 10 | information both to consume and to disseminate information |
| | 11 | online. |
| 11:56 | 12 | Q.   Have you attended training on Internet investigations |
| | 13 | or on obtaining social media evidence? |
| 11:56 | 14 | A.   I have. |
| 11:56 | 15 | Q.   Okay.  What training have you received? |
| 11:56 | 16 | A.   I've received specific training on these various social |
| | 17 | media platforms.  Mainly, you know, there're a key few |
| | 18 | platforms like Facebook, Twitter as well as mobile messaging |
| | 19 | applications, um, that are commonly utilized for |
| | 20 | communicating. |
| 11:57 | 21 | Q.   Have you participated in investigations involving |
| | 22 | evidence maintained by internet service providers? |
| 11:57 | 23 | A.   I have. |
| 11:57 | 24 | Q.   Do you provide training to other investigators? |
| 11:57 | 25 | A.   Yes, I do. |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 11:57 | 1 | Q.   And what kind of training do you provide? |
| 11:57 | 2 | A.   I specifically provide social media and mobile |
| | 3 | messaging application training to other investigators and |
| | 4 | how they can use various tools.  Specifically involved with |
| | 5 | furthering investigations related to social messaging and |
| | 6 | mobile messaging applications. |
| 11:57 | 7 | Q.   In this case, did you analyze various social media |
| | 8 | accounts? |
| 11:57 | 9 | A.   Yes. |
| 11:57 | 10 | Q.   And what were the primary social media platforms that |
| | 11 | you reviewed in this case? |
| 11:57 | 12 | A.   Related to social media, Facebook and Twitter were the |
| | 13 | main platforms. |
| 11:57 | 14 | Q.   Can you -- |
| 11:57 | 15 | A.   And -- |
| 11:57 | 16 | Q.   I'm sorry.  Go ahead. |
| 11:57 | 17 | A.   And then in terms of mobile messaging applications, |
| | 18 | there were multiple applications that were utilized.  I -- |
| | 19 | the main ones being, um -- uh, there is WhatsApp is a mobile |
| | 20 | messaging application that was utilized as well as surespot. |
| | 21 | I think that those are the two main -- Skype.  Those are -- |
| | 22 | those are the main ones. |
| 11:58 | 23 | Q.   Can you briefly explain what Twitter is? |
| 11:58 | 24 | A.   Yes.  So for those that are not aware, Twitter is a |
| | 25 | social media platform.  It is a -- it is a community, a |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | forum for people that can open their own accounts, and they        |
|       | 2  | can post information on that account.  They can follow other        |
|       | 3  | people's accounts.  So that's the social connection with           |
|       | 4  | others.  And they have the option to distribute their own          |
|       | 5  | information or to also disseminate other's and consume it.         |
|       | 6  | So they can follow other accounts, and they will get what's        |
|       | 7  | called a "feed" on their own Twitter account that will             |
|       | 8  | display the other information posted by the users they're          |
|       | 9  | following.                                                          |
| 11:59 | 10 | Q.   And is the information posted limited to a certain             |
|       | 11 | number of characters?                                              |
| 11:59 | 12 | A.   Yes, it is.                                                    |
| 11:59 | 13 | Q.   How many?  Is it a long message or --                          |
| 11:59 | 14 | A.   No, it's fairly short.  On Twitter, they cap the total        |
|       | 15 | field for each tweet at 140 characters.                           |
| 11:59 | 16 | Q.   And you mentioned tweet.  Is that what it's called?            |
|       | 17 | That's what you referred to as a Twitter message?                  |
| 11:59 | 18 | A.   Right.  So a post, you know, what some refer to as a          |
|       | 19 | post is called a tweet on Twitter.                                |
| 11:59 | 20 | Q.   Can a Twitter user send a tweet from an iPhone or a           |
|       | 21 | cellular device that has Internet service?                        |
| 11:59 | 22 | A.   Yes.                                                          |
| 11:59 | 23 | Q.   How is a Twitter account identified to other users?          |
| 12:00 | 24 | A.   Generally, through what is called a handle.  And             |
|       | 25 | Twitter uses the, um, "at" symbol, and then the handle will       |

**DEBBIE GALE, U.S. COURT REPORTER**

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | come after the "at" symbol, similar to what is in the middle             |
|       | 2  | of an e-mail.  You know, it's the name of your e-mail "at"               |
|       | 3  | and then the provider.  That "at" symbol is utilized for --              |
|       | 4  | in front of the handle of their Twitter account.                        |
| 12:00 | 5  | Q.   And if someone decides to follow someone else on                    |
|       | 6  | Twitter, are the Twitter communications of the person being              |
|       | 7  | followed delivered automatically?                                       |
| 12:00 | 8  | A.   Yes.  To -- I mentioned before, a feed.  So when you                |
|       | 9  | open up your account you, um -- it will open up to feed                  |
|       | 10 | which will include all of the tweets that were made by the              |
|       | 11 | accounts that you're following.                                          |
| 12:00 | 12 | Q.   Does the account holder have to grant permission to                 |
|       | 13 | someone who wants to follow them?                                        |
| 12:01 | 14 | A.   Yes.                                                                |
| 12:01 | 15 | Q.   How is a hashtag used in connection with Twitter?                    |
| 12:01 | 16 | A.   Okay.  So a hashtag is -- it's a way of categorizing or             |
|       | 17 | almost like warehousing specific tweets by placing a                     |
|       | 18 | hashtag, or a pound symbol, in front of a phrase.  And what              |
|       | 19 | will happen is, if that pound sign is placed in front of the            |
|       | 20 | phrase inside of a tweet, then you can go to that hashtag                 |
|       | 21 | site, and it will have all of the tweets that were sent out             |
|       | 22 | that include that hashtag inside of it.                                   |
| 12:01 | 23 | Q.   In the course of your investigation, did you obtain                 |
|       | 24 | subscriber information for Twitter accounts used by                      |
|       | 25 | Defendant Nader Elhuzayel?                                               |

Case 8:15-cr-00060-DOC   Document 291   Filed 03/31/17   Page 75 of 83   Page ID #:4277
8:15-CR-0060-DOC - 6/8/2016 - Day 2, Volume II

75

| 12:01 | 1 | A.    Yes, I did. |
| 12:01 | 2 | Q.    What is subscriber information generally? |
| 12:01 | 3 | A.    Subscriber information is identifiable information |
| | 4 | related to the user of that account and when they set it up. |
| | 5 | Oftentimes, it will include an e-mail address, phone number, |
| | 6 | Internet protocol or IP address.  And that's -- that's just |
| | 7 | the general account information for the subscriber. |
| 12:02 | 8 | Q.    For all Twitter subscriber records you obtained in this |
| | 9 | case, did you do so pursuant to lawful court process? |
| 12:02 | 10 | A.    Yes. |
| 12:02 | 11 | THE COURT:  Would this be a convenient breaking |
| | 12 | place? |
| 12:02 | 13 | MS. ELIOT:  Certainly, Your Honor. |
| 12:02 | 14 | THE COURT:  *(To the jury:)* We're going to send you |
| | 15 | to lunch.  I'm going to ask you to come back at 1:15. |
| 12:02 | 16 | You're admonished not to discuss this matter |
| | 17 | amongst yourselves, nor form or express any opinion |
| | 18 | concerning this case.  Leave your notes, if you're taking |
| | 19 | notes. |
| 12:02 | 20 | Remember this:  Notes are only for your own use. |
| | 21 | In other words, another juror should not be influenced by |
| | 22 | the notes of another juror.  And even your own independent |
| | 23 | memory prevails over your notes. |
| 12:02 | 24 | I know a lot of courts don't allow rereading.  This |
| | 25 | is Debbie *(indicating)* and Deborah *(indicating)*.  They're |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | court reporters, and they're taking a record of these        |
|       | 2  | proceedings.  The problem is it's not an official record, so  |
|       | 3  | we can't hand you back a transcript at the present time.      |
|       | 4  | *(Verbatim.)*                                                 |
| 12:03 | 5  | But during your deliberations, if there's some               |
|       | 6  | confusion or disagreement and you want a portion reread, we   |
|       | 7  | can reread that back to you in open court.  Okay?  So we'll   |
|       | 8  | always have a good record for you in case you miss something  |
|       | 9  | or there's some concern or disagreement between you.          |
| 12:03 | 10 | And you'll make that request if you get in to your            |
|       | 11 | deliberations and you need that kind of information.          |
| 12:03 | 12 | Go to lunch.  We'll see you at 1:15.                          |
| 12:03 | 13 | *(Jury recesses for lunch at 12:03 p.m.)*                     |
| 12:04 | 14 | *(Outside the presence of the jury.)*                         |
| 12:04 | 15 | THE COURT:  All right.  Counsel, you started to              |
|       | 16 | raise a concern over exhibits, and then you said we could     |
|       | 17 | resolve it during the lunch hour.  So we can use our lunch    |
|       | 18 | hour for that.  And what would you like to do?                |
| 12:04 | 19 | MR. LENGYEL-LEAHU:  My binder didn't have those              |
|       | 20 | exhibits, and so I wanted to check and make sure that         |
|       | 21 | they're what we've seen before.  That's all.                  |
| 12:05 | 22 | THE COURT:  What would you like the Court to do?            |
|       | 23 | I'm confused.                                                 |
| 12:05 | 24 | MR. LENGYEL-LEAHU:  I just wanted to check the               |
|       | 25 | exhibits.  I didn't get 'em in my binder from the            |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | government.  I wanted to make sure what she was looking at    |
|       | 2  | was what we've seen before.                                   |
| 12:05 | 3  | THE COURT:  Are you satisfied?                                |
| 12:05 | 4  | MR. LENGYEL-LEAHU:  I think so.                               |
| 12:05 | 5  | Yes, I'm satisfied.                                           |
| 12:05 | 6  | THE COURT:  Okay.  There are a number of exhibits.           |
|       | 7  | And, just to retrace quickly, for all of your records, the   |
|       | 8  | first agent was Special Agent Nicholas Vicencia, and these   |
|       | 9  | exhibits were received:  1003, 606, 607, 608, 1001, 1002,    |
|       | 10 | 1004, 1005, 1007, 617, 618, and 619.                         |
| 12:06 | 11 | Does that comport with the records that the                  |
|       | 12 | government and the defense has?                              |
| 12:06 | 13 | MS. CORRIGAN:  Yes, Your Honor.                              |
| 12:06 | 14 | MR. LENGYEL-LEAHU:  That's what I have,                      |
|       | 15 | Your Honor.                                                   |
| 12:06 | 16 | THE COURT:  Government.                                       |
| 12:06 | 17 | MS. HEINZ:  I'm sorry, Your Honor, did we -- did            |
|       | 18 | you state 1004?                                              |
| 12:06 | 19 | THE COURT:  Yes.                                              |
| 12:06 | 20 | MS. CORRIGAN:  Yes.                                           |
| 12:06 | 21 | MS. HEINZ:  And 1003?                                         |
| 12:06 | 22 | THE COURT:  Yes.  No, no.  I said 1003, 606, 607,           |
|       | 23 | 608, 1001, 1002, 1004, 1005, 1006, 617, 618, and 619.       |
| 12:06 | 24 | MS. CORRIGAN:  I have 103 also *(sic)*.                      |
| 12:06 | 25 | MS. HEINZ:  I thought 1003 was --                            |

| | | |
|---|---|---|
| 12:06 | 1 | THE COURT:  I do too.  That was the first one that |
| | 2 | was received. |
| 12:06 | 3 | MS. CORRIGAN:  Correct. |
| 12:06 | 4 | THE COURT:  Let's do this again by the numbers. |
| 12:06 | 5 | 1003. |
| 12:06 | 6 | MS. HEINZ:  Yes. |
| 12:06 | 7 | THE COURT:  I'm doing this sequentially, just as |
| | 8 | you presented them. |
| 12:06 | 9 | MS. HEINZ:  Yes, Your Honor. |
| 12:06 | 10 | THE COURT:  606, 607, 608, 1001, 1002, 1004, 1005, |
| | 11 | 1007, 617, 618, 619. |
| 12:07 | 12 | MS. HEINZ:  Correct, Your Honor. |
| 12:07 | 13 | THE COURT:  Those are all the exhibits that I have |
| | 14 | in my notes.  Now, remember, I'm taking notes, listening |
| | 15 | looking at exhibits.  I want to check, though:  Is that an |
| | 16 | accurate receipt of evidence? |
| 12:07 | 17 | MS. HEINZ:  Yes, Your Honor. |
| 12:07 | 18 | MS. CORRIGAN:  Yes, Your Honor. |
| 12:07 | 19 | THE COURT:  Mr. Lengyel-Leahu? |
| 12:07 | 20 | MR. LENGYEL-LEAHU:  Yes, Your Honor. |
| 12:07 | 21 | THE COURT:  And Ms. Corrigan? |
| 12:07 | 22 | MS. CORRIGAN:  It is. |
| 12:07 | 23 | THE COURT:  There were no exhibits on |
| | 24 | cross-examination. |
| 12:07 | 25 | The second witness, Mr. Hall (sic), 601 was |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | received.  Any other exhibits that you offered?              |
| 12:07 | 2  | MS. ELIOT:  No, Your Honor.                                  |
| 12:07 | 3  | THE COURT:  Is that an accurate record?                      |
|       | 4  | Mr. Lengyel-Leahu?                                           |
| 12:07 | 5  | MR. LENGYEL-LEAHU:  Agreed, Your Honor.                      |
| 12:07 | 6  | THE COURT:  Ms. Corrigan?                                    |
| 12:07 | 7  | MS. CORRIGAN:  Agreed.                                       |
| 12:08 | 8  | THE COURT:  The third witness was Tom Hom.  He               |
|       | 9  | referred to Exhibit 69.  I do not have that received at the  |
|       | 10 | present time.                                                |
| 12:08 | 11 | MS. HEINZ:  That's correct, Your Honor.                      |
| 12:08 | 12 | THE COURT:  He referred to 617.  Remember, I'm               |
|       | 13 | taking that sequentially.  That was previously received.     |
| 12:08 | 14 | He referred for 148.  I do not have that received.           |
| 12:08 | 15 | MS. HEINZ:  That is correct, Your Honor.                     |
| 12:08 | 16 | THE COURT:  Any other exhibits that you presented            |
|       | 17 | during his examination?                                      |
| 12:08 | 18 | MS. HEINZ:  No, Your Honor.                                  |
| 12:08 | 19 | THE COURT:  Mr. Lengyel-Leahu, is that accurate?            |
| 12:08 | 20 | MR. LENGYEL-LEAHU:  Yes, it is, Your Honor.                  |
| 12:08 | 21 | THE COURT:  Ms. Corrigan?                                    |
| 12:08 | 22 | MS. CORRIGAN:  It is.                                        |
| 12:08 | 23 | THE COURT:  Exhibit *(sic)* No. 4, Abdalla Ahmed.           |
|       | 24 | And he testified as to 1021, which I received.              |
| 12:08 | 25 | Is that accurate, Counsel?                                   |

12:08   1          MS. HEINZ:  Yes, Your Honor.

12:08   2          THE COURT:  Mr. Lengyel-Leahu?

12:08   3          MR. LENGYEL-LEAHU:  That's accurate, Your Honor.

12:08   4          THE COURT:  Mr.-- Ms. Corrigan?

12:08   5          MS. CORRIGAN:  Yes.

12:08   6          THE COURT:  The fifth witness was Agent Palmer.

        7    There was a reference to 430, 431, 432.  I've not received

        8    any of those up to this time.  There was an exhibit

        9    concerning the car/vehicles at 843 and 844.  I've not

        10   received those nor have they been offered.

12:09   11         Is that accurate?

12:09   12         MS. ELIOT:  That's correct.

12:09   13         MR. LENGYEL-LEAHU:  That's correct, Your Honor.

12:09   14         THE COURT:  Ms. Corrigan, is that accurate?

12:09   15         MS. CORRIGAN:  It is.

12:09   16         THE COURT:  The sixth witness was Lena Grote.  And

        17   she referred to the Snagit, 203, 210, 211.  Those have not

        18   been received by the Court.

12:09   19         She referred to 204 and 212, the conversations

        20   captured by FireShot.  Those have not been received by the

        21   Court.  They've not been offered.

12:09   22         201 was the screen shot from the Twitter page from

        23   a phone.  That has not been offered yet.

12:09   24         205, 206, 207, 208, and 213.  Those have not been

        25   offered yet.  That's the MTH *(sic)* capture.

| | | |
|---|---|---|
| 12:09 | 1 | Is that an accurate record? |
| 12:09 | 2 | MS. ELIOT:  That's accurate, Your Honor. |
| 12:09 | 3 | THE COURT:  Mr. Lengyel-Leahu? |
| 12:09 | 4 | MR. LENGYEL-LEAHU:  That's what I have, |
| | 5 | Your Honor. |
| 12:09 | 6 | THE COURT:  Ms. Corrigan? |
| 12:09 | 7 | MS. CORRIGAN:  Yes. |
| 12:09 | 8 | THE COURT:  The seventh witness was Scott Wales, |
| | 9 | and so far he's referred to nothing. |
| 12:10 | 10 | MS. ELIOT:  That's correct. |
| 12:10 | 11 | THE COURT:  Okay.  Now, we're going to do that at |
| | 12 | the end of each day.  We'll have an accurate record.  I'm |
| | 13 | gonna check along the way so we can keep up because there |
| | 14 | may be a lot of exhibits.  Okay? |
| 12:10 | 15 | Now, what else would you like to do with your lunch |
| | 16 | hour? |
| 12:10 | 17 | MS. CORRIGAN:  Eat. |
| 12:10 | 18 | MS. HEINZ:  Eat. |
| 12:10 | 19 | THE COURT:  Counsel? |
| 12:10 | 20 | MS. CORRIGAN:  That's what I indicated is eat. |
| 12:10 | 21 | THE COURT:  Would that be a good thing? |
| 12:10 | 22 | MR. LENGYEL-LEAHU:  That'd be a great thing. |
| 12:10 | 23 | THE COURT:  Why don't we go eat, then? |
| 12:10 | 24 | Then we're in recess. |
| 12:10 | 25 | MS. HEINZ:  Your Honor, could the witness be |

1    excused?

12:10    2         THE COURT:  You're coming back at 1:15.

12:10    3         THE WITNESS:  Yes, Your Honor.

12:10    4         THE COURT:  All right.  At 1:15 you're to be

5    seated.

12:10    6      *(Lunch recess held at 12:10 p.m.)*

12:10    7      *(Further proceedings reported by Deborah Parker*

8       *in Volume II.)*

12:11    9                        -oOo-

12:11    10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
12:11    1                           -oOo-

12:11    2

12:11    3                         CERTIFICATE

12:11    4

12:11    5          I hereby certify that pursuant to Section 753,

         6    Title 28, United States Code, the foregoing is a true and

         7    correct transcript of the stenographically reported

         8    proceedings held in the above-entitled matter and that the

         9    transcript page format is in conformance with the

        10    regulations of the Judicial Conference of the United States.

12:11   11

12:11   12    Date:  March 23, 2017

12:11   13

12:11   14
12:11                              /s/ Debbie Gale
12:11   15                    _____
12:11                         DEBBIE GALE, U.S. COURT REPORTER
12:11   16                    CSR NO. 9472, RPR, CCRR

12:11   17

        18

        19

        20

        21

        22

        23

        24

        25
```