1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4              - - - - - - -

5   UNITED STATES OF AMERICA,        )
                                     )        **CERTIFIED**
6           Plaintiff,               )
                                     )
7       vs.                          ) No. 8:15-CR-0060-DOC
                                     )    Day 6, Volume III
8   1) NADER SALEM ELHUZAYEL;        )
    2) MUHANAD ELFATIH M.A. BADAWI,  )
9                                    )
            Defendants.              )
10  _____)

11

12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  Jury Trial

17              Santa Ana, California

18          Tuesday, June 14, 2016

19

20

21

22  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
23  United States District Court
    411 West 4th Street, Room 1-053
24  Santa Ana, California 92701
    (714) 558-8141

25

1    **APPEARANCES OF COUNSEL:**

2

     FOR THE UNITED STATES OF AMERICA:
3
          DEPARTMENT OF JUSTICE
4         OFFICE OF THE UNITED STATES ATTORNEY
          Criminal Division
5         BY:  Judith A. Heinz
               Assistant United States Attorney
6         312 North Spring Street
          15th Floor
7         Los Angeles, California 90012
          213-894-7280
8         USACAC.Criminal@usdoj.gov

9         DEPARTMENT OF JUSTICE
          OFFICE OF THE UNITED STATES ATTORNEY
10        Criminal Division
          BY:  Deirdre Z. Eliot
11             Assistant United States Attorney
          411 West 4th Street
12        Suite 8000
          Santa Ana, California 92701
13        714-338-3500
          USACAC.SACriminal@usdoj.gov
14
          DEPARTMENT OF JUSTICE
15        OFFICE OF THE UNITED STATES ATTORNEY
          General Crimes Section
16        BY:  Julius J. Nam
               Assistant United States Attorney
17        312 North Spring Street
          Suite 1200
18        Los Angeles, California 90012
          213-894-4491
19        julius.nam@usdoj.gov

20
     FOR DEFENDANT NADER SALEM ELHUZAYEL:
21
          Pal A. Lengyel-Leahu *(retained)*
22        LAW OFFICES OF PAL A. LENGYEL-LEAHU
          360 East First Street
23        Suite 609
          Tustin, California 92780
24        714-497-6813
          plitigate@aol.com
25

1    **APPEARANCES (Continued):**

2

        FOR DEFENDANT MUHANAD ELFATIH M.A. BADAWI:
3

4            Katherine T. Corrigan *(CJA appointment)*
             CORRIGAN WELBOURN AND STOKKE APLC
5            4100 Newport Place
             Suite 550
6            Newport Beach, California 92660
             949-251-0330
7            kate@cwsdefense.com

8

9    ALSO PRESENT:

10           Cambria Lisonbee (assisting Ms. Corrigan)
             Joshua Hopps (assisting Mr. Lengyel-Leahu)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **I N D E X**

2           Jury Trial - Day 6, Volume III

3   **PROCEEDINGS**                              **PAGE**

4   ROPEL, Thomas                              5

5   Discussion outside the presence of the jury      82

6

7

8

9                        **WITNESSES**

10  **WITNESSES**            **DIRECT  CROSS  REDIRECT  RECROSS**

11  ROPEL, Thomas

12  By Mr. Lengyel-Leahu          5               72

13  By Ms. Corrigan              38               80

14  By Ms. Heinz                      57

15

16

17

18

19

20

21

22

23

24

25

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | **SANTA ANA, CALIFORNIA, TUESDAY, JUNE 14, 2016**            |
|          | 2  | **Day 6, Volume III**                                        |
|          | 3  | (1:04 p.m.)                                                  |
| 01:04    | 4  | *(In the presence of the jury.)*                            |
| 01:04    | 5  | THE COURT:  The jury's present.  The parties are            |
|          | 6  | present.  The defendants are present.  Alternates are        |
|          | 7  | present.                                                     |
|          | 8  | **THOMAS ROPEL, CALLED BY THE GOVERNMENT, PREVIOUSLY SWORN** |
|          | 9  | **RESUMED THE STAND**                                        |
| 01:04    | 10 | THE COURT:  And, Counsel, your cross-examination,           |
|          | 11 | please, on behalf of Mr. Elhuzayel.                          |
| 01:04    | 12 | And this is Mr. Lengyel-Leahu.                              |
| 01:05    | 13 | MR. LENGYEL-LEAHU:  Thank you, Your Honor.                  |
| 01:05    | 14 | **CROSS-EXAMINATION**                                        |
| 01:05    | 15 | BY MR. LENGYEL-LEAHU:                                         |
| 01:05    | 16 | Q.   Good afternoon.  Do you have Exhibits 760 and 761       |
|          | 17 | available?                                                   |
| 01:05    | 18 | A.   Actually, I have them in front of me, sir.             |
| 01:05    | 19 | Q.   Okay.  You were integral part of this investigation;   |
|          | 20 | correct? *(Verbatim.)*                                       |
| 01:05    | 21 | A.   I was one of the key agents that was involved with it, |
|          | 22 | yes, sir.                                                    |
| 01:05    | 23 | Q.   And as a result of that, you've probably reviewed a lot |
|          | 24 | of evidence in this case?                                    |
| 01:05    | 25 | A.   Yes, I have.                                            |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

6

| | | |
|---|---|---|
| 01:05 | 1 | Q.   And more than what you testified in court today? |
| 01:05 | 2 | A.   Yes. |
| 01:06 | 3 | Q.   And that has allowed you to scrutinize the whole of the |
| | 4 | picture of the investigation; correct? |
| 01:06 | 5 | A.   Yes. |
| 01:06 | 6 | Q.   But the time that you were assigned this case, my |
| | 7 | client was already identified as a suspect; correct? |
| 01:06 | 8 | A.   I wasn't assigned the case.  I was assisting on the |
| | 9 | investigation, sir. |
| 01:06 | 10 | Q.   Okay.  So there was already an investigation in place |
| | 11 | when you came onboard; is that right? |
| 01:06 | 12 | A.   Yes, that's correct. |
| 01:06 | 13 | Q.   And my client was already the subject of that |
| | 14 | investigation; is that right? |
| 01:06 | 15 | A.   Yes, sir. |
| 01:06 | 16 | Q.   And so you were tasked with assisting in the |
| | 17 | accumulation of evidence? |
| 01:06 | 18 | A.   Yes, sir. |
| 01:06 | 19 | Q.   And presumably quality control of that evidence? |
| 01:06 | 20 | A.   Absolutely. |
| 01:06 | 21 | Q.   And so you testified to the jury based on the evidence |
| | 22 | accumulated, and you seem to -- you seem to testify with a |
| | 23 | certain amount of, uh, certainty behind what you're saying; |
| | 24 | is that right? |
| 01:07 | 25 | A.   Yes, sir. |

**DEBBIE GALE, U.S. COURT REPORTER**

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

7

| | | |
|---|---|---|
| 01:07 | 1 | Q.   Because of the quality of the evidence that you think |
| | 2 | you brought in; correct? |
| 01:07 | 3 | A.   Yes. |
| 01:07 | 4 | Q.   Okay.  Turn your attention, please, to 760. |
| 01:07 | 5 | *(Court reporter requests clarification for the* |
| | 6 | *record.)* |
| 01:07 | 7 | MR. LENGYEL-LEAHU:  Seven-six-zero. |
| 01:07 | 8 | *(Exhibit displayed.)* |
| 01:07 | 9 | THE WITNESS:  Okay.  Got it, sir. |
| 01:07 | 10 | BY MR. LENGYEL-LEAHU: |
| 01:07 | 11 | Q.   I'm gonna now direct your attention to the conversation |
| | 12 | that we spoke about earlier on direct, number 749. |
| 01:08 | 13 | *(Exhibit displayed.)* |
| 01:08 | 14 | BY MR. LENGYEL-LEAHU: |
| 01:08 | 15 | Q.   Do you see that, sir? |
| 01:08 | 16 | A.   Yes, sir. |
| 01:08 | 17 | Q.   And you'll -- you'll notice that the time there is -- |
| | 18 | it's 5 -- the date is 5/20, May 20th, at 1:07 and 16 |
| | 19 | seconds; correct? |
| 01:08 | 20 | A.   Yes, sir. |
| 01:08 | 21 | Q.   Now let me show you the other exhibit, 761. |
| 01:08 | 22 | *(Exhibit displayed.)* |
| 01:08 | 23 | Q.   And direct your attention to 757. |
| 01:08 | 24 | *(Exhibit displayed.)* |
| | 25 | |

**DEBBIE GALE, U.S. COURT REPORTER**

| 01:08 | 1 | BY MR. LENGYEL-LEAHU: |
| 01:08 | 2 | Q.   Do you see that, sir? |
| 01:08 | 3 | A.   Yes, sir.  757.  Yes, sir. |
| 01:08 | 4 | Q.   That's also at 5/20, May 20th, at 1:07 and 14 seconds; |
|  | 5 | is that right? |
| 01:08 | 6 | A.   Yes, sir. |
| 01:08 | 7 | Q.   We didn't hear any -- two conversations at the same |
|  | 8 | time this morning. |
| 01:08 | 9 | THE COURT:  Well, Counsel, a question. |
| 01:09 | 10 | MR. LENGYEL-LEAHU:  Uh, you're right, Your Honor. |
|  | 11 | I'll withdraw the statement. |
| 01:09 | 12 | BY MR. LENGYEL-LEAHU: |
| 01:09 | 13 | Q.   Those two exhibits seem to indicate that those two |
|  | 14 | calls occurred at the same time; isn't that correct? |
| 01:09 | 15 | A.   Looking at those, they're off by, I believe, two |
|  | 16 | seconds, sir. |
| 01:09 | 17 | Q.   I'm sorry.  Okay.  Two seconds. |
| 01:09 | 18 | A.   Yes, sir. |
| 01:09 | 19 | Q.   I don't recall ever hearing a single conversation that |
|  | 20 | was two seconds long this morning.  Do you recall a |
|  | 21 | 2-second-long conversation? |
| 01:09 | 22 | A.   No, sir.  I was bringing to your attention that |
|  | 23 | they're -- the time is off by about two seconds. |
| 01:09 | 24 | Q.   We all saw that.  Okay? |
| 01:09 | 25 | These exhibits indicate that both conversations were |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | being held simultaneously, within two seconds of each other;        |
|       | 2  | isn't that correct?                                                 |
| 01:09 | 3  | A.    Yes, sir.                                                      |
| 01:10 | 4  | Q.    Okay.  You began your testimony regarding an interview        |
|       | 5  | that you had with Mr. Badawi; is that correct?                      |
| 01:10 | 6  | A.    Yes, sir.                                                      |
| 01:10 | 7  | Q.    That occurred at the FBI offices?                             |
| 01:10 | 8  | A.    Yes, sir.  The FBI resident agency office over in            |
|       | 9  | Orange.                                                             |
| 01:11 | 10 | Q.    Okay.  Just answering yes or no, he was under arrest at       |
|       | 11 | the time; is that correct?                                          |
| 01:11 | 12 | A.    That is correct, yes.                                         |
| 01:11 | 13 | Q.    You had explained to him the nature of the charges at        |
|       | 14 | that time?                                                          |
| 01:11 | 15 | A.    No.                                                           |
| 01:11 | 16 | Q.    You showed him your credentials, your badges?                |
| 01:11 | 17 | A.    Yes.                                                           |
| 01:11 | 18 | Q.    You had handcuffs?                                            |
| 01:11 | 19 | A.    He did have handcuffs, yes.                                   |
| 01:11 | 20 | Q.    And you had a gun?                                            |
| 01:11 | 21 | A.    On my ankle, yes, sir.                                        |
| 01:11 | 22 | Q.    Okay.  And you didn't tell him he was free to leave at       |
|       | 23 | any time?                                                           |
| 01:11 | 24 | A.    Correct.                                                      |
| 01:11 | 25 | Q.    And you read him his rights, but did you tell him he         |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | could have a lawyer present?                                        |
| 01:11 | 2  | A.   Absolutely.                                                    |
| 01:11 | 3  | Q.   That you would stop the proceedings right there and go         |
|       | 4  | fetch 'em a lawyer?                                                 |
| 01:11 | 5  | A.   Yes.                                                           |
| 01:11 | 6  | Q.   You didn't tell him that the Court would appoint him a         |
|       | 7  | lawyer; you told 'em you'd go get 'em a lawyer if he wanted         |
|       | 8  | one.                                                                |
| 01:11 | 9  | A.   At the end of the interview, sir, I did tell him that          |
|       | 10 | the Court would appoint him an attorney.                            |
| 01:11 | 11 | Q.   At the end of the interview?                                   |
| 01:11 | 12 | A.   Yes, sir.                                                      |
| 01:11 | 13 | Q.   So you didn't tell him up front that he had a right to         |
|       | 14 | have an attorney while questioning?                                 |
| 01:12 | 15 | A.   I did, yes, sir.  About 7 and a half minutes into my           |
|       | 16 | interview.                                                          |
| 01:12 | 17 | Q.   But did you tell him that he could stop the proceedings        |
|       | 18 | at any time and have that attorney there -- not when the           |
|       | 19 | Court appoints -- but he could have one there?                      |
| 01:12 | 20 | A.   Sir, I'd have to read -- reread the transcript to find         |
|       | 21 | out what order that I presented the information -- just so I        |
|       | 22 | was accurate, sir.                                                  |
| 01:12 | 23 | Q.   Okay.  You did read the transcript prior to testifying         |
|       | 24 | today, did you not?                                                 |
| 01:12 | 25 | A.   Yes, sir.  More than 15 times.                                 |

**DEBBIE GALE, U.S. COURT REPORTER**

01:12  1   Q.   Okay.  And I think we brought out that that transcript

2   is an accurate verbatim record of the entire interrogation

3   of Mr. Badawi?

01:12  4   A.   The interview, yes, sir.

01:12  5   Q.   Call it an interview.  Don't you take courses in

6   interrogation techniques?

01:12  7   A.   They are taught within the FBI, yes, sir.

01:12  8   Q.   They're called Interrogation Courses, aren't they?

01:12  9   A.   Yes, sir.  At times, some are.  Some are just called --

01:12  10  Q.   Do you teach them?

01:13  11  A.   I have taught those courses, yes, sir.

01:13  12  Q.   So we're *(sic)* not afraid of the word "interrogation"

13  are you?  You performed an interrogation; right?

01:13  14  A.   He was in custody.  We read 'em Miranda.  Yes, sir, by

15  legal means, it would be an interrogation.

01:13  16  Q.   Okay.  Thank you.

01:13  17       During the course of your interrogation of him, he told

18  you -- Mr. Badawi told you he doesn't fight; correct?

01:13  19            MS. HEINZ:  Objection.  Hearsay.

01:13  20            THE COURT:  No.  Overruled.

01:13  21            *(To the witness:)* You can answer that question.

01:13  22            THE WITNESS:  Sir, I would have to review the

23  transcript.  I don't wanna give an inaccurate statement to

24  the Court, sir.

25

| | | |
|---|---|---|
| 01:13 | 1 | BY MR. LENGYEL-LEAHU: |
| 01:13 | 2 | Q.   Page 24, line 7 -- I'm sorry -- line 4. |
| 01:13 | 3 | MR. LENGYEL-LEAHU:  May I approach, Your Honor? |
| 01:13 | 4 | THE COURT:  You may. |
| 01:13 | 5 | *(Document provided to the witness.)* |
| 01:14 | 6 | BY MR. LENGYEL-LEAHU: |
| 01:14 | 7 | Q.   After reviewing the transcript does that refresh your |
| | 8 | recollection, sir? |
| 01:14 | 9 | A.   Yes, sir. |
| 01:14 | 10 | Q.   Is it true that Badawi told you he does not fight? |
| 01:14 | 11 | A.   Mr. Badawi -- that conversation, sir, if I could |
| | 12 | elaborate on that? |
| 01:14 | 13 | Q.   He said, *"Nader doesn't fight."* |
| 01:14 | 14 | A.   *"Nader does not fight MMA fighting,"* sir, that's what |
| | 15 | the conversation was about. |
| 01:14 | 16 | Q.   Mr. Badawi also told you that Nader was going over |
| | 17 | there to get married; is that correct? |
| 01:14 | 18 | A.   Yes. |
| 01:14 | 19 | MS. HEINZ:  Objection.  Hearsay. |
| 01:14 | 20 | THE COURT:  Overruled. |
| 01:14 | 21 | BY MR. LENGYEL-LEAHU: |
| 01:14 | 22 | Q.   In fact, he repeated that to you on several occasions |
| | 23 | during the course of your interrogation; is that correct? |
| 01:14 | 24 | A.   Yes. |
| 01:15 | 25 | Q.   I count at least four different occasions where that |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | occurred; would that be accurate, to your recollection?            |
| 01:15 | 2  | A.   That sounds accurate, yes, sir.                               |
| 01:15 | 3  | Q.   Okay.  Now, you said on direct testimony that                 |
|       | 4  | Mr. Badawi did not distinguish between ISIS and ISIL and the       |
|       | 5  | Islamic State; is that right?                                      |
| 01:15 | 6  | A.   Yes.                                                          |
| 01:15 | 7  | Q.   Now, you use those terms synonymously, don't you?             |
|       | 8  | You --                                                             |
| 01:15 | 9  | A.   Yes.                                                          |
| 01:15 | 10 | Q.   -- interchange them?                                          |
| 01:15 | 11 | A.   Yes, sir.                                                     |
| 01:15 | 12 | Q.   Where in that entire interrogation does Mr. Badawi use        |
|       | 13 | the expression "ISIS" or "ISIL"?                                   |
| 01:15 | 14 | A.   I don't -- I do not recall that he used the other            |
|       | 15 | terms, other than Islamic State.  But that's known to be --        |
| 01:15 | 16 | Q.   Exactly.                                                      |
| 01:15 | 17 | A.   -- the same as the group that Abu Bakr al-Baghdadi is        |
|       | 18 | the leader of.                                                     |
| 01:16 | 19 | Q.   And that's my point:  He never says "ISIS" and "ISIL."       |
| 01:16 | 20 | A.   Because Islamic State is ISIS and ISIL.  It's all the        |
|       | 21 | same, sir.                                                         |
| 01:16 | 22 |       MR. LENGYEL-LEAHU:  Move to strike, Your Honor.              |
|       | 23 | Nonresponsive.                                                     |
| 01:16 | 24 |       THE COURT:  Sustained.                                       |
| 01:16 | 25 |       Reask the question.                                          |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

14

| | | |
|---|---|---|
| 01:16 | 1 | MR. LENGYEL-LEAHU:  Thank you. |
| 01:16 | 2 | BY MR. LENGYEL-LEAHU: |
| 01:16 | 3 | Q.   In the entire course of the interrogation, he never |
| | 4 | uses the expression "ISIS" or "ISIL"; correct? |
| 01:16 | 5 | A.   That is correct. |
| 01:16 | 6 | Q.   In fact -- did you handle most of the questioning? |
| 01:16 | 7 | A.   I would say it's about 50/50, sir. |
| 01:16 | 8 | Q.   So you and your partner never refer to "ISIS" or "ISIL" |
| | 9 | either, do you? |
| 01:16 | 10 | A.   Yes, we did. |
| 01:16 | 11 | Q.   You primarily refer to the "Islamic State"; is that |
| | 12 | correct? |
| 01:17 | 13 | A.   Once again, I'd have to review the whole transcript to |
| | 14 | see primarily is that 50/50.  I know we said the words |
| | 15 | "ISIS" several times.  I'm not sure if we used "Islamic |
| | 16 | State" more than "ISIS," but we did use -- used both terms. |
| 01:17 | 17 | Q.   By my count -- |
| 01:17 | 18 | THE COURT:  Counsel, this would be testimony. |
| 01:17 | 19 | If you need him to review his transcript, he can |
| | 20 | be called back; in other words, if you want the exact number |
| | 21 | of times used.  But I doubt he's gonna be able to answer the |
| | 22 | exact number of time used without reviewing the transcript. |
| 01:17 | 23 | MR. LENGYEL-LEAHU:  We would be willing to |
| | 24 | introduce the entire interview, Your Honor. |
| 01:17 | 25 | THE COURT:  Well, Counsel, your question. |

| | | |
|---|---|---|
| 01:17 | 1 | BY MR. LENGYEL-LEAHU: |
| 01:17 | 2 | Q.   You told Mr. Badawi -- or either -- and I say "you," |
| | 3 | 'cause I didn't mark down who was speaking at the time, uh, |
| | 4 | and I don't recognize either of your voices.  Um, you |
| | 5 | indicated to Mr. Badawi that you knew he wanted to join the |
| | 6 | "Islamic State"? |
| 01:18 | 7 | A.   Who are you referring to as "he"?  When "I" said "he"? |
| 01:18 | 8 | Q.   Mr. Nader Elhuzayel. |
| 01:18 | 9 |      Is that correct? |
| 01:18 | 10 | A.   Yes, sir. |
| 01:18 | 11 | Q.   So you didn't call it at that time "ISIS" or "ISIL." |
| | 12 | You told him that he was -- you told Mr. Badawi that you |
| | 13 | knew that Mr. Elhuzayel was going to join the Islamic State? |
| 01:18 | 14 | A.   That is correct. |
| 01:18 | 15 | Q.   And after you told him about your knowledge regarding |
| | 16 | the Islamic State, that's when you or your partner |
| | 17 | threatened Mr. Badawi's immigration status? |
| 01:19 | 18 |           MS. HEINZ:  Objection, Your Honor. |
| 01:19 | 19 | BY MR. LENGYEL-LEAHU: |
| 01:19 | 20 | Q.   Is that correct? |
| 01:19 | 21 |           MS. HEINZ:  Argumentative. |
| 01:19 | 22 |           THE COURT:  Well, "Called attention to"? |
| | 23 | "Discussed with"?  What's the appropriate wording? |
| 01:19 | 24 |           MR. LENGYEL-LEAHU:  Perhaps we can have the agent |
| | 25 | quote it, Your Honor. |

| | | |
|---|---|---|
| 01:19 | 1 | THE COURT:  So, Counsel's objecting to the word |
| | 2 | "threatened." |
| 01:19 | 3 | Beyond that, the subject is subject to appropriate |
| | 4 | cross-examination.  So why don't you ask him about... |
| 01:19 | 5 | BY MR. LENGYEL-LEAHU: |
| 01:19 | 6 | Q.   Do you remember the conversation that you had with |
| | 7 | Mr. Badawi regarding his immigration status as well as the |
| | 8 | immigration status of his personal family members? |
| 01:19 | 9 | A.   I remember there was a conversation regarding that. |
| 01:19 | 10 | Q.   You remember the contents of that conversation? |
| 01:19 | 11 | A.   I don't wanna be inaccurate, sir.  So if I could take a |
| | 12 | look at the transcript, please. |
| 01:20 | 13 | *(Document provided to the witness.)* |
| 01:20 | 14 | THE WITNESS:  Okay. |
| 01:20 | 15 | BY MR. LENGYEL-LEAHU: |
| 01:20 | 16 | Q.   Does that refresh your recollection? |
| 01:20 | 17 | A.   Yes, sir, it does. |
| 01:20 | 18 | Q.   Could you read that transcript to the jury, just the |
| | 19 | portions regarding the immigration status. |
| 01:20 | 20 | A.   The agent states:  *"You have -- you know -- you -- you* |
| | 21 | *know that when people are applying to become U.S. citizens,* |
| | 22 | *for example, that the government always wants to know* |
| | 23 | *what -- you know, are there any connections to that person,* |
| | 24 | *between that person and terrorism."* |
| 01:20 | 25 | Mr. Badawi says:  *"Uh-huh."* |

01:20   1        Agent:  *"I know you're not a citizen."*
01:21   2        Mr. Badawi says:  *"Right."*
01:21   3        Agent says:  *"You and your brothers aren't citizens*
        4   *yet."*
01:21   5        Mr. Badawi says:  *"Uh-huh."*
01:21   6        Agent says:  *"You know, we talk to the immigration*
        7   *folks all the time, so if you're cooperative"* --
01:21   8        And another agent says:  *"As a matter of fact we have*
        9   *your"* --
01:21  10        Other agent says:  *"Yeah, it's right here"* -- referring
       11   to his, uh, alien file.
01:21  12        Agent says*:  "-- file right here."*
01:21  13        Agent says:  *"Here's your A file or -- now, this is --*
       14   *sorry."*
01:21  15        Mr. Badawi says:  *"That's my brother."*
01:21  16        Agent says:  *"This is your brother.  This is your*
       17   *brother's file.  And you know we talk to immigration all the*
       18   *time.  And if -- if you are cooperative with us, that's*
       19   *something we'll tell them straight away:  Hey, this guy, he*
       20   *came in and he was cooperative.  But if you're gonna lie*
       21   *and"* --
01:21  22        Other agent says:  *"We have a duty to let them know --"*
01:21  23        Other agent says:  "Yeah."
01:21  24        The other agent says:  *"-- about that is really what it*
       25   *comes down to."*

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 01:22 | 1 | Q.   And so in preparation for the interview with |
| | 2 | Mr. Badawi, you all had pulled the immigration file for his |
| | 3 | brother and had it sitting on the table in front of him; is |
| | 4 | that right? |
| 01:22 | 5 | A.   Yes, sir, we had several -- |
| 01:22 | 6 | Q.   And you showed it to him; is that right? |
| 01:22 | 7 | A.   We had several A files on the table, yes, sir. |
| 01:22 | 8 | Q.   Several A files.  Several family members are |
| | 9 | identified? |
| 01:22 | 10 | A.   Yes. |
| 01:22 | 11 | Q.   Thank you.  During the course of that interrogation, |
| | 12 | you discussed the purchase of the ticket, did you not?  This |
| | 13 | is the ticket that Mr. Elhuzayel was going to fly back to |
| | 14 | Tel Aviv? |
| 01:22 | 15 | A.   Yes, we did. |
| 01:22 | 16 | Q.   During that conversation Mr. Badawi told you that it |
| | 17 | was around $700; is that right? |
| 01:22 | 18 | A.   Yes. |
| 01:22 | 19 | Q.   And he told you that Nader had given him cash? |
| 01:23 | 20 | A.   I'd have to refresh myself with the transcript at this |
| | 21 | time, sir. |
| 01:23 | 22 | Q.   Okay, sir. |
| 01:23 | 23 |      *(Witness reviews document.)* |
| 01:23 | 24 | BY MR. LENGYEL-LEAHU: |
| 01:23 | 25 | Q.   Does that refresh your recollection? |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

19

| | | |
|---|---|---|
| 01:23 | 1 | A.   Yes, it does. |
| 01:23 | 2 | Q.   During the course of that interrogation, he told you |
| | 3 | that he was paid cash by Mr. Elhuzayel; correct? |
| 01:23 | 4 | A.   Yes. |
| 01:23 | 5 | Q.   And when the FBI executed the search warrant on |
| | 6 | Mr. Badawi's house, they found that cash -- or they found |
| | 7 | cash. |
| 01:23 | 8 | MS. HEINZ:  Objection.  Lack of foundation. |
| 01:23 | 9 | THE COURT:  Sustained. |
| 01:23 | 10 | BY MR. LENGYEL-LEAHU: |
| 01:24 | 11 | Q.   Did you review the evidence of the results of the |
| | 12 | search warrant'a Mr. Badawi's house? |
| 01:24 | 13 | A.   No, I did not. |
| 01:24 | 14 | Q.   You didn't follow up to determine whether that |
| | 15 | statement was true? |
| 01:24 | 16 | A.   I did not review the evidence from his home. |
| 01:24 | 17 | Q.   Okay.  During the course of that interrogation, |
| | 18 | Mr. Badawi told you that there was an announcement of a |
| | 19 | caliphate, did he not? |
| 01:24 | 20 | A.   Yes, he did. |
| 01:24 | 21 | Q.   He indicated that that was a significant event in his |
| | 22 | life, didn't he? |
| 01:24 | 23 | A.   Yes. |
| 01:24 | 24 | Q.   And the caliphate is something different as different |
| | 25 | in the context in this case, isn't it?   *(Verbatim.)* |

| | | |
|---|---|---|
| 01:24 | 1 | A. *(No response.)* |
| 01:24 | 2 | Q. Prior to the forming of the caliphate, there were a |
| | 3 | number of groups, insurgent groups, throughout the Middle |
| | 4 | East; is that correct? |
| 01:25 | 5 | A. Yes. |
| 01:25 | 6 | Q. You seem to be a student of the history. Have you |
| | 7 | studied this history? |
| 01:25 | 8 | A. I make myself very aware of current events because of |
| | 9 | my position. |
| 01:25 | 10 | Q. Understood. Do you have a college degree? |
| 01:25 | 11 | A. Yes. |
| 01:25 | 12 | Q. What's it in? |
| 01:25 | 13 | A. Bachelor's in communication studies; master's in |
| | 14 | management. |
| 01:25 | 15 | Q. Master's in management? |
| 01:25 | 16 | A. Yes. |
| 01:25 | 17 | Q. And when did you -- did you go straight from your |
| | 18 | bachelor's to your master's? |
| 01:25 | 19 | A. No, sir. |
| 01:25 | 20 | Q. There was some time in between you did some work? |
| | 21 | *(Verbatim.)* |
| 01:25 | 22 | A. Yes. |
| 01:25 | 23 | Q. Okay. And you been FBI agent for how long? |
| 01:25 | 24 | A. 14 years, sir. |
| 01:25 | 25 | Q. And how long have you been focusing on the issues |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

21

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | involving insurgencies?  Terrorism?  Middle East politics?   |
| 01:25 | 2  | A.   14 years.                                               |
| 01:25 | 3  | Q.   You got quite an education -- pretty much your Ph.D in  |
|       | 4  | it by now.                                                   |
| 01:25 | 5  |        THE COURT:  Counsel, your question.                   |
| 01:25 | 6  | BY MR. LENGYEL-LEAHU:                                        |
| 01:25 | 7  | Q.   The caliphate was an important event within the Middle  |
|       | 8  | East, was it not? -- the announcement of the caliphate?      |
| 01:25 | 9  | A.   Yes, absolutely.                                        |
| 01:25 | 10 | Q.   Would you agree that that occurred approximately        |
|       | 11 | June 30th of 2014?                                           |
| 01:26 | 12 | A.   For -- which group are you referring to, sir?           |
| 01:26 | 13 | Q.   Right.  There's actually two caliphates right now;      |
|       | 14 | isn't there?                                                 |
| 01:26 | 15 | A.   *(No response.)*                                        |
| 01:26 | 16 | Q.   There's the one declared by al-Qa'ida in Afghanistan,   |
|       | 17 | Taliban, Pakistan area --                                    |
| 01:26 | 18 |      *(Court reporter requests clarification for the*        |
|       | 19 |    *record.)*                                                |
| 01:26 | 20 | BY MR. LENGYEL-LEAHU:                                        |
| 01:26 | 21 | Q.   Afghanistan, Pakistan, the Taliban area -- which is in  |
|       | 22 | competition to the one declared by Baghdadi in June of 2014; |
|       | 23 | correct?                                                     |
| 01:26 | 24 | A.   There's been debates between the groups --              |
| 01:26 | 25 | Q.   Does that mean --                                       |

**DEBBIE GALE, U.S. COURT REPORTER**

01:26    1    A.    -- disagreements.

01:26    2    Q.    -- it's correct?

01:26    3    A.    Yes.

01:26    4    Q.    Okay.  And prior to the establishment of the caliphate,

         5    were you aware of the communications going on between

         6    various insurgent groups in the Middle East at the time?

01:26    7    A.    Can you elaborate on that?  What type of

         8    communications, sir?

01:26    9    Q.    Any kinda communications, whether it's their public

        10    relation, their media, their mass media, their Twitter,

        11    their Facebook, their YouTubes.

01:27   12    A.    Sure.  It was well-known that they communicated amongst

        13    different organizations.

01:27   14    Q.    And prior to Baghdadi making the announcement of the

        15    caliphate, there was a large amount of traffic that talked

        16    about ordering a caliphate to be established; is that right?

01:27   17    A.    I can't recall that exact information, sir.

01:27   18    Q.    Don't remember anybody talking about it before he did

        19    it?

01:27   20    A.    Tell you the truth, I don't.  No.

01:27   21    Q.    Okay.  But -- but the seminal event in the

        22    establishment of the caliphate was the fall of Mosul;

        23    correct?

01:27   24    A.    That was the same time frame as the caliphate came out,

        25    yes, sir.

01:27   1   Q.   So it's -- and -- and, to recall, Mosul was where the

2   insurgency in Iraq attacked the city and the entire Iraqi

3   army just quit and ran away --

01:28   4            MS. HEINZ:  Objection, Your Honor.  Relevance.

01:28   5            THE COURT:  Well, there are going to be other

6   people testifying in this area.  And it's beyond the scope

7   of what he was called for.

01:28   8            But there was information that the government

9   elicited concerning certain people, Zakari *(sic)*, for

10   instance.

01:28  11            So I'm going to let you continue on in a limited

12   basis in this area, but I think these questions will be ably

13   asked and answered by another witness, apparently.

01:28  14            MR. LENGYEL-LEAHU:  Thank you, Your Honor.

01:28  15            THE COURT:  So a few more questions in this area.

01:28  16            MR. LENGYEL-LEAHU:  I just wanted to --

01:28  17  BY MR. LENGYEL-LEAHU:

01:28  18  Q.   For those of us that may remember the history, that was

19   event where the Iraqis surrendered the entire city, and all

20   of the arms and tanks and equipment that the Americans had

21   provided them were surrendered over to those forces;

22   correct?

01:29  23  A.   That is correct.  ISIS did take over some of those --

24   some'a the weaponry.

01:29  25  Q.   And -- and they announced that as a fulfilling of

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

24

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | prophecy from Muhammad, the prophet; correct?                |
| 01:29 | 2  | MS. HEINZ:  Objection, Your Honor.  Beyond the               |
|       | 3  | scope, and relevance.                                        |
| 01:29 | 4  | THE COURT:  It is, but it's a hard -- it can be              |
|       | 5  | argued that it is.  It's not an improper objection.  But it  |
|       | 6  | can also be argued that once we got into Zarqawi, the leader |
|       | 7  | of al-Qa'ida, et cetera, that he's expressed a great amount  |
|       | 8  | of expertise also.  So I'm gonna use my discretion, Counsel. |
| 01:29 | 9  | If he knows, he can answer.  But there'll be                 |
|       | 10 | another witness.                                             |
| 01:29 | 11 | THE WITNESS:  There were reports of that, sir.               |
| 01:29 | 12 | THE COURT:  I think this is perhaps common                   |
|       | 13 | knowledge to everyone.  So I don't know that he's            |
|       | 14 | necessarily even an expert in the area.                      |
| 01:29 | 15 | BY MR. LENGYEL-LEAHU:                                        |
| 01:29 | 16 | Q.  The establishment of the caliphate not only had          |
|       | 17 | political dimensions of what they were calling a             |
|       | 18 | geographical center, but also had religious significance     |
|       | 19 | too, didn't it?                                              |
| 01:30 | 20 | MS. HEINZ:  Objection, Your Honor.  Lacks                    |
|       | 21 | foundation to express this opinion.                          |
| 01:30 | 22 | THE COURT:  If you know that answer, you can                 |
|       | 23 | express it; if you don't, then say you don't.                |
| 01:30 | 24 | THE WITNESS:  Could you repeat, please?                      |
|       | 25 |                                                              |

| | | |
|---|---|---|
| 01:30 | 1 | BY MR. LENGYEL-LEAHU: |
| 01:30 | 2 | Q.   The establishment of the caliphate, as announced by |
| | 3 | Baghdadi in June of 2014, had both political and religious |
| | 4 | significance to his followers; is that true? |
| 01:30 | 5 | A.   It -- you're getting a little too deep for me at this |
| | 6 | point.  I mean, it's getting a little more opinion-based |
| | 7 | where -- you know what I mean, sir?  So -- |
| 01:30 | 8 | Q.   Fair enough. |
| 01:30 | 9 | A.   -- I don't feel whole-heartedly comfortable with my |
| | 10 | knowledge to -- to go that deep. |
| 01:30 | 11 | Q.   Fair enough. |
| 01:30 | 12 | Mr. Badawi expressed the fact that he believed that |
| | 13 | al-Baghdadi was a legitimate ruler; correct? |
| 01:31 | 14 | A.   Yes. |
| 01:31 | 15 | Q.   He also told you that Nader doesn't speak Arabic, |
| | 16 | didn't he? |
| 01:31 | 17 | MS. HEINZ:  Objection.  Hearsay. |
| 01:31 | 18 | THE COURT:  No. |
| 01:31 | 19 | *(To the witness:)* You can answer that question. |
| 01:31 | 20 | THE WITNESS:  I'm sorry, Your Honor? |
| 01:31 | 21 | THE COURT:  You can answer the question; and that |
| | 22 | is, if Badawi told you that Nader did not speak Arabic. |
| 01:31 | 23 | THE WITNESS:  He did mention that his Arabic -- he |
| | 24 | was learning Arabic.  I do recall that. |
| 01:31 | 25 | MR. LENGYEL-LEAHU:  *(Provides document to the* |

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | *witness.)*                                                      |
| 01:31 | 2  | BY MR. LENGYEL-LEAHU:                                             |
| 01:31 | 3  | Q.   Lines 24 and 25 -- that refresh your recollection, sir?    |
| 01:31 | 4  | A.   Yes.                                                        |
| 01:31 | 5  | Q.   On line 24 what was the question asked of Mr. Badawi?      |
| 01:32 | 6  | A.   He was asked, *"Does Nader speak Arab?" (Verbatim.)*        |
| 01:32 | 7  | Q.   And what was his response, sir?                            |
| 01:32 | 8  | A.   His response was "No."                                      |
| 01:32 | 9  | Q.   You asked Mr. Badawi about Garland, Texas?                 |
| 01:32 | 10 | A.   Yes.                                                        |
| 01:32 | 11 | Q.   Isn't it true that he told you that the events at          |
|       | 12 | Garland, Texas, are not part of Islam?                          |
| 01:32 | 13 | A.   I remember a conversation.  I reviewed it several         |
|       | 14 | times -- but, for accuracy, sir, I'd like to once again see    |
|       | 15 | the transcript, please.                                         |
| 01:33 | 16 | *(Document provided to the witness.)*                           |
| 01:33 | 17 | THE WITNESS:  Thank you.                                         |
| 01:33 | 18 | BY MR. LENGYEL-LEAHU:                                            |
| 01:33 | 19 | Q.   Have you read it?                                           |
| 01:33 | 20 | A.   Yes.                                                        |
| 01:33 | 21 | Q.   What does it say?                                           |
| 01:33 | 22 | A.   Discussion about the Texas shootings, um, line 20, says   |
|       | 23 | "No."                                                            |
| 01:34 | 24 | Uh, Mr. Badawi says, *"No.  I talked about him like --*         |
|       | 25 | *like -- like -- like the Texas shooting."*                     |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 01:34 | 1 | I said, *"Yeah."* |
| 01:34 | 2 | Mr. Badawi said:  *"I told him that -- I told him that's* |
| | 3 | *not part of Islam like we -- here, we have a,* |
| | 4 | *unintelligible, piece and, unintelligible, security, which* |
| | 5 | *is the visa."  (Verbatim as read.)* |
| 01:34 | 6 | Q.   That was a covenant of security; right? |
| 01:34 | 7 | A.   I -- it's unintelligible.  And I don't recall being |
| | 8 | able to pick that up either, since I went through these. |
| 01:34 | 9 | Q.   Okay.  So you've reviewed the tape -- which, you told |
| | 10 | us "ten times "-- you reviewed excerpts of it maybe 30 |
| | 11 | times, you refreshed your recollection before you came here |
| | 12 | today, and you never cleared that up on the transcript, that |
| | 13 | what he says is *"there's a covenant of security"*? |
| 01:34 | 14 | MS. HEINZ:  Objection.  Testifying. |
| 01:34 | 15 | THE COURT:  Sustained. |
| 01:34 | 16 | BY MR. LENGYEL-LEAHU: |
| 01:34 | 17 | Q.   Do you understand what the "covenant of security" means |
| | 18 | in -- for a Muslim? |
| 01:34 | 19 | MS. HEINZ:  Objection.  Relevance. |
| 01:35 | 20 | THE COURT:  Overruled. |
| 01:35 | 21 | THE WITNESS:  I don't think I can explain that |
| | 22 | properly. |
| 01:35 | 23 | BY MR. LENGYEL-LEAHU: |
| 01:35 | 24 | Q.   Let me ask you if this is true:  That when a Muslim |
| | 25 | lives in a country and they're under that country's |

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
|          | 1  | protection, it would be against their belief to hurt the   |
|          | 2  | people that are protecting them.                           |
| 01:35    | 3  | That's the covenant of security, is it not?                |
| 01:35    | 4  | A.   That's accurate in certain -- certain countries, yes. |
| 01:35    | 5  | Q.   You also talked about the Fort Hood shooting with      |
|          | 6  | Mr. Badawi.  He also disagreed with what happened there, did|
|          | 7  | he not?                                                     |
| 01:35    | 8  | A.   Once again, I'd have to read that part of the          |
|          | 9  | transcript, sir.                                           |
| 01:35    | 10 | MR. LENGYEL-LEAHU:  *(Provides document to the*            |
|          | 11 | *witness.)*                                                |
| 01:35    | 12 | BY MR. LENGYEL-LEAHU:                                      |
| 01:35    | 13 | Q.   Page 15, starting around 12.                          |
| 01:35    | 14 | A.   Okay.  Thank you.  Okay.                              |
| 01:36    | 15 | Q.   Okay.  Directing your attention to page 16, line 13,  |
|          | 16 | isn't it true that Mr. Badawi indicated to you too that he |
|          | 17 | was opposed to the Fort Hood shooting?                     |
| 01:36    | 18 | A.   Actually, he says Islamic State justifies it -- on    |
|          | 19 | page 15, sir.                                              |
| 01:36    | 20 | Q.   I'm sorry.  We were *(sic)* talking about the Islamic  |
|          | 21 | State now, were we?  I thought my question was Mr. Badawi  |
|          | 22 | tells you that he doesn't approve of it.  Right?           |
| 01:37    | 23 | A.   Okay.  Yes, that's correct.                           |
| 01:37    | 24 | Q.   Thank you.                                            |
| 01:37    | 25 | You also like wanted to interrogate him regarding --        |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

29

| | | |
|---|---|---|
| 01:37 | 1 | MS. HEINZ:  Objection.  Argumentative. |
| 01:37 | 2 | MR. LENGYEL-LEAHU:  I withdraw, Your Honor. |
| 01:37 | 3 | BY MR. LENGYEL-LEAHU: |
| 01:37 | 4 | Q.  Your discussion included, um, who were assisting |
| | 5 | Mr. Badawi and Mr. Elhuzayel; correct? |
| 01:37 | 6 | A.  Yes. |
| 01:37 | 7 | Q.  And Mr. Badawi told you that no one was assisting them; |
| | 8 | that they were acting alone; is that correct? |
| 01:37 | 9 | MS. HEINZ:  Objection.  Vague. |
| 01:37 | 10 | THE COURT:  Do you understand the question, sir? |
| 01:38 | 11 | THE WITNESS:  I don't.  No. |
| 01:38 | 12 | THE COURT:  Sustained. |
| 01:38 | 13 | MR. LENGYEL-LEAHU:  *(Approaching the witness with* |
| | 14 | *a document.)*  Page 20 -- |
| 01:38 | 15 | THE COURT:  No, Counsel, he doesn't need his |
| | 16 | recollection refreshed.  So go back to the lectern.  You |
| | 17 | need to ask a question first. |
| 01:38 | 18 | The record should reflect that Counsel was |
| | 19 | approaching the witness without asking a question. |
| 01:38 | 20 | BY MR. LENGYEL-LEAHU: |
| 01:38 | 21 | Q.  Isn't it true that Mr. Badawi told you that the two of |
| | 22 | them were acting alone without any help from anybody back |
| | 23 | East -- back in the Middle East? |
| 01:38 | 24 | MS. HEINZ:  Objection.  Vague as to "two of them." |
| 01:38 | 25 | THE COURT:  Overruled. |

Case 8:15-cr-00060-DOC   Document 296   Filed 03/31/17   Page 30 of 94   Page ID #:4865
8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

30

| | | |
|---|---|---|
| 01:38 | 1 | *(To the witness:)* You can answer the question. |
| 01:38 | 2 | THE WITNESS:  Yes, that is correct. |
| 01:38 | 3 | BY MR. LENGYEL-LEAHU: |
| 01:38 | 4 | Q.   You asked him if he was aware of whether Mr. Elhuzayel |
| | 5 | was talking with anyone over there; correct? |
| 01:39 | 6 | A.   Yes. |
| 01:39 | 7 | Q.   And he told you, no -- he didn't know. |
| 01:39 | 8 | A.   Once again, I'd have to see the part of the transcript |
| | 9 | 'cause we discussed Mr. Elhuzayel's Twitter context quite a |
| | 10 | bit, and it -- I'd have to see that one, please. |
| 01:39 | 11 | Q.   That help refresh your recollection? |
| 01:39 | 12 | A.   Yes. |
| 01:39 | 13 | *(Document provided to the witness.)* |
| 01:39 | 14 | BY MR. LENGYEL-LEAHU: |
| 01:39 | 15 | Q.   Have you had a chance to refresh your recollection? |
| 01:40 | 16 | A.   Yes. |
| 01:40 | 17 | Q.   Mr. Badawi indicated that he had no idea of anyone from |
| | 18 | the Middle East talking with Mr. Elhuzayel. |
| | 19 | "Communicating," I think, is the word you used. |
| 01:40 | 20 | A.   He contradicts himself, though, to be fair here.  In |
| | 21 | line 22, he does say, *"I heard he's following some people* |
| | 22 | *from the Mujahideen over there*," so -- |
| 01:40 | 23 | Q.   Following.  Like on Twitter?  Is that how you |
| | 24 | understood it? |
| 01:40 | 25 | A.   Communicating.  Yes, sir. |

**DEBBIE GALE, U.S. COURT REPORTER**

| 01:40 | 1 | Q.   Well, communicating is -- when you read the paper, |
|---|---|---|
| | 2 | you're not communicating with the newspaper, are you? |
| 01:40 | 3 | A.   Correct. |
| 01:40 | 4 | Q.   When you're watching TV and listening to news, you're |
| | 5 | not communicating with the newscasters, are you? |
| 01:40 | 6 | A.   No. |
| 01:40 | 7 | Q.   Okay.  In all of the evidence that you've reviewed in |
| | 8 | this case, is there any indication of a communication -- a |
| | 9 | two-way communication between my client and anyone |
| | 10 | identified living over there in the Middle East? |
| 01:41 | 11 | A.   Oh, yes. |
| 01:41 | 12 | Q.   Who? |
| 01:41 | 13 | A.   I'd have to pull those exhibits to tell you exactly |
| | 14 | who, but there -- there were several. |
| 01:41 | 15 | Q.   But you can't name them. |
| 01:41 | 16 | A.   I would have to get refreshed by my team here to, uh -- |
| | 17 | I wasn't testifying about that. |
| 01:41 | 18 | Q.   Okay.  Okay.  You asked about recruiters to Mr. Badawi? |
| 01:42 | 19 | A.   Yes. |
| 01:42 | 20 | Q.   And he indicated to you that he never encountered any |
| | 21 | recruiters. |
| 01:42 | 22 | A.   Yes. |
| 01:42 | 23 | Q.   You talked about link-ups -- you'd link-up -- link-ups |
| | 24 | with other contacts in the Middle East. |
| 01:42 | 25 | A.   I -- similar to this conversation here, between -- |

| | | |
|---|---|---|
| 01:42 | 1 | Q.   No. |
| 01:42 | 2 | A.   -- your client, sir?  Or -- |
| 01:42 | 3 | Q.   Actual link-ups -- |
| 01:42 | 4 | A.   -- Mr. Badawi? |
| 01:42 | 5 | Q.   I'm sorry? |
| 01:42 | 6 | A.   Between your client or Mr. Badawi, sir? |
| 01:42 | 7 | Q.   Either one. |
| 01:42 | 8 | A.   Yes.  We did discuss who they were in contact with |
| | 9 | overseas, or if they were gonna link up with anybody when |
| | 10 | Mr. Elhuzayel traveled. |
| 01:42 | 11 | Q.   And Mr. Badawi told you they didn't have a contact or a |
| | 12 | link up? |
| 01:42 | 13 | A.   Not that Mr. Badawi was aware of. |
| 01:42 | 14 | Q.   Correct.  And just to be clear on the conversations |
| | 15 | that we heard, they were never run through any voice |
| | 16 | recognition software? |
| 01:43 | 17 | A.   No, they were not. |
| 01:43 | 18 | Q.   And you're not certified as a voice recognition expert; |
| | 19 | is that right? |
| 01:43 | 20 | A.   We don't have those certifications in my organization. |
| 01:43 | 21 | We rely on, you know, listening to several different |
| | 22 | samples. |
| 01:43 | 23 | Q.   I'm sorry, sir.  You don't have that certification, do |
| | 24 | you? |
| 01:43 | 25 | A.   I do not. |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

33

01:43   1    Q.    In fact, in courts, the FBI usually hires outside

        2    resources to perform those services for them, don't they?

01:43   3    A.    I've not been involved in one'a those trials, and I'm

        4    actually not aware of that.  I never been involved.

01:44   5    Q.    Okay.  So you didn't hire any'a those outside resources

        6    to verify your opinion in this case.

01:44   7    A.    Personally, I did not.  I do not know if we did that in

        8    this investigation.  I wasn't aware of that part of it, if

        9    we did.

01:44   10   Q.    As a Special Agent for the FBI, you take a certain

        11   responsibility to *(sic)* the authenticity of the evidence you

        12   collect; correct?

01:44   13   A.    Yes.

01:44   14   Q.    And if an evidence has a loophole or a loose end, you

        15   would generally try to tie that up, wouldn't you?

01:44   16   A.    Absolutely.

01:44   17   Q.    And the scientific process of police work requires that

        18   part'a that process involves eliminating alternate sources

        19   of evidence; correct?

01:44   20   A.    Yes.

01:44   21   Q.    How many brothers does Mr. Badawi have?

01:44   22   A.    I believe two.

01:45   23   Q.    How many cousins?

01:45   24         MS. HEINZ:  Objection, Your Honor.  Relevance.

01:45   25         THE COURT:  What's the relevance of that, Counsel?

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 01:45 | 1 | MR. LENGYEL-LEAHU:  How many people that are -- it |
| | 2 | has to go to his, uh -- foundation for his opinion of |
| | 3 | identifying Mr. Badawi on the tape. |
| 01:45 | 4 | BY MR. LENGYEL-LEAHU: |
| 01:45 | 5 | Q.   How many members of his family did you interview for |
| | 6 | the purpose of comparing speech patterns in order to |
| | 7 | determine that it couldn't be their voice? |
| 01:45 | 8 | THE COURT:  I'll overrule the objection. |
| 01:45 | 9 | *(To the witness:)* You can answer the question. |
| 01:45 | 10 | THE WITNESS:  I've interviewed no one else, except |
| | 11 | for Mr. Badawi, from his family. |
| 01:45 | 12 | BY MR. LENGYEL-LEAHU: |
| 01:45 | 13 | Q.   Twitter is used as a news source, isn't it? |
| 01:45 | 14 | A.   It's one of the purposes'a Twitter, yes. |
| 01:45 | 15 | Q.   So people see things, they see events, they post it on |
| | 16 | Twitter; correct? |
| 01:46 | 17 | A.   Yes. |
| 01:46 | 18 | Q.   And when people see those things and retweet those |
| | 19 | things, uh, that's just a way of spreading the information |
| | 20 | that they receive; is that correct? |
| 01:46 | 21 | A.   That's one purpose, yes. |
| 01:46 | 22 | Q.   When you like something on Twitter, you're |
| | 23 | automatically notifying all'a your followers of that |
| | 24 | information; correct? |
| 01:46 | 25 | A.   I don't know Twitter well enough to know that that |

**DEBBIE GALE, U.S. COURT REPORTER**

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

35

|  |  |  |
|---|---|---|
|  | 1 | happens, sir. |
| 01:46 | 2 | Q.  You talked about the 72 virgins. |
| 01:46 | 3 | A.  Yes. |
| 01:46 | 4 | Q.  Is it your understanding that that's what it says in |
|  | 5 | the Quran? |
| 01:46 | 6 | A.  I'm not aware that it says that in the Quran. |
| 01:46 | 7 | Q.  It comes from the *hadiths*?  The sayings of the prophet? |
| 01:46 | 8 | A.  I'm not qualified to answer that, sir.  I just know |
|  | 9 | that -- the basics under- -- understanding from being |
|  | 10 | involved with this for several years, but I'm not sure |
|  | 11 | exactly where the origin of that comes from. |
| 01:47 | 12 | Q.  Okay.  But that's a metaphor of paradise; right? |
| 01:47 | 13 | MS. HEINZ:  Objection.  Lack of foundation. |
| 01:47 | 14 | THE COURT:  Sustained. |
| 01:47 | 15 | There's no foundation, Counsel. |
| 01:47 | 16 | BY MR. LENGYEL-LEAHU: |
| 01:47 | 17 | Q.  In your experience have you come across situations of |
|  | 18 | copycats -- copycat criminals? |
| 01:47 | 19 | MS. HEINZ:  Objection.  Relevance. |
| 01:47 | 20 | THE COURT:  Sustained. |
| 01:47 | 21 | BY MR. LENGYEL-LEAHU: |
| 01:47 | 22 | Q.  Do you rely on propaganda to come to a conclusion about |
|  | 23 | responsibility for a crime? |
| 01:47 | 24 | A.  Can you explain specifically "propaganda," what you're |
|  | 25 | referring to, sir? |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

36

01:47  1    Q.   Uh, sure.  Uh, the media that you talked about -- and I

       2    can't remember his name -- al-Adoni?

01:47  3    A.   Al-Adnani.

01:48  4    Q.   Okay.  He is the media branch, and he puts out all

       5    their publications and their press releases and their

       6    videos?

01:48  7    A.   He's the head of the ISIS media branch, yes, sir.

01:48  8    Q.   Exactly.  And wouldn't you characterize what he is

       9    posting, for the most part, propaganda?

01:48 10    A.   It could be character -- one characterization is -- we

      11    would call it Islamist or Jihadist propaganda, yes, from a

      12    terrorist organization, yes, sir.

01:48 13    Q.   In fact, that's in your research.  It's in your

      14    training manuals.  It's in your, um -- the speeches that've

      15    talked about the subject.  It's a propaganda wing; right?

01:48 16    A.   It's ISIS's media wing to get the information out to as

      17    many people as possible.  That's their -- that's their goal.

01:48 18    Q.   And, as a police officer, you don't rely on either the

      19    media or propaganda to determine allocation of

      20    responsibility for a particular act; right?

01:48 21    A.   The media is a first amendment right.  It's protected,

      22    obviously.  So, no, we cannot, um -- can you restate the

      23    question?  Are you asking me if it's utilized to, you know,

      24    find criminal activity?  Could you clarify, please?

01:49 25    Q.   This media wing has made some statements that are kind

**DEBBIE GALE, U.S. COURT REPORTER**

|       |    |                                                                 |
|-------|----|-----------------------------------------------------------------|
|       | 1  | of inflammatory and trying to scare people, right?  Is that     |
|       | 2  | right?                                                           |
| 01:49 | 3  | A.   Yes.                                                        |
| 01:49 | 4  | Q.   And part of that scare tactic is to say that they could    |
|       | 5  | be anywhere in the world; correct?                              |
| 01:49 | 6  | A.   You mean a goal of ISIS's media wing is to --              |
| 01:49 | 7  | Q.   No.  I'm not saying a goal.  I'm saying one of the         |
|       | 8  | things they do is -- to scare people is to tell 'em that        |
|       | 9  | these attacks could occur anywhere.                             |
| 01:49 | 10 | A.   Yes.                                                        |
| 01:49 | 11 | Q.   And anybody can do an act and say it's ISIS and ISIL;      |
|       | 12 | correct?                                                         |
| 01:50 | 13 | A.   That is -- that is accurate, yes.                          |
| 01:50 | 14 | Q.   Doesn't make it true.  Just means that they're taking      |
|       | 15 | credit for it -- or blame; right?                               |
| 01:50 | 16 | A.   Yes.                                                        |
| 01:50 | 17 | Q.   Do you believe everything that Mr. al-Adnani posts?        |
| 01:50 | 18 | MS. HEINZ:  Objection.  Relevance --                            |
| 01:50 | 19 | THE COURT:  Sustained.                                           |
| 01:50 | 20 | MS. HEINZ:  -- as to his belief.                                |
| 01:50 | 21 | THE COURT:  Sustained.                                           |
| 01:50 | 22 | MR. LENGYEL-LEAHU:  If I could retrieve my                      |
|       | 23 | documents, Your Honor, I'm done.                                |
| 01:51 | 24 | THE COURT:  Mr. Lengyel-Leahu, you said you've                  |
|       | 25 | concluded?                                                       |

**DEBBIE GALE, U.S. COURT REPORTER**

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

38

01:51    1            MR. LENGYEL-LEAHU:  Yes, Your Honor.

01:51    2            THE COURT:  All right.  Then we'll call upon

         3    Ms. Corrigan for Mr. Badawi.

01:51    4            MS. CORRIGAN:  Thank you, Your Honor.

01:51    5                    **CROSS-EXAMINATION**

01:51    6    BY MS. CORRIGAN:

01:52    7    Q.   Just for ease purposes, may we just retrieve exhibits

         8    all at once, and then we can just -- so if I can call them

         9    out, and perhaps the assistant there can pull them so we can

        10    move efficiently.

01:52   11       Exhibit 702-A, 715-A, 742-A, 743-A, 758-A, 1012-A,

        12    701-A and then 1-A and 2-A.  I think they're now just being

        13    handed to you.

01:53   14            *(Exhibits provided to the witness.)*

01:53   15            THE WITNESS:  Okay.  I think we're good.

01:53   16    BY MS. CORRIGAN:

01:53   17    Q.   Okay.  Great.  All right.  Why don't we go back just

        18    initially to -- I'm not gonna refer to an exhibit right now.

        19    Go back to the date of May 21st, 2015.  And I'm gonna go

        20    back to the interview that you and co-defendant's counsel

        21    just discussed on cross.  I want to make sure that we have a

        22    full read of exactly what was said in a couple areas.

01:54   23       And what I'd like to direct your attention to is the

        24    questioning that he did and the answers you gave him

        25    regarding the airplane ticket.  Okay?

Case 8:15-cr-00060-DOC   Document 296   Filed 03/31/17   Page 39 of 94   Page ID #:4874
8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

39

01:54   1       So if I'm understanding correctly what you indicated on

2       cross-examination is that the co-defendant -- and I'll call

3       him Nader -- just, Elhuzayel -- but I'll call him Nader for

4       purposes of our questioning -- that Mr. Badawi told you that

5       Nader gave him cash; correct?

01:54   6   A.   Yes.

01:54   7   Q.   In the amount of $700?

01:54   8   A.   Yes.

01:54   9   Q.   And that -- it was at the same time that the ticket was

10      booked inside the car using the computer?

01:54  11   A.   Yes.  Correction -- could I clarify?

01:55  12   Q.   Yes.

01:55  13   A.   I'm not sure if it was a computer or a cellphone that

14      was used for the ticket.  I don't have that information.

01:55  15   Q.   But, in any event, at the time that the ticket was

16      purchased?

01:55  17   A.   Sure.

01:55  18   Q.   And he said to you, quote, *"He gave me the money, and I*

19      *booked him a ticket,"* end quote.

01:55  20   A.   Yes.

01:55  21   Q.   (Reading:) *"I was with him when he booked the ticket,*

22      *but he used my card,"* end quote.

01:55  23      Is that correct?

01:55  24   A.   Yes.

01:55  25   Q.   And when asked when this occurred, you responded,

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | *"About three weeks ago"*; correct?                         |
| 01:55 | 2  | A.   I'd have to see the transcript at this point.  My      |
|       | 3  | apologies.                                                  |
| 01:55 | 4  | Q.   That's all right.                                      |
| 01:55 | 5  |     But would that be in keeping with your knowledge of the |
|       | 6  | timeline?                                                   |
| 01:55 | 7  | A.   Yes.                                                   |
| 01:55 | 8  | Q.   And you asked him again, *"So you let"* -- or, quote:  |
| 01:55 | 9  |         *"So you let him use your card to book*             |
|       | 10 |         *his ticket.*"  End quote.                          |
| 01:55 | 11 |     Do you remember that question?                          |
| 01:55 | 12 | A.   Yes.                                                   |
| 01:55 | 13 | Q.   Do you remember the answer, quote:  *"Uh-huh"*?        |
| 01:56 | 14 | A.   Yes.                                                   |
| 01:56 | 15 | Q.   And did that -- was that in your mind, at that time, an |
|       | 16 | affirmative response; in other words, the equivalent to a   |
|       | 17 | yes?                                                        |
| 01:56 | 18 | A.   Correct.                                               |
| 01:56 | 19 | Q.   Quote:  *"And why did you do that?"*  End quote.       |
| 01:56 | 20 |     Do you remember asking him that question?              |
| 01:56 | 21 | A.   I -- no, I'd have to see the transcript.  I want to   |
|       | 22 | make sure I'm accurate on this.                            |
| 01:56 | 23 | Q.   Sure.                                                  |
| 01:56 | 24 |         MS. CORRIGAN:  May I approach the witness,         |
|       | 25 | Your Honor?                                                 |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 01:56 | 1 | THE COURT:  You may. |
| 01:56 | 2 | MS. CORRIGAN:  All right.  What I'm gonna do is |
| | 3 | hand you my iPad.  And I've got it on the page. |
| 01:56 | 4 | *(Exhibit shown to witness.)* |
| 01:56 | 5 | THE WITNESS:  Okay. |
| 01:57 | 6 | BY MS. CORRIGAN: |
| 01:57 | 7 | Q.   And just for the purposes of the record, you have in |
| | 8 | your hands an iPad, which -- just call it my iPad.  Does it |
| | 9 | appear to be -- what you're looking at -- a true and correct |
| | 10 | copy of the transcript in this case? |
| 01:57 | 11 | A.   Yes, it does. |
| 01:57 | 12 | Q.   All right.  All right.  So if you could look at that |
| | 13 | transcript, and I'm gonna direct you to the question that -- |
| | 14 | it's, quote: |
| 01:57 | 15 | *"And why did you do that?"*  End quote. |
| 01:57 | 16 | A.   What page is that?  Page 4? |
| 01:57 | 17 | Q.   That would be -- let me just -- I was just handed |
| | 18 | another iPad.  Let me just get my bearings now that I gave |
| | 19 | you mine. |
| 01:58 | 20 | A.   Okay.  That's the last statement on page 3, actually. |
| 01:58 | 21 | Q.   That's right.  Okay.  You're correct.  Okay. |
| 01:58 | 22 | So do you see that?  And when did you -- and *"Why did* |
| | 23 | *you do that"*? |
| 01:58 | 24 | A.   Yes. |
| 01:58 | 25 | Q.   Is it correct that he stated, quote: |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

42

| | | |
|---|---|---|
| 01:58 | 1 | *"Well, he said he doesn't have a bank* |
| | 2 | *account so I gave 'em my card"*? |
| 01:58 | 3 | Is that accurate? |
| 01:58 | 4 | A.  Yes. |
| 01:58 | 5 | Q.  And then you -- your question was, *"How much was the* |
| | 6 | *ticket?"* or something to that effect? |
| 01:58 | 7 | A.  Yes. |
| 01:58 | 8 | Q.  His answer was, quote*:* |
| 01:58 | 9 | *"I think it was almost 700, 700* |
| | 10 | *something."*  End quote. |
| 01:58 | 11 | Is that right? |
| 01:58 | 12 | A.  Yes. |
| 01:58 | 13 | Q.  Next question is, quote*:* |
| 01:58 | 14 | *"And then now (verbatim) did he pay* |
| | 15 | *you?"*  End quote. |
| 01:58 | 16 | Do you see that? |
| 01:58 | 17 | A.  Yes. |
| 01:58 | 18 | Q.  And his response is, quote, *"He paid me cash,"* end |
| | 19 | quote. |
| 01:58 | 20 | A.  Correct. |
| 01:58 | 21 | Q.  *(Reading:)* Question:  "When" -- quote: |
| 01:58 | 22 | *"When did he pay you cash?"*  End quote. |
| 01:58 | 23 | A.  Yeah. |
| 01:58 | 24 | Q.  His answer was, quote, *"Same time."* |
| 01:58 | 25 | A.  Yes. |

01:58  1   Q.   *(Reading:)* Question, quote*: "He had the money with*
       2   *him?"*  End quote.

01:59  3   A.   Yes.

01:59  4   Q.   *(Reading:)* Answer, quote*:  "He had the money with*
       5   *him."*  Period.  End quote.

01:59  6   A.   Correct.

01:59  7   Q.   Question and -- quote:  *"And where did he get the*
       8   *money?"*  End quote.

01:59  9   A.   Correct.

01:59 10   Q.   Answer, quote:  *"He had the money."*  End quote.

01:59 11   A.   Correct.

01:59 12   Q.   And then you asked essentially from what source and he
      13   responded he mows lawns; correct?

01:59 14   A.   Yes, that's correct.

01:59 15   Q.   And Mr. Badawi further indicated to you that it was his
      16   understanding that the co-defendant Mr. -- or Nader
      17   Elhuzayel had been saving up money.

01:59 18   A.   Yes, that's accurate.

01:59 19   Q.   Okay.  Based on your recollection and the transcript
      20   that you have before you -- you're free to go through it --
      21   did you follow up with any questions about what Mr. Badawi
      22   did with the cash?

01:59 23   A.   No, we did not.

01:59 24   Q.   Okay.  So there were no questions about whether he used
      25   the money for school?

| | | |
|---|---|---|
| 02:00 | 1 | A.   No. |
| 02:00 | 2 | Q.   Housing expense -- housing or living expenses? |
| 02:00 | 3 | A.   Nope.  No questions were asked -- |
| 02:00 | 4 | MS. HEINZ:  Objection.  Asked and answered. |
| 02:00 | 5 | THE COURT:  Overruled. |
| 02:00 | 6 | BY MS. CORRIGAN: |
| 02:00 | 7 | Q.   Books? |
| 02:00 | 8 | A.   No. |
| 02:00 | 9 | Q.   Food? |
| 02:00 | 10 | A.   No. |
| 02:00 | 11 | Q.   Medical care? |
| 02:00 | 12 | A.   No. |
| 02:00 | 13 | Q.   Dental care? |
| 02:00 | 14 | A.   No. |
| 02:00 | 15 | Q.   Did you ask him if he had given it to his mother? |
| 02:00 | 16 | A.   No. |
| 02:00 | 17 | Q.   All right.  Let me go to -- and you indicated on cross |
| | 18 | you're not familiar with the search results, uh -- or the |
| | 19 | search that occurred on May 21st at Mr. Badawi's home? |
| 02:00 | 20 | A.   I'm not familiar with the items that were seized or the |
| | 21 | items that were seen there, no. |
| 02:00 | 22 | Q.   And you haven't had the opportunity to look at |
| | 23 | photographs that show a desk -- or what appears to be a desk |
| | 24 | drawer with two envelopes of cash? |
| 02:01 | 25 | A.   I have not seen that. |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

45

| | | |
|---|---|---|
| 02:01 | 1 | Q.   And you haven't seen pictures of cash splayed out on -- |
| | 2 | or, not splayed, but spread out on a table? |
| 02:01 | 3 | A.   I have not. |
| 02:01 | 4 | Q.   During the interview on 2000 -- I'm sorry -- May 21st, |
| | 5 | 2015, would you describe my client as being cooperative with |
| | 6 | you? |
| 02:01 | 7 | A.   He was, um -- yes, he answered our questions. |
| 02:01 | 8 | Q.   He told you that, um, Nader Elhuzayel had told him he |
| | 9 | was planning to get married; correct? |
| 02:01 | 10 | A.   Yes, he did. |
| 02:01 | 11 | Q.   And that his fiancée or future wife's family lived in |
| | 12 | Palestine; correct? |
| 02:02 | 13 | A.   Yes. |
| 02:02 | 14 | Q.   Now, you asked him during the course of that -- |
| | 15 | whatever we wanna call it -- conversation/interrogation -- |
| | 16 | but during the meeting between the two of -- or between the |
| | 17 | three of you, you talked about attacks on Syria; right? |
| 02:02 | 18 | A.   Yes. |
| 02:02 | 19 | Q.   Thank you.  I have to -- you were nodding. |
| 02:02 | 20 |      Libya? |
| 02:02 | 21 | A.   Yes. |
| 02:02 | 22 | Q.   Sinai? |
| 02:02 | 23 | A.   Yes. |
| 02:02 | 24 | Q.   Egypt? |
| 02:02 | 25 | A.   Yes. |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 02:02 | 1 | Q.    Those were at the time all current events. |
| 02:02 | 2 | A.    Yes. |
| 02:02 | 3 | Q.    Items that were available in the *New York Times,* common |
| | 4 | newspapers that are easily available to all of us; right? |
| 02:02 | 5 | A.    That's correct. |
| 02:02 | 6 | Q.    On TV? |
| 02:02 | 7 | A.    Yes. |
| 02:02 | 8 | Q.    All right.  It was out in the open? |
| 02:02 | 9 | A.    Yes. |
| 02:02 | 10 | Q.    You could go to pretty much any paper or news channel. |
| 02:02 | 11 | A.    Can you clarify which information?  The part about the |
| | 12 | attacks? |
| 02:02 | 13 | Q.    Yes, the attacks. |
| 02:02 | 14 | A.    Yes.  That is public sourced on the Internet. |
| 02:03 | 15 | Q.    And, in fact, ISIS and ISIL, the Islamic State, during |
| | 16 | this period of time, were also topics that were found |
| | 17 | within -- I'll call it mainstream media? |
| 02:03 | 18 | A.    Yes. |
| 02:03 | 19 | Q.    And al-Jazeera, I think you said, is a media outlet |
| | 20 | that's available; correct? |
| 02:03 | 21 | A.    Yes. |
| 02:03 | 22 | Q.    And that's a TV station for -- as one part of it; |
| | 23 | right? |
| 02:03 | 24 | A.    Correct.  Satellite TV channel, along with other media |
| | 25 | platforms, yes. |

02:03  1    Q.   Okay.  And it's readily available to anyone who wants
       2    to watch it; correct?
02:03  3    A.   Yes.
02:03  4    Q.   You can see it whether you're in the United States or
       5    any other place; right?
02:03  6    A.   Yes.
02:03  7    Q.   Let me direct your attention to -- you talked about Abu
       8    Malik al-Tamimi?  I'm butchering his name, but T-A-M-I-M-I.
02:03  9    A.   Yes.
02:03 10    Q.   And his photograph was shown during the course of your
       11   direct examination; do you recall that?
02:04 12    A.   Yes, I do.
02:04 13    Q.   Now, that's a person who, if you Google that name, his
       14   photos pop up; right?
02:04 15    A.   You can find his photos with a little bit of searching
       16   on Google, yes.
02:04 17    Q.   So they are available to -- they could be available to
       18   me.  I'm not gonna ask you to use my iPad; but if you were
       19   to use my iPad, assuming that it was -- had Google
       20   available, you could Google it and find it.
02:04 21    A.   Most likely.  But, as you know, a year ago things are
       22   (sic) different on Google than they are today.  So I can't
       23   recall on that date what would come up.  But I can, you
       24   know, tell you that very likely his photo would come up.
02:04 25    Q.   All right.  As would many other leaders or people

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | involved with ISIS, ISIL, or the Islamic State?                    |
| 02:04 | 2  | A.   Yes.                                                           |
| 02:05 | 3  | Q.   Now, the Muslim Brotherhood, you were asked about that        |
|       | 4  | on direct today.  And what is your understanding of what the       |
|       | 5  | Muslim Brotherhood is?                                             |
| 02:05 | 6  | A.   Just basic overview, as I gave you before.  I don't           |
|       | 7  | have in-depth knowledge.  But I can tell you that they're a        |
|       | 8  | Sunni Islam organization.  It was -- as I stated, it was           |
|       | 9  | founded in 1928 in Egypt.                                          |
| 02:05 | 10 | And do you wanna talk about current events?  Most                  |
|       | 11 | recently, in 2011, they were responsible for the overthrow         |
|       | 12 | of President Hosni Mubarak in Egypt --                             |
| 02:05 | 13 | Q.   All right.                                                    |
| 02:05 | 14 | A.   -- and, uh, one'a their leaders Mohamed Morsi were --         |
|       | 15 | was the president for about a year till he got voted out by        |
|       | 16 | the Egyptians, so...                                               |
| 02:05 | 17 | Q.   Right.  And they are known for supporting democracy;          |
|       | 18 | correct?                                                           |
| 02:05 | 19 | A.   They have certain wings within their organization --          |
|       | 20 | religious, political, um -- but, overall, yes.  Democracy          |
|       | 21 | has been -- they have been known to support democracy, yes.        |
| 02:06 | 22 | Q.   Thank you.                                                    |
| 02:06 | 23 | All right.  So why don't we go to the exhibits.  Bear              |
|       | 24 | with me for a moment.  If we can go to 701-A.  It's a long         |
|       | 25 | call that we started off with.                                     |

| | | |
|---|---|---|
| 02:07 | 1 | A.    Okay. |
| 02:07 | 2 | Q.    During that call -- and you have the transcript in |
| | 3 | front of you? |
| 02:07 | 4 | A.    Yes. |
| 02:07 | 5 | Q.    There's discussion about a trimmed beard.  Do you |
| | 6 | recall that? |
| 02:07 | 7 | A.    Yes. |
| 02:07 | 8 | Q.    And the references -- that conversation was, um -- at |
| | 9 | least according to your testimony -- a conversation between |
| | 10 | Mr. Badawi and Mr. Elhuzayel; correct? |
| 02:07 | 11 | A.    Yes. |
| 02:07 | 12 | Q.    And the references to a trimmed beard, was that -- |
| | 13 | someone with a trimmed beard would be a *kaffir*; correct? |
| 02:07 | 14 | A.    I'd have to read it.  Do you know what page that was |
| | 15 | on? |
| 02:07 | 16 | Q.    Yes.  I will get -- find that for you.  If you'd go to |
| | 17 | page 5, lines 4 through 8 -- or 7 -- or in that area. |
| 02:08 | 18 | A.    Okay.  This is referencing the potential new leader of |
| | 19 | ISIS, yeah.  Okay. |
| 02:08 | 20 | Q.    And indicates that the person looks like a media |
| | 21 | person; correct? |
| 02:08 | 22 | A.    Yes. |
| 02:08 | 23 | Q.    And because -- and it's referenced, the trimmed beard? |
| 02:08 | 24 | A.    Yes. |
| 02:08 | 25 | Q.    And it's referenced that this would be a fake if |

Case 8:15-cr-00060-DOC   Document 296   Filed 03/31/17   Page 50 of 94   Page ID #:4885
8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

50

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | someone has a trimmed beard; right?  Is that your --                 |
| 02:08 | 2  | A.    That's what Mr. Elhuzayel said, yes.                            |
| 02:08 | 3  | Q.    And that an Islamic State leader would not have --              |
|       | 4  | would not've been shaved; correct?                                   |
| 02:09 | 5  | A.    Yes.                                                            |
| 02:09 | 6  | Q.    So I guess I jumped to the conclusion it would be a             |
|       | 7  | *kaffir*.  But it would be indicative of someone who's not a         |
|       | 8  | believer; correct?                                                   |
| 02:09 | 9  | A.    Not in my experience of dealing with the -- Islam and          |
|       | 10 | talking to Muslim individuals for several years.  It doesn't         |
|       | 11 | necessarily mean you're *kaffir* if you don't grow your beard.       |
|       | 12 | There's many clean-shaven Muslims that are not *kaffir*s, I          |
|       | 13 | would say.                                                           |
| 02:09 | 14 | Q.    But in terms of the context of the conversation, it            |
|       | 15 | appears that Mr. Elhuzayel is not complementing the person           |
|       | 16 | for having a trimmed beard; would that be fair?                      |
| 02:09 | 17 | A.    Well, he's not -- he's not saying he would be "a"              |
|       | 18 | Islamic -- uh, a state leader.  The leader of ISIS wouldn't          |
|       | 19 | have --                                                              |
| 02:09 | 20 | Q.    Right.                                                          |
| 02:09 | 21 | A.    -- a shaved beard, so...                                        |
| 02:09 | 22 | Q.    Okay.  Okay.  So if I could then direct your attention         |
|       | 23 | to page 28 on the last line, and going into page 29.                 |
| 02:09 | 24 | A.    Okay.                                                           |
| 02:09 | 25 | Q.    Is -- if -- you may recall, during that portion of the         |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

51

|   |   |   |
|---|---|---|
| | 1 | call, there's some discussion about -- and I'm gonna butcher |
| | 2 | the name, but Ibn -- it's I-B-N.  Do you see -- |
| 02:10 | 3 | A.   Yep.  Ibn Taymiyyah. |
| 02:10 | 4 | Q.   Thank you. |
| 02:10 | 5 | A.   Yep. |
| 02:10 | 6 | Q.   And that "talk" about some historical perspective -- |
| | 7 | that he's born in 1263; right? -- and dies in 1328? |
| 02:10 | 8 | A.   Yes. |
| 02:10 | 9 | Q.   And then there's some -- a delay.  And did -- it |
| | 10 | appeared to you that there was some delay in commune -- or |
| | 11 | not communication -- but at least researching something or |
| | 12 | looking something up at that point? |
| 02:10 | 13 | A.   Maybe doing a calculation with the dates.  That's kinda |
| | 14 | what I -- to be honest, when I heard it this morning, I was |
| | 15 | listening to it again for the, you know, 15th or 20th time. |
| | 16 | It seemed like maybe they were doing math on their |
| | 17 | calculators -- |
| 02:10 | 18 | Q.   Okay.  But -- |
| 02:10 | 19 | A.   -- on their -- |
| 02:10 | 20 | Q.   I'm sorry? |
| 02:10 | 21 | A.   -- or on their phone. |
| 02:10 | 22 | Q.   I didn't mean to talk over. |
| 02:10 | 23 | A.   Oh.  No.  Go ahead. |
| 02:10 | 24 | Q.   But there is some delay.  And it looked like |
| | 25 | something's being done in terms of some calculation or |

|  |  |  |
|---|---|---|
|  | 1 | research; correct? |
| 02:11 | 2 | A.   That's very possible, yes. |
| 02:11 | 3 | Q.   And during this conversation there's references to |
|  | 4 | al-Jazeera -- and, again, that's the same media outlet that |
|  | 5 | you'd mentioned earlier when I asked you about it; correct? |
| 02:11 | 6 | A.   Yes. |
| 02:11 | 7 | Q.   Thank you.  We're finished with that. |
| 02:11 | 8 | And if I could direct you to Exhibit 715-A.  This is a |
|  | 9 | conversation that includes the discussion about a ticket. |
| 02:12 | 10 | Do you recall that? |
| 02:12 | 11 | A.   *(No response.)* |
| 02:12 | 12 | Q.   There's discussion about -- |
| 02:12 | 13 | A.   Yes. |
| 02:12 | 14 | Q.   -- about costs. |
| 02:12 | 15 | Based on your investigation, is it your understanding |
|  | 16 | that that ticket was paid in full on May 20th, 2016? |
|  | 17 | What's -- not in this call.  I'm just referencing the |
|  | 18 | call -- |
| 02:12 | 19 | A.   I'm not aware. |
| 02:12 | 20 | Q.   Did you do any research to follow up whether that |
|  | 21 | ticket was, in fact, paid -- paid in Los Angeles County? |
| 02:12 | 22 | A.   Personally, no.  But I remember that being talked about |
|  | 23 | with the investigative team.  I did not personally follow up |
|  | 24 | on that so I don't have the answer to that. |
| 02:12 | 25 | Q.   So -- but to your knowledge or your impressions from |

|  |  |  |
|---|---|---|
|  | 1 | what you learned from your investigative team that that |
|  | 2 | ticket was not outstanding that -- or ended up not being |
|  | 3 | outstanding; it got taken care of by Mr. Badawi? |
| 02:12 | 4 | A.   I -- I don't know. |
| 02:12 | 5 | Q.   Okay.  Finished with that one. |
| 02:13 | 6 | If you could direct your attention to Exhibit 743-A. |
| 02:13 | 7 | A.   Okay.  If you hold on one second. |
| 02:13 | 8 | Q.   Okay. |
| 02:13 | 9 | A.   Okay.  I have it. |
| 02:13 | 10 | Q.   Okay.  If we go to page -- I'll just direct your |
|  | 11 | attention to page 5 in case you need refreshing. |
| 02:14 | 12 | During the course of this conversation, which is |
|  | 13 | another recorded call, which purported -- which, your |
|  | 14 | testimony's been, that it's between Elhuzayel and my |
|  | 15 | client -- there's discussion of Mr. Elhuzayel -- of having a |
|  | 16 | lawn-mowing job or business; is that right? |
| 02:14 | 17 | A.   Yes. |
| 02:14 | 18 | Q.   Okay.  And that he -- that, uh, he was owed money for |
|  | 19 | lawn-mowing work that he had completed? |
| 02:14 | 20 | A.   That's correct. |
| 02:14 | 21 | Q.   And he was telling my -- telling Mr. Badawi that he had |
|  | 22 | not gotten paid and was not at that time working; correct? |
| 02:14 | 23 | A.   Yes. |
| 02:14 | 24 | Q.   And what was the date of that call? |
| 02:14 | 25 | A.   Date of this call was May 10th, 2015. |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

54

| | | |
|---|---|---|
| 02:14 | 1 | Q.   At approximately 3:10 in the afternoon; correct? |
| 02:14 | 2 | A.   Yes, ma'am. |
| 02:14 | 3 | Q.   All right.  Finished with that. |
| 02:15 | 4 | Let me direct your attention to Exhibit 758-A. |
| 02:15 | 5 | A.   Okay. |
| 02:15 | 6 | Q.   And that's also a call -- a recorded call that is |
| | 7 | purportedly between Mr. Badawi and Mr. Elhuzayel; correct? |
| 02:15 | 8 | A.   Yes. |
| 02:15 | 9 | Q.   Okay.  And let me direct your attention to the area |
| | 10 | where the discussion of leprosy is occurring. |
| 02:15 | 11 | Do you recall that? |
| 02:15 | 12 | A.   I do recall that.  Towards the back, I believe. |
| 02:16 | 13 | Okay.  Page 8 at the top. |
| 02:16 | 14 | Q.   Right.  And that was a story that my client was |
| | 15 | telling -- I'll use the initials "KN" -- I'm sorry.  You |
| | 16 | know what?  Let me back up 'cause I think I misstated |
| | 17 | something earlier. |
| 02:16 | 18 | This call is a call -- 758 is 8 *(sic)* -- I'm sorry. |
| | 19 | 758-A relates to a call purportedly between my client and |
| | 20 | not Mr. Elhuzayel.  So I misspoke.  And for the record, I |
| | 21 | correct that. |
| 02:16 | 22 | And it's with someone with the initials of "KN"; |
| | 23 | correct? |
| 02:16 | 24 | A.   Yes. |
| 02:16 | 25 | Q.   All right.  And at page 8 -- 7 and 8, Mr. Badawi is |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       |  1 | talking about story -- a story about Allah and, um, that     |
|       |  2 | Allah had healed someone of leprosy; is that correct?        |
| 02:16 |  3 | A.    That's correct.                                         |
| 02:16 |  4 | Q.    And leprosy, as far as you know, is a disease; correct?|
| 02:17 |  5 | A.    Yes.                                                    |
| 02:17 |  6 | Q.    And I'm finished with that.  Thank you.                 |
| 02:17 |  7 |         MS. CORRIGAN:  If I might just have a moment,         |
|       |  8 | Your Honor, to look at my notes.                             |
| 02:17 |  9 |         THE COURT:  Certainly.                                |
| 02:17 | 10 | BY MS. CORRIGAN:                                              |
| 02:18 | 11 | Q.    Let me go back just to the conversation or the         |
|       | 12 | interrogation you had with my client on May 21, 2015, at the |
|       | 13 | Orange offices of the FBI.                                    |
| 02:18 | 14 |       Now, during the course of that conversation or         |
|       | 15 | interrogation, you also talked about topics with him such as |
|       | 16 | that he was attending school?                                |
| 02:18 | 17 | A.    Yes.                                                    |
| 02:18 | 18 | Q.    That he played soccer?                                  |
| 02:18 | 19 | A.    Yes.                                                    |
| 02:18 | 20 | Q.    You talked about some foods?                            |
| 02:18 | 21 | A.    Yes.                                                    |
| 02:18 | 22 | Q.    You talked about, um -- little bit about his family?   |
| 02:18 | 23 | A.    Yes.                                                    |
| 02:18 | 24 | Q.    Talked about the fact that he had exams that day?      |
| 02:18 | 25 | A.    Yes.                                                    |

| | | |
|---|---|---|
| 02:19 | 1 | Q.    He never became combative with you; correct? |
| 02:19 | 2 | A.    No, he did not. |
| 02:19 | 3 | Q.    In fact, he sat in a chair that was shown on the video |
| | 4 | throughout that interrogation? |
| 02:19 | 5 | A.    Yes. |
| 02:19 | 6 | Q.    Answered your questions? |
| 02:19 | 7 | A.    Yes. |
| 02:19 | 8 | Q.    And early on in the conversation you told him that -- |
| | 9 | or you and your colleagues -- I'm not sure which one of |
| | 10 | you -- told him that he wasn't the target of the |
| | 11 | investigation? |
| 02:19 | 12 | A.    We did say that, yes. |
| 02:19 | 13 | MS. CORRIGAN:  All right. |
| 02:19 | 14 | I have nothing further. |
| 02:19 | 15 | THE COURT:  Redirect examination by the |
| | 16 | government. |
| 02:19 | 17 | MS. CORRIGAN:  May I just retrieve my iPad, |
| | 18 | Your Honor? |
| 02:20 | 19 | THE COURT:  Certainly. |
| 02:20 | 20 | *(Laughter in the courtroom.)* |
| 02:20 | 21 | THE WITNESS:  Thank you. |
| 02:20 | 22 | *(iPad retrieved by Counsel.)* |
| 02:20 | 23 | MS. CORRIGAN:  Thank you. |
| | 24 | |
| | 25 | |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
| 02:20 | 1  | **REDIRECT EXAMINATION**                                   |
| 02:20 | 2  | BY MS. HEINZ:                                               |
| 02:20 | 3  | Q.   Special Agent Ropel, could you please look at         |
|       | 4  | Exhibit 749-A and 757-A.                                   |
| 02:21 | 5  | A.   Okay.  I have them in front of me.                    |
| 02:21 | 6  | Q.   Could you read those to yourself and compare them.    |
| 02:21 | 7  | A.   Okay.  I've read them.                                 |
| 02:21 | 8  | Q.   Okay.  And I'm going to ask you about when            |
|       | 9  | Defendant Elhuzayel's counsel asked you about the call that |
|       | 10 | is 749 and the call that is 757, and he commented or asked |
|       | 11 | you a question about how there could be two different calls |
|       | 12 | that are two seconds apart.                                |
| 02:22 | 13 | Do you remember those questions?                           |
| 02:22 | 14 | A.   Yes, I do.                                            |
| 02:22 | 15 | Q.   Okay.  After you've compared Exhibit 749A and 757A,  |
|       | 16 | have you reached any conclusions after comparing those two? |
| 02:22 | 17 | A.   I've reached a conclusion that they are the exact same |
|       | 18 | call.                                                      |
| 02:22 | 19 | Q.   Turning your attention to Government's Exhibit 1013.  |
| 02:22 | 20 | A.   Okay.  I have 1013.                                   |
| 02:23 | 21 | Q.   And again, I'm going to ask you a question about a    |
|       | 22 | question that was asked you by counsel for                 |
|       | 23 | Defendant Elhuzayel.                                        |
| 02:23 | 24 | Would you look at the section of Government's              |
|       | 25 | Exhibit 1013 where it says "Your rights."                  |

| | | |
|---|---|---|
| 02:23 | 1 | A.   Yes. |
| 02:23 | 2 | Q.   Okay. |
| 02:23 | 3 | *(Exhibit displayed.)* |
| 02:23 | 4 | BY MS. HEINZ: |
| 02:23 | 5 | Q.   Could you look down there and just -- I think it's |
| | 6 | about the fourth line down.  Could you read the fourth line |
| | 7 | down. |
| 02:23 | 8 | A.   *(Reading:)* |
| 02:23 | 9 | *"You have the right to talk to a lawyer* |
| | 10 | *for advice before we ask you any* |
| | 11 | *questions."* |
| 02:23 | 12 | Q.   And could you read the next line. |
| 02:23 | 13 | A.   *(Reading:)* |
| 02:23 | 14 | *"You have the right to have a lawyer* |
| | 15 | *with you during questioning."* |
| 02:23 | 16 | Q.   And the next line. |
| 02:23 | 17 | A.   *(Reading:)* |
| 02:23 | 18 | *"If you cannot afford a lawyer, one will* |
| | 19 | *be appointed for you before any* |
| | 20 | *questioning, if you wish."* |
| 02:23 | 21 | Q.   And the next. |
| 02:23 | 22 | A.   *(Reading:)* |
| 02:23 | 23 | *"If you decide to answer questions now* |
| | 24 | *without a lawyer present, you have the* |
| | 25 | *right to stop answering at any time."* |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 02:23 | 1 | Q.   And did Mr. Badawi sign this form? |
| 02:23 | 2 | A.   Yes, he did. |
| 02:23 | 3 | Q.   Turning now to questions that were asked you by counsel |
| | 4 | for Mr. Elhuzayel about "ISIS" and the "Islamic State" and |
| | 5 | the use of those terms in the post-arrest statement. |
| 02:24 | 6 | A.   Yes. |
| 02:24 | 7 | Q.   Okay.  When the agents in that interview used the term |
| | 8 | "ISIS," did Defendant Badawi appear not to understand? |
| 02:24 | 9 | A.   He -- no.  He appeared like he understood. |
| 02:24 | 10 | MR. LENGYEL-LEAHU:  Objection, Your Honor. |
| | 11 | There's no evidence. |
| 02:24 | 12 | THE COURT:  Overruled. |
| 02:24 | 13 | *(To the witness:)*  You can answer the question. |
| 02:24 | 14 | THE WITNESS:  Okay.  He did not make any |
| | 15 | distinguish -- distinguishing between "ISIS" or "Islamic |
| | 16 | State." |
| 02:24 | 17 | MR. LENGYEL-LEAHU:  Objection.  That calls for |
| | 18 | speculation, Your Honor. |
| 02:24 | 19 | THE COURT:  Well, the last answer does.  That's |
| | 20 | true.  I'm gonna sustain the objection, Counsel. |
| 02:24 | 21 | You can just reask the question.  We'll strike the |
| | 22 | answer. |
| 02:24 | 23 | BY MS. HEINZ: |
| 02:24 | 24 | Q.   Special Agent Ropel, when the agents used the term |
| | 25 | "ISIS" during the interview of Defendant Badawi on May 21st, |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | 2015, was there any appearance that Mr. Badawi did not       |
|       | 2  | understand?                                                  |
| 02:25 | 3  | MR. LENGYEL-LEAHU:  Excuse me, Your Honor.  The              |
|       | 4  | question's vague.                                            |
| 02:25 | 5  | Could the counsel point us to where she's talking           |
|       | 6  | about?                                                        |
| 02:25 | 7  | THE COURT:  Overruled.                                       |
| 02:25 | 8  | *(To the witness:)* You can answer that question.           |
| 02:25 | 9  | THE WITNESS:  Could you ask again?                           |
| 02:25 | 10 | MS. HEINZ:  Yes.                                             |
| 02:25 | 11 | BY MS. HEINZ:                                                |
| 02:25 | 12 | Q.   During the interview on May 21st, 2015, did the agents |
|       | 13 | use the term "ISIS" in the interview to question Mr. Badawi? |
| 02:25 | 14 | A.   Yes.                                                    |
| 02:25 | 15 | Q.   And at those points where the agents used the word     |
|       | 16 | "ISIS," did Mr. Badawi give any indication that he did not   |
|       | 17 | understand the term?                                         |
| 02:25 | 18 | A.   No.                                                     |
| 02:25 | 19 | Q.   Did he give any indication that he did not understand  |
|       | 20 | that term to refer to the "Islamic State"?                  |
| 02:25 | 21 | A.   No.                                                     |
| 02:25 | 22 | MR. LENGYEL-LEAHU:  Leading, Your Honor.                    |
| 02:25 | 23 | THE COURT:  Overruled.                                       |
| 02:25 | 24 | *(To the witness:)* You can answer the question.            |
|       | 25 | Your answer was?                                             |

| | | |
|---|---|---|
| 02:25 | 1 | THE WITNESS:  "No." |
| 02:25 | 2 | BY MS. HEINZ: |
| 02:25 | 3 | Q.   Okay.  You've also testified on cross-examination that |
| | 4 | in that interview you had immigration files for members of |
| | 5 | Defendant Badawi's family; is that correct? |
| 02:25 | 6 | A.   Yes, that's correct. |
| 02:26 | 7 | Q.   Would it be standard practice in the FBI to interview |
| | 8 | immigration files prior to interviewing a person like |
| | 9 | Mr. Badawi? |
| 02:26 | 10 | A.   Absolutely, yes. |
| 02:26 | 11 | Q.   And did you, in fact, show these files to |
| | 12 | Defendant Badawi during the interview?  I mean, did you open |
| | 13 | them up and show them to him? |
| 02:26 | 14 | A.   We did not open them up.  We had them there for |
| | 15 | reference, if needed. |
| 02:26 | 16 | Q.   And did you ever show him anything in those files |
| | 17 | during the interview? |
| 02:26 | 18 | A.   No, we did not. |
| 02:26 | 19 | Q.   All right.  You testified on cross-examination a little |
| | 20 | bit about the covenant of security; do you remember that? |
| 02:26 | 21 | A.   Yes. |
| 02:26 | 22 | Q.   Okay.  Can you tell us whether the covenant of security |
| | 23 | would apply to the draw -- "Draw the Prophet Mohammad" |
| | 24 | contest? |
| 02:27 | 25 | MR. LENGYEL-LEAHU:  Calls for speculation, |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

62

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | Your Honor.                                                        |
| 02:27 | 2  | THE COURT:  Well, I'm happy to expand his                          |
|       | 3  | expertise for both of you.                                         |
| 02:27 | 4  | So, if I do that, then on recross, it keeps                        |
|       | 5  | opening the door for the reason he was called.  But I'm            |
|       | 6  | gonna overrule the objection.                                      |
| 02:27 | 7  | Ask the question.                                                  |
| 02:27 | 8  | BY MS. HEINZ:                                                      |
| 02:27 | 9  | Q.   Well, do you remember -- you remember talking about the       |
|       | 10 | covenant of security --                                            |
| 02:27 | 11 | A.   Yes.                                                          |
| 02:27 | 12 | Q.   -- on cross-examination?                                      |
| 02:27 | 13 | A.   Yes.                                                          |
| 02:27 | 14 | Q.   Is that correct?                                              |
| 02:27 | 15 | A.   Yes.                                                          |
| 02:27 | 16 | Q.   Okay.  And you've also testified about Garland, Texas;        |
|       | 17 | is that correct?                                                   |
| 02:27 | 18 | A.   Yes.                                                          |
| 02:27 | 19 | Q.   And Garland, Texas shooting was the -- a shooting that        |
|       | 20 | was at an art exhibit about the "Draw the Prophet Mohammad"        |
|       | 21 | contest; is that correct?                                          |
| 02:27 | 22 | A.   That's correct.                                               |
| 02:27 | 23 | Q.   So can you now talk about how the covenant of security        |
|       | 24 | would apply there?                                                 |
| 02:27 | 25 | A.   Sure.  In the United States, as we know, we have              |

**DEBBIE GALE, U.S. COURT REPORTER**

|       |    |                                                                 |
|-------|----|-----------------------------------------------------------------|
|       | 1  | freedom of -- you know, First Amendment freedom of              |
|       | 2  | expression, freedom of the press.  That would cover a type      |
|       | 3  | of art exhibit that would be, um, you know, controversial.      |
| 02:28 | 4  |     Um, but any type of exhibit like that would be covered |
|       | 5  | by our Constitution, and also by the security of our police     |
|       | 6  | forces to, you know, ensure that it's a safe environment to     |
|       | 7  | practice your First Amendment --                                |
| 02:28 | 8  |         MR. LENGYEL-LEAHU:  Objection.  Move to strike. |
|       | 9  | Nonresponsive, Your Honor.                                      |
| 02:28 | 10 |         THE COURT:  No.  Overruled.            |
| 02:28 | 11 |         MS. HEINZ:  I don't think my question was clear. |
|       | 12 | I'm sorry.                                                      |
| 02:28 | 13 |         THE COURT:  I don't think it directly answers the |
|       | 14 | question.                                                       |
| 02:28 | 15 |         *(Reading realtime:)*  The question was: |
| 02:28 | 16 |         *"So can you now talk about how the* |
|       | 17 |         *covenant of security would apply there?"* |
| 02:28 | 18 |     You know, I'm going to reverse that ruling. |
|       | 19 | That's an incorrect ruling by the Court.                        |
| 02:28 | 20 |         I'm going to sustain your objection, Counsel. |
| 02:28 | 21 |         We'll strike the answer.  |
| 02:28 | 22 |         MR. LENGYEL-LEAHU:  Thank you, Your Honor. |
| 02:29 | 23 |         MS. HEINZ:  I'll move on.    |
| 02:29 | 24 | BY MS. HEINZ:                                                   |
| 02:29 | 25 | Q.  The Fort Hood shooting -- you were asked about on          |

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | cross-examination.                                             |
| 02:29 | 2  | A.    Yes.                                                     |
| 02:29 | 3  | Q.    Okay.  And I believe you stated that the Islamic State   |
|       | 4  | approved of that?                                              |
| 02:29 | 5  | A.    If I did, that would be inaccurate because the Islamic   |
|       | 6  | State was at that time "AQI" -- al-Qa'ida in Iraqi -- so, if   |
|       | 7  | I did say that, that was inaccurate.                           |
| 02:29 | 8  | Q.    During the interview with Defendant Badawi, did he       |
|       | 9  | answer all of your questions that you asked about              |
|       | 10 | Defendant Elhuzayel?                                           |
| 02:29 | 11 | A.    No.                                                      |
| 02:29 | 12 | Q.    Why not?                                                 |
| 02:29 | 13 |        MR. LENGYEL-LEAHU:  Objection, Your Honor.  Calls       |
|       | 14 | for speculation.                                              |
| 02:29 | 15 |        MS. CORRIGAN:  Objection.  Join.                        |
| 02:29 | 16 |        THE COURT:  Well, I don't know what the answer's        |
|       | 17 | going to be.                                                  |
| 02:29 | 18 |        MS. HEINZ:  I'll rephrase, Your Honor.  I'll            |
|       | 19 | rephrase.  I'll rephrase.                                     |
| 02:29 | 20 | BY MS. HEINZ:                                                  |
| 02:29 | 21 | Q.    Do you remember what questions he did not answer?        |
| 02:29 | 22 | A.    I recall a few, yes.                                     |
| 02:29 | 23 | Q.    What were they?                                          |
| 02:30 | 24 | A.    They were his -- Mr. Elhuzayel's final destination on    |
|       | 25 | his trip that he was leaving for May 21st.  *(Verbatim.)*      |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

65

| | | |
|---|---|---|
| 02:30 | 1 | Q.   So he wouldn't answer that question? |
| 02:30 | 2 | A.   He would not. |
| 02:30 | 3 | Q.   Anything else? |
| 02:30 | 4 | A.   Just need to think for a second. |
| 02:30 | 5 |      Are you asking specifically questions that we asked |
| | 6 | Defendant Badawi about Defendant Elhuzayel? |
| 02:30 | 7 |           MR. LENGYEL-LEAHU:  Objection.  Vague, Your Honor. |
| 02:30 | 8 |           THE COURT:  No.  Just a moment. |
| 02:30 | 9 |           I don't think the question's clear, so reask the |
| | 10 | question. |
| 02:30 | 11 |           MS. HEINZ:  Okay. |
| 02:30 | 12 |           THE COURT:  I'm going to sustain the objection, |
| | 13 | just for the record.  But just reask it. |
| 02:30 | 14 | BY MS. HEINZ: |
| 02:30 | 15 | Q.   Did it appear to you during the interview that |
| | 16 | Defendant Badawi was attempting to shield |
| | 17 | Defendant Elhuzayel? |
| 02:30 | 18 |           MS. CORRIGAN:  Objection. |
| 02:30 | 19 |           MR. LENGYEL-LEAHU:  Objection. |
| 02:30 | 20 |           THE COURT:  Sustained.  I'll strike that.  I'll |
| | 21 | strike the answer, if there was an answer. |
| 02:30 | 22 | BY MS. HEINZ: |
| 02:30 | 23 | Q.   Did it appear to you that -- or do you know that at |
| | 24 | times in the interview Defendant Badawi was not truthful? |
| 02:31 | 25 |           MR. LENGYEL-LEAHU:  Objection, Your Honor. |

**DEBBIE GALE, U.S. COURT REPORTER**

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

66

| | | |
|---|---|---|
| 02:31 | 1 | MS. CORRIGAN:  Objection. |
| 02:31 | 2 | THE COURT:  Sustained. |
| 02:31 | 3 | BY MS. HEINZ: |
| 02:31 | 4 | Q.   You were asked on cross-examination whether or not you |
| | 5 | relied on the allocation of responsibility for an act; in |
| | 6 | other words, whether, as a law enforcement investigator, you |
| | 7 | rely on when there is an allocation of responsibility for an |
| | 8 | act, whether you -- whether or not you would rely on -- if |
| | 9 | the media said that. |
| 02:31 | 10 | Do you remember that line of questioning? |
| 02:31 | 11 | A.   Yes. |
| 02:31 | 12 | Q.   Is it true that ISIS has taken credit for acts in the |
| | 13 | media? |
| 02:31 | 14 | MR. LENGYEL-LEAHU:  Objection, Your Honor. |
| 02:31 | 15 | MS. CORRIGAN:  Objection. |
| 02:31 | 16 | MR. LENGYEL-LEAHU:  It's leading. |
| 02:31 | 17 | THE COURT:  Didn't I also sustain that objection? |
| | 18 | Didn't I sustain that objection? |
| 02:31 | 19 | MS. CORRIGAN:  You did. |
| 02:31 | 20 | THE COURT:  When that came up, I believe I |
| | 21 | sustained that objection so we didn't get into that area. |
| | 22 | You can check back in the transcript during the recess. |
| 02:32 | 23 | MS. HEINZ:  Okay. |
| 02:32 | 24 | THE COURT:  I believe I sustained that objection. |
| 02:32 | 25 | MR. LENGYEL-LEAHU:  Move to strike, Your Honor. |

| | | |
|---|---|---|
| 02:32 | 1 | THE COURT: I didn't hear an answer. But it's |
| | 2 | stricken, if there was an answer. |
| 02:32 | 3 | BY MS. HEINZ: |
| 02:32 | 4 | Q. Did Defendant Badawi admit to you in the interview |
| | 5 | whether or not Defendant Elhuzayel pledged allegiance to |
| | 6 | ISIS? |
| 02:32 | 7 | MR. LENGYEL-LEAHU: Objection. Misstates -- |
| 02:32 | 8 | THE WITNESS: He did not. |
| 02:32 | 9 | MR. LENGYEL-LEAHU: -- the testimony, Your Honor. |
| 02:32 | 10 | THE COURT: Overruled. |
| 02:32 | 11 | BY MS. HEINZ: |
| 02:32 | 12 | Q. Did Defendant Badawi admit to you during the interview |
| | 13 | that Defendant Elhuzayel had pledged allegiance to |
| | 14 | al-Baghdadi? |
| 02:32 | 15 | A. He did not. |
| 02:32 | 16 | MS. HEINZ: No further questions. |
| 02:32 | 17 | THE COURT: Recross by Mr. Lengyel-Leahu. |
| 02:32 | 18 | MS. HEINZ: Oh, I'm sorry, Your Honor. I forgot. |
| | 19 | There was one more question. I'm sorry. I'm sorry. |
| 02:32 | 20 | THE COURT: You don't have to be. Just ask the |
| | 21 | question. |
| 02:32 | 22 | BY MS. HEINZ: |
| 02:32 | 23 | Q. Special Agent Ropel, at one point in the |
| | 24 | cross-examination, counsel for Defendant Elhuzayel showed |
| | 25 | you part of the transcript of the post-arrest interview. |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

68

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
|          | 1  | And, specifically, I'm talking about a transcript from               |
|          | 2  | Volume III, pages 19 and 20.  And this was with respect to           |
|          | 3  | Defendant Badawi's reference to Defendant Nader Elhuzayel             |
|          | 4  | communicating with people -- other people.                           |
| 02:33    | 5  | Do you remember that?                                                 |
| 02:33    | 6  | A.   Yes.                                                             |
| 02:33    | 7  | Q.   Okay.  I would like to show you now that part of the            |
|          | 8  | transcript.                                                           |
| 02:33    | 9  | THE COURT:  Okay.                                                     |
| 02:33    | 10 | MS. CORRIGAN:  What page are you on, please?                         |
| 02:33    | 11 | MS. HEINZ:  I'm on Volume III, page 19 and 20.                       |
| 02:33    | 12 | MS. CORRIGAN:  Okay.  Thank you.                                     |
| 02:33    | 13 | *(Document provided to the witness.)*                                |
| 02:33    | 14 | BY MS. HEINZ:                                                         |
| 02:34    | 15 | Q.   Okay.  I believe that during the cross-examination you          |
|          | 16 | read part of the bottom of the transcript.                           |
| 02:34    | 17 | A.   Yes.                                                             |
| 02:34    | 18 | Q.   And I would like you to read a little further in the           |
|          | 19 | transcript.  So if we could start with -- I'm sorry.  Hold          |
|          | 20 | on.                                                                   |
| 02:34    | 21 | A.   I believe it was --                                             |
| 02:34    | 22 | Q.   I'm sorry.  It's page 20.                                        |
| 02:34    | 23 | A.   Yes.                                                             |
| 02:34    | 24 | Q.   Excuse me.  It's page 20.                                        |
| 02:34    | 25 | So if we could start with -- on the bottom where it                 |

**DEBBIE GALE, U.S. COURT REPORTER**

|         |    |                                                                  |
|---------|----|------------------------------------------------------------------|
|         | 1  | says -- let's start at line 11.  Do you see that?                |
| 02:34   | 2  | A.   Yes.                                                        |
| 02:34   | 3  | Q.   Okay.  Let's start with line 11.  And why don't you         |
|         | 4  | read the "agents" and I'll read "MB"?                            |
| 02:35   | 5  | A.   Okay.                                                       |
| 02:35   | 6  |           MR. LENGYEL-LEAHU:  Objection, Your Honor.  What       |
|         | 7  | is this?                                                         |
| 02:35   | 8  |           THE COURT:  Well, ask him the question first.  I'm     |
|         | 9  | not sure he needs --                                            |
| 02:35   | 10 |           MS. HEINZ:  Yes, Your Honor.                           |
| 02:35   | 11 |           THE COURT:  -- recollection refreshed at all.  So     |
|         | 12 | it's improper to read.                                           |
| 02:35   | 13 |           So your question.                                      |
| 02:35   | 14 |           MS. HEINZ:  Okay.                                       |
| 02:35   | 15 | BY MS. HEINZ:                                                     |
| 02:35   | 16 | Q.   Do you recall the line of questioning that Counsel for      |
|         | 17 | Defendant Elhuzayel asked you about whether or not his           |
|         | 18 | client was following anyone overseas?  Do you remember that?     |
| 02:35   | 19 | A.   Yes.                                                        |
| 02:35   | 20 | Q.   Okay.  And I believe that at that time he asked -- you      |
|         | 21 | needed your memory refreshed, and he asked you to read from      |
|         | 22 | the transcript; do you remember that?                            |
| 02:35   | 23 | A.   Yes.                                                        |
| 02:35   | 24 | Q.   Okay.  So I would like you to -- uh, to ask you whether     |
|         | 25 | or not -- okay? -- you now remember exactly what                 |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | Defendant Badawi told you during this section of the        |
|       | 2  | interview?                                                  |
| 02:36 | 3  | A.   Yes, I do.                                             |
| 02:36 | 4  | Q.   Okay.  Would you read it to us, then.                 |
| 02:36 | 5  | A.   Yes.  *(Reading:)*                                    |
| 02:36 | 6  | *"AGENT:  What about -- so Nader*                         |
|       | 7  | *obviously is going to go over and join*                 |
|       | 8  | *somebody over there.  Who was he talking*               |
|       | 9  | *to over there?  Like was he talking to*                 |
|       | 10 | *somebody inside Iraqi or Syria that --*                 |
| 02:36 | 11 | Mr. Badawi says:  *"I have no idea."*                     |
| 02:36 | 12 | *"AGENT:  Who was he going to connect*                   |
|       | 13 | *with?"*                                                  |
| 02:36 | 14 | Mr. Badawi:  "I have no idea."                             |
| 02:36 | 15 | *"AGENT:  He didn't tell you anything*                   |
|       | 16 | *about -- about that?"*                                   |
| 02:36 | 17 | Mr. Badawi said:  "No."                                    |
| 02:36 | 18 | *"AGENT:  Because he's got quite the*                    |
|       | 19 | *robust --*                                               |
| 02:36 | 20 | Mr. Badawi says:  *"Really?"*                             |
| 02:36 | 21 | Agent says:  *"-- following on Twitter."*                |
| 02:36 | 22 | MR. LENGYEL-LEAHU:  At this point, Your Honor, we         |
|       | 23 | would interpose an objection because the next line's       |
|       | 24 | hearsay.                                                   |
| 02:36 | 25 | THE COURT:  Overruled.                                     |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

71

| | | |
|---|---|---|
| 02:36 | 1 | I believe this is all part and parcel of the same |
| | 2 | question.  And you read part of that section, and this is |
| | 3 | the additional part. |
| 02:36 | 4 | So this will give completeness.  Overruled. |
| 02:37 | 5 | THE WITNESS:  Continuing: |
| 02:37 | 6 | Agent says:  *"-- following on Twitter."* |
| 02:37 | 7 | Mr. Badawi says:  *"Yeah.  I heard he's following* |
| | 8 | *some people from the Mujahideen over there."* |
| 02:37 | 9 | Agent says:  *"Yeah, yeah, exactly.  What do you* |
| | 10 | *think about those guys?"* |
| 02:37 | 11 | Mr. Badawi says: |
| 02:37 | 12 | *"Well, he told me he's -- he's actually* |
| | 13 | *told me he joined Twitter and he talks* |
| | 14 | *to some Mujahideen.  I'm like, okay.* |
| | 15 | *But so far I haven't met any Mujahideen* |
| | 16 | *from over there."* |
| 02:37 | 17 | *"AGENT:  Oh, you haven't met any from --* |
| | 18 | *any on there?"* |
| 02:37 | 19 | Mr. Badawi shakes his head. |
| 02:37 | 20 | *"AGENT:  No.  So what do you (sic) say* |
| | 21 | *about them?  Did he say they -- like* |
| | 22 | *they were trying to get him to come over* |
| | 23 | *to fight or?"* |
| 02:37 | 24 | Mr. Badawi says:  *"No, he didn't say that, but he was* |
| | 25 | *following some of them."* |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 02:37 | 1 | MS. HEINZ:  All right.  That's fine. |
| 02:37 | 2 | THE WITNESS:  Okay. |
| 02:37 | 3 | MS. HEINZ:  Nothing further, Your Honor. |
| 02:37 | 4 | THE COURT:  Recross, Mr. Lengyel-Leahu, on behalf |
| | 5 | of Mr. Elhuzayel? |
| 02:37 | 6 | **RECROSS-EXAMINATION** |
| 02:38 | 7 | BY MR. LENGYEL-LEAHU: |
| 02:38 | 8 | Q.  During your investigation you had an opportunity to -- |
| | 9 | when I say "you," I mean the FBI -- had an opportunity to |
| | 10 | review all of the electronic media that was collected |
| | 11 | through the various search warrants; correct? |
| 02:39 | 12 | MS. HEINZ:  Objection.  Lacks foundation. |
| 02:39 | 13 | THE COURT:  No.  Overruled. |
| 02:39 | 14 | *(To the witness:)* If you know the answer -- I'm |
| | 15 | not sure which agent would be in charge of that -- but if |
| | 16 | you know, you can answer the question. |
| 02:39 | 17 | THE WITNESS:  I was not personally responsible. |
| | 18 | But, yes, we would've reviewed -- that's -- our procedure is |
| | 19 | anything we seize, we review within a timely manner. |
| 02:39 | 20 | BY MR. LENGYEL-LEAHU: |
| 02:39 | 21 | Q.  And you haven't been here through the whole trial, but |
| | 22 | we've had a number of exhibits regarding that social media |
| | 23 | contact. |
| 02:39 | 24 | Were you aware of those items being flagged as |
| | 25 | evidence? |

02:39    1    A.    Not all of them.

02:39    2    Q.    Not all of 'em.

02:39    3          And as we talked about before, following someone on

         4    Twitter is not the same thing as having a conversation with

         5    them; correct?

02:39    6    A.    That's what you said before, sir.  I'm not fully up to

         7    date on Twitter and exactly how it works, so I can't talk to

         8    that.

02:39    9    Q.    Well, you do follow a lot of social media, you

        10    indicated, that is emanating from the Middle East; right?

02:40   11    A.    At times, yes -- certain.

02:40   12    Q.    And those are postings of news reports and things that

        13    are going on back over there, and propaganda; right?

02:40   14    A.    Yes, sir.

02:40   15    Q.    Okay.  And so following those isn't having a

        16    communication with 'em; it's following 'em; it's reading

        17    'em?

02:40   18    A.    My understanding is that they know if you're following

        19    them, so they can see who's following them.  So it's -- I

        20    guess it's not direct communication; but, like I said, I'm

        21    not the expert on that.

02:40   22    Q.    Do you have the transcript in front of you?

02:40   23    A.    I do not.  I only have part it, sir.

02:40   24          THE COURT:  Well, ask the question first, Counsel,

        25    before we start reading.

| | | |
|---|---|---|
| 02:40 | 1 | BY MR. LENGYEL-LEAHU: |
| 02:40 | 2 | Q.   You testified on redirect that Mr. Badawi refused to |
| | 3 | answer the question of where Nader was gonna go? |
| 02:41 | 4 | A.   I did say that, yes. |
| 02:41 | 5 | MR. LENGYEL-LEAHU:  May I approach, Your Honor? |
| 02:41 | 6 | THE COURT:  You may. |
| 02:41 | 7 | *(Document provided to the witness.)* |
| 02:41 | 8 | MS. CORRIGAN:  Can I ask just for the record what |
| | 9 | he's referring to? |
| 02:41 | 10 | MR. LENGYEL-LEAHU:  Page 48 and 49. |
| 02:41 | 11 | MS. CORRIGAN:  Page 48 and 49? |
| 02:41 | 12 | THE WITNESS:  Okay. |
| 02:42 | 13 | BY MR. LENGYEL-LEAHU: |
| 02:42 | 14 | Q.   Could you read that for the jury, please? |
| 02:42 | 15 | A.   From which line, sir? |
| 02:42 | 16 | Q.   I forget.  The one where you were asking about where |
| | 17 | he's going. |
| 02:42 | 18 | A.   Okay.  Okay.  Here we go: |
| 02:42 | 19 | *"AGENT:  Okay.  So what -- what's he* |
| | 20 | *planning on doing?  Is he just planning* |
| | 21 | *on going there, joining, and staying* |
| | 22 | *there and fighting against the regime?* |
| | 23 | *Or is he going -- or is he gonna go* |
| | 24 | *elsewhere -- somewhere else, take the* |
| | 25 | *experience?  Or is he gonna stay there* |

|       |    |                                             |
|-------|----|---------------------------------------------|
|       | 1  | *and fight?"*                               |
| 02:42 | 2  | Mr. Badawi says:                            |
| 02:42 | 3  | *"Well, what I know is he's gonna get*      |
|       | 4  | *married."*                                 |
| 02:42 | 5  | Agent says:  *"Okay."*                      |
| 02:42 | 6  | Mr. Badawi says:                            |
| 02:42 | 7  | *"He's gonna stay in Israel.  Okay.  And*   |
|       | 8  | *if he wants to go over there, that's up*   |
|       | 9  | *to the Israeli government to deal with."*  |
| 02:42 | 10 | *"AGENT:  What do you mean by that?"*        |
| 02:42 | 11 | *"MR. BADAWI:  I mean, they would --*        |
|       | 12 | *they -- they are over there.  They --*     |
|       | 13 | *they have a Mossad, just like FBI and*     |
|       | 14 | *CIA here."*                                |
| 02:43 | 15 | *"AGENT:  Yeah, they're pretty good too."*  |
| 02:43 | 16 | *"MR. BADAWI:  Yeah, they're good so, I*     |
|       | 17 | *mean, they -- they would be -- as*         |
|       | 18 | *concern to, so --"*                        |
| 02:43 | 19 | *"AGENT:  Yeah.*                             |
| 02:43 | 20 | *"MR. BADAWI:  So if you wanted to go do*    |
|       | 21 | *something like that, then they will deal*  |
|       | 22 | *with him over there."*                     |
| 02:43 | 23 | *"AGENT:  Yeah.  But as far as you now*      |
|       | 24 | *(sic) and we're giving you the*            |
|       | 25 | *opportunity here to be forthright and*     |

```
                      honest with us -- okay? -- about our

                      conversations with him specifically over

                      the last three weeks or so, you know, so

                      tell us what you know about where

                      he's -- where he's planning on going."

02:43   6    Mr. Badawi says:  "Tel Aviv.  Okay."

02:43   7  Q.  You can stop there.

02:43   8  A.  Yep.

02:43   9  Q.  He told you Tel Aviv.  He didn't refuse to answer the

       10  question, did he?

02:43  11  A.  At other times during the interview, from what I

       12  recall, is that he did not -- he did not answer the final

       13  destination.

02:43  14  Q.  Well, you didn't explain that earlier on your direct,

       15  did you?

02:43  16  A.  Well, I wasn't asked that, sir.

02:44  17  Q.  You were asked what Mr. Badawi refused to answer, were

       18  you not?

02:44  19  A.  Yes.

02:44  20  Q.  He did answer the question at least once in the

       21  transcript.

02:44  22  A.  That's correct.

02:44  23  Q.  Okay.  You used the terms "Islamic State," "ISIS" and

       24  "ISIL" as if they're all the same thing; correct?

02:44  25  A.  Yes.
```

**DEBBIE GALE, U.S. COURT REPORTER**

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

77

| | | |
|---|---|---|
| 02:44 | 1 | Q.   Okay.  And you're aware of the establishment of the |
| | 2 | caliphate in June of 2014; correct? |
| 02:44 | 3 | A.   Yes. |
| 02:44 | 4 | Q.   And shortly after the establishment of the caliphate, |
| | 5 | al-Baghdadi made a personal speech in Mosul, did he not? |
| 02:44 | 6 | A.   Yes. |
| 02:45 | 7 | Q.   And in that personal speech in Mosul -- the first time |
| | 8 | we'd ever seen him live; correct? |
| 02:45 | 9 | A.   Well, in a video from -- |
| 02:45 | 10 | Q.   In the -- |
| 02:45 | 11 | A.   -- what I recall.  I don't know if it was live-streamed |
| | 12 | or not, but, yeah. |
| 02:45 | 13 | Q.   From the mosque in Mosul -- |
| 02:45 | 14 | A.   Yeah. |
| 02:45 | 15 | Q.   -- there he stood on the balcony, making his speech; |
| | 16 | correct? |
| 02:45 | 17 | A.   Yes. |
| 02:45 | 18 | Q.   And that's when he established or at least announced to |
| | 19 | the world that the Islamic State is hereby established and |
| | 20 | all of the Muslim brothers should come to me -- or words'a |
| | 21 | that effect? |
| 02:45 | 22 | A.   I'm not sure if he said "Islamic State" or "ISIS," |
| | 23 | "ISIL," "DAESH".  I'd know -- don't know exactly what words |
| | 24 | he said there, but, uh -- |
| 02:45 | 25 | Q.   You didn't study that? |

**DEBBIE GALE, U.S. COURT REPORTER**

| | | |
|---|---|---|
| 02:45 | 1 | A.   I can't recall which words he used -- |
| 02:45 | 2 | Q.   Okay. |
| 02:45 | 3 | A.   -- at this time.  Yeah. |
| 02:45 | 4 | Q.   Okay.  And your familiar with the designation of a |
| | 5 | foreign terrorist organization -- |
| 02:45 | 6 | A.   Yes. |
| 02:45 | 7 | Q.   -- are you not? |
| 02:45 | 8 | A.   Absolutely. |
| 02:45 | 9 | Q.   In order to be designated as a foreign terrorist |
| | 10 | organization, there are specific laws in place for that to |
| | 11 | occur; correct? |
| 02:46 | 12 | A.   Yes. |
| 02:46 | 13 | Q.   And those laws -- the process would be that the |
| | 14 | Secretary of State, in conjunction with the Secretary of |
| | 15 | Treasury and the Attorney General, would come together and |
| | 16 | submit a name of a foreign terrorist organization. |
| 02:46 | 17 |        MS. HEINZ:  Objection.  Lack of foundation as to |
| | 18 | this witness's legal knowledge. |
| 02:46 | 19 |        THE COURT:  Sustained. |
| 02:46 | 20 |        It's also beyond the scope, Counsel. |
| 02:46 | 21 | BY MR. LENGYEL-LEAHU: |
| 02:46 | 22 | Q.   Are you aware of how a foreign terrorist organization |
| | 23 | is designated? |
| 02:46 | 24 |        MS. HEINZ:  Objection -- same objection. |
| 02:46 | 25 |        THE COURT:  Sustained. |

| | | |
|---|---|---|
| 02:46 | 1 | It's beyond the scope, Counsel. |
| 02:46 | 2 | BY MR. LENGYEL-LEAHU: |
| 02:46 | 3 | Q.   In your work, do you read the published reports |
| | 4 | concerning terrorism? |
| 02:46 | 5 | A.   Yes. |
| 02:46 | 6 | Q.   Are you familiar with the State Department's report |
| | 7 | called *Country Reports on Terrorism*? |
| 02:46 | 8 | MS. HEINZ:  Objection.  Beyond the scope. |
| 02:46 | 9 | THE COURT:  Sustained, Counsel. |
| 02:46 | 10 | In other words, this is coming up during |
| | 11 | recross-examination.  It hasn't been alluded to on cross. |
| | 12 | It gives no opportunity for the government to respond. |
| 02:47 | 13 | There's going to be obviously another witness |
| | 14 | called in this area.  The objection's sustained. |
| 02:47 | 15 | MR. LENGYEL-LEAHU:  Um -- |
| 02:47 | 16 | THE COURT:  The objection's sustained. |
| 02:47 | 17 | MR. LENGYEL-LEAHU:  Thank you. |
| 02:47 | 18 | THE COURT:  And, of course, you're welcome to call |
| | 19 | a witness in that area.  But not through this witness and |
| | 20 | not on recross, Counsel. |
| 02:47 | 21 | MR. LENGYEL-LEAHU:  Could we have a brief sidebar? |
| 02:47 | 22 | THE COURT:  No. |
| 02:47 | 23 | MR. LENGYEL-LEAHU:  Okay. |
| 02:47 | 24 | BY MR. LENGYEL-LEAHU: |
| 02:47 | 25 | Q.   In your knowledge, do you review the published reports |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       |  1 | by the State Department concerning terrorism?                |
| 02:47 |  2 |            MS. HEINZ:  Objection.  Beyond the scope.         |
| 02:47 |  3 |            THE COURT:  Sustained.                            |
| 02:48 |  4 | BY MR. LENGYEL-LEAHU:                                        |
| 02:48 |  5 | Q.   At the time of the arrest -- which woulda been May of   |
|       |  6 | 2015 -- was the Islamic State designated as a foreign        |
|       |  7 | terrorist organization, as required by law?                  |
| 02:48 |  8 |            MS. HEINZ:  Objection.  Beyond the scope.         |
| 02:48 |  9 |            THE COURT:  Sustained.                            |
| 02:48 | 10 | BY MR. LENGYEL-LEAHU:                                        |
| 02:48 | 11 | Q.   Do you know when the Islamic State was formally         |
|       | 12 | designated as a foreign terrorist organization?             |
| 02:48 | 13 |            MS. HEINZ:  Objection.  Beyond the scope.         |
| 02:48 | 14 |            THE COURT:  Sustained.                            |
| 02:48 | 15 |            MR. LENGYEL-LEAHU:  Nothing further, Your Honor.  |
| 02:48 | 16 |            Can I retrieve my document?                       |
| 02:48 | 17 |            THE COURT:  Certainly.                            |
| 02:49 | 18 |            MS. CORRIGAN:  Just briefly, Your Honor.          |
| 02:49 | 19 |            THE COURT:  Counsel.                              |
| 02:49 | 20 |            And this would be Ms. Corrigan on behalf of       |
|       | 21 | Mr. Badawi on recross.                                       |
| 02:49 | 22 |            MS. CORRIGAN:  Thank you, Your Honor.             |
| 02:49 | 23 |                  **RECROSS-EXAMINATION**                     |
| 02:49 | 24 | BY MS. CORRIGAN:                                             |
| 02:49 | 25 | Q.   Just briefly, I'd like to direct your attention to      |

**DEBBIE GALE, U.S. COURT REPORTER**

|  |  |  |
|---|---|---|
|  | 1 | Exhibits 1-A and 2-A.  And those are the QuickTime videos |
|  | 2 | that were shown earlier. |
| 02:49 | 3 | Do you recall those? |
| 02:49 | 4 | A.   Yes. |
| 02:49 | 5 | Q.   All right.  I'm not gonna get into the content. |
| 02:50 | 6 | A.   Okay. |
| 02:50 | 7 | Q.   Based on your investigation of -- in this case, is it a |
|  | 8 | fair statement to say that those two items were not |
|  | 9 | disseminated over the Internet?  In other words, they |
|  | 10 | weren't shared over Facebook or Twitter? |
| 02:50 | 11 | A.   I do not know that answer. |
| 02:50 | 12 | Q.   Okay.  It is also -- based on your knowledge of the |
|  | 13 | investigation, was it brought to your attention those items |
|  | 14 | were both deleted? |
| 02:50 | 15 | A.   I'm not aware of them being deleted. |
| 02:50 | 16 | Q.   All right. |
| 02:50 | 17 | MS. CORRIGAN:  Thank you. |
| 02:50 | 18 | THE COURT:  *(To the witness:)* Now, we're going to |
|  | 19 | ask you to remain on call.  In fact, if you'd remain during |
|  | 20 | the recess for just a few moments.  And we're doing that |
|  | 21 | with all of the witnesses who've testified, except the |
|  | 22 | civilian witnesses where it's obvious that they won't be |
|  | 23 | returning.  That will save any re-subpoenaing.  Okay? |
| 02:50 | 24 | If you would step down, sir. |
| 02:50 | 25 | THE WITNESS:  Thank you, Your Honor. |

02:50    1            *(Witness steps down.)*

02:50    2                 THE COURT:  And, Counsel, why don't we take a

         3    recess at this time.  Would that be acceptable?

02:50    4                 COUNSEL IN UNISON:  Yes, Your Honor.

02:50    5                 THE COURT:  *(To the jury:)* Would you like a

         6    recess?

02:50    7                 Ladies and gentlemen, we'll come and get you, oh,

         8    in about -- how 'bout quarter after the hour?  That's easy.

         9    And we'll get you at 3:15 and get right back into session.

02:51   10                 You're admonished not to discuss this matter

        11    amongst yourselves nor to form or express any opinion

        12    concerning the case.

02:51   13                 And, Counsel, if you'd remain for just a few

        14    moments.

02:51   15            *(Jury recesses at 2:51 p.m.)*

02:51   16                 THE COURT:  Counsel, have your agent remain also.

02:51   17            *(Outside the presence of the jury.)*

02:51   18                 THE COURT:  All right.  Have a seat.

02:51   19                              **DISCUSSION**

02:51   20                 THE COURT:  All right.  Now, we're on the record.

        21    And here's what's occurring, from the Court's perspective.

02:51   22                 First of all, I think the Court has been very

        23    expansive in allowing questions on cross-examination in two

        24    areas.  And I'll just state what those are for the record.

02:52   25                 First, I think concerning the rule of completeness

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

83

```
     1    and in relation not only to the interview but the tapes that
     2    were played, that it is appropriate that you were able to
     3    ask questions.  And some of those could've been perceived to
     4    be Bruton issues eventually.
02:52 5            First, is there anything untruthful about what was
     6    read into the record?  In other words, if a lie walks around
     7    on legs -- so are we having untruthful testimony here?  I
     8    don't think so.  But if somebody wants to make a record of
     9    that, I think that was a fairly accurate reading.
02:52 10           Counsel for the government, even though you were
    11    objecting -- you're objecting?
02:52 12           MS. HEINZ:  I'm sorry?
02:52 13           THE COURT:  Was it a truthful reading?
02:52 14           MS. HEINZ:  Was -- was what?
02:52 15           THE COURT:  From the transcript concerning the
    16    interview of Mr. Badawi.
02:52 17           MS. HEINZ:  Oh, yes.  Yes.
02:52 18           THE COURT:  Okay.
02:52 19           Ms. Corrigan, was that a truthful reading?
02:52 20           MS. CORRIGAN:  From the items that were read
    21    verbatim, yes, they --
02:52 22           THE COURT:  Mr. Lengyel-Leahu --
02:52 23           MS. CORRIGAN:  -- were accurate.
02:52 24           THE COURT:  -- was that a truthful reading?
02:52 25           MR. LENGYEL-LEAHU:  I believe so.
```

**DEBBIE GALE, U.S. COURT REPORTER**

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

84

02:52   1          THE COURT:  So then we get into the rule of

        2    completeness.  Okay?  And I know you've brought an earlier

        3    motion, Counsel, but I don't think this can be used as a

        4    sword and then a shield, in a sense.

02:53   5          When you take the overall perspective of the Court

        6    and your presentation, which is both the personal interviews

        7    of Badawi, obviously the law is designed to avoid hearsay.

        8    Simple issue.  I agree.

02:53   9          But also, there's a rule of completeness.  And

        10   here I don't perceive that this is the rule of completeness

        11   or accuracy; and, therefore, I've allowed a rather expansive

        12   examination.  That's a close call, quite frankly.

02:53   13         And you got into a number of areas.  And I'm going

        14   to go over those, because none of those are being precluded.

02:53   15         First of all, the airplane tickets -- well, let's

        16   just start.

02:54   17         The areas covered were the two-second discrepancy

        18   in 749 and 751, which on redirect you asked about, and the

        19   opinion was it's the same conversation.  That was the

        20   conversation where there was a problem with the phone, if

        21   you recall.

02:54   22         The interview with Badawi where his rights were

        23   called into question.  So on redirect you've gone into a

        24   "sheet," setting forth each of the four rights and the

        25   signature.  So each of you've had a full and complete

1    colloquy concerning that.

02:54    2         The court's allowed each of you to get into the

3    immigration status.  The reason for that isn't the

4    immigration status, nor my prior ruling.  The reason for

5    that is whether the person is truthful or not based upon any

6    perceived, from your perspective, threat -- from the

7    government's perspective, a standard practice where

8    immigration consequences would be a great note to the FBI in

9    a case involving what they perceive to be material support.

10    So you've both had a full and fair colloquy concerning that.

02:55    11         Concerning the discussion of the caliphate, which

12    was brought up next by Mr. Elhuzayel's counsel, there was a

13    large discussion concerning Baghdadi and his announcement.

14    But you both had, I think, a full play concerning Baghdadi.

02:55    15         The fall of Mosul.  Um, the agent can't

16    specifically recall whether it was "ISIS," "ISIL" or the

17    "Islamic State."  And I wouldn't expect him to, frankly.

18    That may come with the next witness you present.

02:55    19         There was a discussion about Nader Elhuzayel not

20    speaking Arabic, according to Mr. Badawi.  There were no

21    questions asked on redirect about that, but I think that

22    that's an accurate depiction of the conversation with

23    Mr. Badawi.

02:55    24         But if you listen to the entire tapes, there's

25    also the ability for the government to argue and the defense

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | to refute that he was studying Arabic and, in fact, was          |
|       | 2  | going to a library.                                              |
| 02:56 | 3  | There was a large discussion -- or started to be a               |
|       | 4  | discussion about Garland, Texas.  There was a discussion         |
|       | 5  | about Muslim security, and a little bit about the Fort Hood      |
|       | 6  | shooting.                                                        |
| 02:56 | 7  | And then there was an interesting discussion about               |
|       | 8  | contact in the Middle East.  And the back and forth between      |
|       | 9  | counsel for the defense on cross; and then redirect was          |
|       | 10 | that, while there isn't anybody specific that is being           |
|       | 11 | alluded to, and that Mr. Badawi denied Mr. Elhuzayel having      |
|       | 12 | any specific contact, you've come back with information in       |
|       | 13 | the transcript that shows -- I think, on page 20.  I'm not       |
|       | 14 | certain -- in a complete reading that at least that was the      |
|       | 15 | intent.  There might not've been a specific person, but the      |
|       | 16 | attempt was made.                                                |
| 02:57 | 17 | I'm really willing to listen to your complaints                  |
|       | 18 | and concerns.  Because the primary concern and the               |
|       | 19 | frustration I'm seeing from the defense, Mr. Lengyel-Leahu,      |
|       | 20 | is that you've been precluded, thus far, from asking about,      |
|       | 21 | um -- well, various aspects of the certification process.        |
|       | 22 | And you've repeatedly requested that, and I've repeatedly        |
|       | 23 | sustained the objection by Counsel.                              |
| 02:57 | 24 | So let's talk about that, because this may be an                 |
|       | 25 | absolutely appropriate area, and it is.  It can't be             |

Case 8:15-cr-00060-DOC  Document 296  Filed 03/31/17  Page 87 of 94  Page ID #:4922
8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

87

|       |     |                                                                 |
|-------|-----|-----------------------------------------------------------------|
|       | 1   | appropriate, though, when it comes up on recross-examination    |
|       | 2   | and there's no forewarning, if you will, on                     |
|       | 3   | cross-examination.  Because now it leaves the government in     |
|       | 4   | a position that it's outside the scope, minimally; that         |
|       | 5   | there's no foundation; and there's no ability for the other     |
|       | 6   | side to respond to it.                                          |
| 02:58 | 7   | So, first, you're not precluded from calling this               |
|       | 8   | agent.  That's why he's on call.  And he's sitting right        |
|       | 9   | here, and he'll be available to you.  And if you'd like to      |
|       | 10  | examine him in that area when your case begins, there he is.    |
|       | 11  | Call him.                                                       |
| 02:58 | 12  | Second, besides recalling Agent Ropel, if you                   |
|       | 13  | would like to, there's no preclusion by this Court getting      |
|       | 14  | into that area -- I want that clear on this record -- you       |
|       | 15  | can call your own witness.  But it is beyond the scope.  And    |
|       | 16  | what it leaves is the other party simply unable to respond.     |
| 02:58 | 17  | So James Roper (sic) is here if you wanna recall                |
|       | 18  | 'em.  Your own witnesses are available to you.  But that        |
|       | 19  | area is not being precluded from you.                           |
| 02:58 | 20  | Now, let's hear your concerns on both sides.  This              |
|       | 21  | is a good time to set your record.                              |
| 02:58 | 22  | So, Counsel on behalf of the government.                        |
| 02:58 | 23  | MS. HEINZ:  Well, Your Honor, of course, the                    |
|       | 24  | government did bring the motion to preclude the defense from    |
|       | 25  | introducing their own out-of-court statements and --            |

**DEBBIE GALE, U.S. COURT REPORTER**

Case 8:15-cr-00060-DOC   Document 296   Filed 03/31/17   Page 88 of 94   Page ID #:4923
8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

88

| | | |
|---|---|---|
| 02:58 | 1 | THE COURT:  That's correct. |
| 02:58 | 2 | But you also brought a joint trial.  And it'd be |
| | 3 | easy for this Court to have severed this matter.  So it |
| | 4 | brings with you a tremendous amount of decision-making in |
| | 5 | bringing that original motion. |
| 02:59 | 6 | So while you may disagree that it's hearsay -- |
| | 7 | which I think it is -- I'm having trouble with the rule of |
| | 8 | completeness.  That's where you're falling short, in my |
| | 9 | opinion.  And, therefore, if it's not a lie, if it's not |
| | 10 | perjury, if it's within the realm, I'm gonna use my |
| | 11 | discretion -- which I have.  And there's -- that's your real |
| | 12 | concern. |
| 02:59 | 13 | MS. HEINZ:  I understand, Your Honor. |
| 02:59 | 14 | I just wanna make one small point. |
| 02:59 | 15 | THE COURT:  Sure. |
| 02:59 | 16 | MS. HEINZ:  Okay. |
| 02:59 | 17 | Allowing the defendants to bring in their own |
| | 18 | statements this way, they're the only witnesses in the |
| | 19 | courtroom who are not subject to cross-examination that way. |
| 02:59 | 20 | THE COURT:  That's true.  But you never had to put |
| | 21 | on those statements.  And in requesting a joint trial, |
| | 22 | there's where you put yourself at risk. |
| 02:59 | 23 | In a severed trial, I might agree with you.  In a |
| | 24 | joint trial, it's fairly difficult to preclude the defense, |
| | 25 | as long as there is some nexus back to the statements. |

03:00    1              Now, you're argument back to the Court would be,
         2    *"Judge, they didn't say that during the actual interview."*
         3    But the combination of the tapes you've played and the
         4    conversation and the interview leaves me a little uneasy,
         5    quite frankly, in carving up nicely your hearsay from the
         6    rule of completeness.  And it's inferred in that interview
         7    with Badawi.  That's a fairly complete interview.

03:00    8              Also, you do have the option, and I agree with the
         9    law in that regard -- of course, we'd like to see the
        10    adversarial process.  Hearsay shouldn't be in court.  But,
        11    once again, I go back to the fact that you've chosen a joint
        12    trial and requested that of the Court.

03:00   13              Now, if you'd like a severance, just let me know.
        14    And, if both parties agree, I would certainly consider that.

03:00   15              MS. HEINZ:  No, Your Honor.

03:00   16              But I would like a bit of a ruling so we know
        17    something going forward.  In other words, is just your
        18    concern with respect to a post-arrest statement or all of
        19    the statements?

03:01   20              THE COURT:  All of the statements, Counsel.

03:01   21              I think in the rule of completeness, that while
        22    you're allowed to bring in statements in a two- or
        23    three-hour interview, that precluding the defense from those
        24    areas isn't complete as far as 106 is concerned.

03:01   25              Now, we can argue about the finiteness of that,

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | et cetera; but, unfortunately, that ruling goes against you. |
| 03:01  | 2  | MS. HEINZ:  Understood, Your Honor. |
| 03:01  | 3  | THE COURT:  Okay. |
| 03:01  | 4  | Now -- but you do have a joint trial.  So there's |
|        | 5  | the good and the bad of it. |
| 03:01  | 6  | All right.  Now, Counsel, this is the time for |
|        | 7  | concerns, complaints, or to create your record. |
| 03:01  | 8  | MR. LENGYEL-LEAHU:  I agree with the Court.  And |
|        | 9  | we would submit that we do want the Badawi interview in its |
|        | 10 | totality played for the jury. |
| 03:01  | 11 | THE COURT:  Well, you said that in front of the |
|        | 12 | jury also, Counsel.  And I just somewhat moved on and |
|        | 13 | ignored you.  Did you notice that? |
| 03:01  | 14 | MR. LENGYEL-LEAHU:  I apologize. |
| 03:01  | 15 | THE COURT:  Now that -- no, you don't.  You did |
|        | 16 | that.  That's fine.  I understand it.  But I just moved on |
|        | 17 | without calling more attention to it.  That's not going to |
|        | 18 | happen.  But I've given you a pretty complete run, if you |
|        | 19 | will, under 106. |
| 03:02  | 20 | MR. LENGYEL-LEAHU:  Yes. |
| 03:02  | 21 | THE COURT:  And some of those are very close |
|        | 22 | calls, and I recognize it -- |
| 03:02  | 23 | MR. LENGYEL-LEAHU:  Yes, sir. |
| 03:02  | 24 | THE COURT:  -- with a joint trial.  I feel a |
|        | 25 | little amiss -- and didn't see any untruthfulness, quite |

Case 8:15-cr-00060-DOC  Document 296  Filed 03/31/17  Page 91 of 94  Page ID #:4926
8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

91

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | frankly, in the statements that were read.               |
| 03:02 | 2  | MR. LENGYEL-LEAHU: I was attempting with the --          |
| 03:02 | 3  | *(Court reporter requests clarification for the*          |
|       | 4  | *record.)*                                                |
| 03:02 | 5  | MR. LENGYEL-LEAHU: I'm sorry.                            |
| 03:02 | 6  | I was attempting with *The Country Reports of*           |
|       | 7  | *Terrorism* -- it is a public document -- and I was attempting |
|       | 8  | to establish the *bona fides* of the witness regarding his |
|       | 9  | knowledge of terrorism and whether or not he relies on this |
|       | 10 | document in his -- it technically would be on our direct. |
|       | 11 | But it was really just a foundational issue.             |
| 03:02 | 12 | I wasn't intending to introduce the report through       |
|       | 13 | the witness, but simply lay the foundation that the      |
|       | 14 | State Department prints this on their website every year. |
|       | 15 | And they're obliged by law to perform this annually.  So |
|       | 16 | consequently, it's right in his particular "wheelhouse" that |
|       | 17 | he testified to.  I'm assuming he reads it as closely as I |
|       | 18 | do.                                                      |
| 03:03 | 19 | THE COURT:  And, Counsel, there he is, subject to        |
|       | 20 | your calling him, if you choose.  But not on recross,    |
|       | 21 | because it doesn't give the chance for the other party to |
|       | 22 | respond; and second, it's beyond the scope; and third, he |
|       | 23 | wasn't qualified in that area.  So you'd need a          |
|       | 24 | qualification.                                          |
| 03:03 | 25 | But, once again, he's not going to be testifying         |

8:15-CR-0060-DOC - 6/14/2016 - Day 6, Volume III

92

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | to this on recross-examination.                        |
| 03:03 | 2  | Now, if you choose to call him --                      |
| 03:03 | 3  | MR. LENGYEL-LEAHU:  Right.                              |
| 03:03 | 4  | THE COURT:  -- he's available.  You can call your      |
|       | 5  | own expert.  I'm not precluding you.                   |
| 03:03 | 6  | But I don't want a record where it appears that        |
|       | 7  | I've precluded you.  That's not true at all.           |
| 03:03 | 8  | MR. LENGYEL-LEAHU:  Well, I think what I was            |
|       | 9  | attempting to do --                                    |
| 03:03 | 10 | THE COURT:  No, Counsel.  What you were attempting      |
|       | 11 | to do was hold up a huge sheet of paper -- so we have an |
|       | 12 | accurate record -- wave it in the air dramatically so that |
|       | 13 | the jury knew that there was a report.  That's what you were |
|       | 14 | doing.                                                  |
| 03:03 | 15 | And then, all the prior questions had been about       |
|       | 16 | certification.  And frankly, you were trying to get in |
|       | 17 | certification.                                         |
| 03:04 | 18 | So bottom line:  All of your questions -- if you       |
|       | 19 | check the record -- went to certification.  And, at the last |
|       | 20 | moment, you went back to these documents.              |
| 03:04 | 21 | Now, you're more than welcome to call the              |
|       | 22 | gentleman.  Like I've said, he's available.  But not on |
|       | 23 | recross.                                               |
| 03:04 | 24 | MR. LENGYEL-LEAHU:  Fair enough, Your Honor.           |
| 03:04 | 25 | THE COURT:  Okay.                                       |

**DEBBIE GALE, U.S. COURT REPORTER**

03:04    1         Now, Ms. Corrigan, your concerns, complaint -- and

         2   I want you to complete the record for your client.

03:04    3         MS. CORRIGAN:  I don't have any complaints,

         4   Your Honor.

03:04    5         THE COURT:  Okay.

03:04    6         Well, then, 10 minutes, Counsel, we're back in

         7   session.  Thank you.

03:04    8       *(Recess held at 3:04 p.m.)*

03:04    9       *(Further proceedings reported by Deborah Parker*

      10     *in Volume IV.)*

03:04   11                   -oOo-

03:04   12

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

| | | |
|---|---|---|
| 03:04 | 1 | -oOo- |
| 03:04 | 2 | |
| 03:04 | 3 | CERTIFICATE |
| 03:04 | 4 | |
| 03:04 | 5 | I hereby certify that pursuant to Section 753, |

```
        6   Title 28, United States Code, the foregoing is a true and

        7   correct transcript of the stenographically reported

        8   proceedings held in the above-entitled matter and that the

        9   transcript page format is in conformance with the

       10   regulations of the Judicial Conference of the United States.
```

| | | |
|---|---|---|
| 03:04 | 11 | |
| 03:04 | 12 | Date:  March 23, 2017 |
| 03:04 | 13 | |
| 03:04 | 14 | |
| 03:04 | | /s/ Debbie Gale |
| 03:04 | 15 | |
| 03:04 | | DEBBIE GALE, U.S. COURT REPORTER |
| 03:04 | 16 | CSR NO. 9472, RPR, CCRR |
| 03:04 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

**DEBBIE GALE, U.S. COURT REPORTER**